UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SAYVION D. BLOUNT,

                                      Plaintiff,

                                                                    5:22-cv-216
v.                                                                  (GTS/TWD)

APPLES, et al.,

                                      Defendants.
_____

APPEARANCES:
SAYVION D. BLOUNT
Plaintiff, *pro se*
11001632
Onondaga County Justice Center
555 South State Street
Syracuse, NY 13202

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

Sayvion D. Blount ("Plaintiff") initiated this action *pro se* on March 7, 2022, asserting

claims under 42 U.S.C. § 1983 against individuals employed by the Syracuse Police Department

("SPD"), the Onondaga County Sheriff's Office, and the Onondaga County Justice Center (the

"Justice Center"). (Dkt. No. 1.) On March 9, 2022, Chief Judge Glenn T. Suddaby denied

Plaintiff's *in forma pauperis* ("IFP") application as incomplete, ordered the administrative

closure of the matter, and permitted Plaintiff to reopen the matter by timely filing a complete IFP

application. (Dkt. No. 4.) Plaintiff timely filed a complete IFP application, and the case was

reopened. (Dkt. Nos. 5, 6.) The Clerk sent Plaintiff's IFP application and Complaint to the

undersigned for initial review. Plaintiff's IFP application is hereby GRANTED. (Dkt. No. 5.)

The undersigned now considers the sufficiency of the allegations set forth in the Complaint

under 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A.

## I.      SUMMARY OF THE COMPLAINT[1]

Plaintiff advances several causes of action against SPD officers, Sheriff's Office

employees, and Justice Center employees (collectively "Defendants").  (Dkt. No. 1.[2])  Through

his first cause of action, Plaintiff claims SPD Officers Voggel and Linnertz used excessive force

during his arrest.  *See id.* at 5-7, 18, 20.  Around 1:52 p.m. on December 6, 2021, Officers

Voggel and Linnertz arrested Plaintiff on Holland Street in Syracuse, New York.  *Id.* at 6.

Plaintiff claims he was on the ground, not resisting, and "in a position to be handcuffed" when

the officers unnecessarily dragged him into nearby mud where Officer Linnertz kicked his

abdomen and torso.  *Id.* at 6-7.  As they dragged Plaintiff through the mud, Officer Voggel

pulled, twisted, and forcefully yanked his arms.  *Id.*  Plaintiff "nearly lost consciousness due the

force of the kick and the pain," he "sustained injuries to [his] right shoulder, right arm, and right

hand," and "received an injury to [his] abdomen/torso."  *Id.*  Plaintiff suffered mental anguish,

emotional distress, and costly damages to his clothes.  *Id.* at 7.

Through his second cause of action, Plaintiff claims Nurse Robert Taylor, Physician

Assistant ("PA") Marie Parker, and Nurse Thomas Maloney were deliberately indifferent to his

---

[1] The following recitation of facts is drawn from the Complaint, which the Court accepts as true for purposes of initial review.  *See, e.g., LaTouche v. Rockland County*, No. 22-CV-1437 (LTS), 2022 WL 953111, at *1 (S.D.N.Y. Mar. 29, 2022); *Walker v. City of New York*, No. 20-CV-5240 (PKC) (LB), 2021 WL 1838277, at *1 n.1 (E.D.N.Y. May 7, 2021).

[2] Plaintiff named the following individuals in the caption of his *pro se* Complaint: Ettinger, SPD Officer; Linnertz, SPD Officer; Voggel, SPD Officer; Campaneo, Sheriff's Deputy; Sullivan, Sheriff's Deputy; Apples, Sheriff's Deputy; Daughton, Thomas Maloney, Justice Center Nurse; Sheriff's Deputy; K. Williams, Sheriff's Sergeant; Dober, Sheriff's Deputy; Guillaume, Sheriff's Captain; Lang, Sheriff's Lieutenant; Passino, Sheriff's Deputy; McDonald, Sheriff's Deputy; Robert Taylor, Justice Center Nurse; Anne Marie Parker, Justice Center Physician Assistant; Peterson, Sheriff's Sergeant (collectively "Defendants").  (Dkt. No. 1 at 1-4.)  Parties not included in the caption are not parties to the action.  *See* Fed. R. Civ. P. 10(a); *see also Bloodywone v. Bellnier*, No. 9:18-CV-0615 (GTS/DJS), 2018 WL 10550308, at 5 n.8 (N.D.N.Y. Oct. 17, 2018) ("A party not named in the caption of the complaint is not a party to the action.") (collecting cases).

medical needs. *Id.* at 5-9. Following his arrest, Plaintiff met with Nurse Taylor for intake at the Justice Center. *Id.* at 5. Plaintiff requested medical attention for his injuries, but Nurse Taylor denied his request. *Id.* at 5-6. Nurse Taylor told Plaintiff he would receive medical attention once he was transferred to a housing unit within the Justice Center, but that never came to pass. *Id.* at 6-7. Plaintiff was repeatedly denied adequate medical care for his shoulder injury. *Id.* at 7. Plaintiff requested additional medical care, but on December 30, 2021, PA Parker refused his request to see a medical doctor, opining his shoulder injury was not severe enough for further attention and would heal itself. *Id.* at 7-8. Following this rejection, Plaintiff requested an MRI to help diagnose his injuries on January 9, 2022. *Id.* at 8. On January 12, 2022, Nurse Maloney told Plaintiff his request had been rejected. *Id.* Plaintiff told Nurse Maloney he was in severe pain and "that the pain relievers [he] was receiving so far had been inadequate." *Id.* Plaintiff was denied additional medical care and received no diagnosis for his shoulder injuries. *Id.* Plaintiff believes he suffered ligament damage, joint damage, and nerve damage. *Id.* at 9. Due to the injuries, he continues to experience numbness and tingling in his shoulder, arm, hand, and fingers. *Id.* Plaintiff has also experienced severe mental anguish and emotional distress. *Id.* at 8.

Through his third cause of action, Plaintiff claims Deputy Daughton failed to intervene and protect him when another inmate came into Plaintiff's cell and assaulted him. *Id.* at 8-9. On January 4, 2022, Deputy Daughton overheard inmate Stridiron threaten to physically beat Plaintiff. *Id.* at 9. When Deputy Daughton asked Plaintiff if he was okay, Plaintiff said "[n]o, you need to lock him in or something, I feel like he's going to try to do something to me." *Id.* Deputy Daughton "laughed and waived his hand . . . stating, 'who him, no, you['re] good Blount.'" *Id.* Minutes later, inmate Stridiron came into Plaintiff's cell and assaulted him. *Id.* In

addition to his physical injuries, Plaintiff suffered severe mental anguish and emotional distress. *Id.*

Through his fourth cause of action, Plaintiff claims Deputies Campaneo and Sullivan failed to forward his Inmate Complaint Forms in violation of his First, Eighth, and Fourteenth Amendment rights. *Id.* at 9-10. On January 7, 2022, Plaintiff gave both Deputies a grievance. *Id.* at 9. Neither one of them forwarded his grievance to the appropriate authorities. *Id.* Plaintiff accordingly never received a response—his complaints went unresolved. *Id.* Plaintiff claims this was a violation of his First Amendment right to petition the government for redress of grievances, his Eighth and Fourteenth Amendment rights, and "a violation of the Onondaga County Sheriff's office policy and procedure, the New York Codes, Rules and Regulations, the New York State Constitution, and the New York Minimum Standards; Title 9, Subtitle AA; Chapter A; Subchapter A; Part 7032 Sections 1-12." *Id.* at 10. Plaintiff claims these violations caused him severe mental anguish and emotional distress. *Id.*

Through his fifth cause of action, Plaintiff claims Deputies Apples and Daughton failed to forward his Inmate Complaint Forms in violation of his First, Eighth, and Fourteenth Amendment rights. *Id.* at 10. On January 17, 2022, Plaintiff gave both Deputies a grievance. *Id.* Neither one of them forwarded his grievance to the appropriate authorities. *Id.* Plaintiff accordingly never received a response—his complaints went unresolved. *Id.* On January 20, 2022, Plaintiff asked why he received no response and Deputy Apples said "you ain't getting shit Blount, I didn't give your complaint to the Sergeant." *Id.* Both Deputies told Plaintiff nobody cared about his grievances. *Id.* at 11. Plaintiff therefore asked for a formal grievance form on January 20, 2022, but the Deputies refused. *Id.* Plaintiff claims this conduct violated his First Amendment right to petition the government for redress of grievances, his Eighth and Fourteenth

4

Amendment rights, and "a violation of the NYS minimum standards section 7032; 1-12, the O.C.S.O. policy and procedure the NYCRR and the NYS Constitution." *Id.* at 10.  Plaintiff further avers that because the grievance concerned Deputy Daughton, the Deputy's refusal to forward his Inmate Complaint Form as required by policy and procedure constitutes retaliation under the First Amendment. *Id.*  Plaintiff complains of severe mental anguish and emotional distress. *Id.*

Through his sixth cause of action, Plaintiff claims Deputy O'Connell and Sergeant Kenney violated his First, Eighth, and Fourteenth Amendment rights by refusing to accept a grievance form. *Id.* at 11.  On January 20, 2022, Plaintiff submitted a grievance to Deputy O'Connell concerning the whereabouts of his grievances from January 17, 2022. *Id.*  However, Sergeant Kenney refused to accept the grievance, indicating she would only accept a formal grievance. *Id.*  Plaintiff never received a formal grievance form, so he was never able to submit a grievance concerning the whereabouts of his grievances from January 17, 2022. *Id.*  Plaintiff claims this caused him severe mental anguish and emotional distress. *Id.*

Through his seventh cause of action, Plaintiff claims Sergeant Williams violated his First, Eighth, and Fourteenth Amendment rights by deliberately taking actions to prevent him from receiving a response to a formal grievance submitted on January 21, 2022. *Id.* at 12.  On January 21, 2022, Plaintiff gave Deputy Passino a formal grievance concerning the whereabouts of his grievances from January 7th and 17th. *Id.* at 11-12.  Deputy Passino followed procedure by submitting the grievance to Sergeant Williams. *Id.* at 12.  Sergeant Williams "deliberately assigned a grievance [number] to the formal grievance form" that was the same grievance number assigned to another grievance form Plaintiff had submitted on January 20, 2022. *Id.* The grievance from January 21, 2022, was originally given a separate grievance number, but

Sergeant Williams deliberately "crossed out" that number. *Id.* Plaintiff avers this made it appear as though his grievance from January 21, 2022, had been resolved. *Id.* Plaintiff claims Deputies Dober and Guilliame were complicit in this violation because "they both did not correct this error." *Id.* at 13. Plaintiff claims this has caused severe mental anguish and emotional distress. *Id.* at 12.

Through his eighth cause of action, Plaintiff claims Deputy McDonald and Deputy Lieutenant Lang retaliated against him for submitting a grievance. *Id.* at 14-15. On February 2, 2022, Deputies McDonald and Sherwood did not let Plaintiff out of his cell during his scheduled recreation time because they wanted to let another inmate out, who was under a no-contact order with Plaintiff. *Id.* Plaintiff complained and Deputy McDonald let him out for his scheduled morning recreation time. *Id.* at 15. However, Deputy McDonald "fabricated a report that stated a reason as to why he had to cancel" Plaintiff's scheduled afternoon recreation time. *Id.* Plaintiff submitted a grievance concerning this report. *Id.* The following day, Deputy McDonald told Plaintiff "I got good news and I got bad news." *Id.* The good news was Plaintiff's grievance had been received, but the bad news was that Plaintiff was placed under protective custody. *Id.* When Plaintiff asked why, Deputy McDonald responded, "you should stop making complaints, you complained about your rec, now you only get 2 hours out [of] your cell." *Id.* Plaintiff asked for a formal explanation for this treatment but received none. *Id.* at 16. Plaintiff claims Deputy McDonald and Lieutenant Lang retaliated against him for submitting a grievance and placing him in protective custody against his will. *Id.* at 15-16. Plaintiff complains, "[t]his feels like torture, and is a violation of my 8th amendment rights due to the fact that this is unconstitutional confinement, cruel and unusual punishment, and denial of due

process which is a violation of my 14th Amendment and excessive force all stemming from a retaliation for the exercise of first amendment right." *Id.* at 16.

Through his ninth cause of action, Plaintiff claims Deputy McDonald and Sergeant Peterson failed to timely respond to a formal grievance. *Id.* at 17-18.  On February 21, 2022, Plaintiff submitted a formal grievance to Deputy McDonald and Sergeant Peterson concerning Sergeant Williams' treatment of Plaintiff's grievance on January 21, 2022. *Id.* at 17.  Both grievances have gone unanswered. *Id.* at 18.  Plaintiff claims this violates his First, Eighth, and Fourteenth Amendment rights. *Id.* at 17-18.

In what appears to be his tenth and final cause of action, Plaintiff claims his court-appointed attorneys violated his Sixth and Fourteenth Amendment rights. *Id.* at 19.  Plaintiff claims these attorneys "refused" to intervene to stop the grievance-related violations at the Justice Center. *Id.*  Plaintiff further argues the attorneys refused to show him body-camera footage of his arrest on December 6, 2021. *Id.*

## II.    STANDARD OF REVIEW

This Court must conduct an initial review of complaints filed *in forma pauperis*, and "complaints in which a prisoner[3] seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915(e)(2)(B) (governing complaints filed *in forma pauperis*); 28 U.S.C. § 1915A (governing complaints filed by prisoners against the government). When reviewing these types of complaints, this Court must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint . . . is frivolous,

---

[3] Plaintiff is a "prisoner" as that term is used in 28 U.S.C. § 1915A(a).  (*See* Dkt. No. 1 at 2; *see also* 28 U.S.C. § 1915A(c) (defining "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program.").)

malicious, or fails to state a claim upon which relief may be granted; or . . . seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A; 28 U.S.C. § 1915(e)(2)(B); *see also Allen v. Stringer*, No. 20-3953, 2021 WL 4472667, at *1 (2d Cir. Sept. 30, 2021) (applying Section 1915(e)(2)(B)); *Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (applying Section 1915A).[4]

This Court must exercise caution when determining whether to *sua sponte* dismiss a *pro se* complaint on the grounds that it is frivolous.  *See Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991); *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory."  *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998).  "A claim is based on an indisputably meritless legal theory when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint."  *Id.*

When undertaking this initial review, the Court must construe *pro se* pleadings with the utmost leniency.  *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (holding that a *pro se* litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers"); *see also Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).  To survive dismissal for failure to state a claim, a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2).  This short and plain statement of the claim must be "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads

---

[4] Unless otherwise indicated, in quoting cases, all alterations, internal quotation marks, emphases, footnotes, and citations are omitted.  *See, e.g.*, *Sczepanski v. Saul*, 946 F.3d 152, 157 n.4 (2d Cir. 2020).

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The statement of the claim must do more than present "an unadorned, the-defendant-harmed-me accusation." *Iqbal*, 556 U.S. 662, 678.  It must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. 544, 555; *see also* Fed. R. Civ. P. 8(a)(2).

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## III.    DISCUSSION

Plaintiff's claims fit into six categories: (A) excessive force, (B) deliberate indifference, (C) failure to intervene and protect, (D) failure to follow inmate grievance procedures, (E) retaliation, and (F) failure to provide adequate representation and due process of law.  *See generally id.*  The Court will address each category of claims, in turn.

### A.    Excessive Force

Plaintiff claims SPD Officers Voggel and Linnertz used unconstitutionally excessive force when arresting him on December 6, 2021.  (Dkt. No. 1 at 5-7, 18, 20.)  Plaintiff offers specific details about when and where the arrest occurred, how he conducted himself during the arrest, what each officer did to him, and the injuries he suffered.  *See id.*  Plaintiff alleges the unlawful conduct occurred during his arrest on a residential street in Syracuse, New York.  *See id.*

Construing Plaintiff's *pro se* pleading liberally, *Sealed Plaintiff*, 537 F.3d at 191, the

Court views Plaintiff's excessive force claim as one arising under the Fourth Amendment.  *See*

*Graham v. Connor*, 490 U.S. 386, 394 (1989) ("Where, as here, the excessive force claim arises

in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized

as one invoking the protections of the Fourth Amendment."); *see generally Young v. Cabrera*,

No. 18-CV-3028 (RPK) (ST), 2020 WL 7042759, at *4 (E.D.N.Y. Nov. 30, 2020) (dismissing

plaintiff's Eighth and Fourteenth Amendment excessive force claims because "all claims that law

enforcement officers have used excessive force in the course of an arrest are analyzed under the

Fourth Amendment and its reasonableness standard, rather than the Eighth Amendment or the

Fourteenth Amendment.").  Construing Plaintiff's allegations liberally and taking his factual

allegations as true, the undersigned concludes Plaintiff Plaintiff's Fourth Amendment excessive

force claim against SPD Officer Voggel and Linnertz survives initial review.  *See McClendon v.*

*Cty. of Nassau*, No. 11-CV-0190 (SJF) (ETB), 2012 WL 4849144, at *9 (E.D.N.Y. Oct. 11,

2012) ("Unnecessary blows inflicted while an arrestee is in handcuffs may be sufficient to

sustain an excessive force claim.") (collecting cases); *see, e.g.*, *Young*, 2020 WL 7042759, at *7-

9, 11 (concluding plaintiff's excessive force claim survived summary judgment where evidence

indicated the officers "used excessive force in kicking and stomping Mr. Young before and after

he was handcuffed."); *Johnson v. City of New York*, No. 05 CIV. 2357 (SHS), 2006 WL

2354815, at *5 (S.D.N.Y. Aug. 14, 2006) (explaining an excessive force claim "would be

actionable under the case law" against an officer who stomped or kicked "an individual already

under police control").

The undersigned accordingly recommends that the District Court conclude Plaintiff's

excessive force claim against SPD Officers Voggel and Linnertz survives initial review under 28

U.S.C. § 1915(e) and 28 U.S.C. § 1915A and requires a response.  In so recommending, the undersigned expresses no opinion regarding whether the claim could survive a properly filed motion to dismiss or motion for summary judgment.

### B.    Deliberate Indifference

Plaintiff claims Nurse Taylor, PA Parker, and Nurse Maloney were deliberately indifferent to his post-arrest medical needs.  (Dkt. No. 1 at 5-9.)  Plaintiff complains of severe pain that was not alleviated with Tylenol or ibuprofen.  *See id.* at 8.  He further avers he suffered ligament damage, joint damage, and nerve damage causing numbness and tingling in his shoulder, arm, hand, and fingers.  *Id.* at 9.  Despite his repeated requests for medical attention, Nurse Taylor, PA Parker, and Nurse Malone refused to offer him stronger pain medications, grant him access to a medical doctor, or examine his injuries with an MRI.  *Id.* at 5-9.

Because Plaintiff was a pretrial detainee at the time of the events in question, the Court construes his medical deliberate indifference claim as one arising out of the Fourteenth Amendment.  *See id.* at 2; *compare Sims v. City of New York*, 788 F. App'x 62, 63 n.3 (2d Cir. 2019) ("Although *Darnell* involved a challenge to conditions of confinement, we have applied that decision's holding to medical deliberate-indifference claims."), *with Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) ("A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment.").  In the Second Circuit, the Fourteenth Amendment standard for challenging confinement conditions is used to test a pretrial detainee's medical deliberate indifference claim.  *See, e.g.*, *Yancey v. Robertson*, 828 F. App'x 801, 803 (2d Cir. 2020) (using the Fourteenth Amendment standard for challenging

confinement conditions to a pretrial detainee's medical deliberate inference claim); *Sims*, 788 F. App'x at 63 (same); *Charles v. Orange Cty.*, 925 F.3d 73, 87 (2d Cir. 2019) (same).

This standard has two prongs, and claimants must satisfy both. *Yancey*, 828 F. App'x at 803. First, the claimant must show a sufficiently serious medical need. *Id.* Second, the claimant must show the defendant acted with deliberate indifference to the medical need. *Id.; see generally Charles*, 925 F.3d at 87 ("Thus, a detainee asserting a Fourteenth Amendment claim for deliberate indifference to his medical needs can allege either that the defendants knew that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the defendants should have known that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health.").

Construing Plaintiff's *pro se* pleading liberally, *Sealed Plaintiff*, 537 F.3d at 191, the Court concludes his medical indifference claim against Nurse Taylor, PA Parker, and Nurse Maloney survives initial review. Plaintiff claims he experienced severe pain, complained about his severe pain to these individuals, was give inadequate medical treatment, and now experiences numbness and tingling from his shoulder to his fingers. (Dkt. No. 1. at 5-9.) The undersigned accordingly recommends the District Court conclude that Plaintiff's medical indifference claim against Nurse Taylor, PA Parker, and Nurse Maloney survives initial review under 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A and requires a response. In so recommending, the undersigned expresses no opinion regarding whether the claim could survive a properly filed motion to dismiss or motion for summary judgment.

### C.      Failure to Protect

"Prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Although "not every injury that a

prisoner suffers at the hands of another results in constitutional liability for the officials responsible for that prisoner's safety," "allowing an attack on an inmate to proceed without intervening is a constitutional violation in certain circumstances." *Taylor v. City of New York*, No. 16-CIV-7857 (NRB), 2018 WL 1737626, at *11 (S.D.N.Y. Mar. 27, 2018); *see also Leckie v. City of New York*, No. 18-CV-3917 (RRM) (LB), 2021 WL 84234, at *5 (E.D.N.Y. Jan. 11, 2021).

When an officer acts with deliberate indifference to a substantial risk of serious harm to a pretrial detainee, a Fourteenth Amendment violation occurs. *See Taylor,* 2018 WL 1737626, at *11; *see also Charles v. Rockland Cty. Off. of the Sheriff*, No. 16 CV 166 (VB), 2019 WL 1299804, at *3 (S.D.N.Y. Mar. 21, 2019) (addressing failure to protect claims); *Rosen v. City of New York*, 667 F. Supp. 2d 355, 359–60 (S.D.N.Y. 2009) (addressing failure to intervene claims). To prove such a violation occurred, pretrial detainees must satisfy "(1) an objective prong showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process; and (2) a *mens rea* prong that shows that the officer acted with at least deliberate indifference to the challenged conditions." *House v. City of New York*, No. 18-CIV-6693 (PAE) (KNF), 2020 WL 6891830, at *11 (S.D.N.Y. Nov. 24, 2020) (citing *Darnell*, 849 F.3d at 29); *see also Taylor*, 2018 WL 1737626, at *12 ("Although *Darnell* involved a Fourteenth Amendment challenge to a prisoner's conditions of confinement, its holding applies with equal measure to failure to protect claims.").

Plaintiff was a pretrial detainee at the time of the events in question. (*See* Dkt. No. 1 at 2.) Reading his *pro se* pleading leniently, the Court construes his third cause of action as a failure to protect claim arising out of the Fourteenth Amendment. *See Sealed Plaintiff*, 537 F.3d at 191. Plaintiff alleges Deputy Daughton was aware that an inmate had threatened to attack

him.  (Dkt. No. 1 at 9.)  He further alleges he asked Deputy Daughton for help, but Deputy

Daughton refused to offer protection.  *Id.*  Minutes after that refusal, the inmate attacked

Plaintiff.  *Id.*  These allegations appear to make out the fundamental elements of a Fourteenth

Amendment failure to protect claim.  *See House,* 2020 WL 6891830, at *11; *Taylor*, 2018 WL

1737626, at *11-12.  The undersigned accordingly recommends that the District Court conclude

Plaintiff's failure to protect claim against Deputy Daughton survives initial review under 28

U.S.C. § 1915(e) and 28 U.S.C. § 1915A and requires a response.  In so recommending, the

undersigned expresses no opinion regarding whether the claim could survive a properly filed

motion to dismiss or motion for summary judgment.

### D.     Inmate Grievance Procedure Claims

Plaintiff claims Defendants violated his First, Eighth, and Fourteenth Amendment rights

by failing to follow grievance procedures.  (Dkt. No. 1 at 9-18.)  He claims Deputies Campaneo

and Sullivan failed to forward a grievance he filed on January 7, 2022 (the fourth cause of

action), Deputies Apples and Daughton failed to forward a grievance he filed on January 17,

2022, and refused to give him another grievance form on January 20, 2022 (the fifth cause of

action), Deputy O'Connell and Sergeant Kenny refused to accept a grievance he completed on

January 20, 2022 (the sixth cause of action), Sergeant Williams and Deputies Dober and

Guilliame prevented him from receiving a response to a grievance he filed on January 21, 2022

(the seventh cause of action), and Deputy McDonald and Sergeant Peterson failed to timely

respond to a grievance filed on February 21, 2022 (the ninth cause of action).  *See id.*

These alleged grievance procedure violations do not give rise to actionable claims under

42 U.S.C. § 1983.  *See Matthews v. Barq*, No.9:18-CV-0855 (TJM) (CFH), 2019 WL 1025828,

at *13 (N.D.N.Y. Mar. 4, 2019); *Harris v. Westchester Cty. Dep't of Corr.*, No. 06-CIV-2011

14

(RJS), 2008 WL 953616, at *5 (S.D.N.Y. Apr. 3, 2008) (collecting cases); *Cancel v. Goord*, No. 00-CIV-2042 (LMM), 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001). "[T]he Fourteenth Amendment does not provide a constitutionally protected right to file a grievance or receive process with respect to a filed grievance." *Williams v. City of New York*, No. 19-CV-3347 (LJL) (JLC), 2022 WL 130409, at *21 (S.D.N.Y. Jan. 14, 2022), *report and recommendation adopted*, No. 19-CV-3347 (LJL), 2022 WL 446041 (S.D.N.Y. Feb. 14, 2022); *see also Animashaun v. Fischer*, No. 9:19-CV-0820 (LEK) (DJS), 2020 WL 374578, at *9 (N.D.N.Y. Jan. 23, 2020) ("As an initial matter, inmates do not have a constitutional right to state grievance programs") (collecting cases). "Access to administrative remedies is therefore not a constitutionally-protected right, and a violation of prison grievance procedure is not a cognizable Section 1983 claim." *Williams*, 2022 WL 130409, at *21 (citing *George v. Cty. of Westchester*, No. 20-CV-1723 (KMK), 2021 WL 4392485, at *4 (S.D.N.Y. Sept. 24, 2021) (collecting cases)). "Rather, in the event that prison officials ignore a grievance that raises constitutional claims, the proper avenue to seek relief is directly petitioning the government for redress of his claims." *Williams*, 2022 WL 130409, at *21; *Harris*, 2008 WL 953616, at *5. Despite the alleged grievance procedure violations, Plaintiff has petitioned the government for redress in this Court by filing his Complaint. (*See generally* Dkt. No. 1.) Any claim that Plaintiff was denied his First Amendment right to petition the government for redress is "belied by the fact of his bringing this lawsuit." *Williams*, 2022 WL 130409, at *21.

The alleged grievance procedure violations accordingly do not give rise to First or Fourteenth Amendment claims that could be brought under 42 U.S.C. §1983. *See id.* Moreover, Plaintiff has failed to make out a cognizable Eighth Amendment claim stemming from these alleged grievance procedure violations. (*See generally* Dkt. No. 1 at 9-18.) The undersigned

15

therefore recommends that the District Court dismiss Plaintiff's grievance procedure claims against Deputy Campaneo, Deputy Sullivan, Deputy Apples, Deputy Daughton, Deputy O'Connell, Sergeant Kenny, Sergeant Williams, Deputy Dober, Deputy Guilliame, Deputy McDonald, and Sergeant Peterson.  *See, e.g.*, *George*, 2021 WL 4392485, at *4; *Harris*, 2008 WL 953616, at *5.

### E.    Retaliation Claims

Plaintiff advances two retaliation claims—one through his fifth cause of action, and one through his eighth cause of action.  (*See* Dkt. No. 1 at 10, 14-16.)  Through his fifth cause of action, Plaintiff claims Deputy Daughton retaliated against him by preventing him from filing a grievance after he had already filed a grievance about Deputy Daughton.  *Id.*  Through his eighth cause of action, Plaintiff claims Deputy McDonald and Lieutenant Lang retaliated against him by issuing a false report about him and placing him in protective custody on February 3, 2022, after Plaintiff had complained on February 2, 2022, and filed a grievance on February 3, 2022.  *Id.* at 14-16.

"To prevail on a First Amendment retaliation claim under 42 U.S.C. § 1983, a prisoner must demonstrate: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action."  *Vidal v. Valentin*, No. 16-CV-5745 (CS), 2019 WL 3219442, at *6 (S.D.N.Y. July 17, 2019); *see also Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).  A claimant meets the first element by demonstrating that he filed a grievance, which is a "constitutionally protected activity."  *Davis*, 320 F.3d at 352-53; *see also Vidal*, 2019 WL 3219442, at *6 (explaining it "is well supported by case law" that the submission of a grievance constitutes a protected activity) (collecting cases); *Smith v. Hash*, No. 904-CV-0074 (LEK)

(DRH), 2006 WL 2806464, at *6 (N.D.N.Y. Sept. 28, 2006) ("Smith's filing of a grievance was clearly an assertion of a constitutional right protected by the First Amendment").  A claimant can meet the second element by demonstrating that he was subject to "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004); *see also Williams*, 2022 WL 130409, at *22.  Finally, "[i]n considering whether a causal connection exists, a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff."  *Williams*, 2022 WL 130409, at *24; *see also Speaks v. Saeed*, No. 14-CV-06826 (JMA) (AYS), 2022 WL 541767, at *8 (E.D.N.Y. Feb. 23, 2022).

Reading Plaintiff's *pro se* Complaint leniently, *Sealed Plaintiff*, 537 F.3d at 191, the undersigned concludes Plaintiff has alleged facts in support of both retaliation claims.  (*See* Dkt. No. 1 at 10, 14-16.)  First, he alleges he filed two grievances—one on January 17, 2022, and the other on February 3, 2022.  *See id.* at 10, 15-16; *see also Davis*, 320 F.3d at 352-53.  Second, Plaintiff alleges that after he filed each grievance, he suffered adverse actions.  (Dkt. No. 1 at 10, 14-16.)  After he filed the grievance on January 17, 2022, Plaintiff was prevented from filing further grievances—he was prevented from engaging in further constitutionally protected activity.  *See id.* at 10; *see generally Vidal*, 2019 WL 3219442, at *6.  Additionally, after he filed the grievance on February 3, 2022, Plaintiff was placed in protective custody against his will. (Dkt. No. 1 at 15-16; *see, e.g.*, *Vidal*, 2019 WL 3219442, at *8 ("Confinement in the SHU is an adverse action."); *Smith*, 2006 WL 2806464, at *6 (same).)  Plaintiff further alleges that around the time he filed that grievance, Deputy McDonald created a false misbehavior report about him.

17

(Dkt. No. 1 at 15; *see, e.g.*, *Speaks*, 2022 WL 541767, at *8 (concluding "plaintiff's claim that he received a false disciplinary report resulting in his lock down for seventeen days constitutes adverse action"); *Vidal*, 2019 WL 3219442, at *8 ("Plaintiff is correct that a plaintiff's allegation that a defendant issued a false misbehavior report in response to the plaintiff's protected activity can support a claim of unlawful retaliation.").)  Third, Plaintiff advances allegations relevant to the causation inquiry.  (*See* Dkt. No. 1 at 10, 14-16; *see generally Williams*, 2022 WL 130409, at *24.)  The retaliatory actions came just after he filed grievances.  (Dkt. No. 1 at 10, 14-16.)  Furthermore, after Plaintiff submitted the grievance on January 17, 2022, Deputies Apples and Daughton told him nobody cared about his grievances, and Deputy Apples said "you ain't getting shit Blount, I didn't give your complaint to the Sergeant."  (Dkt. No. 1 at 10.)  Plaintiff further claims that after he submitted the grievance on February 3, 2022, Deputy McDonald told him that he "should stop making complaints, you complained about your rec, now you only get 2 hours out [of] your cell."  *Id.* at 15.  These factual allegations are relevant to two considerations under the causation inquiry: temporal proximity and relevant statements made by Defendants. *Williams*, 2022 WL 130409, at *24.

Based on the foregoing, the undersigned recommends that the District Court conclude Plaintiff's retaliation claims against Deputy Daughton, Deputy McDonald, and Lieutenant Lang survive initial review under 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A and require a response. In so recommending, the undersigned expresses no opinion regarding whether the claim could survive a properly filed motion to dismiss or motion for summary judgment.

### F.     Representation and Due Process

Plaintiff's tenth and final claim is frivolous and should be dismissed.  *See* 28 U.S.C. § 1915(e)(2)(B)(i); 28 U.S.C. § 1915A(b)(1).  Plaintiff claims his court-appointed attorneys

violated his Sixth and Fourteenth Amendment rights by failing to sue to prevent numerous

constitutional violations and by failing to disclose body-camera footage from his arrest on

December 6, 2021.  (Dkt. No. 1 at 19-20.)  Plaintiff brought this civil action under 42 U.S.C.

§ 1983.  *Id.* at 1.  However, Plaintiff's court-appointed attorneys cannot be sued under Section

1983 because they are not state actors, and therefore did not act under color of state law.  *See*

*Polk Cty. v. Dodson*, 454 U.S. 312, 325 (1981) ("[A] public defender does not act under color of

state law when performing a lawyer's traditional functions as counsel to a defendant in a

criminal proceeding."); *see also Tapp v. Champagne,* 164 F. App'x 106, 108 (2d Cir. 2006)

(upholding initial review dismissal of Section 1983 claim against public defenders); *see*

*generally Hardy-Graham v. Southampton Just. Ct.*, No. 20-CV-0981 (JS) (SIL), 2021 WL

260102, at *7 (E.D.N.Y. Jan. 25, 2021) (dismissing Section 1983 claims against public defender

on initial review) (collecting cases).  The undersigned accordingly recommends that the District

Court dismiss this claim.  *See, e.g.*, *Johnson v. Bieling*, No. 5:20-CV-1124 (GTS) (ML), 2021

WL 1841470, at *12 (N.D.N.Y. Jan. 6, 2021), *report and recommendation adopted*, No. 5:20-

CV-1124 (GTS) (ML), 2021 WL 1840591 (N.D.N.Y. May 7, 2021).

## III.    CONCLUSION

For the foregoing reasons, the undersigned recommends the District Court conclude the

following claims survive *sue sponte* review: (i) the first cause of action, claiming a Fourth

Amendment excessive force violation by Syracuse Police Department Officers Voggel and

Linnertz; (ii) the second cause of action, claiming a Fourteenth Amendment medical indifference

violation by Nurse Taylor, PA Parker, and Nurse Maloney; (iii) the third cause of action,

claiming a Fourteenth Amendment failure to protect violation by Deputy Daughton; (iv) the fifth

cause of action, claiming a First Amendment retaliation violation by Deputy Daughton; and (v)

the eighth cause of action, claiming a First Amendment retaliation violation by Deputy

McDonald and Lieutenant Lang.  *See generally* 28 U.S.C. § 1915(e)(2)(b); 28 U.S.C.

§ 1915A(b).

The undersigned further recommends the District Court dismiss all remaining claims

against all other Defendants.  *See id.*  This would result in the dismissal of Plaintiff's grievance

procedure claims against Deputy Campaneo, Deputy Sullivan, Deputy Apples, Deputy

Daughton, Deputy O'Connell, Sergeant Kenney, Sergeant Williams, Deputy Dober, Deputy

Guilliame, Deputy McDonald, and Sergeant Peterson.  This would also result in the dismissal of

Plaintiff's Sixth and Fourteenth Amendment claims against his court-appointed attorneys: Jordan

McQuillan, Keith Young, Lawrence Sunser, and Sarah Hansen.

**WHEREFORE**, based on the above, it is hereby

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 5) is **GRANTED**;[5] and it is further

**RECOMMENDED** that Plaintiff's Fourth Amendment excessive force claim against

Defendants Voggel and Linnertz **survive *sua sponte* review**; and it is further

**RECOMMENDED** that Plaintiff's Fourteenth Amendment medical indifference claim

against Defendants Taylor, Parker, and Maloney **survive *sua sponte* review**; and it is further

**RECOMMENDED** that Plaintiff's Fourteenth Amendment failure to protect claim

against Defendant Daughton **survive *sua sponte* review**; and it is further

**RECOMMENDED** that Plaintiff's First Amendment retaliation claim against Defendant

Daughton **survive *sua sponte* review**; and it is further

---

[5] Plaintiff should note that although his IFP Application has been granted, he will still be
required to pay fees that he may incur in this action, including copying and/or witness fees.

**RECOMMENDED** that Plaintiff's First Amendment retaliation claim against Defendants by McDonald and Lang **survive *sua sponte* review**; and it is further

**RECOMMENDED** that pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), Plaintiff's grievance procedure claims be **DISMISSED** as against Defendants Campaneo, Sullivan, Apples, Daughton, O'Connell, Kenney, Williams, Dober, Guilliame, McDonald, and Peterson; and it is further

**RECOMMENDED** that pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), Plaintiff's Sixth and Fourteenth Amendment claims be **DISMISSED** as against Defendants McQuillan, Young, Sunser, and Hansen; and it is further

**RECOMMENDED** that if the District Court adopts this Report-Recommendation, the Clerk be directed to: (1) provide the superintendent of the facility that Plaintiff designated as his current location with a copy of Plaintiff's inmate authorization form (Dkt. No. 3) and notify that official that this action has been filed and that Plaintiff is required to pay the entire statutory filing fee of $350.00 pursuant to 28 U.S.C. § 1915 through periodic withdrawals from his inmate accounts; (2) provide a copy of Plaintiff's authorization form (Dkt. No. 3) to the Financial Deputy of the Clerk's Office; and (3) issue summonses and forward them, along with a copy of the Complaint (Dkt. No. 1), to the United States Marshal for service upon Defendants Voggel, Linnertz, Taylor, Parker, Maloney, Daughton, McDonald, and Lang; and it is further

**RECOMMENDED** that Defendants Voggel, Linnertz, Taylor, Parker, Maloney, Daughton, McDonald, and Lang be **ORDERED** to file a formal response to Plaintiff's Complaint (Dkt. No. 1) as provided for in the Federal Rules of Civil Procedure subsequent to service of process; and it is further

**ORDERED** that all pleadings, motions, and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367.  Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel.  Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.  Plaintiff must comply with all requests by the Clerk's Office for any documents that are necessary to maintain this action.  All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions.  **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so will result in the dismissal of this action**; and it is further

**ORDERED** that the Clerk serve a copy of this Order and Report-Recommendation on Plaintiff, along with a copy of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[6]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

---

[6] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 72, 6(a).


Dated: April 13, 2022
      Syracuse, New York

                                        Therese Wiley Dancks
                                        United States Magistrate Judge

2021 WL 4472667
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Doran ALLEN, Plaintiff-Appellant,

v.

Scott M. STRINGER, New York City Comptroller,
Warden AMKC-C-95, Defendants-Appellees.

20-3953
|
September 30, 2021

Appeal from a judgment of the United States District Court
for the Southern District of New York (Stanton, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of the district court is **AFFIRMED**.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Doran Allen, pro se,
Ossining NY.

FOR DEFENDANTS-APPELLEES: No appearance.

PRESENT: RICHARD C. WESLEY, RICHARD J.
SULLIVAN, Circuit Judges, JOHN G. KOELTL, District
Judge. [*]

[*]    Judge John G. Koeltl of the United States District
Court for the Southern District of New York, sitting
by designation.

**SUMMARY ORDER**

Appellant Doran Allen, proceeding pro se, sued Scott M.
Stringer, in his capacity as New York City Comptroller, and
the unnamed warden of the Rikers Island Anna M. Kross
Center ("AMKC") under 42 U.S.C. § 1983 for violations of
the Due Process Clause of the Fourteenth Amendment. Allen
alleges that, while he was detained at AMKC, a corrections
officer refused to help him carry breakfast trays, causing
him to slip and fall on broken stairs, injuring himself. The district
court dismissed the complaint sua sponte for failure to state a
claim. We assume the parties' familiarity with the underlying
facts, the procedural history of the case, and the issues on
appeal.

We review de novo a district court's sua sponte dismissal of
a complaint under 28 U.S.C. § 1915(e)(2). *Zaleski v. Burns*,
606 F.3d 51, 52 (2d Cir. 2010). Under that statute, the district
court must dismiss a complaint filed in forma pauperis if
it determines that the action "(i) is frivolous or malicious;
(ii) fails to state a claim on which relief may be granted;
or (iii) seeks monetary relief against a defendant who is
immune from such relief." 28 U.S.C. § 1915(e)(2)(B). To
avoid dismissal, a complaint must plead "enough facts to
state a claim to relief that is plausible on its face." *Bell Atl.
Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft
v. Iqbal*, 556 U.S. 662, 678 (2009) (recognizing that "legal
conclusions" and "[t]hreadbare recitals of the elements of a
cause of action, supported by mere conclusory statements, do
not suffice" to plead a viable claim). Pro se submissions are
reviewed with "special solicitude," and "must be construed
liberally and interpreted to raise the strongest arguments that
they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d
471, 474–75 (2d Cir. 2006) (internal quotation marks and
emphasis omitted).

Conditions-of-confinement claims brought by pretrial
detainees are analyzed under the Fourteenth Amendment's
Due Process clause. *Darnell v. Pineiro*, 849 F.3d 17, 29
(2d Cir. 2017). To state such a claim, a plaintiff must
satisfy both an objective prong and a subjective prong.
*See id.* The objective prong requires "showing that the
challenged conditions were sufficiently serious to constitute
objective deprivations of the right to due process," while
the subjective prong requires "showing that [an] officer
acted with at least deliberate indifference to the challenged
conditions." *Id.* (internal quotation marks omitted). If a
conditions-of-confinement claim is predicated on an unsafe
condition, a court will analyze "whether society considers
the risk that the prisoner complains of to be so grave that it
violates contemporary standards of decency to expose *anyone*
unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25,
36 (1993).

Allen alleges that he slipped or tripped on broken stairs,
causing him to fall. But while the existence of broken stairs
could be deemed to constitute negligence on the part of
the prison, broken stairs alone cannot satisfy the objective
prong of a conditions-of-confinement claim. *See McCray v.
Lee*, 963 F.3d 110, 120 (2d Cir. 2020) (explaining that the
defendant's complaint alleging unconstitutional conditions of

confinement after a slip and fall in an icy prison yard did not show "exceptional circumstances" that would "elevate" the conditions "beyond the typical level of danger presented by a slippery sidewalk or a wet floor"). Because broken stairs cannot be considered a risk that is "so grave that it violates contemporary standards of decency," Allen's conditions-of-confinement claim was properly dismissed. *Helling*, 509 U.S. at 36.

**\*2** But even if it could be argued that Allen alleged an objectively serious condition, the district court properly dismissed Allen's claims against Stringer and the AMKC warden due to the obvious deficiencies in Allen's complaint. As the district court concluded, the suit against the warden in his official capacity was more properly a suit against the City of New York because Allen did not allege that the warden personally had done or failed to do anything that violated his rights. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity... should be treated as suits against the State."). Similarly, Stringer, as the New York City Comptroller, is sued in his official capacity. Allen was therefore obligated to allege sufficient facts showing that the Fourteenth Amendment violation occurred "pursuant to a municipal policy or custom," *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (citing, inter alia, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692–94 (1978)), or was caused by a "failure to train," *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (citing *Monell*, 436 U.S. at 694). Allen did not allege any facts showing that the corrections officer acted pursuant to an unconstitutional policy or custom, or that the City of New York failed to train its corrections officers, as required for such a claim.

The district court also did not abuse its discretion by declining to exercise supplemental jurisdiction over any state-law claims because the district court properly dismissed Allen's § 1983 claim, the only claim over which it had original jurisdiction. *See Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("[A] district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction." (internal quotation marks omitted)).

Finally, the district court did not err by denying Allen leave to amend his complaint. A district court should not dismiss a pro se plaintiff's complaint without granting leave to amend "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (internal quotation marks omitted). As discussed above, the incident involving the corrections officer and the broken steps did not amount to a due process violation, and that deficiency in the complaint cannot not be cured. Accordingly, amendment would have been futile.

We have considered all of Allen's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

## All Citations

Not Reported in Fed. Rptr., 2021 WL 4472667

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 7042759
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Shaun YOUNG, Plaintiff,

v.

Eric CABRERA, Shawn Johnston, Keith Di
Presso, Neil Casey, John Doe 1, John Doe
2, and the City of New York, Defendants.

18-cv-3028 (RPK) (ST)
|
Signed 11/30/2020

**Attorneys and Law Firms**

Joel M. Gluck, Law Offices of Joel M. Gluck, New York, NY, for Plaintiff.

Angharad K. Wilson, New York City Law Department, Corporation Counsel, New York, NY, for Defendants Eric Cabrera 1 Police Plaza New York, NY 10007, Shawn Johnston 1 Police Plaza New York, NY 10007, Keith Di Presso 1 Police Plaza New York, NY 10007, Neil Casey 1 Police Plaza New York, NY 10007.

Angharad K. Wilson, Kathleen Deborah Reilly, New York City Law Department, Corporation Counsel, New York, NY, for Defendant The City of New York.

**MEMORANDUM AND ORDER**

RACHEL P. KOVNER, United States District Judge:

**\*1** Plaintiff Shaun Young brings an action under 42 U.S.C. § 1983 against Officers Keith DiPresso, Shawn Johnston, and Eric Cabrera of the New York Police Department ("NYPD"). He also sues Sergeant Neil Casey, two unnamed police officers, and the City of New York. Mr. Young alleges that defendants violated his constitutional rights by using excessive force and fabricating evidence. He further alleges that the City of New York is liable for these constitutional violations under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Defendants have moved for summary judgment on all claims.

Defendants' motion for summary judgment is granted in part and denied in part. I grant summary judgment to defendants

on the excessive force claim with respect to allegations that Officers Dipresso, Johnston, and Cabrera threw Mr. Young to the ground. But I deny summary judgment with respect to allegations that Officers DiPresso, Johnston, and Cabrera kicked and stomped Mr. Young before and after he was handcuffed. I also deny summary judgment to Sergeant Casey with respect to allegations that he failed to intervene.

Further, I grant summary judgment to defendants on the claim that defendants fabricated evidence as well as the claim that the City is liable here. Finally, I grant summary judgment to defendants on any claims relating to unnamed officers. Accordingly, the Clerk of Court is directed to dismiss the City of New York and any unnamed officers.

**BACKGROUND**

**A. Factual Background**

On this the parties agree: At approximately 12:40 a.m. on May 23, 2015, Roland Chateau was robbed of four dollars at knifepoint in front of a store in Rockaway Beach, Queens. *See* Defs.' Local Civil Rule 56.1 Statement of Facts ¶ 1 (Dkt. #42) ("Defs.' Statement"); Pl.'s Local Rule 56.1 Counter Statement of Facts ¶ 1 (Dkt. #48) ("Pl.'s Statement"); Decl. of Angharad K. Wilson Ex. B. at 2 (Dkt. #43-2) ("Complaint Report"). Mr. Chateau called 911, and when two officers drove up, he told them what happened: A man had threatened him with a knife, taken several dollars, and then fled toward a nearby housing complex. *See* Defs.' Statement ¶¶ 2, 4; Pl.'s Statement ¶¶ 2, 4; Wilson Decl. Ex. D ¶¶ 4-6 ("DiPresso Decl.").

Mr. Chateau accompanied the officers to the housing complex. *See* Defs.' Statement ¶ 6; Pl.'s Statement ¶ 6; DiPresso Decl. ¶¶ 8-9; Wilson Decl. Ex. E ¶¶ 8, 10 ("Johnston Decl."). There, from the back seat of the police car, he identified Shaun Young as the man who had robbed him. *See* Defs.' Statement ¶ 8; Pl.'s Statement ¶ 8; DiPresso Decl. ¶ 10; Johnston Decl. ¶ 11. The officers exited, joining two more officers who had since arrived. *See* Defs.' Statement ¶¶ 10-11; DiPresso Decl. ¶ 11; Johnston Decl. ¶ 12. Soon after, officers Keith DiPresso, Shawn Johnston, and Eric Cabrera approached Mr. Young, along with a supervising officer, Sergeant Neil Casey. *See* Defs.' Statement ¶ 11; DiPresso Decl. ¶¶ 12-13; Johnston Decl. ¶ 13.

From there, the parties' accounts diverge. As the officers tell it, when they approached Mr. Young, they identified

themselves as police officers. *See* DiPresso Decl. ¶ 14; Johnston Decl. ¶ 14. They then told Mr. Young that he had been identified as the perpetrator of a robbery, *see* Defs.' Statement ¶ 11, and told him to put his hands behind his back, *see id.* ¶ 12; DiPresso Decl. ¶ 14; Johnston Decl. ¶ 13, but Mr. Young refused, *see* Defs.' Statement ¶ 12; DiPresso Decl. ¶ 14; Johnston Decl. ¶ 14.

**\*2** Because Mr. Young would not be handcuffed, Officers DiPresso and Johnston grabbed his arms. *See* Defs.' Statement ¶ 13; DiPresso Decl. ¶14; Johnston Decl. ¶ 14. As Mr. Young struggled to break free, Officers DiPresso, Johnston, and Cabrera wrestled him to the ground. *See* Defs.' Statement ¶14; DiPresso Decl. ¶ 16; Johnston Decl. ¶¶ 15-16. Mr. Young kept moving his arms and kicking his legs, *see* Defs.' Statement ¶ 16; DiPresso Decl. ¶ 16; Johnston Decl. ¶ 16, but once Officer Cabrera held down his legs, Officers DiPresso and Johnston were able to handcuff him, *see* Defs.' Statement ¶ 17; DiPresso Decl. ¶ 17; Johnston Decl. ¶ 17. At that point, Mr. Young stopped resisting. *See* DiPresso Decl. ¶ 17; Johnston Decl. ¶ 17. The officers then retrieved a folding knife and four dollars from his pocket. *See* Defs.' Statement ¶¶ 20-21; Pl.'s Statement ¶ 20; DiPresso Decl. ¶ 20; Complaint Report at D00005-8. The officers denied ever kicking or stomping Mr. Young. *See* Defs.' Statement ¶¶ 18-19; DiPresso Decl. ¶ 19; Johnston Decl. ¶ 18.

Mr. Young gives a different account. As he tells it, the officers did identify themselves, *see* Shaun Young Dep. 90:13-15 (Dkt. #46-3) ("Young Dep."), and they did tell him that someone had identified him as the perpetrator of a robbery, *see* Young Dep. 87:11-14. But when he told them he did not commit the robbery, *see ibid.*, two or three officers "rushed" him, "picked [him] up off the ground," and then "threw [him] to the floor," Young Dep. 94:12-13, 100:21-24.

Once on the ground, the officers "started kicking [him] [and] stomping [him]" for about fifteen seconds until they were able to handcuff him. *See* Young Dep. 98:15-16, 98:19-20, 102:11-13, 105:14-16. Even after Mr. Young was handcuffed, the officers kept kicking and stomping him for another fifteen seconds. *See* Young Dep. 102:13-14, 105:8-10. At some point after the officers lifted him up, Mr. Young lost consciousness. *See* Young Dep. 110:1-5. Mr. Young denied ever resisting arrest. *See* Young Dep. 94:14-16, 164:11-12.

Several of Mr. Young's neighbors have submitted declarations that provide some corroboration for Mr. Young's account. Tanisha Nock and her daughter Latiqua Blockwood said

that they "saw at least four [p]olice beating" Shaun Young "while he was sitting on the ground." Decl. of Witness Tanisha Nock ¶ 6 (Dkt. #46-10) ("Nock Decl."); Decl. of Latiqua Blockwood ¶ 6 (Dkt. #46-11) ("Blockwood Decl"). Specifically, they saw the officers "beating him, kicking him and poking him with their night sticks." Nock Decl. ¶ 6; Blockwood Decl. ¶ 6. Mr. Young's mother Danielle Maness-Williams also recalled that Ms. Nock and Ms. Blockwood told her at the time of the arrest that the police "were kicking Shaun while he was on the ground, and they were poking him with their nightsticks." Aff. of Witness Danielle Maness-Williams ¶ 11 (Dkt. #46-6) ("Maness-Williams Aff.").

After the officers arrested Mr. Young, they took him to the police precinct. Defs.' Statement ¶ 24; *see* Wilson Decl. Ex. I at D 0707. Police records indicate that there, Mr. Young complained that he felt knee and chest pains and told officers that he had a history of seizures, *see ibid.*, so the officers called an ambulance, *see* Defs.' Statement ¶25; Wilson Decl. Ex. J. at D 0653-55. Prehospital records indicate that, in the ambulance, Mr. Young repeated that he felt pain in his ribs and knees, *see* Defs.' Statement ¶ 26; Wilson Decl. Ex. J. at D 0653-655, but the medical professionals were not able to do a full assessment, because Mr. Young was uncooperative, *see* Wilson Decl. Ex. J. at D 0654. Hospital records indicate that, at the emergency department, Mr. Young complained that he felt pain in his ribs and knees, and he was given a diagnosis code of abdominal pain. *See* Wilson Decl. Ex. K. at D 0640, D 0641, D 0643, D 0645. Hours later, he told the emergency physician that the pain had resolved itself. *See* Defs.' Statement ¶ 27; Wilson Decl. Ex. K. at D 0643, 0649. Records from the emergency physician indicate that he received a physical exam, which found no apparent distress beyond abdominal pain of an "unknown etiology." Wilson Decl. Ex. K. at D 0651-52.

**\*3** In his deposition, Mr. Young stated that he did not regain consciousness until he woke up in the hospital. *See* Young Dep. 110:1-5. He said that when he woke up, his head, ribs, and knees were all hurting. *See* Young Dep. 111:4-11. He said some skin on his shoulder had "peeled off" and "scabbed up." *See* Young Dep. 103:13-19. He also recalled that his knees and his shoulder had "busted open," and both were bleeding. *See* Young Dep. 113:1-9.

### B. Procedural Background

Three years after his arrest, Mr. Young filed this suit under [42 U.S.C. § 1983](#) against Officer DiPresso, Officer Johnston, Officer Cabrera, Sergeant Casey, two John Doe NYPD

Officers, and the City of New York. Compl. ¶¶ 7-11 (Dkt. #1). Mr. Young alleged that defendants violated his constitutional rights by using excessive force and fabricating evidence. *See id.* ¶¶ 28, 31. Further, he alleged that the City of New York was liable because it had "failed to properly train, screen, supervise, or discipline its employees and police officers." *Id.* ¶¶ 36-40.

After a pre-motion conference, the Court granted leave for defendants to file a motion for summary judgment. Dkt. Entry (Dec. 2, 2019). This motion followed. Defs.' Notice of Mot. (Feb. 28, 2020) (Dkt. #40).

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Frost v. New York City Police Dep't*, No. 19-1163, —— F.3d —— 2020 WL 6603609, at *5 (2d Cir. Nov. 12, 2020) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). "A fact is material if it might affect the outcome of the suit under governing law." *Ibid.* In assessing the record, I view "the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Tracy v. Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010).

## DISCUSSION

Defendants have moved for summary judgment on all claims. Mr. Young alleges that defendants used excessive force while arresting Mr. Young and fabricated evidence against Mr. Young. Further, he alleges that the City of New York is liable because it failed to adequately train, screen, supervise, and discipline its officers. Defendants have moved for summary judgment on all claims. On the excessive force claim, I grant summary judgment to defendants in part and deny it in part. I grant summary judgment to defendants in full on the claims of fabrication of evidence and municipal liability.

## I. Summary Judgment is Appropriate in Part on the Excessive Force Claim.

In his first three causes of action, Mr. Young alleges that defendants used excessive force during his arrest in violation

of the Fourth, Eighth, and Fourteenth Amendments. *See* Compl. ¶¶ 28, 31, 34. In his deposition, Mr. Young testified that officers (i) threw him to the ground, *see* Young Dep. 98:13-14, 99:15-19, 100:9-24, where they started (ii) kicking and stomping him for about fifteen seconds before he was handcuffed, *see* Young Dep. 98:15-16, 98:19-20, 105:14-16, and then continued (iii) kicking and stomping him for another fifteen seconds after he was handcuffed, *see* Young Dep. 102:13-14, 105:8-10. Following the parties, I analyze each of these actions in turn. *See Tracy*, 623 F.3d at 96-97. I grant summary judgment to defendants as to assertions that officers threw Mr. Young to the ground but deny summary judgment to defendants as to assertions that officers kicked and stomped Mr. Young. [1]

[1]  To the extent that plaintiff's first cause of action might be read to present a false-arrest claim, plaintiff has explained that he does not bring a claim "for unreasonable seizure of his person arising from a false arrest." Pl.'s Mem. in Opp'n at 13 (Dkt. #47). And though plaintiff's third cause of action might be read to present a separate assault claim, that claim is "duplicative" of the excessive force claim. *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 377 (S.D.N.Y. 2015); Pl.'s Mem. in Opp'n at 22 ("Plaintiff does not dispute that his separate cause of action for assault and battery ... may be consolidated into his claim ... for excessive force.").

## A. The Fourth Amendment Governs Claims of Excessive Force During an Arrest.

**\*4** As an initial matter, insofar as plaintiff alleges that defendants violated the Eighth Amendment or the substantive due process component of the Fourteenth Amendment through use of excessive force, defendants are entitled to summary judgment on those claims. The Fourth Amendment guarantees the right of citizens to be secure against unreasonable seizures, and an excessive force claim must "be judged by reference to the specific constitutional standard which governs that right." *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). Accordingly, "*all* claims that law enforcement officers have used excessive force ... in the course of an arrest" are "analyzed under the Fourth Amendment and its 'reasonableness' standard," *ibid.*, rather than the Eighth Amendment, *see Edrei v. Maguire*, 892 F.3d 525, 533 (2d Cir. 2018), or the Fourteenth Amendment, *see Graham*, 490 U.S. at 395.

Whether officers used excessive force in violation of the Fourth Amendment depends on whether their use of force was " 'objectively reasonable' in light of the facts and circumstances confronting" them. *Id.* at 397 (quoting *Scott v. United States*, 436 U.S. 128, 137-39 (1978)). This test balances "the nature and quality of the intrusion" against "the countervailing governmental interests at stake." *Id.* at 396. Relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Ibid.* The record is assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Ibid.* Given "the fact-specific nature of the inquiry on an excessive force claim, granting summary judgment against a plaintiff ... is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Lennox v. Miller*, 968 F.3d 150, 155 (2d Cir. 2020) (quoting *Rogoz v. City of Hartford*, 786 F.3d 236, 246 (2d Cir. 2015)).

**B. Defendants Are Entitled to Summary Judgment on the Claim that Officers Used Excessive Force by Throwing Mr. Young to the Ground.**

**1. The Officers Acted Reasonably Under the Circumstances When They Tackled Mr. Young.**

I grant summary judgment to defendants as to plaintiff's claim that officers used excessive force when they threw Mr. Young to the ground. Specifically, according to Mr. Young, one officer grabbed his legs, another officer grabbed his arms, the officers picked him off the ground, and then the officers threw him to the ground. *See* Young Dep. 100:9-24. Even assuming Mr. Young's account to be true, no reasonable jury could conclude that this conduct was objectively unreasonable given all of the circumstances.

First, the officers were attempting to arrest someone who had been identified as the perpetrator of a serious crime. "[T]he right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," and the degree depends in part on "the severity of the crime at issue." *Graham*, 490 U.S. at 396. It is undisputed here that Mr. Young had been identified to the officers as someone who had just committed a robbery at knifepoint. Defs.' Statement ¶¶ 1, 8; Pl.'s Statement ¶¶ 1, 8. That act qualifies as robbery in the first degree under New York law,

*see* N.Y. Penal Law § 160.15(3); *People v. Ford*, 903 N.E.2d 256, 258 (N.Y. 2008), a felony punishable up to twenty-five years in prison, *see* N.Y. Penal Law §§ 160.15, 70.02(a), 70.02(3)(a). Courts in this circuit have held comparable force to be reasonable in arresting individuals suspected of less serious crimes. *See, e.g.*, *Blackwood v. Omorvan*, No. 16-CV-644, 2019 WL 4600662, at *6 (S.D.N.Y. Sept. 23, 2019) (granting summary judgment to officers who tackled a suspect who "had been disruptive at a hospital"); *Flanigan v. Town of Colchester*, 171 F. Supp. 2d 361, 365 (D. Vt. 2001) (granting summary judgment to officer who knocked feet out from under arrestee who had threatened neighbor with a BB gun); *cf. Kalfus v. New York & Presbyterian Hosp.*, 476 F. App'x 877, 879 (2d Cir. 2012) (affirming grant of summary judgment in favor of patrolmen who pushed trespasser onto his stomach in order to handcuff him).

**\*5** Second, the officers were attempting to arrest someone who likely possessed a weapon. The reasonableness of force varies with the threat posed by the arrestee. *See Graham*, 490 U.S. at 396; *Johnson v. City of New York*, No. 05-CV-2357, 2006 WL 2354815, at *4 (S.D.N.Y. Aug. 14, 2006) ("The more precarious a particular situation, the more substantial the force that can be used."). Mr. Young emphasizes that "his physical condition does not suggest that he would pose a threat" because "[h]e is slightly built, has cerebral palsy, walks with a limp, had kidney problems and suffers from seizures." Pl.'s Mem. in Opp'n at 15-16. But there is no dispute that Mr. Young had been identified to officers as someone who had just threatened another man with a knife. Defs.' Statement ¶¶ 1, 8; Pl.'s Statement ¶¶ 1, 8. Nor is there any dispute that Mr. Young was not handcuffed when apprehended. *See* Pl.'s Statement ¶ 15; Defs.' Statement ¶ 13. Courts in this circuit have held that officers did not violate the Fourth Amendment by taking an arrestee to the ground when officers had far less information to suggest that an arrestee possessed a weapon. *See, e.g.*, *Massaro v. Jones*, 323 F. App'x 68, 70 (2d Cir. 2009) (affirming summary judgment when officers forced to the ground an arrestee who had "previously been convicted of crimes involving weapons"); *Flanigan*, 171 F. Supp. 2d at 365 (granting summary judgment when officer knocked feet out from an arrestee whose BB gun was in his house); *cf. Hardy v. Plante*, No. 06-CV-687, 2009 WL 249787, at *6 (N.D.N.Y. Feb. 3, 2009) (granting summary judgment where officer punched and tased arrestee who "matched the description of a suspect in a stabbing").

In opposition, Mr. Young argues that the officers did not act reasonably in throwing him to the ground because he did not

resist arrest. *See* Pl.'s Mem. in Opp'n at 21. Instead, according to Mr. Young, he was yelling at officers and telling them "I didn't do it" when he was tackled. *See* Young Dep. 98: 23-25. But whether an arrestee "is actively resisting arrest" is only one factor bearing on whether officers acted reasonably in using force. *Graham*, 490 U.S. at 396. Taking into account all the circumstances here, a reasonable jury could not find that defendants acted unreasonably in tackling a suspect whom they understood to be carrying a knife and to have just threatened to stab another person, when the suspect had not yet been restrained and was shouting at officers.

### 2. Qualified Immunity Would Shield the Officers from Liability for Tackling Mr. Young to the Ground.

Even if tackling Mr. Young amounted to excessive force under these circumstances, qualified immunity would shield the officers from liability. Qualified immunity shields officers from liability unless their conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Chamberlain Estate of Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To overcome qualified immunity, "[t]he contours of the right must be sufficiently clear" at the time of the violation "that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Because "[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case ... officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quotations omitted).

The parties point to no precedent that would have informed Officers DiPresso, Johnston, and Cabrera in May 2015 that they could not tackle an arrestee to the ground under circumstances like those presented here. Indeed, there appears to be no precedent that forbade taking to the ground an arrestee suspected of committing a crime with a knife and who likely possessed a knife. To the contrary, existing precedent held force to be reasonable when "the risk posed to officer safety appeared to be both real and imminent," *Tracy*, 623 F.3d at 97, such as when officers had reason to believe that the arrestee possessed a weapon, *Massaro*, 323 F. App'x at 70 (declaring force to be reasonable when arrestee had "previously been convicted of crimes involving weapons").

**\*6** In contending that it was clearly established at the time of Mr. Young's arrest that the officers' conduct reflected an unreasonable use of force, Mr. Young relies on *Outlaw v. City of Hartford*, 884 F.3d 351 (2d Cir. 2018). But that case is inapposite. In *Outlaw*, the court of appeals held that qualified immunity did not bar liability where an officer "repeatedly beat[ ] an unresisting, supine, jaywalking suspect with a stick," thereby "bloodying his head in several places and breaking his knee." *Id.* at 356-57, 367. The opinion obviously does not concern just tackling an arrestee. Moreover, the arrestee in *Outlaw* was suspected of a far less serious crime that did not involve a weapon. Accordingly, *Outlaw* would not have informed the officers here that tackling Mr. Young to the ground would qualify as excessive force. Defendants are therefore entitled to qualified immunity with respect to their alleged tackling of Mr. Young.

### C. Summary Judgment is Not Appropriate on the Claims that Officers Kicked and Stomped Mr. Young.

I deny summary judgment as to claims that officers used excessive force by kicking and stomping Mr. Young before and after he was handcuffed.

### 1. The Parties' Evidentiary Objections are Denied.

Before assessing the merits of this issue, I consider evidentiary objections bearing on the summary judgment record for these claims. *See Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013). Plaintiff has submitted declarations from his neighbors Tanisha Nock and Latiqua Blockwood, and defendants argue that these declarations should be precluded or deemed inadmissible. *See* Defs.' Reply Mem. at 3-4 (Dkt. #44). [2] Defendants submit medical records, and plaintiff argues that these records are inadmissible. *See* Pl.'s Mem. in Opp'n at 24. Neither objection succeeds.

[2]    Plaintiff also submits a declaration from Danielle Maness-Williams, who is Mr. Young's mother. *See* Maness-Williams Aff. (Dkt. #46-6). Because this declaration is largely duplicative of the declarations submitted by Tanisha Nock and Latiqua Blockwood, and because other evidence in the record is sufficient to establish that there is a genuine dispute of material fact as to whether Mr. Young was kicked and stomped, I need not resolve

whether the affidavit from Ms. Maness-Williams contains admissible evidence.

Defendants first argue that Tanisha Nock and Latiqua Blockwood's declarations should be precluded because these witnesses were not properly disclosed under Federal Rule of Civil Procedure 26(a)(1)(A). *See* Defs.' Reply Mem. at 3. That rule requires that "a party must, without awaiting a discovery request, provide other parties ... the name and, if known, the address and telephone number of each individual likely to have discoverable information ... that the disclosing party may use to support its claim or defenses." Defendants represent that "plaintiff never served any initial or supplemental disclosures in this case." Defs' Reply Mem. at 3.

Even so, preclusion does not follow. "[U]nder Rule 37, it is within the court's discretion to preclude evidence submitted in violation of Rule 26(a) from use on a motion," *Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 434 (S.D.N.Y. 2014) (citing *Haas v. Delaware & Hudson Ry. Co.*, 282 F. App'x. 84, 85 (2d Cir. 2008)), but "[p]reclusion is a harsh remedy that should be imposed only in rare situations," *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 304 (S.D.N.Y. 2015) (quotations omitted). To determine whether preclusion is warranted, a court considers "(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new [evidence]; and (4) the possibility of a continuance." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006) (quoting *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006)).

 **\*7**  Taken together, these factors counsel against preclusion here. Plaintiff has not explained the initial nondisclosure. But the declarations from Ms. Nock and Ms. Blockwood are important as accounts from contemporaneous witnesses. And the prejudice to defendants is minimal because in responses to interrogatories, plaintiff identified Ms. Blockwood and Ms. Nock to defendants as "individuals who had witnesse[d] his [b]eating by members of the City of New York Police Department." Pl.'s Response to Defs.' First Demand for Interrogatories (Dkt. #46-2). Defendants suffered little prejudice from plaintiff's failure to identify those witnesses in initial disclosures given that the witnesses were identified in interrogatories responses with ample time for defendants to depose them. Nor do I find a continuance warranted, because defendants have given no indication that they would like

additional time to depose these witnesses before the summary judgment motion is resolved.

Defendants also argue that these declarations should be precluded because they only "contain hearsay that does not fall within any exception and/or are not relevant to the issues at hand." Defs.' Reply Mem. at 4. But the declarations mostly relay what Ms. Nock and Ms. Blockwood observed on the night in question. Such declarations "submitted to defeat summary judgment" need not be admissible themselves so long as they "contain evidence that will be presented in an admissible form at trial." *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) (per curiam). Defendants offer no reason to believe that plaintiff will be unable to call Ms. Nock and Ms. Blockwood at trial to testify as to what they observed.

For his part, plaintiff argues that defendants may not rely on any medical or hospital records in support of their summary judgment motion because these records are not certified, so they are not admissible as business records under Fed. R. Evid. 803(6). *See* Pl.'s Mem. at 24. For similar reasons, this objection fails as well. "It is well-established that even inadmissible evidence may properly be considered on summary judgment if it may reasonably be reduced to admissible form at trial." *Perpall v. Pavetek Corp.*, No. 12-CV-0336, 2017 WL 1155764, at \*9 (E.D.N.Y. Mar. 27, 2017) (quotations omitted). There is no reason here to think that defendants will not be able to provide certification or an authenticating witness at trial. To the contrary, "[a] review of the medical records submitted by [d]efendants in this case reveals nothing that would indicate a lack of trustworthiness." *Id.* at \*8. "Their appearance, contents, and substance are what one would expect of such records and support [defendants'] claim that they are what they appear to be." *Ibid.*

## 2. A Reasonable Jury Could Find that Officers DiPresso, Johnston, and Cabrera Kicked and Stomped Mr. Young.

Defendants first argue that summary judgment is appropriate because no reasonable jury could find that officers kicked and stomped Mr. Young. *See* Defs.' Mem. at 14-17 (Dkt. #41). But to the contrary, the record reflects a genuine dispute on that question. Mr. Young testified that three officers "started kicking [him] [and] stomping [him]" for about fifteen seconds until they were able to handcuff him. *See* Young Dep. 98:15-16, 98:19-20, 102:11-13, 105:14-16. He then testified that after he was handcuffed, the officers kept kicking and stomping him for another fifteen seconds. *See* Young Dep.

102:13-14, 105:8-10. This "testimony alone" is ordinarily "independently sufficient to raise a genuine issue of material fact." *Bellamy v. City of New York*, 914 F.3d 727, 746 (2d Cir. 2019). And Mr. Young's statements are corroborated by declarations from his neighbors, Tanisha Nock and her daughter Latiqua Blockwood, in which they say that they saw officers "beating him, kicking him, and poking them with their night sticks" while "he was sitting on the ground." Nock Decl. ¶ 6; Blockwood Decl. ¶ 6. Mr. Young's testimony, coupled with the declarations, raises a genuine dispute of material fact as to whether officers engaged in the conduct that Mr. Young claims.

 **\*8** Defendants principally argue that Mr. Young's medical records would foreclose a reasonable jury from finding that officers kicked and stomped Mr. Young. *See* Defs.' Mem. at 14, 16. However, a court "may not make credibility determinations or weigh the evidence" on a motion for summary judgment, *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quotation omitted), unless a litigant's account is "so utterly discredited by the record that no reasonable jury" could believe it, *see Scott v. Harris*, 550 U.S. 372, 380-81 (2007). This is not such a case. To be sure, the medical records undercut plaintiff's testimony regarding the extent of his injuries. For example, plaintiff testified that he was bleeding, and the medical records do not reflect that harm. But as to plaintiff's testimony about whether the officers kicked and stomped him, the records at most provide "ammunition for cross-examination," not grounds for summary judgment. *Galberth v. Durkin*, No. 14-CV-115, 2017 WL 4325774, at \*8 (N.D.N.Y. Aug. 31, 2017), *report and recommendation adopted*, No. 14-CV-115, 2017 WL 4326076 (N.D.N.Y. Sept. 27, 2017). It remains "for the fact-finder to assess whether and to what extent the medical evidence strips that testimony of its credibility." *Pierre-Antoine v. City of New York*, No. 04-CV-6987, 2006 WL 1292076, at \*5 (S.D.N.Y. May 9, 2006).

### 3. A Reasonable Jury Could Find that the Named Officers were Personally Involved in the Alleged Use of Force.

Defendants further argue that they are entitled to summary judgment on plaintiffs' excessive force claim because plaintiff "has failed to identify which officers purportedly kicked and stomped him." Defs.' Mem. at 18. "An individual may be held liable under ... [Section] 1983 only if that individual is personally involved in the alleged deprivation."

*Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015). But evidence of "direct physical participation ... in the constitutional violation" by those who "ha[d] knowledge of the facts that rendered the conduct illegal" ordinarily suffices, *see Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001), and this issue is a question of fact treated like all others on summary judgment, *see Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986). Here, a reasonable jury could readily find that Officers DiPresso, Johnston, and Cabrera were the officers who used excessive force against Mr. Young during his arrest. Mr. Young testified that he was kicked and stomped by three officers, *see* Young Dep. 103:6-10, and there is no dispute that Officers DiPresso, Johnston, and Cabrera were the three officers who arrested him, *see* Defs.' Statement ¶ 14; Johnston Decl. ¶ 16.

Further, because there is a genuine dispute as to whether Officers DiPresso, Johnston, and Cabrera kicked and stomped Mr. Young, there is also a genuine dispute as to whether Sergeant Casey is liable for failing to intercede. "A police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent it." *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016). There is no dispute that while Mr. Young was being arrested, Sergeant Casey was present on the scene. *See* Defs.' Statement ¶ 11; DiPresso Decl. ¶¶ 12-13; Johnston Decl. ¶ 13. Crediting Mr. Young's testimony that the arrest took at least fifteen to thirty seconds, *see* Young Dep. 105:8-16, a reasonable jury could also find that Sergeant Casey had enough time to intervene, *see Figueroa*, 825 F.3d at 107-08 (concluding that jury must decide failure-to-intervene claim even "assuming that the assault lasted less than twenty seconds").

However, a reasonable jury could not find based on the record in this case that any additional unnamed officers used excessive force against Mr. Young. Plaintiff's evidence indicates that at most four officers were on the scene, *see* Nock Decl. ¶ 6; Blockwood Decl. ¶ 6, and defendants' evidence shows the same, *see* Defs.' Statement ¶ 11; DiPresso Decl. ¶¶ 12-13; Johnston Decl. ¶ 13. Those four officers have been identified, and there is nothing to indicate that additional officers played any role in the alleged constitutional violations. In any event, "[i]t is well settled that where ... discovery has closed, the proper course is to dismiss the John Doe Defendants without prejudice." *Cox v. Vill. of Pleasantville*, 271 F. Supp. 3d 591, 618 (S.D.N.Y. 2017); *see Sachs v. Cantwell*, No. 10-CV-1663, 2012 WL 3822220, at

*10 (S.D.N.Y. Sept. 4, 2012). The unnamed defendants are therefore dismissed from the case.

### 4. A Reasonable Jury Could Find that Mr. Young Suffered a Cognizable Injury.

**\*9** Lastly, defendants argue that they are entitled to judgment as a matter of law because Mr. Young at most suffered *de minimis* injuries. As an initial matter, at least four circuits have rejected the premise of this argument—concluding that a plaintiff may bring an excessive force claim even if he suffered only *de minimis* injury. *Rizk v. City of New York*, 462 F. Supp. 3d 203, 223 (E.D.N.Y. 2020) (collecting cases); *see Smith v. Murphy*, 634 F. App'x 914, 917 (4th Cir. 2015) (per curiam) ("[We] [f]ind[ ] no support for Defendants' contention that suffering only de minimis injuries bars one from asserting a Fourth Amendment excessive force claim."); *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011) ("We are not convinced ... that evidence of only de minimis injury necessarily forecloses a claim of excessive force under the Fourth Amendment."); *United States v. Rodella*, 804 F.3d 1317, 1328-29 (10th Cir. 2015) ("[W]e reject the ... premise ... that there is a de minimis injury requirement for Fourth Amendment excessive force claims in cases which involve more than handcuffing."); *Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014) ("[A] plaintiff claiming excessive force under the Fourth Amendment can seek nominal damages if he does not have compensable injuries.").

While the Second Circuit has not squarely addressed whether a plaintiff who suffered truly *de minimis* harm may bring an excessive force claim, it has made clear that, at minimum, "the absence of significant injury ... is not dispositive under a Fourth Amendment analysis." *Jones v. Treubig*, 963 F.3d 214, 239 (2d Cir. 2020). And Mr. Young has alleged here that he suffered rib, knee, and abdominal pain for hours after being kicked and stomped. *See* Wilson Decl. Ex. J. at D 0653-55; Wilson Decl. Ex. K. at D 0640, D 0641, D 0645. Even assuming *arguendo* that some category of *de minimis* harms do not give rise to a Fourth Amendment claim, I decline to hold that an arrestee who suffered hours of pain after being kicked and stomped by police officers falls into such a category. Indeed, the injuries he claims are at least as serious as injuries found sufficient for a Fourth Amendment claim in this circuit in recent years. *See Jones*, 963 F.3d at 239 (reversing summary judgment where plaintiff testified that "he felt numb for 30 to 40 minutes after being tased"); *Sash v. United States*, 674 F. Supp. 2d 531, 540 (S.D.N.Y. 2009)

(denying summary judgment where plaintiff only "insist[ed] that the incident caused pain in his neck and back" and "reported tightening in his chest one hour after the arrest"). I therefore decline to grant summary judgment to defendants based on the extent of plaintiff's injuries.

Separately, defendants argue that plaintiff's injuries are "demonstrative of the *de minimis* nature of the force used to subdue and handcuff him." Defs.' Mem at 17. It is true that "[n]ot every push or shove ... violates the Fourth Amendment," *Graham*, 490 U.S. at 398, because there is some "physical contact common to virtually every custodial arrest," *Figueroa*, 825 F.3d at 105-06. But "kicking and stomping" an arrestee is more than *de minimis* force, and that is the conduct testified to here. *See Johnson*, 2006 WL 2354815, at \*5 (denying summary judgment when officers kicked and stomped person during search); *Davis v. City of New York*, No. 04-CV-3299, 2007 WL 755190, at \*12 (E.D.N.Y. Feb. 15, 2007) (denying summary judgment when arrestee was "intentionally kicked ... while handcuffed on the floor"). To the extent that defendants argue that plaintiff's injuries show that officers did not kick and stomp Mr. Young, that argument is rejected for the reasons it was rejected before: plaintiff's own deposition testimony and the declarations submitted at the summary judgment stage create a genuine issue of material fact, even if plaintiff only suffered slight injuries. Summary judgment is therefore denied as to these allegations.

### II. Summary Judgment is Appropriate on the Fabrication of Evidence Claim.

**\*10** Defendants also seek summary judgment on plaintiff's fabrication of evidence claim. I grant summary judgment to defendants on that claim, because plaintiffs have not presented any evidence that any officer fabricated information or forwarded that information to a prosecutor. To make out a fabrication of evidence claim, a plaintiff must at least show that "a police officer create[d] false information likely to influence a jury's decision and forward[ed] that information to prosecutors." *Bellamy v. City of New York*, 914 F.3d 727, 745 (2d Cir. 2019) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)). The complaint's first cause of action indeed includes a one-line allegation that defendants violated plaintiff's right to be "free[ ] from having [p]olice fabricate evidence." Compl. ¶ 28. But the complaint has no factual allegations to support this claim, and plaintiff has never presented any evidence that defendants fabricated evidence. Indeed, even after defendants identified this absence, plaintiff did not defend this fabrication of

evidence claim in his opposition to defendants' motion for summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (permitting judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case"). Even viewing the evidence in the light most favorable to the plaintiff, a jury could not find that any defendant created false information or forwarded that information to a prosecutor.

## III. Summary Judgment is Appropriate on the Municipal Liability Claim.

Finally, defendants are entitled to summary judgment on plaintiff's municipal liability claim. Although there are genuine disputes of material fact as to whether certain officers violated plaintiff's constitutional rights, a municipality is not liable under Section 1983 merely "by application of the doctrine of *respondeat superior.*" *Lucente v. Cty of Suffolk*, No. 19-347, —— F.3d ——, 2020 WL 6733477, at *8 (2d Cir. Nov. 17, 2020) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986)). Rather, to demonstrate municipal liability under Section 1983, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Ibid.* (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)).

Defendants are entitled to judgment as a matter of law because plaintiff has not sufficiently established any relevant official policy or custom that caused the purported violation of his rights. Ordinarily, "[o]fficial municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Hernandez v. United States*, 939 F.3d 191, 206 (2d Cir. 2019) (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011)). Plaintiff's fourth cause of action alleges only that the City "failed to properly train, screen, supervise or discipline its employees and police officers," Compl. ¶ 38, and that under the umbrella of failure of supervision, the City "had defacto policies ... including but not limited to the improper and inadequate supervision of the Street Crimes Units and Anti Crime Units operating in plainclothes in the County of Queens," *id.* ¶ 37. Plaintiff further alleges that these actions "were a direct and proximate cause of the unconstitutional conduct" suffered by Mr. Young, *id.* ¶ 39. But such "conclusory statements, conjecture, [and] speculation by the party resisting the motion will not defeat summary judgment." *Flores v. United States*, 885 F.3d 119, 122 (2d Cir.

2018) (quoting *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996)).

Aside from these allegations, plaintiff has provided no evidence tending to show that the City had any policies reflecting a failure to train, screen, supervise, or discipline its officers. Even on a motion to dismiss, a "mere assertion" that "a municipality has ... a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Montero v. City of Yonkers*, 890 F.3d 386, 403-04 (2d Cir. 2018). Nor can the disputed constitutional conduct by the officers here make up the difference. Even if true, the single incident of unconstitutional activity disputed in this case cannot suffice to demonstrate a consistent practice that constitutes a de facto policy or custom. *See Hu v. City of New York*, 927 F.3d 81, 106 (2d Cir. 2019) (four instances). Such isolated acts "by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability," *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012), and do not alone show that "the alleged practice [was] so manifest as to imply the constructive acquiescence of senior policymaking officials," *Hu*, F.3d at 106. Summary judgment to defendants is therefore appropriate on plaintiff's municipal liability claim.

## CONCLUSION

**\*11** Defendants' motion for summary judgment is granted in part and denied in part. The motion is granted on allegations that defendants used excessive force in throwing Mr. Young to the ground. The motion is also granted with respect to allegations that defendants used excessive force in violation of the Eighth and Fourteenth Amendments. Further, the motion is granted with respect to any allegations as to any unnamed defendants.

Additionally, defendants' motion for summary judgment is granted on allegations that defendants fabricated evidence. And the motion is granted with respect to allegations that the City of New York is liable for any purported constitutional violations. Accordingly, the Clerk of Court is directed to dismiss the City of New York and any unnamed officers at this time.

Defendants' motion for summary judgment is denied as to allegations that Officers DiPresso, Johnston, and Cabrera used excessive force in kicking and stomping Mr. Young

before and after he was handcuffed. The motion is also denied as to allegations that Sergeant Casey failed to intervene while other officers used excessive force. Because genuine disputes of material fact remain as to these allegations, litigation may continue as to those claims.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 7042759

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4849144
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

James McCLENDON, Plaintiff,
v.
COUNTY OF NASSAU, Lawrence Mulvey,
Police Commissioner of Nassau County Police
Department, Richard Soto, Police Sergeant, James
Tobin, Police Officer, Raymond Buttacaroli, Police
Officer, John Aderson, Police Officer, Brandon
Hillman, Police Officer, Laura Sventoraitis, Police
Officer and Keith Faivr, Police Officer, in their
official and individual capacities, Defendants.

No. 11–CV–0190 (SJF)(ETB).
|
Oct. 11, 2012.

**Attorneys and Law Firms**

James McClendon, Ogdensburg, NY, pro se.

Peter A. Laserna, Mineola, NY, for Defendants.

### *MEMORANDUM AND ORDER*

FEUERSTEIN, District Judge.

**\*1** On January 7, 2011, incarcerated *pro se* plaintiff James
McClendon ("plaintiff") commenced this action pursuant to
42 U.S.C. § 1983 against defendants Nassau County (the
"County"), Nassau County Police Department 1st Precinct
(the "Precinct"), and unidentified Nassau County police
officers, alleging that the officers violated his civil rights
while placing him under arrest in December 2009. [Docket
Entry No. 1]. On May 11, 2011, the Court dismissed the
complaint *sua sponte* with prejudice as against the Precinct
and without prejudice as against the County with leave to
amend. [Docket Entry No. 7]. On July 27, 2011, plaintiff filed
an amended complaint against the County, Lawrence Mulvey,
Police Commissioner of Nassau County, Richard Soto, Police
Sergeant, and several named police officers (collectively,
"defendants"). [Docket Entry No. 28]. On August 2, 2011,
defendants moved to dismiss the amended complaint based
upon plaintiff's failure to comply with Federal Rule of Civil
Procedure 4(m) or, in the alternative, to stay the case pending

resolution of a parallel action plaintiff filed in state court.
[Docket Entry Nos. 29–31], By order dated November 2,
2011, the Court denied both motions. [Docket No. 39].

Defendants now move for summary judgment pursuant to
Federal Rule of Civil Procedure 56. [Docket Entry No. 70].
For the reasons that follow, the motion is GRANTED IN
PART and DENIED IN PART.

### I. Claims
Plaintiff asserts: a claim pursuant to 42 U.S.C. § 1983 alleging
that officers used excessive and unreasonable force in the
course of plaintiff s arrest in violation of his rights under
the Fourth Amendment; [1] common law assault and battery
claims under New York law; a claim pursuant to 42 U.S.C.
§ 1983 alleging that the officers were deliberately indifferent
to his serious medical needs in violation of his rights under
the Fourteenth Amendment; [2] and a claim pursuant to *Monell
v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56
L.Ed.2d 611 (1978), against the County based upon its
alleged endorsement of racially discriminatory policies and
its alleged deliberate indifference to violations of plaintiff's
constitutional rights. [3]

[1]     While plaintiff also alleges violations of his rights
        under the Fourteenth Amendment, allegations of
        the use of excessive force during the course of an
        arrest are analyzed under the Fourth Amendment.
        *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct.
        1865, 104 L.Ed.2d 443 (1989) ("[A]ll claims
        that law enforcement officers have used excessive
        force-deadly or not-in the course of an arrest,
        investigatory stop, or other 'seizure' of a free
        citizen should be analyzed under the Fourth
        Amendment and its 'reasonableness' standard,
        rather than under a 'substantive due process'
        approach."); *Powell v. Gardner,* 891 F.2d 1039,
        1044 (2d Cir.1989) ( "[T]he Fourth Amendment
        standard probably should be applied at least to the
        period prior to the time when the person arrested is
        arraigned or formally charged, and remains in the
        custody ... of the arresting officer .").

[2]     Plaintiff's complaint also alleges violations of his
        rights in this regard under the Eighth Amendment,
        but because his claims relate to his medical
        treatment in the course of his pretrial arrest and
        detainment, plaintiff may only assert a claim under

the Fourteenth Amendment. *City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) ("The Due Process Clause ... require[s] the responsible government or governmental agency to provide medical care to persons ... who have been injured while being apprehended by the police."); *Herbert v. NYC Dep't of Corrections,* No. 10–CV–8799, 2012 WL 3834660, at *2 (S.D.N.Y. Aug.21, 2012) ("A pre-trial detainee ... receives protection against mistreatment ... under the Due Process Clause of the Fourteenth Amendment."). However, the analysis under the Fourteenth Amendment is identical to that applied to post-trial detainees under the Eighth Amendment. *Id.* ("State pre-trial detainees' § 1983 claims for deliberate indifference to serious medical conditions are analyzed ... under the same standard used to address similar Eighth Amendment claims brought under the statute .").

3    Plaintiff's complaint fails to specify a basis for naming Lawrence Mulvey, Police Commissioner of Nassau County Police Department, as a defendant in this action.

## II. Summary Judgment Standard

"Summary judgment must be granted where the pleadings, the discovery and disclosure materials on file, and any affidavits show 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir.2011) (quoting Fed.R.Civ.P. 56(a)). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir.2007) (internal quotations and citations omitted). "A fact is material when it might affect the outcome of the suit under governing law." *Id.* An issue of fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of establishing the absence of any genuine issue of material fact, after which the burden shifts to the nonmoving party to establish the existence of a factual question that must be resolved at trial. *See Koch v. Town of Brattleboro. Vt.,* 287 F.3d 162, 165 (2d Cir.2002)

(citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

**\*2** "In order to defeat a motion for summary judgment supported by proof of facts that would entitle the movant to judgment as a matter of law, the nonmoving party is required under Rule 56(e) to set forth specific facts showing that there is a genuine issue of material fact to be tried." *Yine Jing Gan v. City of N.Y.,* 996 F.2d 522, 532 (2d Cir.1993) (citations omitted). The nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the [nonmoving] party's pleading." *Id.* (internal quotation marks and citations omitted).

## III. Factual Background

### A. 56.1 Statement

Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1") requires a party moving for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure to submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Rule 56.1(a). In response to a motion for summary judgment, non-movants must respond to each purportedly undisputed fact and cite to supporting admissible evidence in the record. Local Rule 56.1(b), (d); Fed.R.Civ.P. 56(c). The movant's asserted facts are deemed to be admitted unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party. Local Rule. 56.1(c). Pro se litigants are "not excused from meeting the requirements of Local Rule 56.1." *Wall v. One Source Co.,* 678 F.Supp.2d 170, 178 (S.D.N.Y.2009).

Plaintiff has failed to submit a proper response to defendants' Rule 56.1 Statement. Plaintiff's response, while sworn, contains no factual allegations supported by admissible evidence in the record to refute defendants' version of purportedly undisputed facts. Nonetheless, the Court retains discretion "to consider the substance of the plaintiff's arguments," even when the plaintiff fails to comply with Local Rule 56.1. *Wali,* 679 F.Supp.2d at 178; *see also Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 Statements, it may in its discretion opt to conduct an assiduous review of the

record even where one of the parties has failed to file such a statement."); *Hayes v. County of Sullivan,* Nos. 07–CV–7667, 09–CV–2071, 2012 WL 1129373, at *1 n. 1 (S.D.N.Y. March 30, 2012) ("In light of Plaintiff's pro se status, the Court overlooks his failure to file a Local Rule 56.1 Statement and conducts its own independent review of the record."). Therefore, the Court will consider the sworn statements made by plaintiff in his deposition.

B. Plaintiff's Arrest

On December 5, 2009 between 10:00 p.m. and 10:50 p.m., plaintiff walked from his home to a nearby "deli" where he remained for approximately thirty (30) minutes, during which time he played pool and drank two (2) beers. County Defendants' Statement of Material Facts Pursuant to Rule 56.1 [Docket Entry No. 70–1] ("Def. 56.1 St.") at ¶¶ 15, 18; Defendants' Motion for Summary Judgment ("Mot.") Ex. F, Deposition of James McClendon dated March 22, 2012 [Docket Entry No. 70–12] ("Pl.Dep.") at 18:24–19:10. Plaintiff then exited the deli and stood near the front door to smoke a cigarette. Def. 56.1 St. at ¶ 19. Plaintiff was wearing dark pants and a blue hooded sweatshirt. *Id.* at ¶ 16.

**\*3** At approximately 11:16 p.m., an anonymous complainant called 911 to report that she saw a tall black male wearing a blue sweater display a gun to people in the deli. *Id.* at ¶ 23; Mot. Ex. F, Nassau County Police Dep't I/Dispatcher Event Information [Docket Entry No. 70–9]. Police Officer Laura Sventoraitis responded to the call and saw plaintiff standing in front of the deli. Def. 56.1 St. at ¶¶ 22–24.

The details of the interaction between plaintiff and Officer Sventoraitis are disputed. Defendants claim that "[i]nitially, Officer Sventoraitis peacefully and from an appropriate distance from Plaintiff began asking him questions." *Id.* at ¶ 27. Plaintiff did not answer the questions and instead attempted to walk away. *Id.* at ¶ 28. Plaintiff refused to respond to Officer Sventoraitis's commands. *Id.* at ¶ 29. During this exchange, Officer Sventoraitis noticed a large bulge in plaintiff's right-front pant pocket. *Id.* at ¶ 30. Plaintiff ignored Officer Sventoraitis's instructions to stand still and show his hands and instead tried to walk away. *Id.* at ¶ 32. Another police officer then "came from behind and blocked Plaintiff from leaving." *Id.* at ¶ 33. Plaintiff then prevented the officers from conducting a pat down, and Officer Sventoraitis arrested plaintiff with the assistance of other officers at the scene. *Id.* at ¶¶ 34–35. "During the arrest, Plaintiff displayed resistance to arrest, which threatened the Officer's safety and required for more Officers to assist with his arrest." *Id.* at

36. During a search of plaintiff incident to the arrest, officers discovered a loaded handgun and several bullets. *Id.* at ¶¶ 37–38.

Plaintiff's account of his interaction with the arresting officers is drawn from his deposition testimony:

> I went outside to smoke a cigarette ... and, then, the next thing you know, you see an officer walking up and she looked around. She walked off. I finished smoking and was getting ready to go back in the store, the officer walks back. She grabs me by the arm, two more officers pull up in the car to get out the car, the officer the middle officer grabs me and, then, the officer grabs me and throws me to the floor.

Pl. Dep. at 19:18–20:05. Plaintiff insists in his testimony that he and the officers did not exchange words at any time during the incident. *Id.* at 20:10–20:21 ("Q: So, this entire interaction occurred and no words were said by anybody? A: No words.").

According to plaintiff, after being taken to the ground, "[he] got pulverized by the police." *Id.* at 20:22–20:25. Plaintiff testified that "more officers started coming and they started pounding on [him], ... they kept pounding on [him] and [he] got kicked in the face and [he] got kicked, again, and ... [he] lost consciousness after that." *Id.* at 21:18–21:23. According to plaintiff, the beating continued after he was handcuffed, he was unconscious for five (5) to fifteen (15) minutes, and following his arrest his face was swollen and his head was hurting, but the officers ignored his requests for medical attention. *Id.* at 21:06–21:15, 24:19–25:19. [4]

[4]    The surveillance footage submitted to the Court depicting a portion of plaintiff's encounter with Officer Sventoraitis is not helpful in determining the issue, as plaintiff is pulled out of view of the surveillance camera immediately after Officer Sventoraitis apparently spots the bulge in plaintiff's pocket. The only thing that is clear is that the surveillance footage does not directly contradict plaintiff's allegation of excessive force.

*Cf. Cameron v. City of N.Y.,* 598 F.3d 50, 60 (2d Cir.2010) ("When a movant presents '[i]ncontrovertible evidence ... such as a relevant videotape whose accuracy is unchallenged,' we will grant the movant's motion for [summary] judgment ... if that evidence 'so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party .") (quoting *Zellner v. Summerlin,* 494 F.3d 344, 371 (2d Cir.2007)).

**\*4** After being placed in custody, plaintiff signed an acknowledgment of understanding and waiver of his Miranda rights and gave a statement. *Id.* at ¶¶ 40–42. Plaintiff's statement reads, in relevant part, "[w]hen I went outside a police car pulled up. The cop started asking me questions and then they told me to get on the ground. The cops then found the gun and bullets in my pocket." Mot. Ex. P, Statement of James McClendon [Docket Entry No. 70–19]. [5]

[5]    According to defendants, plaintiff admitted in his statement "to having been repeatedly asked questions from the Officer and having been asked to get on the ground, and failing to do so." Def. 56.1 St. at ¶ 42. The statement contains no such admission.

At 6:27 a.m. the following morning, plaintiff signed a physical condition questionnaire indicating that he was in good health and did not need a doctor, but that the "cops stepped on [his] head," and his "right ear hurt[ ]." Mot. Ex. R, Nassau County Police Dep't Physical Condition Questionnaire [Docket Entry No. 70–21]. At 9:11 a.m. on the same day, plaintiff signed a second physical condition questionnaire indicating that that he was in good health and did not need a doctor, but that his right hand and right ear were injured during the arrest. Mot. Ex. S, Nassau County Police Dep't Physical Condition Questionnaire [Docket Entry No. 70–22]. Plaintiff was taken to the hospital at approximately 12:05 p.m. on December 6, 2009. Pl. Dep. at 29:07–29:18. The "Discharge Diagnosis" states: "Head Injury, Closed, No Loss of Consciousness [;] Contusion, Face[;] Pain, Neck." Medication was not prescribed by the doctors at the hospital. Pl. Dep. at 31:21–32:03.

C. Plaintiff's Criminal Proceedings
During his criminal proceedings, plaintiff moved to suppress the gun and ammunition and certain inculpatory statements. *People v. McClendon,* 92 A.D.3d 959, 939 N.Y.S.2d 530, 531 (App.Div.2012). Plaintiff's motion was denied following a hearing at which the court viewed surveillance footage of the incident. *Id.* Plaintiff entered a plea of guilty to criminal possession of a weapon in the second degree, criminal possession of a weapon in the third degree, and criminal possession of a weapon in the fourth degree. Plea Minutes, *New York v. James McClendon,* Ind. No. 1349N–10 (N.Y.Sup.Ct. Feb. 7, 2011) at 6:16–7:03. The court permitted plaintiff to plead guilty to the charge of obstructing governmental administration without explicitly admitting his guilt pursuant to *People v. Serrano,* 15 N.Y.2d 304, 310, 258 N.Y.S.2d 386, 206 N.E.2d 330 (1965), in order to allow plaintiff to avoid admitting the veracity of the facts underlying the charge, which were believed to be relevant to plaintiff's appeal of the suppression ruling. *Id.* [6]

[6]    "You're going to plead guilty to counts one, two and three. Based on an agreement that I have reached with your attorney, you will enter what's known as a Serrano plea with respect to count four.... Which means that, the attorney-your attorney is concerned about possibly an admission to the fourth count somehow jeopardizing the right to appeal the hearing you had conducted. The Serrano plea has you not admitting to any of those facts, as it relates to count four." Plea Minutes, at 6:16–7:03.

The Appellate Division affirmed the lower court's denial of the suppression motion, holding that, despite the hearing court's finding that "the security video established that certain noncrucial aspects of [the arresting officer's] testimony may have been inaccurate," the surveillance footage "supported the officer's testimony on the crucial point that the defendant was not subjected to a forcible stop until the officer saw what appeared to be the outline of a gun in the defendant's pocket." *McClendon,* 939 N.Y.S.2d at 531. Accordingly, the Appellate Division affirmed the hearing court's finding that the search of plaintiff was lawful and upheld the denial of the suppression motion. *Id.*

III. Discussion

A. Municipal Liability
**\*5** A municipality may be held liable under 42 U.S.C. § 1983 if a governmental custom, policy, or usage of the municipality causes a deprivation of the plaintiff's rights under federal law. *Monell,* 436 U.S. at 690–91. "[I]solated acts of excessive force by non-policymaking municipal employees are generally not sufficient to demonstrate a

municipal custom, policy, or usage that would justify municipal liability." *Jones v. Town of East Haven,* 691 F.3d 72, 81 (2d Cir.2012); *see also Lee v. City of N.Y.,* No. 00–CV–3181, 2002 WL 1732810, at *9 (E.D.N.Y. July 22, 2002) ("A municipality cannot be liable under § 1983 on a theory of respondeat superior for the isolated unconstitutional acts of its employees."). Such acts may support municipal liability only where "they were done pursuant to municipal policy, or were sufficiently widespread and persistent to a support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware, or if a municipal custom, policy or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses." *Jones,* 691 F.3d at 81.

Beyond his conclusory allegations, plaintiff has offered no evidence to support a finding that a governmental custom, policy or usage caused the alleged constitutional violations at issue. Accordingly, the County is granted summary judgment on all claims against it, which are dismissed with prejudice.

### B. Lawrence Mulvey

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir .1991); *see also Dunn v. Carrier,* 137 F. App'x 387, 389 (2d Cir.2005) ("Where damages are sought in a section 1983 action, the defendant must be responsible for the alleged constitutional violation: The general doctrine of respondeat superior does not suffice and a showing of some personal responsibility of the defendant is required.") (internal quotation marks omitted). Aside from showing a defendant's direct participation in the offending conduct, a plaintiff may demonstrate the personal involvement of a supervisory defendant by showing that the supervisor (1) failed to remedy the wrong after learning of the violation; (3) created or allowed the continuation of a policy or custom pursuant to which the unconstitutional practices occurred; (4) exhibited gross negligence in supervising subordinates who caused the constitutional violation; or (5) demonstrated gross negligence or deliberate indifference by failing to act to remedy unconstitutional practices. *Wright v. Smith,* 21 F.3d 496, 502 (2d Cir.1994).

Plaintiff has offered no evidence to support a finding of liability on any of the above theories. Since no liability may attach to defendants on the basis of their purported supervisory responsibilities alone, which appears to be the only basis for the inclusion of defendant Lawrence

Mulvey in this action, Lawrence Mulvey is granted summary judgment, and plaintiff's claims against him are dismissed with prejudice.

### C. Deliberate Indifference

**\*6** To establish a claim under the Eighth or Fourteenth Amendment for denial of medical care, plaintiff must show that defendants were deliberately indifferent to his serious medical needs. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). A two-pronged test requires (1) that plaintiff's physical condition be sufficiently serious, and (2) that the failure to render care result from a sufficiently culpable state of mind. *Id.* at 66. Plaintiff's claim does not satisfy either prong of this test.

Bruises and lacerations alone are generally insufficient to support a claim of constitutional deprivation. *See, e.g., Dawes v. Coughlin,* 159 F.3d 1346 (2d Cir.1998) (summary order holding that a reasonable finder of fact could not conclude that a one-and-a-half (1½) inch laceration was sufficiently serious to give rise to an Eighth Amendment claim); *Dallio v. Hebert,* 678 F.Supp.2d 35, 60 (N.D.N.Y.2009) (holding that two (2) black eyes, bruising in the kidney area, kick marks, open lacerations, headache and numbness did not constitute serious medical need as a matter of law); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (holding that a bleeding finger, even where skin was "ripped off," did not constitute serious medical need). Rather, the standard for Eighth Amendment violations contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011).

Plaintiff alleges in his complaint that he suffered "facial and scalp contusions." Am. Compl. at ¶ 9. Plaintiff testified in his deposition that the facial and scalp contusions were not bleeding at the time of his arrest. Pl. Dep. at 45:14–45:23. Later in his deposition testimony, plaintiff states that "[the officers] caused head seizures and contusions." *Id.* at 61:14–61:16. Although plaintiff testified that he now suffers from migraines, back pain, and blurry vision as a result of the injuries inflicted upon him during his arrest, *id.* at 61:15–61:17, and that his subsequent requests to return to the hospital while incarcerated at the County Jail have been denied, *Id.* at 32:06–32:14, any inattention to those alleged chronic conditions during plaintiffs incarceration are irrelevant to the determination of whether the officers who arrested plaintiff and initially took him into custody displayed deliberate indifference to a serious medical

2012 WL 4849144

need. The injuries plaintiff exhibited in the immediate aftermath of his arrest, *i.e.,* non-bleeding lacerations and contusions, are not sufficiently serious to support a claim of constitutional deprivation. Although chronic or infected wounds may support an Eighth Amendment claim, *see Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) ("[I]f prison officials deliberately ignore the fact that a prisoner has a five-inch gash on his cheek that is becoming infected, the failure to provide appropriate treatment might well violate the Eighth Amendment."), plaintiff does not allege such an injury here.

**\*7** Plaintiff's claim also fails as a matter of law due to his inability to offer evidence to support a finding that defendants possessed a culpable state of mind in delaying medical treatment. A defendant demonstrates deliberate indifference when he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Courts have equated the requisite state of mind to "criminal recklessness." *Collazo v. Pagano,* 656 F.3d 131, 135 (2d Cir.2011).

The relatively minor nature of plaintiff's injuries does not support an inference that defendants were able to conclude from plaintiff's physical appearance alone that he was in serious need of medical attention. Further, while plaintiff testified in his deposition that he requested medical attention after he was arrested, Pl. Dep. at 28:17–29:09, he signed two statements to the contrary. [Docket Entry Nos. 70–21, 70–22]. Thus, plaintiff has failed to allege any basis for defendants to have inferred that a substantial risk of serious harm existed. Given the minor nature of plaintiff's injuries and his own statements, defendants cannot be reasonably found to have possessed information regarding plaintiff's medical condition sufficient to render any delay in providing treatment evidence of a culpable state of mind.

Accordingly, defendants are granted summary judgment on plaintiff's Fourteenth Amendment claims related to his medical treatment following his arrest, which are dismissed with prejudice.

D. Excessive Force [7]

[7] To the extent that plaintiff is also asserting a claim for false arrest or "unlawful seizure," such a claim

is barred by the doctrine of collateral estoppel. *Hayes v. County of Sullivan,* 853 F.Supp.2d 400, 426 (S.D.N.Y.2012) (" 'Settled authority establishes that where, as here, a state court has determined that the ... warrantless [search or] seizure was supported by probable cause, the defendant may not relitigate that determination in a federal Section 1983 action.' ") (quoting *DeFranco v. Town of Irondequoit,* No. 06–CV–6442, 2009 WL 2957813, at \*4 (W.D.N.Y. Sept. 11, 2009) (holding that plaintiffs who pled guilty after their motion to suppress evidence was denied were barred by collateral estoppel from re-litigating their Fourth Amendment claims under § 1983)).

In order to establish that the degree of force used to effectuate his arrest constituted a constitutional violation, plaintiff must show that the actions of the arresting officers were " 'objectively unreasonable in light of the facts and circumstances confronting [them], without regard to [their] underlying intent or motivation.' " *Nimely v. Citv of N.Y.,* 414 F.3d 381, 390 (2d Cir.2005) (quoting *Maxwell v. Citv of N.Y.,* 380 F.3d 106, 108 (2d Cir.2004)). The Court must pay "careful attention to the facts and circumstances ..., including the severity of the crime at issue, whether ... [plaintiff] pose[d] an immediate threat to the safety of the officers or others, and whether he ... actively resist[ed] arrest or attempt[ed] to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

Defendants argue that plaintiff's excessive force claim is barred by the doctrine of collateral estoppel as a consequence of plaintiff's plea to the charge of obstructing governmental administration. [8] According to defendants, the plea conclusively determined that plaintiff "was acting combative [sic], while armed with a fully loaded .357 magnum, ... [and] was also refusing to comply with Officer Sventoraitis's commands and that he attempted to 'evade arrest' " Memorandum of Law in Support of County Defendants Motion for Summary Judgment [Docket Entry No. 70–23] ("Def.Memo.") at 8–9 (citing Def. 56.1 Stmt. at ¶ 49). Because "the threat of danger to the officer and society" and "whether the suspect is resisting or attempting to evade arrest" are two factors to be considered in determining the reasonableness of the officers' use of force, defendants argue that the plea determined these facts and thus necessarily resolved the excessive force issue, precluding its relitigation. Def. Memo. at 8–9 (citing *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999). [9]

8    "A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act...." N.Y. Penal Law § 195.05 (McKinney 2012).

9    Given the disposition of this issue, the Court need not address whether plaintiff's entry into a Serrano plea changes the preclusive effect of the plea.

**\*8** Defendants are correct that "under appropriate circumstances, an issue decided in a criminal proceeding may be given preclusive effect in a subsequent civil action and such preclusive effect is possible regardless of whether the underlying criminal proceeding was resolved by a jury trial." Searles v. Dalton, 299 A.D.2d 788, 751 N.Y.S.2d 84, 84–85 (App.Div.2002) (internal quotation marks and citations omitted). "[A] guilty plea conclusively establishes the factual predicate for the offense to which the defendant is pleading guilty.... Whether that same guilty plea forecloses a future cause of action or legal proceeding, however, is to be determined on the basis of other principles, specifically, of collateral estoppel and the full faith and credit statute." United States v. Gregg, 463 F.3d 160, 164 (2d Cir.2006) (internal quotation marks omitted). Under New York law, there are two (2) requirements for the application of collateral estoppel: (1) " 'the identical issue was necessarily decided in the prior action and is decisive in the present action' "; and (2) " 'the party to be precluded from relitigating an issue must have had a full and fair opportunity to contest the prior determination.' " Gregg, 463 F.3d at 165 n. 1 (quoting D'Arata v. N.Y. Cent. Mut. Fire Ins. Co., 564 N, E.2d 634, 636 (N.Y.1990)). The party seeking preclusion bears the burden of showing that the issue to be precluded was necessarily decided in the prior action. Merchants Mut. Ins. Co. v. Arzillo, 98 A.D.2d 495, 472 N.Y.S.2d 97, 103 (App.Div.1984).

Plaintiffs guilty plea to obstructing governmental administration does not preclude his excessive force claim. Although "some degree of physical force is incident, and even necessary, to making an arrest, especially in situations where the suspect has previously refused to comply with the officers' orders," Davis v. Callaway, No. 3:05CV00127, 2007 WL 1079988, at \*5 (D.Conn. Apr. 9, 2007), "an officer is not entitled to use an unlimited amount of force, even where the

arrestee resists or assaults the officer," McMillan v. City of N.Y., No. 10 Civ. 2296, 2011 WL 6129627, at \*5 (S.D.N.Y. Dec. 9, 2011) (internal quotation marks omitted). Even where the arrestee resists, "[t]he force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." Sullivan v. Gagnier, 225 F.3d 161, 166 (2d Cir.2000). Therefore, plaintiff's conviction of obstructing governmental administration, even if it establishes the factual predicate of the charge, i.e., that plaintiff interfered in some way with defendants' investigation, is not dispositive of whether defendants used excessive force in response to plaintiff's resistance or interference. Id. at 165 ("As our brethren in other Circuits have squarely held, the jury's return of a guilty verdict in state court for resisting arrest, and/or other offenses such as assault on a police officer does not necessarily preclude a subsequent claim of excessive force in federal court."); see also, e.g., Griffin v. Crippen, 193 F.3d 89, 92 (2d Cir.1999) (plaintiff's guilty plea to assault did not preclude excessive force claim against guards stemming from same incident because conviction was not inconsistent with the use of excessive force in subduing the plaintiff); Getlin v. Zoll, 707 F.Supp.2d 369, 376 (E.D.N.Y.2010) (holding that plaintiff's excessive force claim was not precluded by his prior conviction for reckless endangerment because neither the conviction nor the plea allocution addressed the details of plaintiff's behavior and the reasonableness of the officers' response); Sanabria v. Martins, 568 F.Supp.2d 220, 226 (D.Conn.2008) (holding that plaintiff's guilty plea to offense of interfering with a police investigation did not preclude him from claiming that excessive force was used in response to plaintiff's interference); McCrory v. Belden, No. 01 Civ. 0525, 2003 WL 22271192, at \*5 (S.D.N.Y. Sept. 30, 2003) (holding that inmate's conviction for attempted assault did not preclude inmate from claiming that excessive force was used either before or after the attempted assault).

**\*9** Given that plaintiff's claim is not precluded by the doctrine of collateral estoppel, the Court must assess the sufficiency of the evidence plaintiff has presented. As stated above, an application of force is excessive if it is "objectively unreasonable 'in light of the facts and circumstances confronting [the officers], without regard to [their] underlying intent or motivation.' " Jones v. Parmley, 465 F.3d 46, 61 (2d Cir.2006) (quoting Graham, 490 U.S. at 397). While "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment," Graham, 490 U.S. at 396, relatively minor injuries are often held to be sufficient to sustain an excessive

force claim past summary judgment. *See, e.g., Maxwell v. City of N.Y.,* 380 F.3d 106, 109–10 (2d Cir.2004) (reversing summary judgment for defendants where plaintiff testified that head-first shove into police car caused a scrape, pain in her arm and lower back, and post-concussive syndrome); *Robinson v. Via,* 821 F.2d 913, 923–24 (2d Cir.1987) (holding that plaintiff's testimony that officer pushed her against inside of the door of her car, yanked her out, threw her up against the fender, and twisted her arm behind her back causing "bruises lasting a 'couple weeks' " was sufficient to prevent summary judgment on excessive force claim). Therefore, the contusions and lacerations suffered by plaintiff could sustain a claim of excessive force.

Plaintiff's testimony that he was kicked and "pulverized" after being placed in handcuffs also raises a triable issue of fact. Unnecessary blows inflicted while an arrestee is in handcuffs may be sufficient to sustain an excessive force claim. *See, e.g., Lemmo v. McKoy,* No. 08–CV4264, 2011 WL 843974, at *6 (E.D.N.Y. Mar.8, 2011) ("[G]ratuitous uses of force that are not required to subdue an individual likely fail the ... objective reasonableness test."); *Castellar v. Caporale,* No. CV–04–3402, 2010 WL 3522814, at *8 (E.D.N.Y. Sept.2, 2010) (denying summary judgment for defendants where plaintiff testified that officer shoved him against the wall when plaintiff was already handcuffed, despite absence of any serious injuries); *Hamilton v. City of N.Y.,* Nos. 07–CV3633, 07–CV–3825, 2009 WL 2226105, at *9 (E.D.N.Y. July 23, 2009) (holding that it was objectively unreasonable for an officer to trip plaintiff after he was already handcuffed and cooperating); *Davis v. City of N.Y.,* No. 04–CV–3299, 2007 WL 755190, at *12 (E .D.N.Y. Feb. 15, 2007) (denying defendants' motion for summary judgment due to plaintiff's testimony that she was kicked in the shoulder for no reason while handcuffed on the floor, holding that such a "gratuitous" use of force does not constitute an objectively reasonable use of force as a matter of law); *Pierre–Antoine v. City of N.Y.,* No. 04 CV–6987, 2006 WL 1292076, at *4 (S.D.N.Y. May 9, 2006) (denying defendant's motion for summary judgment on excessive force claim and noting plaintiff's testimony that the assault continued after he was handcuffed, "when a claim of necessary force would be much harder to maintain").

*10 Although plaintiff relies almost exclusively on his own testimony in support of his excessive force claim, defendants have failed to offer any evidence that conclusively refutes that testimony. At this stage, therefore, there is no evidence before the Court from which it can conclude that a fact-finder could not reasonably credit plaintiff's testimony and

find the force used against him to be unreasonable. *See Sachs v. Cantwell,* No. 10 Civ. 1663, 2012 WL 3822220, at *15 (S.D.N.Y. Sept. 14, 2012) ("Ultimately there is a dearth of evidence in the record that would conclusively establish exactly how much force was used and whether that force was objectively reasonable."); *see also Lemmo,* 2011 WL 843974, at *7 ("[T]he record contains only a general denial by the officers with respect to this episode rather than an actual conflicting account. The jury can and should decide what actually occurred and what, if any, compensation is due plaintiff."). Whether plaintiff is entitled to recover depends on a determination of a number of issues, including plaintiff's behavior toward the officers, the degree of force used to subdue him, the severity of his injuries, and the credibility of the parties. These determinations cannot be made as a matter of law based upon the record here. *See Sachs,* 2012 WL 3822220, at *15 (" '[A]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.' ") (quoting *Jeffreys v. City of N.Y.,* 426 F.3d 549, 553–54 (2d Cir.2005)). Accordingly, summary judgment on plaintiff's excessive force claim is denied.

E. *State Law Claims*
Plaintiff's state law claims must be dismissed based upon plaintiff's failure to adequately plead compliance with the notice of claim requirements under New York law. *See* N.Y. Gen. Mun. Law § 50–e (McKinneys 2012). "Under New York law, a notice of claim is a condition precedent to bringing certain tort actions against a municipality ... for damages sustained by reason of the negligence or wrongful act of the municipality or its officers, agents or employees." *Ferlito v. County of Suffolk,* No. 06–5708, 2007 WL 4180670, at *3 (E.D.N.Y. Nov.19, 2007). "The notice of claim requirements apply equally to state tort claims brought as pendent claims in a federal civil rights action." *Warner v. Village of Goshen Police Dept.,* 256 F.Supp.2d 171, 175 (S.D.N.Y.2003). "[A] plaintiff asserting state tort law claims against a municipal entity or its employees must plead in the complaint that: (1) the Notice of Claim was timely served within ninety days after such claim arose; (2) at least thirty days have elapsed since the Notice of Claim was filed and before the complaint was filed; and (3) the defendant failed to satisfy the claim in that time." *Matthews v. City of N.Y.,* No. 10–CV–4991, 2012 WL 3839505, at *23 (E.D.N.Y. Sept.5, 2012). Plaintiff has failed to plead compliance with these requirements and, therefore, his claims must be dismissed. Because no evidence has been presented regarding the status of plaintiff's parallel state action and the Court cannot conclude that any application

for relief from the notice of claim requirements in state court would be unsuccessful, plaintiff's state law claims are dismissed without prejudice to allow plaintiff to pursue relief in state court if appropriate.

III. Conclusion

 **\*11** For the foregoing reasons, defendants motion for summary judgment [Docket Entry No. 62] is granted in part and denied in part. The Clerk of Court shall, pursuant to Rule 77(d)(1) of the Federal Rules of Civil Procedure, serve notice

of entry of this order upon all parties in accordance with Rule 5(b) of the Federal Rules of Civil Procedure and mail a copy of this order to plaintiff's address of record pursuant to Rule 5(b)(2)(C).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4849144

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 2354815
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Brian JOHNSON, Plaintiff,
v.
The CITY OF NEW YORK, The New
York City Police Department, and Police
Officer Brian Holland, Defendants.

No. 05 Civ. 2357(SHS).
|
Aug. 14, 2006.

**Attorneys and Law Firms**

Jonathan Anthony Fink, Fink & Katz, PLLC, New York, NY,
for Plaintiff.

Sheryl Ann Bruzzese, NYC Law Dept., Office of the
Corporation Counsel, Brooklyn, NY, for Defendants.

*OPINION & ORDER*

SIDNEY H. STEIN, U.S. District Judge.

 **\*1** Plaintiff Brian Johnson has sued defendants the City of
New York, the New York City Police Department ("NYPD"),
and Police Officer Brian Holland pursuant to 42 U.S.C.
§ 1983, alleging violations of his Fourth and Fourteenth
Amendment rights in connection with his February 26, 2002
arrest and subsequent prosecution for narcotics possession. In
particular, Johnson asserts that the police employed excessive
force in detaining him while executing a search warrant
at his girlfriend's apartment; that his subsequent arrest was
unconstitutional; and that following that unlawful arrest, he
was maliciously prosecuted for both cocaine and marijuana
possession. Defendants have moved for summary judgment
pursuant to Rule 56 of the Federal Rules of Civil Procedure
on the grounds that that there no material facts are in dispute
and that they are entitled to judgment as a matter of law.

For the reasons that follow, defendants' motion is granted
with respect to Johnson's claims of false arrest and malicious
prosecution against Officer Holland, and granted in its
entirety with respect to his claims against defendants City of
New York and NYPD. However, the motion is denied with

respect to Johnson's claim of excessive force against Officer
Holland.

*I. Background*

Except where noted, the following facts are not disputed by
the parties:

On February 26, 2002, several NYPD officers-among them
Officer Holland-participated in the execution of a search
warrant at Apartment A at 375 Ashford Street in Brooklyn
("375A Ashford"). (Defs.' Local Civil Rule 56.1 Statement
("D. Rule 56.1") ¶ 6.) The warrant, which had been signed
by New York State Supreme Court Justice Robert Kreindler,
represented that probable cause existed to believe that crack
cocaine would be found at that address. (*Id.* ¶¶ 1-2.) Indeed,
upon searching the apartment, police officers uncovered 13
bags of crack cocaine, as well as marijuana. (*Id.* ¶¶ 8-9.)

The defendant, whose girlfriend resided at the apartment,
was also there. (*Id.* ¶¶ 5, 7.) According to Johnson, upon
entering the apartment, police officers dragged him out of
his bed at gunpoint, threw him to the ground and pressed on
his back, attempting to detain him while the apartment was
searched. (Plaintiff's Response to Defendant's 56.1 Statement
and Plaintiff's Additional Statement of Material Facts ("P.
Rule 56.1") ¶¶ 27-28.) He also alleges that he was "stumped,
kicked, and stood on," and that an officer stepped on his
head. (*Id.* ¶¶ 29-30 .). At some point, Johnson told Officer
Holland that the marijuana belonged to him. (Dep. of Brian
Johnson dated October 7, 2005 ("Johnson Dep."), attached as
Exhibit E to the Declaration of Sheryl Bruzzese dated Nov. 4,
2005 ("Bruzzese Decl.") at 35.) According to Johnson, after
the contraband was discovered, he was taken outside in his
underwear and a shirt and placed in a police van, where he was
given a pair of pants to put on. (P. Rule 56.1 ¶¶ 37, 39.) He was
placed under arrest and handcuffed. (*Id.* ¶ 40.) Johnson claims
that the handcuffs were fastened extremely tightly around his
wrists, but acknowledges that a police officer relaxed the grip
after he complained. (D. Rule 56.1 ¶ 10; Johnson Dep. at 63.)

 **\*2** Johnson asserts that these events caused him
psychological injury (P. Rule 56.1 ¶ 42) and that, although he
did not suffer any sustained physical injuries, he "received a
red mark where he was handcuffed" and that "[h]is wrist was
worn out a little bit." (*Id.* at ¶ 11). Johnson also claims that his
back was bruised as a result of the officers' having stepped on
him (Johnson Dep. at 37-38), although he admits he neither
saw any bruising nor reported it to a doctor. (*Id.* at 39-40.)
Finally, Johnson testified that $1,418.00 was removed from

his pants and vouchered by Office Holland and that, despite obtaining a release for the money from the Brooklyn District Attorney's Office, he has been stymied by the NYPD in his attempts to recover it. (*Id.* at 48-49, 58-60; P. Rule 56 .1 ¶¶ 33-36)

In March 2002, a grand jury returned a true bill indicting Johnson on five counts: criminal possession of a controlled substance (cocaine) in the third, fifth, and seventh degrees; criminal use of drug paraphernalia in the second degree; and unlawful possession of marijuana. (D. Rule 56.1 ¶ 16.) During the course of his criminal prosecution, Johnson moved to controvert the search warrant; that motion was denied by New York State Supreme Court Justice Patricia DiMango. (*Id.* ¶ 18-21.) Justice DiMango found that given Justice Kreindler's personal interview of a confidential informant who said he purchased drugs out of 375A Ashford Street, the warrant was appropriately issued. (*People v. Johnson,* No. 1275/2002, Order dated Dec. 20, 2002, attached as Exh. C to the Bruzzese Decl.). However, Johnson successfully moved to suppress his statements to police that the marijuana at the apartment was his. (*People v. Johnson,* No. 1275/2002, Tr. dated Oct. 16, 2002 ("Oct.16.Tr.") at 33-34). After a jury trial in October 2002, Johnson was acquitted on all counts. He then brought the present suit, alleging that (i) he was falsely detained and arrested; (ii) police officers used excessive force in detaining and arresting him; (iii) he was maliciously prosecuted; and (iv) his due process rights were violated by the NYPD's refusal to return the money vouchered during the search.

## II. DISCUSSION

### A. The Summary Judgment Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995). In ruling on the motion, the court "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor ." *American Cas. Co. of Reading, Pa. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994) (quoting *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir.1993)) (internal quotation marks omitted). However, the party opposing summary judgment "may not rely on mere conclusory allegations or speculation, but instead must offer some hard evidence" in support of his factual assertions opposing summary judgment. *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998); *see Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996).

### B. False Arrest

**\*3** Under both New York and federal law, a plaintiff claiming false arrest must demonstrate that he was intentionally confined without his consent and without justification. *See Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1995); *Broughton v. State,* 37 N.Y.2d 451, 456 (N.Y.1975). If probable cause to arrest existed, a false arrest claim will fail. *See Provost v. City of Newburgh,* 262 F.3d 146, 157 (2d Cir.2001); *Broughton,* 37 N.Y.2d at 456. Similarly, a false arrest claim fails if the underlying detention occurred during a search pursuant to a warrant predicated on probable cause. *See Michigan v. Summers,* 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). Based on these standards, both the initial detention and the eventual arrest of Johnson were proper.

Johnson's initial detention was proper because it occurred during the search of his girlfriend's premises, where he was staying, and because that search was performed pursuant to a valid warrant issued by a neutral judge. *Summers,* 452 U.S. at 705. Johnson's only argument to the contrary is one that he raised and lost before the state court, viz., that the warrant itself was improperly issued (and therefore presumably that the detention was the fruit of an unlawful search). However, Johnson has not made a sufficient showing to overcome the substantial deference accorded to the issuing judge's finding of probable cause. *United States v. Ventresca,* 380 U.S. 102, 106, 85 S.Ct. 741, 13 L.Ed.2d 684 (1985). There is no suggestion that the warrant affiant deliberately misled Justice Kreindler or that the judge abandoned his function as a neutral arbiter of probable cause. *See United States v. Leon,* 468 U.S. 897, 914, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Instead, Johnson simply contends that there was insufficient evidence to support Justice Kreindler's probable cause finding because his questioning of the confidential informant did not establish probable cause to find that criminal activity was occurring at 375A Ashmont Street. Specifically, Johnson asserts that because the judge only asked the informant what he did "in connection with the building," there was insufficient reason to believe that drugs were being sold from apartment 375A in particular.

The Court disagrees. As Justice DiMango noted in denying Johnson's motion to controvert the warrant at the state court level, the confidential informant specifically told Justice Kreindler that he had personally purchased crack from the first floor apartment at 375 Ashmont Street and that 375A is the only apartment on the first floor of 375 Ashmont Street.

2006 WL 2354815

(Search Warrant Hearing before Hon. Robert Kreindler, Supreme Court of the State of New York, Kings County, Tr. dated Feb. 21, 2002, at 3-5) This, combined with the fact that the purchase was performed pursuant to police surveillance, provided Justice Kreindler with ample evidence to conclude that probable cause existed to search that specific apartment, and plaintiff has presented no further evidence to call that finding into question. *See United States v. Wagner,* 989 F.2d 69, 73 (2d Cir.1993) ("An informant's participation in supervised drug purchases is powerful corroborative evidence for purposes of determining probable cause."). Johnson's initial detention, which occurred during the execution of this warrant, was therefore proper. *Summers,* 452 U.S. at 705.

**\*4** Moreover, Johnson's eventual arrest was proper because, according to his own deposition testimony, he told police officers that any "weed" they found on his pants was his. (Johnson Dep., at 30; Oct. 16 Tr. at 30). Whether or not there was probable cause to believe that the cocaine found in the apartment was his (a point heavily contested by plaintiff) is irrelevant because Johnson's admission of marijuana possession was sufficient on its own to merit his arrest. Accordingly, because both Johnson's initial detention and his eventual arrest were supported by probable cause, *Provost,* 262 F .3d at 157, defendants are entitled to judgment as a matter of law as to Johnson's false arrest claim.

### C. Malicious Prosecution

Johnson does not respond to defendants' motion insofar as it relates to his claim for malicious prosecution, an omission that on its own would be sufficient for this Court to rule against him. *See Lipton v. County of Orange,* 315 F.Supp.2d 434, 446 (S.D.N .Y.2004) (noting, in summary judgment context, that a court can rule in favor of moving party if respondent fails to respond to that party's arguments favoring dismissal of particular claims). This claim also fails on the merits.

To sustain a section 1983 claim for malicious prosecution, Johnson must proffer evidence demonstrating "(1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding;" and (4) actual malice. *Kinzer v. Jackson,* 316 F.3d 139, 143 (2d Cir.2003). Importantly, the first element-the commencement of a criminal proceeding-requires that a plaintiff present some evidence that the defendant police officer was involved in the prosecution subsequent to the arrest and initial charge. *See Townes v. City of New York,* 176 F.3d 138, 147 (2d Cir.1999); *Mejia v. City of New York,* 119 F.Supp.2d 232, 272 n. 37 (E.D.N.Y.2000). Here, Johnson has not offered any evidence of Officer Holland's involvement in the decision to prosecute him after the arrest. Similarly, Johnson has not proffered any evidence of malice by Officer Holland. Therefore, because there are no facts on the record which would support these elements of malicious prosecution, defendants are entitled to judgment on this claim as a matter of law. *See Golub v. City of New York,* 334 F.Supp.2d 399, 407 (S.D.N . Y.2004) (police officers granted summary judgment where there was no evidence of their involvement in the prosecution after the original arrest and charge).

### D. Excessive Force [1]

[1] Johnson's complaint styles his excessive force claim as a state law claim of assault and battery, not as a federal Fourth Amendment claim. (Complaint at ¶¶ 43-39). His moving papers, however, clarify that this classification was erroneous and that "all of Johnson's claims are brought pursuant to federal law." (Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment dated Dec. 9, 2005, at 8.)

Claims for excessive force meted out during the course of an arrest or a search are analyzed under the Fourth Amendment's "reasonableness" standard. *Graham v. Connor,* 490 U.S. 386, 394-95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Using this standard, police behavior is unconstitutional if it is objectively unreasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. The more precarious a particular situation, the more substantial the force that can be used. *See Muehler v. Mena,* 544 U.S. 93, 100, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005); *cf. id.* at 108 (Stevens, J., concurring in the judgment) ("When officers undertake a dangerous assignment to execute a warrant to search property ... presumably occupied by violence-prone gang members, it may well be appropriate to use both overwhelming force and surprise....").

**\*5** Employing this standard, Johnson's excessive force claim cannot be disposed of at this stage because it is the topic of some factual dispute which, if resolved in his favor, could lead a reasonable jury to find that his Fourth Amendment rights were violated. Johnson stated at his deposition that he was thrown off the bed, stepped on, stomped, and kicked. In response, the City correctly points out that an officer's holding an individual to the ground with his foot during a

potentially dangerous narcotics search is likely "objectively reasonable." Cf. *Zirlin v. Village of Scarsdale,* 365 F.Supp.2d 477, 486-87 (S.D.N.Y.2005) (detaining individual on ground and in handcuffs during search was reasonable). But Johnson alleges more than this, specifically, that he was actually "st[o]mped on" and "kicked" by officers. While " 'not every push or shove' ... violates the Fourth Amendment," *Graham,* 490 U.S. at 397 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)), there surely would be no objective need to "stomp" and "kick" an individual already under police control. Such gratuitous force-if true-would be actionable under the case law. *See Maxwell v. City of New York,* 380 F.3d 106, 108-09 (2d Cir.2004) (where plaintiff alleged-and officer denied-that officer "violently and unnecessarily swung and jerked her" and "shoved her head first into his police car, causing her head to strike [a] metal partition," district court was wrong to grant summary judgment on excessive force claim); *Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987) (where plaintiff had testified that Officer pushed her against a car door, "yanked" her out, "threw" her up against the fender and twisted her arm back, causing bruises that lasted a couple weeks, district court incorrectly granted summary judgment).[2]

[2]
Despite the City's assertions to the contrary, even if Johnson suffered no sustained injuries from the officers' alleged attack, he would still have an excessive force claim. *Robison* and *Maxwell* make clear that temporary bruising or pain from unnecessary police action is sufficient to state a claim for excessive force. *See Robison,* 821 F.3d at 924; *Maxwell,* 380 F.3d at 109.

Similarly, on the facts alleged, Officer Holland is not entitled to qualified immunity as to Johnson's excessive force claim. Qualified immunity attaches where (i) a constitutional right would have been violated on the facts alleged; but (ii) it would have been objectively reasonable for the defendant to have believed that his actions did not violate clearly established law. *Saucier v. Katz,* 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272. Johnson has a constitutional right to be free from a police officer's use of excessive force, and it could not be objectively reasonable for Officer Holland to believe that the use of gratuitous force beyond what is necessary to subdue an individual during a search is allowed under the law. Cf. *Smith v. Fields,* 95 Civ. 8374, 2002 U.S. Dist. LEXIS 3529, at *22 n. 9 (S.D.N.Y. Mar. 1, 2002) (allegation that plaintiff was "slapped and kicked about the face" sufficient to defeat claim of qualified immunity at summary judgment

stage); *Nogue v. City of New York,* No. 98 Civ. 3058, 1999 U.S. Dist. LEXIS 13201, at *31 (E.D.N.Y. Aug. 27, 1999) (where plaintiff alleged that officer kicked and punched him while he was on the ground, question of qualified immunity was for a jury).

### D. The Specific Defendants

**\*6** *i. Officer Holland.* Defendants assert that summary judgment must be granted as to Officer Holland because there is no evidence-or even suggestion-that he was the individual who used excessive force. However, excessive force claims can be brought both against the perpetrating officer and against officers who are "present during the assault, yet fail[ ] to intercede on behalf of the victim even though [they] had a reasonable opportunity to do so." *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (citing *Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994)).

Here, though it is conceded that Officer Holland entered the premises shortly *after* the first set of officers, there is a material dispute regarding Officer Holland's proximity to the alleged assault on Johnson. Johnson cites Officer Holland's testimony in front of the grand jury in the underlying criminal matter indicating that at the moment the other officers broke down the door and entered the bedroom, he could see inside the apartment. *(People v. Johnson,* No. 1275/02, Tr. dated Mar. 5, 2002 at 6-8, attached as Exh. 1 to Fink Declaration). If Officer Holland did have a line of vision to the alleged attack-an issue of fact that the City does not address-or if he was in fact inside by the time the alleged force was exacted, he could be liable for his fellow officers' actions. *See Jeffreys,* 272 F.Supp.2d at 475 (since defendant officers "were either located inside [the classroom where the wrongful force was used] or in the doorway or hallway outside of the classroom," plaintiff survived summary judgment motion); *cf. Fischl v. Armitage,* 128 F.3d 50, 57 (2d Cir.1997) (inmate's excessive force claim against corrections officer should not have been disposed of at summary judgment stage where reasonable juror could conclude from the record that officer was "in the vicinity" of an attack but did not step in despite inmate's audible protestations). As such, ruling as a matter of law is inappropriate at this stage.

*ii. The City of New York and the NYPD.* While the Eleventh Amendment does not bar suits against municipalities and their agencies, such entities cannot be sued simply on a theory of respondeat superior. *Bd. of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 400, 117 S.Ct. 1382, 137 L.Ed.2d

626 (1997); *Patterson v. County of Oneida,* 375 F.3d 206, 226 (2d Cir .2004). Instead, municipalities or their agencies can only be liable for a plaintiff's injuries if those injuries resulted from policy or practice endemic to the agency, i.e., from an official directive or even an unspoken custom of acquiescence by agency officials. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Hayes v. O'Connor,* No. 03 Civ. 1371, 2004 U.S. Dist. LEXIS 20640, at *16-17 (S.D.N.Y. Oct. 12, 2004).

Johnson has not suggested that any evidence exists linking the alleged attack on himself to a more widespread City policy. In fact, Johnson has not responded to the City's motion for summary judgment on this point. Instead, his complaint simply asserts that the City has "failed to take steps necessary to discipline, train, supervise or otherwise correct the improper, illegal conduct of the individual defendants in this and in similar cases" and that this supervisory failure has damaged him. (Complaint ¶¶ 31-32.) Without citing facts to support his allegation of a City policy-such as instances of supervisory failures other than that involving Officer Holland-Johnson cannot survive the City's motion for summary judgment. *See Jeanty v. County of Orange,* 379 F.Supp.2d 533, 545 (S.D.N.Y.2005) ("Conclusory allegations of a municipality's pattern or policy of unconstitutional behavior are insufficient to establish a *Monell* claim, absent evidence to support such an allegation." (quoting *McAllister*

*v. New York City Police Dep't,* 49 F.Supp.2d 688, 705 (S.D.N.Y.1999)) (internal quotation marks omitted)); *Hayes,* 2004 U.S. Dist. LEXIS 20640, at *16-17 (same). Therefore, the City of New York is entitled to summary judgment.

**\*7** This same analysis applies to defendant NYPD, even were that agency a suable entity in the first place, which it is not, see N.Y. City Charter, Ch. 17 § 396, *Neishlos v. City of New York,* 00 Civ. 914, 2003 U.S. Dist. LEXIS 19554, at *1 fn.1 (S.D.N.Y. Oct. 31, 2003). Thus, the NYPD is also entitled to summary judgment in its favor.

### III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted with respect to Johnson's claims of false arrest and malicious prosecution. The motion is also granted in its entirety as to defendants City of New York and New York City Police Department. However, the motion is denied insofar as it relates to Johnson's claim of excessive force against Officer Holland.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2354815

Case 5:22-cv-00216-GTS-TWD    Document 7    Filed 04/13/22    Page 50 of 227

Taylor v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1737626

2018 WL 1737626
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Warren TAYLOR, Plaintiff,

v.

The CITY OF NEW YORK; Department of Correction
Commissioner Joseph Ponte; Bureau Chief of Security
Brian Suprenant; Captain Harper; Deputy Warden Cort;
Correction Officer Anderson #3597; Correction Officer
Stevenson; GRVC Warden Yolanda Canty; Assistant
Deputy Warden Sardia Lewis #97; Correction Officer
John Doe Supervising and Policy Making Officials,
##1-8; John Doe Correction Official Responsible
for Detainee Placement in Housing Areas ##1-4;
John Doe Correction Officers ##1-8, Defendants.

16 Civ. 7857 (NRB)
|
Signed 03/27/2018

**Attorneys and Law Firms**

Leo Glickman, Stoll, Glickman & Bellina, LLP, Brooklyn,
NY, for Plaintiff.

Brachah Goykadosh, New York City Law Department, New
York, NY, for Defendants.

**MEMORANDUM AND ORDER**

NAOMI REICE BUCHWALD, UNITED STATES
DISTRICT JUDGE

**I. Introduction**

 *1  Plaintiff Warren Taylor alleges that he was attacked by
another inmate, resulting in the loss of his eye, while he was
detained at the George R. Vierno Center ("GRVC") on Rikers
Island. Plaintiff brings this action against the City of New
York, several supervisory defendants from the New York City
Department of Correction ("DOC"), and several Correction
Officers from GRVC pursuant to 42 U.S.C. § 1983, asserting
violations of his Eighth and Fourteenth Amendment rights.
Defendants move to dismiss the complaint pursuant to Fed.
R. Civ. P. 12(b)(6). For the reasons set forth below, the motion
to dismiss is granted in part and denied in part.

**II. Allegations in the Complaint**

The following facts are adopted from plaintiff's complaint
(ECF No. 19). For the purposes of this motion to dismiss, the
court accepts plaintiff's factual allegations as true and draws
all reasonable inferences in his favor. See City of Providence
v. BATS Glob. Mkts., Inc., 878 F.3d 36, 48 (2d Cir. 2017).

**A. Plaintiff's Imprisonment**

Plaintiff was, at all times relevant to this case, incarcerated
in the custody of the DOC in the GRVC on Rikers Island.
Compl. ¶ 7. While plaintiff's criminal case was pending in
Kings County Supreme Court, he was remanded to Rikers
Island, where he "was placed in protective custody for his own
safety due to the sexual nature of the charges" against him.
Compl. ¶ 27. [1]

[1]
 The Court takes judicial notice that plaintiff was
charged with committing a criminal sexual act
in the first degree, a class B felony (N.Y.P.L. §
310.50), and criminal impersonation in the first
degree, a class E felony (N.Y.P.L § 190.26).
Goykadosh Decl. Ex. J, ECF No. 49-1 at 2;
see, e.g., Williams v. City of New York, No.
07 Civ. 3764 (RJS), 2008 WL 3247813, at *2
(S.D.N.Y. Aug. 7, 2008) (taking judicial notice of
the plaintiff's crime of conviction).

In 2013, plaintiff was removed from protective custody over
his stated objections. Compl. ¶ 28. On March 12, 2014,
plaintiff was assaulted and seriously injured by another
inmate because of the charges against him. Compl. ¶ 29.
Plaintiff alleges that on or about April 28, 2014, "Judge Chung
of Brooklyn Supreme Court" issued an order that "plaintiff be
held in protective custody due to safety concerns," and gave
him a "court card" that said he was required to be held in
protective custody. Compl. ¶¶ 31-32. [2]

[2]
 Defendants challenge the existence of such an
order, noting that it is not in Plaintiff's Inmate File.
ECF No. 45 at 3 n.3. For the purposes of this motion
to dismiss, we accept as true plaintiff's factual
allegation that he was granted a court order that
he be held in protective custody. See BATS, 878 F.3d
at 50 ("We must, at this stage, accept as true the
factual allegations in the complaint and draw all
reasonable inferences in favor of plaintiffs.").

2018 WL 1737626

Plaintiff was detained in a medium security housing area for a time, but was subsequently moved to the general population in GRVC 15A, which houses detainees known to be members of security risk groups. Compl. ¶¶ 14, 33-34. While plaintiff was housed in GRVC 15A, correction officers, including defendant Correction Officer Stevenson, told other detainees in the unit about the nature of plaintiff's crimes, which plaintiff believed exposed him to hostility from detainees and guards. Compl. ¶ 37.

**\*2** On January 10, 2015, a large fight involving multiple detainees broke out in GRVC 15A. Compl. ¶ 38. Plaintiff alleges that he kept a safe distance from the fight at first, but was then instructed by probe team correction officers to "go to the location of the fight and get on the floor." Compl. ¶ 39. With multiple officers standing by, plaintiff was attacked by another detainee, Jose Grijalva. Compl. ¶ 40. Defendant Correction Officer Anderson told plaintiff and Mr. Grijalva to stop fighting, but did not take further action when they did not comply with his order. Compl. ¶ 41. Mr. Grijalva stabbed plaintiff in the eye, "cit[ing]" plaintiff's sex crimes while doing so. Compl. ¶ 40. Plaintiff lost his eye in the attack. Compl. ¶ 42.

### B. Allegations Against the Supervisory Defendants and the City

Plaintiff alleges that since at least August 5, 2013, GRVC 15A has housed detainees identified by DOC officials as gang members affiliated with two rival gangs, the Crips and the Trinitarios. Compl. ¶¶ 14-16. Gang riots broke out between members of the Crips and Trinitarios in GRVC 15A on several occasions between August 2013 and January 2015, including on August 5, 2013, December 25, 2013, May 12, 2014, May 20, 2014, and June 5, 2014. Compl. ¶¶ 18-26. These riots resulted in multiple injuries and at least one death. Compl. ¶¶ 18-26. On June 11, 2014, DOC Captain Claudel Jean-Pierre submitted an investigation report of the incident that occurred on May 12, 2014. Compl. ¶ 24. In that report, Captain Jean-Pierre indicated that these riots were part of an "ongoing power struggle" to control the housing unit and that "there have been clear statements made by inmates affiliated with both the Crips and Trinitarios that this conflict will go on and acts of retaliation are imminent." Id. No corrective measures were taken to address these ongoing issues, but Captain Jean-Pierre was disciplined by defendant Assistant Deputy Warden Sardia Lewis for his report. Compl. ¶ 25.

### III. Procedural History

Plaintiff filed a complaint on October 7, 2016, asserting that defendants violated 42 U.S.C. § 1983 by "act[ing] under color of law and with intent and/or deliberate indifference to deprive Plaintiff of his civil, constitutional and statutory rights to be free from cruel and unusual punishment pursuant to the Eighth and Fourteenth Amendments to the United States Constitution." Compl. ¶¶ 45-47. Specifically, plaintiff alleges violations of his constitutional rights based on Officer Stevenson and John Doe Officers publishing plaintiff's criminal charges to detainees, Captain Harper and Deputy Warden Cort ignoring the order of the Kings County Supreme Court to place plaintiff in protective custody and instead placing him into GRVC 15A, and Officer Anderson and John Doe Officers observing the attack on plaintiff but failing to prevent the assault and/or permitting the assault to occur. Compl. ¶¶ 44-47. Plaintiff also alleges municipal and supervisory liability against the City of New York, Commissioner Ponte, Chief of Security Suprenant, Warden Canty, Assistant Deputy Warden Lewis, and John Doe Supervising and Policy Making Officials for adopting polices, customs, and practices, and failing to train or supervise that amounted to deliberate indifference to the constitutional rights of inmates at GRVC 15A. Compl. ¶¶ 50-63.

Defendants filed a "partial"[3] motion to dismiss on May 25, 2017, asserting that (1) this action is barred by the Prison Litigation Reform Act ("PLRA"); (2) plaintiff failed to adequately plead municipal liability; (3) plaintiff failed to plead the involvement of certain named defendants; and (4) plaintiff failed to state a claim for any constitutional violation. ECF No. 45.

[3]    While defendants labeled their motion a "partial" motion to dismiss, (ECF Nos. 43-46, 49-50), the entire action would be dismissed if the Court granted defendants' requested relief in full.

### IV. Discussion

#### A. Motion to Dismiss

**\*3** On a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor. BATS, 878 F.3d at 48. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) ).

Taylor v. City of New York, Not Reported in Fed. Supp. (2018)

Case 5:22-cv-00216-GTS-TWD   Document 7   Filed 04/13/22   Page 52 of 227

2018 WL 1737626

A district court may not consider matters outside the pleadings on a motion to dismiss. See Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000). [4] "A complaint 'is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.' " Nicosia v. Amazon.com, Inc., 834 F.3d 220, 230 (2d Cir. 2016) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) ). Matters of which the Court takes judicial notice are also not considered matters outside the pleadings. Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 426 (2d Cir. 2008). The Court may take judicial notice of documents that are publicly available and whose accuracy cannot reasonably be questioned. See Apotex Inc. v. Acorda Therapeutics, Inc., 823 F.3d 51, 60 (2d Cir. 2016).

[4]   Every paragraph of the Declaration of Brachah Goykadosh in Support of Defendants' Partial Motion to Dismiss ("Goykadosh Decl."), ECF No. 44, contains legal argument, in violation of Local Civil Rule 7.1(a). See Hughes v. Lebron, No. 14 Civ. 9479 (PAE), 2016 WL 5107030, at *5 n.5 (S.D.N.Y. Sept. 19, 2016) ("[U]nder Local Civil Rule 7.1, legal argument must be set forth in a memorandum of law, not in an attorney affirmation." (quoting Dejana Indus., Inc. v. Village of Manorhaven, No. 12 Civ. 5140 (JS), 2015 WL 1275474, at *3 (E.D.N.Y. Mar. 18, 2015) ) ). The Court will not consider any legal argument set forth by counsel in this Declaration, nor will we consider any of the exhibits attached thereto, except to the extent that they are matters of which the Court is entitled to take judicial notice, as described herein.

### B. PLRA

Defendants argue that the Court should dismiss this lawsuit in its entirety because plaintiff failed to comply with the exhaustion requirement of the PLRA, which provides: "No action shall be brought with respect to prison conditions under section 1983 of this title ... until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "An inmate ... must exhaust available remedies, but need not exhaust unavailable ones." Ross v. Blake, 136 S. Ct. 1850, 1858 (2016) (holding that dismissal under the PLRA "hinges on the 'availability' of administrative remedies"). Properly exhausting administrative remedies requires compliance with the applicable procedural rules, which "are defined not by the PLRA, but by the prison grievance process itself." Jones v. Bock, 549 U.S. 199, 218 (2007) (citing Woodford v. Ngo, 548 U.S. 81, 88 (2006) ).

The Supreme Court and Second Circuit have identified three circumstances "in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." Ross v. Blake, 136 S. Ct. at 1859.

> First, an administrative remedy may be unavailable when 'it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates.' Second, 'an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.' In other words, 'some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it.' Third, an administrative remedy may be unavailable 'when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'

*4  Williams v. Priatno, 829 F.3d 118, 123–24 (2d Cir. 2016) (citations omitted) (quoting Ross v. Blake, 136 S. Ct. at 1859-60).

Failure to exhaust under the PLRA is an affirmative defense: "[I]nmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. at 216. A district court may only "dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement." Williams, 829 F.3d at 122. When a suit alleges multiple claims, the Court must analyze exhaustion on a claim-by-claim basis. See Jones v. Bock, 549 U.S. at 222 ("A typical PLRA suit with multiple claims ... may combine a wide variety of discrete complaints, about interactions with guards, prison conditions, generally applicable rules, and so on, seeking different relief on each claim. There is no reason failure to exhaust on one necessarily affects any other."); Tartt v. City of New York, No. 12 Civ. 5405 (VEC), 2014 WL 3702594, at *4 (S.D.N.Y. July 16, 2014) ("[C]ourts analyze exhaustion independently for each claim in a complaint....").

Here, plaintiff does not allege that he made any attempt to file an administrative complaint prior to filing this lawsuit. Rather, he contends that no administrative remedy was available to him under the applicable prison grievance process, the Inmate Grievance and Request Program ("IGRP"), because "[i]nmate allegations of physical or sexual assault or harassment by either staff or inmates are not subject to the IGRP process." Pl.'s Mem. of Law in Opp'n, ECF No. 47 at 7 (quoting The City of New York Department of

Correction Directive: Inmate Grievance and Request Program ("IGRP Directive") at 6, Goykadosh Decl., Ex. C, ECF No. 44-3).[5]

[5]   "Consistent with common practice in this District," the Court takes judicial notice of the IGRP Directive. Leneau v. City of New York, No. 16 Civ. 893 (RA), 2018 WL 583120, at *2 n.3 (S.D.N.Y. Jan. 26, 2018); see also Myers v. City of New York, No. 11 Civ. 8525 (PAE), 2012 WL 3776707, at *4 & n. 6 (S.D.N.Y. Aug. 29, 2012) (collecting cases), aff'd, 529 Fed.Appx. 105 (2d Cir. 2013).

Because assault claims are explicitly excluded from the IGRP process, several courts have held that prisoners do not fail to exhaust administrative remedies when they file claims in federal court related to allegations of assault before attempting to complete the IGRP process. See Drew v. City of New York, No. 16 Civ. 594 (AJP), 2016 WL 4533660, at *7-8 (S.D.N.Y. Aug. 29, 2016) (staff-on-inmate assault claim not subject to IGRP); Tartt, 2014 WL 3702594, at *4-5 (excessive force claim against correction officers not subject to IGRP); Taylor v. Swift, 21 F. Supp. 3d 237, 241-44 (E.D.N.Y. 2014) (Weinstein, J.) (claim "that prison officials stood idly by while [plaintiff] suffered an 'assault ... by [other] inmates' " not subject to IGRP) (second alteration in original), appeal dismissed, No. 14-3382 (2d Cir. Mar. 10, 2015). Indeed, defendants do not contest that plaintiff was not required to exhaust his remedies in the IGRP process to the extent his claims relate to the assault he suffered. See ECF No. 50 at 6-7.

**\*5** Instead, defendants argue that plaintiff's grievances regarding housing at GRVC 15A would be subject to the IGRP process, and urge the Court to dismiss any portion of plaintiff's claims based on those grievances. Id. In so arguing, defendants attempt to slice plaintiff's claims too thinly. The IGRP Directive provides simply that "[i]nmate allegations of physical ... harassment by either staff or inmates are not subject to the IGRP process." IGRP Directive at 6. The IGRP Directive does not require inmates to parse out and exhaust any grievable aspects of their assault complaints before filing suit. If we were to adopt defendants' interpretation of the PLRA, victims of assault at Rikers Island (the vast majority of whom have no training in the law) would be required to consider whether any of the contributing factors to their assault are grievable, file a grievance related to those factors and pursue all available appeals (while not referencing their assault allegations in those grievances, lest they be deemed ungrievable), and would be barred from filing suit in this

court until they complete this process. That mechanism for relief would be so complex that "no ordinary prisoner [could] discern or navigate it." Ross, 136 S. Ct. at 1859-60 ("Remedies that rational inmates cannot be expected to use are not capable of accomplishing their purposes and so are not available.") (quoting Turner v. Burnside, 541 F.3d 1077, 1084 (11th Cir. 2008) ).

Defendants next argue that by failing to address the details of his grievance history, plaintiff is improperly "rely[ing] on deliberate vagueness and obscurity to defeat a defense of non-exhaustion," quoting Landron v. City of New York, No. 14 Civ. 1046 (NRB), 2014 WL 6433313 (S.D.N.Y. Nov. 7, 2014). Here, however, plaintiff has plausibly alleged that his non-exhaustion was excusable because the IGRP process was not available for his complaint. To the extent defendants are arguing that plaintiff was required to provide more specific allegations of exhaustion in his complaint, their argument is foreclosed by Supreme Court precedent. See Jones v. Bock, 549 U.S. at 218 ("[I]nmates are not required to specially plead or demonstrate exhaustion in their complaints.").

In sum, defendants have not met their burden to show that "it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement," Williams, 829 F.3d at 122, because plaintiff's claims are inmate allegations of physical assault by inmates, and are therefore not grievable, see, e.g., Taylor v. Swift, 21 F. Supp. 3d at 243. Accordingly, we deny defendant's motion to dismiss for failure to exhaust under the PLRA.

### C. Municipal Liability / Monell Claim

A municipality cannot be liable under section 1983 under the doctrine of respondeat superior; "plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury." Roe v. City of Waterbury, 542 F.3d 31, 37 (2d Cir. 2008) (internal quotation marks omitted). To hold a municipality liable under 42 U.S.C. § 1983, a plaintiff must establish (1) the existence of a municipal policy, custom, or practice, which (2) caused the alleged violation of the plaintiff's constitutional rights. Jones v. Town of East Haven, 691 F.3d 72, 80 (2d Cir. 2012).

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." Connick v. Thompson, 563 U.S. 51, 61 (2011). To plead a claim for failure to train, a plaintiff must allege: "(1) that a

policymaker of the municipality knows to a moral certainty that its employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and (3) that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights." Young v. Cty. of Fulton, 160 F.3d 899, 904 (2d Cir. 1998) (internal quotation marks and alterations omitted) (quoting Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992) ).

"[A] § 1983 plaintiff need not prove that his injury was caused by an explicitly stated municipal rule or regulation.... [A] municipality may be liable even for its inaction if, in its failure to act, it 'exhibit[ed] deliberate indifference to constitutional deprivations caused by subordinates.' " Outlaw v. City of Hartford, Nos. 16-480, 16-635, —— F.3d ——, 2018 WL 1177403, at *17 (2d Cir. Mar. 7, 2018) (third alteration in original) (quoting Cash v. County of Erie, 654 F.3d 324, 334 (2d Cir. 2011) ). "[A] municipal policy of deliberate indifference ... may be shown by evidence that the municipality had notice of complaints ... but repeatedly failed to make any meaningful investigation into such charges." Id. at *23.

 *6 Plaintiff asserts two municipal policies or customs that violated his constitutional rights. First, he alleges that the City had a policy or custom of housing rival gang members in the same facility. Compl. ¶ 53. However, plaintiff cites no facts that support this theory. He merely alleges that "15A housed detainees identified by DOC officials as members of the Crips gang and member of the Trinitarios gang...." Compl. ¶ 15. No allegation in the complaint suggests that these rival gang members were placed in the same housing unit intentionally or based on any official municipal policy. As alleged in the complaint, there were an average of 11,408 inmates in DOC custody in 2014, Compl. ¶ 53, some of whom had gang affiliations, and some of whom may have gang affiliations that are unknown to the DOC. Based on this state of affairs, it is unsurprising that members of rival gangs might end up in the same prison facilities. At most, plaintiff alleges that the DOC had no policy about separating gangs.

Plaintiff has not in any way evaluated the alternative. That is not surprising—the notion of enacting a policy of housing together all Crips, for example, is untenable. Nor does counsel consider whether requiring pre-trial detainees to answer questions about their gang affiliations raises any potential

Fifth Amendment issues. Moreover, given that membership in gangs is often divided along racial lines, such a policy could potentially implicate concerns of racial discrimination. See Johnson v. California, 543 U.S. 499, 505 (2005) (holding that strict scrutiny applies to racial classifications in the prison context); Lee v. Washington, 390 U.S. 333 (1968) (per curiam) (striking down Alabama's policy of segregation in its prisons). Without any support from any specific allegation, it is too great a leap to conclude that rival gang members are neighbors in GRVC based on City policy to deliberately house rival gangs in the same facility.

Second, plaintiff alleges that the City had a policy or custom of placing detainees who should be in protective custody in high security risk housing units. Compl. ¶ 54. However, the complaint identifies only one example of such a detainee: the plaintiff himself. [6] Aside from bald allegations that "detainees who should be or are mandated by courts to be in protective custody in the general population of high security risk housing units," plaintiff offers no other facts that would identify any widespread pattern of misbehavior. In short, the complaint alleges nothing more than a single violation of a protective order, which is not enough to state a Monell claim. See Williams v. City of New York, No. 14 Civ. 5123 (NRB), 2015 WL 4461716, at *5–7 (S.D.N.Y. July 21, 2015).

6    Moreover, plaintiff did not describe the content of the protective order with any specificity, nor did he file it with his complaint.

Plaintiff's failure to train theory is supported by specific facts alleged in the complaint, and therefore fares better. Plaintiff alleges that the City knew that gang violence plagued GRVC 15A, citing at least five prior incidents of violence involving rival gangs in GRVC 15A in the eighteen months before the attack on plaintiff. Compl. ¶¶ 14-26, 51-52. Plaintiff alleges that although the City was aware of this problem, it failed to stop the violence and failed to train correction officers regarding gangs and gang riots and how to assist detainees who were trying to avoid the violence. Compl. ¶¶ 55-59.

Taken as true and making all inferences in plaintiff's favor, these allegations render plausible that there was a failure to properly train or supervise correction officers to stop fights between rival gangs or to intercede on behalf of inmates attacked by gang members that amounted to deliberate indifference to the rights of inmates detained in GRVC 15A. See Edwards v. City of New York, No. 14 Civ. 10058 (KBF), 2015 WL 5052637, at *5-7 (S.D.N.Y. Aug. 27, 2015)

Case 5:22-cv-00216-GTS-TWD    Document 7    Filed 04/13/22    Page 55 of 227

Taylor v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1737626

(denying motion to dismiss failure to train claim based on evidence from government reports, news articles, and prior lawsuits); Battle v. City of New York, No. 11 Civ. 3599 (RMB), 2012 WL 112242, at *6 (S.D.N.Y. Jan. 12, 2012) (denying motion to dismiss failure to train claims). The cited incidents of gang violence and Captain Jean-Pierre's report plausibly suggest that policymakers knew to a "moral certainty" that correction officers in GRVC 15A routinely confronted gang violence, had mishandled these incidents in the past, and would continue to do so without proper training. See Walker, 974 F.2d at 297-98; Edwards, 2015 WL 5052637, at *5-7.

 **7**  Defendants primarily challenge the first element of the failure to train claim, arguing that plaintiff failed to plead facts giving rise to a plausible inference that "a policymaker of the municipality kn[ew] 'to a moral certainty' that its employees will confront a given situation." Young, 160 F.3d at 904; see Walker, 974 F.2d at 297-98. Defendants first cite An v. City of New York, 230 F. Supp. 3d 224 (S.D.N.Y. 2017), where the court held that six lawsuits and a newspaper article alleging that NYPD officers arrested individuals who recorded police activity in violation of the First Amendment were insufficient to plausibly allege that the need to act was obvious. While An bears some superficial numerical resemblance to the present case, none of the lawsuits in An resulted in a finding of liability against the NYPD officers. Id. at 230. Those unsubstantiated allegations of misconduct are readily distinguishable from the repeated acts of gang violence in GRVC 15A alleged here. Cf. Global Comm'cs Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006) (documents filed in another court may be used to establish the fact of other litigation, not for the truth of the matters asserted in the other litigation). Moreover, an internal report identifying "that this conflict will go on and acts of retaliation are imminent," Compl. ¶ 24, much more clearly states an obvious need for corrective action than does a single news article.

Defendants next cite Walker v. City of New York, No. 14 Civ. 808 (ER), 2015 WL 4254026 (S.D.N.Y. July 14, 2015), where the plaintiff based his Monell claim on the number of lawsuits filed in Richmond County for false arrest against the NYPD and the individual officers named as defendants in his case. Id. at *5-10. These lawsuits, none of which attributed liability to the City or the officers, id. at *9, similarly do not compare to the allegations here. [7]

7    The cases cited for the first time in defendants' reply bear even less resemblance to the present case. The "forty discrete incidents of misconduct" in Webb v. Goord, 340 F.3d 105, 107 (2d Cir. 2003), described a diverse array of abuses that occurred at 14 separate correctional facilities over the course of a decade, not repeated incidents of the same type at the same facility over an 18-month timespan. Smith v. Martuscello, 602 Fed.Appx. 550, 552 (2d Cir. 2015), is similarly distinguishable because it also involved "a series of discrete incidents taking place ... over a long period of time." In Aquino v. City of New York, No. 16 Civ. 1577 (GHW), 2017 WL 384354, at *4 (S.D.N.Y. Jan. 25, 2017), the plaintiff relied on reports describing incidents that occurred at a different facility from the one where he was in custody, and in Edwards v. City of New York, No. 03 Civ. 9407 (PAC), 2005 WL 3466009, at *10-11 (S.D.N.Y. Dec. 19, 2005), the plaintiff asked the court to extrapolate a practice of discrimination based solely on allegations that he personally had been discriminated against.

Plaintiff alleges repeated gang fights occurring within an eighteen-month period and a report warning that these attacks would continue, and asserts that the City failed to take any corrective action in response. These allegations, with all inferences made in plaintiff's favor, plausibly support municipal liability under a failure to train theory.

While these allegations may ultimately be difficult to prove, plaintiff has adequately alleged liability at this stage in the litigation. Accordingly, defendants' motion to dismiss plaintiff's municipal liability claim is denied.

### D. Claims Against the Individual Defendants in Their Official Capacities

Plaintiff sued all defendants "in their individual and official capacities as officials of the City of New York's Department of Corrections [sic]." Compl. ¶ 13. Plaintiff's claims against the individual defendants in their official capacities are duplicative of their claims against the City and therefore must be dismissed. McMillian v. Monroe Cty., 520 U.S. 781, 785 n.2 (1997) ("[A] suit against a governmental officer in his official capacity is the same as a suit against the entity of which the officer is an agent.") (internal quotation marks omitted and alterations incorporated); Kentucky v. Graham, 473 U.S. 159, 166 (1985); Davis v. Stratton, 360 Fed.Appx. 182, 183 (2d Cir. 2010) ("[I]n a suit against

Taylor v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1737626

a public entity, naming officials of the public entity in their official capacities add[s] nothing to the suit." (internal quotation marks omitted) ); Brown, 2017 WL 1390678, at *5; Phillips v. Cty. of Orange, 894 F. Supp. 2d 345, 384 n.35 (S.D.N.Y. 2012) ("Within the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant.").

### E. Personal Involvement of Named Defendants

**\*8** "To establish a section 1983 claim, 'a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity.' " Warren v. Pataki, 823 F.3d 125, 136 (2d Cir. 2016) (quoting Patterson v. Cty. of Oneida, 375 F.3d 206, 229 (2d Cir. 2004) ). Defendants argue that plaintiff fails to allege the personal involvement of defendants Ponte, Suprenant, Canty, Cort, Harper, Lewis, and Anderson, and that the claims against these defendants should therefore be dismissed.

### 1. Ponte, Suprenant, and Canty

According to the complaint, defendant Joseph Ponte was the Commissioner of the DOC, defendant Brian Suprenant was the Bureau Chief of Security for the DOC, and defendant Yolanda Canty was the Warden of GRVC at all times relevant to the Complaint. Compl. ¶¶ 9-11. Under § 1983, liability for a supervisor, such as Ponte, Suprenant, and Canty, may be shown in any of the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). [8]

[8]    The Second Circuit has recognized that the Supreme Court's holding in Iqbal that "vicarious liability is inapplicable to ...§ 1983 suits," 556 U.S. at 676, created ambiguity as to the 'continued validity' of some of the five Colon factors, see Raspardo v. Carlone, 770 F.3d 97, 117 (2d Cir. 2014); Reynolds v. Barrett, 685 F.3d 193, 205 n.14 (2d Cir. 2012). Courts in this district have reached different conclusions as to whether all or merely some of the Colon factors survive Iqbal. Compare Aponte v. Fischer, No. 14 Civ. 3989 (KMK), 2018 WL 1136614, at *8 n.5 (S.D.N.Y. Feb. 28, 2018) ("[A]ll five categories under Colon are still valid unless and until the Second Circuit holds otherwise."), and El Hanafi v. United States, No. 13 Civ. 2072 (GHW), 2015 WL 72804, at *13 (S.D.N.Y. Jan. 6, 2015) ("The majority of the district courts, however, have held that, absent any contrary directive from the Second Circuit, all five Colon factors survive."), with Bellamy v. Mount Vernon Hosp., No. 07 Civ. 1801 (SAS), 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third Colon categories pass Iqbal's muster...."), aff'd, 387 Fed.Appx. 55 (2d Cir. 2010).
    While divisions persist, "neither sect ... disputes the viability of the 'direct participation' and 'policy or custom' factors." Marom v. City of New York, No. 15 Civ. 2017 (PKC), 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016), reconsideration granted on other grounds, 2016 WL 5900217 (July 29, 2016). In any event, it is clear that a supervisor may be liable where his "own individual actions ... violated the Constitution," Iqbal, 556 U.S. at 676, but that supervisory liability may not be premised on "allegations indicating nothing more than a defendant's passive acquiescence in the misconduct of subordinates," J.S. v. T'Kach, No. 11 Civ. 103 (NRB), 2014 WL 4100589, at *9 (S.D.N.Y. Aug. 20, 2014).

Here, plaintiffs allege that defendants Ponte and Suprenant developed DOC policies, were responsible for the training and supervision of DOC officers, and were regularly provided with reports of applications of force and other breaches of security in DOC facilities, while defendant Canty was responsible for the policy, conduct, and implementation of security within GRVC. Compl. ¶¶ 9-11. Plaintiff alleges that defendants Ponte, Suprenant, and Canty knew that there had been repeated incidents of gang violence in GRVC 15A in the months prior to this incident, and took no action to address these problems. Compl. ¶¶ 51-52. Plaintiffs also allege that these defendants failed to discipline, train or supervise their correction officers regarding gangs and gang riots, failed to take corrective actions to stop weapons from being transported into GRVC, and virtually never disciplined

2018 WL 1737626

officers for not reporting fellow officers' misconduct. Compl. ¶¶ 55-61.

**\*9** These allegations survive a motion to dismiss. Proceeding, as we must, "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)," Twombly, 550 U.S. at 555, plaintiff adequately pleads these defendants' personal involvement based on the allegations that they created policies and/or allowed policies to continue under which unconstitutional practices occurred, failed to remedy wrongs that were brought to their attention, and failed to act on information indicating that such violations were occurring, see Colon, 58 F.3d at 873.

### 2. Cort and Harper

Plaintiff alleges that defendants Deputy Warden Cort and Captain Harper violated his constitutional rights "when they ignored the Order of the Kings County Supreme Court to place him in protective custody" and assigned him to GRVC 15A. Compl. ¶¶ 35, 47. Plaintiff's allegations related to defendants Cort and Harper lack certain pertinent details—plaintiff does not indicate what role these defendants played in his protective custody determination, nor when they took any such relevant action. Defendants therefore assert that these spare allegations do not rise to a level of plausibility because DOC's Protective Custody Directive, Goykadosh Decl., Ex. H, ECF No. 44-8 ("Protective Custody Directive"), states that deputy wardens and captains, such as defendants Cort and Harper, are not responsible for housing assignments as a matter of practice. We take judicial notice of the Protective Custody Directive, which is publicly available and the accuracy of which cannot reasonably be questioned.[9] See Apotex, 823 F.3d at 60.

[9]  The Court takes judicial notice of the fact that the policy exists and the provisions thereof; we make no assumptions as to whether defendants followed the Protective Custody Directive as to plaintiff.

Examining the Protective Custody Directive reveals that both captains and deputy wardens have important responsibilities in protective custody determinations, and therefore renders plausible plaintiff's allegations that Cort and Harper were personally involved in his case. The Protective Custody Directive details procedures for (1) an inmate's initial assignment to temporary protective custody; (2) the review of this initial assignment and the determination to keep an inmate in protective custody; and (3) the on-going review of protective custody assignments. Captains play an integral role in the first and third of these procedures; deputy wardens are involved in the third procedure.

Captains are tasked with assessing whether inmates should receive an initial assignment to protective custody. If an inmate requests protection or if any staff member receives information that an inmate may require protective custody, the area captain is responsible for interviewing the inmate and explaining the conditions of protective custody. Protective Custody Directive at 5. The captain must document detailed reasons for the inmate's assignment to protective custody and immediately forward it to the tour commander for review. Id. at 5, 19. During an initial review period, "the captain must ensure that the inmate is kept separate from all other inmates." Id. at 5. If an inmate receives an initial assignment to protective custody, the tour commander reviews the captain's reasoning and determines whether to keep the inmate there. Id. at 5-6, 19. Given the captain's role in interviewing the inmate, keeping the inmate separate from other prisoners during an initial review period, and recommending whether the inmate should receive an initial assignment to protective custody, it is plausible that a captain such as defendant Harper would have been personally involved in an inmate being denied protective custody.

**\*10** After an inmate is assigned to temporary protective custody housing, the Operations Security Intelligence Unit ("OSIU") ultimately determines whether continued assignment to protective custody is necessary. Id. at 6-8. The OSIU then periodically reviews protective custody assignments. The deputy warden for security is responsible for facilitating that review and transmitting the inmate's request for continued protective custody to the OSIU. Id. at 11. In determining whether the inmate should remain in protective custody, the OSIU considers the recommendation of the adjudication captain, who states whether the inmate should continue his current housing designation and the basis for his decision. Id. at 11-12, 22. Therefore, both deputy warden and captain plausibly play a role in the decision whether to remove an inmate from protective custody.

At this stage, plaintiff has adequately, though not as specifically as might be desired, alleged the personal involvement of Deputy Warden Cort and Captain Harper. See Brown, 2017 WL 1390678, at *10 (holding that allegations that defendants' actions caused plaintiff "to be improperly

2018 WL 1737626

placed in the general prison population" survives a motion to dismiss premised on lack of personal involvement).

### 3. Lewis

Plaintiff alleges that defendant Assistant Deputy Warden Sardia Lewis initiated disciplinary charges against DOC Captain Claudel Jean-Pierre for his report on a May 12, 2014 gang riot, eight months before plaintiff was injured by a gang member in a fight. Compl. ¶¶ 24-25, 57. Plaintiff alleges that, by doing so, Lewis "helped create an environment of intimidation and retaliation against Correction employees who honestly report security problems in the facility" which leads to "a culture of cover-up and actual cover-ups in the system, leading to official impunity and constitutional violations against detainees." Compl. ¶ 57.

These allegations are too attenuated from the alleged harm to form a plausible basis for Lewis's personal involvement. Plaintiff does not allege that Lewis had any direct involvement in the constitutional violations he purportedly suffered. To the extent plaintiff asserts claims against Lewis under a theory of supervisory liability, these claims fail because his constitutional injuries were not a reasonably foreseeable consequence of Lewis's actions. See Marom, 2016 WL 916424, at *16 ("[I]f the constitutional deprivation at issue was not a foreseeable consequence of any alleged policy or custom, or the deprivation was caused by some unforeseeable intervening event, plaintiffs have not stated a plausible claim against a supervisory defendant." (citing Victory v. Pataki, 814 F.3d 47, 69 (2d Cir. 2016) ) ).

Here, the only time Lewis is mentioned in the complaint is in the context of the disciplinary action she took against Captain Jean-Pierre. Unlike defendants Ponte, Suprenant, and Canty, Lewis is not alleged to have had any specific policy-making authority or to have had a role in the policies or customs at issue in this case. Thus, even accepted as true, the allegations about Lewis's conduct do not amount to a violation of plaintiff's constitutional rights.

Randle v. Alexander, 960 F. Supp. 2d 457 (S.D.N.Y. 2013), cited by plaintiff, is inapposite. In Randle, a supervisor allegedly "played a direct role in covering up an illegal forced fight within the prison" by filing a false report to cover up the actions of guards. Id. at 478. Here, however, Lewis did not play any direct role in the incident at the heart of plaintiff's complaint, but instead allegedly took disciplinary

action against a Correction Officer several months earlier, which "helped create an environment of intimidation and retaliation," Compl. ¶ 57, and "tacitly permitted other officials ... to continue in the unconstitutional conduct," Mem. of Law in Opp'n at 14, purportedly leading to plaintiff's constitutional injuries. This chain of events is too attenuated to hold Lewis liable under § 1983, and is therefore too speculative to survive a motion to dismiss.

### 4. Anderson

**\*11** Plaintiff clearly pleads the direct personal involvement of Correction Officer Anderson, who defendants concede was "present at the scene of the attack," Defs.'s Reply, ECF No. 50 at 13, and who allegedly failed to take action to prevent it. Compl. ¶¶ 41, 46; see Walker v. Schult, 717 F.3d 119, 128 (2d Cir. 2013) ("[P]rison officials have a duty ... to protect prisoners from violence at the hands of other prisoners.") (quoting Farmer v. Brennan, 511 U.S. 825, 833 (1994) ). Defendants' argument that Officer Anderson was not personally involved in the alleged attack relies on an Incident Report, Goykadosh Decl., Ex. I, ECF No. 44-9, that is not properly before the Court on this motion to dismiss. See Friedl, 210 F.3d at 83. Even if we were to consider the Incident Report at this stage in the litigation, it at most creates dueling narratives between plaintiff and Officer Anderson, which would not merit dismissal. See Fin. Guar. Ins. Co. v. Putnam Advisory Co., 783 F.3d 395, 405 (2d Cir. 2015) (resolution of a factual dispute is inappropriate on a motion to dismiss).

### F. Failure to State a Claim

Finally, defendants argue that plaintiff failed to state a claim for any constitutional violation, focusing primarily on plaintiff's purported failure to state a claim for deliberate indifference to safety under the Fourteenth Amendment.

"[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." Walker, 717 F.3d at 128 (quoting Farmer, 511 U.S. at 833). Therefore, "[a]llowing an attack on an inmate to proceed without intervening is a constitutional violation in certain circumstances." Rosen v. City of New York, 667 F. Supp. 2d 355, 359 (S.D.N.Y. 2009). Not every injury that a prisoner suffers at the hands of another results in constitutional liability for the officials responsible for that prisoner's safety. Farmer, 511 U.S. at 834.

Taylor v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1737626

Rather, an official must act with " 'deliberate indifference' to a substantial risk of serious harm to an inmate." Id. at 828.

When such claims are made by a pretrial detainee such as Mr. Taylor, [10] they "are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment," which applies to convicted prisoners. Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017). To state a claim for deliberate indifference, plaintiff's allegations must satisfy a two-prong test, referred to as the "objective prong" and the "subjective prong" (this prong has more recently been referred to as the mens rea or mental element prong). See id. at 30-32.

[10]     Although the Complaint is slightly ambiguous, see Compl. ¶ 27, counsel agree that Mr. Taylor was a pre-trial detainee at the time of the alleged attack, see ECF No. 44 at 19; ECF No. 47 at 15 ("Plaintiff in the instant case was a pre-trial detainee."). Courts in this district have taken judicial notice of a prisoner's status, and we do the same here. See, e.g., Narvaez v. City of New York, No. 16 Civ. 1980 (GBD), 2017 WL 1535386, at *5 n.6 (S.D.N.Y. Apr. 17, 2017).

Under the first prong, the inmate must show that the alleged violation was "sufficiently serious to constitute objective deprivations of the right to due process." Id. at 29. Defendants do not contest that plaintiff has met this prong, and for good reason. Making all inferences in plaintiff's favor, he alleges that he was exposed to a gang riot facilitated by actions of the defendant-officers, during which a defendant-officer had the opportunity to prevent and/or stop an attack on plaintiff that resulted in the loss of his eye.

The second prong requires the defendant's deliberate indifference to the objective deprivation. See id. at 32. The Second Circuit's analysis of this second prong has oscillated between a more easily met objective test of the defendant's deliberate indifference and a subjective test that requires assessment of the defendant's state of mind. Compare Benjamin v. Fraser, 343 F.3d 35, 51 (2d Cir. 2003) (objective test), and Liscio v. Warren, 901 F.2d 274, 276 (2d Cir. 1990) (objective test), with Caiozzo v. Koreman, 581 F.3d 63, 69-72 (2d Cir. 2009) (subjective test, overruling Benjamin and Liscio), with Darnell, 849 F.3d 17, 36 (objective test, overruling Caiozzo). In Darnell, decided in 2017, the Second Circuit redefined the applicable standard for this prong:

    *12  [T]he pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety. In other words, the 'subjective prong' (or 'mens rea prong') of a deliberate indifference claim is defined objectively.

Darnell, 849 F.3d at 35.

Although Darnell involved a Fourteenth Amendment challenge to a prisoner's conditions of confinement, its holding applies with equal measure to failure to protect claims. See 849 F.3d at 33 n.9 ("[D]eliberate indifference means the same thing for each type of claim under the Fourteenth Amendment."). Indeed, Darnell explicitly endorsed the Ninth Circuit's en banc decision applying the objective test to failure to protect claims. Id. at 35-36 (citing Castro v. Cty. of Los Angeles, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc), cert. denied, No. 16-655, 137 S. Ct. 831 (2017) ).

Applying Darnell's objective test to the second prong eviscerates defendants' argument that plaintiff's failure to protect claim should be dismissed because "[n]o Defendants, including Defendant Anderson, had the necessary state of mind or were on notice that an attack on Plaintiff by another inmate was imminent." Mem. of Law at 20, ECF No. 45. Under Darnell, defendants' subjective state of mind is no longer part of the test for the mens rea prong of a deliberate indifference claim. 849 F.3d at 35 ("[T]he 'subjective prong' (or 'mens rea prong') of a deliberate indifference claim is defined objectively."). Similarly, defendants' reliance on pre-2017 cases applying the subjective test is unavailing. Darnell "significantly altered the judicial landscape," Little v. Mun. Corp., City of New York, No. 12 Civ. 5851 (KMK), 2017 WL 1184326, at *8 (S.D.N.Y. Mar. 29, 2017), and any decision applying the subjective test for the mens rea prong has little persuasive power under the current state of the law.

Taylor v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1737626

Defendants also argue that "[a]bsent clear notice of a risk of harm to the prisoner, [c]ourts routinely deny deliberate indifference claims based upon surprise attacks," citing Brown, 2017 WL 1390678, at *11, and Fernandez v. N.Y.C. Dep't of Corr., No. 08 Civ. 4294 (KMW), 2010 WL 1222017 (S.D.N.Y. Mar. 29, 2010). Fernandez illustrates the type of incident that courts define as a "surprise attack": there, the plaintiff was attacked from behind while brushing his teeth with no officers present. Fernandez, 2010 WL 1222017, at *1. By contrast, in Brown, the plaintiff properly alleged deliberate indifference claims against two correction officers who allegedly witnessed an attack on the plaintiff but failed to intervene. 2017 WL 1390678, at *1, 11-12. Likewise, plaintiff here has stated a claim for deliberate indifference to safety against Officer Anderson, who witnessed the attack on plaintiff and allegedly failed to take action to prevent it.

Defendants also seek to dismiss what they characterize as plaintiff's due process claim regarding his transfer to GRVC 15A, but plaintiff did not assert any such claim. To the extent he had, the parties agree that the "mere transfer of a pretrial detainee within a prison population or between prisons does not give rise to a protected liberty interest under the Due Process Clause." Perez v. Ponte, 236 F. Supp. 3d 590, 614 (E.D.N.Y. 2017) (quoting Corley v. City of New York, No. 14 Civ. 3202 (GHW), 2015 WL 5729985, at *7 (S.D.N.Y. Sept. 30, 2015) ).

### G. Officer Stevenson

*13 A review of the docket indicates that plaintiff still has not served the complaint on defendant Correction Officer Stevenson. See ECF No. 38, p. 3 (Affidavit of Attempted Service as to Officer Stevenson stating, "Your deponent verily believes that he will be unable to effect personal service upon the above named person(s) herein, although your Deponent made due and diligent effort to effect same."). Plaintiff filed his complaint on October 12, 2016. ECF No. 19. On

December 7, 2016, the Court sent a letter to counsel stating that unless plaintiff "achieve[s] service or can show good cause why your time to serve should be extended, this matter will be dismissed without prejudice on January 11, 2017," 90 days after the complaint was filed. See Fed. R. Civ. P. 4(m). Plaintiff's complaint is therefore dismissed without prejudice as to defendant Officer Stevenson unless plaintiff can show that he already served defendant Officer Stevenson within that 90-day window or had good cause for his failure to do so.

### V. Conclusion

For the foregoing reasons, defendants' motion to dismiss is granted in part and denied in part. Plaintiff's claims against Assistant Deputy Warden Sardia Lewis are dismissed for lack of personal involvement. Plaintiff's claims against Officer Stevenson are dismissed under Fed. R. Civ. P. 4(m). All claims against the individual defendants in their official capacities are dismissed. Defendants' motion to dismiss is denied in all other respects. The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 43. The parties are directed to appear for a conference on April 18, 2018 at 3:00 p.m.

As this case continues, counsel are expected to act in a professional and civil manner with each other and with the Court. See New York Rules of Professional Conduct, Rule 3.3(f)(2) ("In appearing as a lawyer before a tribunal, a lawyer shall not. engage in undignified or discourteous conduct."); Local Civil Rule 26. 4 (a) ("Counsel are expected to cooperate with each other, consistent with the interests of their clients, in all phases of the discovery process and to be courteous in their dealings with each other.").

### SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2018 WL 1737626

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 84234
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Naquan M. LECKIE, Plaintiff,

v.

The CITY OF NEW YORK, Captain Jones,
and Correction Officer Ling, Defendants.

18-CV-3917 (RRM) (LB)
|
Signed 01/11/2021

**Attorneys and Law Firms**

Naquan M. Leckie, Brooklyn, NY, pro se.

Stefano Perez, New York City Law Department Office of the
Corporation Counsel, New York, NY, for Defendants.

**MEMORANDUM AND ORDER**

ROSLYNN R. MAUSKOPF, Chief United States District
Judge.

**\*1** Plaintiff Naquan M. Leckie, proceeding *pro se*, brings
this action pursuant to 42 U.S.C. § 1983, against defendants
City of New York, Captain Ashley Jones ("Jones"), and
Correction Officer Chi Ling ("Ling"), alleging deliberate
indifference to his safety in connection with an allegedly
homophobic inmate-on-inmate attack on December 25, 2017.
(Compl. (Doc. No. 2).) Defendants now move for summary
judgment. (Mot. (Doc. No. 59).) For the reasons stated below,
defendants' motion is granted in part and denied in part.

**BACKGROUND**

Factual Background
The relevant facts outlined below are drawn from defendants'
Local Rule 56.1 Statement of Material Facts, to the extent
that those facts are supported by evidence submitted by
defendants in connection with the motion for summary
judgment.[1] Unless otherwise noted, the facts are undisputed.

[1]      Defendants' motion is unopposed. In the case of
        an unopposed motion for summary judgment, "in

determining whether the moving party has met
[its] burden of showing the absence of a genuine
issue for trial, the district court may not rely solely
on the statement of undisputed facts contained in
the moving party's Rule 56.1 statement. It must
be satisfied that the citation to evidence in the
record supports the assertion." *Vt. Teddy Bear Co.
v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 244 (2d
Cir. 2004); *see also Giannullo v. City of New York*,
322 F.3d 139, 143 n.5 (2d Cir. 2003) (stating that
not verifying in the record the assertions in the
motion for summary judgment "would derogate the
truth-finding functions of the judicial process by
substituting convenience for facts").

On December 25, 2017, Naquan Leckie was a pre-
trial detainee incarcerated at Brooklyn Detention Complex
("BKDC"), a New York City Department of Correction
("DOC") facility located at 275 Atlantic Avenue in Brooklyn.
(Defendants' Rule 56.1 Statement of Undisputed Facts
("Defs.' SOF") (Doc. No. 61) at ¶ 3.) Prior to being
housed at BKDC, Leckie was held at Manhattan Detention
Center ("MDC"), but was transferred out of that complex
on December 14, 2017, because "the guys in there felt like
[Leckie] was gay because [he] had took a shower, but [he] had
[his] drawers on." (Excerpt from Leckie Deposition, Exhibit
B (Doc. No. 60-3) at 5.)[2]

[2]      All page numbers refer to ECF pagination.

In accordance with the Prison Rape Elimination Act
("PREA") and DOC policy, upon his arrival at BKDC, Leckie
participated in an initial intake interview and was asked
whether he considered himself to be lesbian, gay, bisexual,
transgender, intersex or gender nonconforming. (Defs.' SOF
at ¶ 7.) During the intake interview, Leckie indicated that he
did not identify as such and said that he was straight. (*Id.* at
¶ 8.) At no point did Leckie inform Ling, Jones, or any other
correctional staff of his sexual orientation or alert them of any
risks to his safety due to his sexual orientation. (*Id.* at ¶ 9.)
However, Leckie told correction officials that he feared for
his life due to his previous gang affiliation and was placed
in protective custody at BKDC. (*Id.* at ¶ 5.) Leckie testified
that he submitted a signed statement that he feared for his life
because he "did not want to be around the people that he was
around." (*Id.* at ¶ 6.) Leckie testified that prior to the incident
on December 25, 2017, he did not fear for his life, did not
fear any particular individual, and did not believe he was in
danger, nor had any inmates made any threats against him.
(*Id.* at ¶ 4.)

**\*2** At BKDC, Leckie was housed in a protective custody housing area located on the sixth floor, Housing Area 6B. (*Id.* at ¶ 10.) A protective custody housing area is a housing area where inmates can be placed on a voluntary or involuntary basis to protect them from fears or threats pertaining to their physical safety concerns. (*Id.* at ¶ 11.) Inmates placed in protective custody are afforded the same lock-in/lock-out privileges and access to mandated services and programs as general population inmates but are segregated from the rest of the inmate population. (*Id.* at ¶ 12.) The Housing Area Supervisor is not informed of the reason that an inmate is placed in protective custody. (Declaration of Correction Captain Ashley Jones ("Jones Dec.") (Doc. No. 64) at ¶ 4.) There are four housing areas located on the sixth floor: Housing Areas 6A, 6B, 6C, and 6D. (Defs.' SOF at ¶ 14.) Each housing area consists of two tiers, a dayroom, and houses approximately 20–28 inmates. (*Id.* at ¶ 15.) The dayroom is a common area recreation room where inmates can unwind, watch television, play games, and/or talk on the phone. (*Id.* at ¶ 16.)

On the day of the incident, as the Housing Area Supervisor, Jones was responsible for conducting tours of approximately eight housing areas, including Housing Area 6B. (*Id.* at ¶ 17.) Sometime prior to 6:15 p.m. that day, Jones conducted a security inspection of Housing Area 6B. (*Id.* at ¶ 18.) During the security inspection, Jones did not have any communication with Leckie and Leckie could not hear any communication that Jones may have had with any other inmates. (*Id.* at ¶ 19.)

At that same time, Ling was manning the control post for Housing Areas 6A, 6B, 6C, and 6D, where he was responsible for communicating with other parts of the facility, such as the Control Room, the Area Supervisor, Law Library, Social Services, Commissary, and the Kitchen. (*Id.* at ¶ 20.) The control post for Housing Areas 6A, 6B, 6C, and 6D was approximately 20 feet away from the Housing Area 6B dayroom; Housing Areas 6A, 6B, 6C, 6D, and their respective dayrooms were in partial view from the control post. (*Id.* at ¶ 21.)

The parties disagree as to the details of the incident. At his deposition, Leckie testified that Jones entered the dayroom while he was playing chess, looked around the room, and then said, "come on, guys, let's have an exciting day." (Deposition of Naquan Leckie ("Leckie Dep.") (Doc. No. 60-2) at 9.) Jones states in her declaration that she did not "have any

communication with" Leckie "at any point" during her security inspection in Housing Area 6B. (Jones Dec. at ¶ 7.) According to Leckie, Jones then stepped out of the dayroom, and several inmates followed her. (Leckie Dep. at 9.) They spoke, but Leckie could not hear what was said. (*Id.*) Then, those inmates re-entered the room and pointed at Leckie, with at least one of them referring to him as a "faggot" and telling him to go "lock ... in now." (*Id.* at 9–10.) Leckie testified that he stood up and asked why he was required to lock in when several inmates started to "jump" him. (*Id.*) He testified that the attack lasted between a minute and "three or four" minutes and he did not fight back because "when they see you fight back that's when they try to cut you," though he stated that he did not see any of his attackers with a weapon. (*Id.* at 18.) Defendants assert that the fight lasted about one minute. (Declaration of Correction Officer Chi Ling ("Ling Dec.") (Doc. No. 63) at ¶ 9.)

Ling was sitting at the control post "when he heard a commotion coming from Housing Area 6B dayroom" and he "immediately responded." (Defs.' SOF at ¶¶ 22, 24.) Ling responded by calling the Probe Team and notifying the Area Supervisor by pressing the "personal body alarm on his belt which activated the institutional alarm." (*Id.* at ¶ 26.) Ling simultaneously issued verbal commands directing the inmates to stop fighting and gained compliance. (*Id.* at ¶ 27.) During this incident, Jones was conducting a security inspection of Housing Area 6C, a different housing area on the same floor that is approximately six feet away from Housing Area 6B but separated by a concrete wall, and so she did not witness the incident. (*Id.* at ¶¶ 31–32.) After Ling activated the institutional alarm, Jones left Housing Area 6C and immediately returned to Housing Area 6B. (*Id.* at ¶ 33.)

**\*3** Upon Jones's arrival to the Housing Area 6B dayroom, Ling reported that Leckie was involved in a physical altercation with inmates Jonathan Sanchez, Christopher Rodriguez, and Lumumba Moss, and further reported that his instructions and direct orders to the inmates to stop fighting had terminated the incident. (*Id.* at ¶ 34.) The Probe Team, which arrived within ten minutes of being called by Ling, escorted Leckie, Sanchez, Rodriguez, and Moss outside of the housing area. (*Id.* at ¶ 35.) All four inmates were taken to the clinic and subsequently rehoused in different housing areas. (*Id.* at ¶ 36.)

Leckie was treated at the clinic by Dr. Iosif Shpits, M.D. (*Id.* at ¶ 37.) An "injury to inmate" report and medical record were generated, to reflect that Leckie complained

of arm pain, denied loss of consciousness or blurry vision, was diagnosed with a left-hand contusion, and was given 800mg of Ibuprofen for the pain. (*Id.*; *see also* Injury to Inmate Report Ex. D; *see also* Medical Records Exhibit E.) The Injury to Inmate Report, which is handwritten and only partially legible, also indicates "lump on scalp" but "no bleeding no wound." (Exhibit D.) The Medical Records indicate that Leckie had "no scalp lesions" and that his nose had normal pink mucosa. (Exhibit E at 2.)

Ling issued Notices of Infraction to Sanchez, Rodriguez, and Moss, charging them with fighting and refusing to obey direct orders. (*Id.* at ¶ 39.) After generating these Notices of Infraction and submitting them to Jones, Ling's involvement in the incident concluded. (*Id.* at ¶ 40.) Upon receiving these Notices of Infraction, Jones investigated each infraction, completed an Investigation Report, and referred Sanchez, Rodriguez, and Moss to the Adjudication Unit for a hearing. (*Id.* at ¶ 41.) Jones recommended the maximum penalty indicated. (*Id.*)

When asked at his deposition whether any of the inmates who had attacked him had previously threatened him, Leckie said, "they just looked and stared at me but they never said nothing ... they looked at me but they never did nothing physically to make it look like they were trying to harm me." (Leckie Dep. at 10.)

The Complaint

Leckie timely filed his complaint on June 26, 2018, as a form § 1983 complaint that does not allege any causes of action. Rather, the complaint attaches a narrative. Leckie asserts that while his assailants were kicking him in the face, punching him in the head and arms, and calling him a "faggot" a "gay ass nigga" and saying "I hate you you fucking homo," Ling was outside of the room but "didn't bother to come in and help. He just watched from the outside and [Leckie] was screaming for them to stop but they didn't listen." (Compl. at 6–7.) Leckie further alleges that Jones, who was initially "across the room on the other side patro[l]ling," "never came to diffuse the situation" when she returned to Housing Area 6B, but "just walk[ed] the other way as though nothing was happening." (*Id.* at 7–8.) Leckie also states that it is "very suspicious" that the assault occurred immediately after Jones had a conversation with the inmates who attacked him. (*Id.* at 8.) Finally, Leckie asserts that the cameras in the facility were not operable, placing the facility "out of compliance." (*Id.* at 7.) For the injuries he suffered in the attack, including a bloody nose and bruises and bumps to his head an arms,

as well as the mental anguish and discriminatory conduct, unsafe environment, and the threats to his life and safety, Leckie seeks $30 million in damages. (*Id.* at 4, 10.) The Court construes this narrative as raising two deliberate indifference claims against all defendants, for failure to protect Leckie prior to the attack and failure to intervene during the ongoing attack, as well as an excessive force claim against Jones for inciting the attack.

The Instant Motion

**\*4** Defendants now bring the instant motion for summary judgment. Defendants construe Leckie as bringing only deliberate indifference to safety claims under § 1983, and do not brief the excessive force claim. Defendants first argue that Leckie has failed to demonstrate a sufficiently serious condition, as Leckie had not notified Jones, Ling, or anyone else at BKDC that he felt unsafe or that he anticipated a threat to his safety due to his sexual orientation or the conditions of his confinement in Housing Area 6B, nor did Leckie inform anyone at BKDC that he was bisexual. (Mem. (Doc. No. 62) at 12–16.) Next, Defendants argue that Leckie's injuries do not satisfy the objective standard for deliberate indifference because they were not sufficiently serious. (*Id.* at 17–18.) Further, Defendants argue that Leckie also fails to demonstrate that either Ling or Jones were deliberately indifferent, as he cannot show that the Defendants were aware of the risk of attack by other inmates or that they failed to intervene to stop it. (*Id.* at 18–19.) Additionally, Defendants argue that the surprise attack is insufficient to support a claim of deliberate indifference. (*Id.* at 20–21.) Moreover, Defendants assert that the claim against Jones must fail as she was not present for the attack and thus Leckie cannot show personal involvement. (*Id.* at 21–22.)

Defendants also argue that Ling and Jones are entitled to qualified immunity because neither of them violated a clearly established right, nor were they on notice to any risk of harm due to Leckie's sexual orientation. (*Id.* at 24.) Viewing Ling's actions in the light most favorable to him, his actions could be construed as a reasonable officer's determination of the safest and most effective way to intervene in the fight. (*Id.* at 24–25.) Finally, Defendants argue that Leckie has failed to state a claim against the City of New York because he has failed to provide any evidence that a policy or custom exists that resulted in the deprivation of a constitutional right. (*Id.* at 25–27.)

Leckie v. City of New York, Slip Copy (2021)

2021 WL 84234

**STANDARD OF REVIEW**

Summary judgment is appropriate when the pleadings, depositions, interrogatories, and affidavits demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is "material" if it may impact the "outcome of the suit under the governing law." *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed," and the Court must draw all "justifiable" or reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (citation omitted); *see also Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995) ("[T]he court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions ... in the light most favorable to the party opposing the motion." (citations omitted)).

The same standards for summary judgment apply where, as here, the non-movant is proceeding *pro se*. *Williams v. Savory*, 87 F. Supp. 3d 437, 451 (S.D.N.Y. 2015). However, "special solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988).

**DISCUSSION**

**I. Deliberate Indifference**

42 U.S.C. § 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable." To state a § 1983 claim brought under the Due Process Clause of the Fourteenth Amendment, a pre-trial detainee must allege two elements, one subjective and one objective. First, to establish

an objective deprivation, the pre-trial detainee "must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health, which includes the risk of serious damage to physical and mental soundness." *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (internal quotations and citations omitted). "There is no static test to determine whether a deprivation is sufficiently serious; instead, the conditions themselves must be evaluated in light of contemporary standards of decency." *Id.* at 30 (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995) (internal quotations omitted)). Second, the pre-trial detainee must "prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.*, at 35.

**a. Failure to Protect**

**\*5** "[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). However, "not every injury that a prisoner suffers at the hands of another [prisoner] results in constitutional liability." *Taylor v. City of New York*, No. 16-CV-7857 (NRB), 2018 WL 1737626, 2018 U.S. Dist. LEXIS 52308, at \*29 (S.D.N.Y. Mar. 27, 2018) (citing *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970). To establish a failure to protect claim under the Fourteenth Amendment, an inmate must satisfy a two-pronged test demonstrating that (1) he was incarcerated under conditions posing a substantial risk of serious harm, and (2) that prison officials demonstrated deliberate indifference to plaintiff's safety. *See Molina v. County of Westchester*, No. 16-CV-3421, 2017 WL 1609021, 2017 U.S. Dist. LEXIS 65195, at \*2–3 (S.D.N.Y. Apr. 28, 2017) (applying the *Farmer* test to Fourteenth Amendment failure to protect claim). When the claim is based on an alleged failure to prevent harm or provide safety, the inmate must show that he "[was] incarcerated under conditions posing a substantial risk of harm." *Lynch v. Jane Doe Corr. Officer Blue*, No. 14-CV-6919 (VB), 2016 WL 831969, 2016 U.S. Dist. LEXIS 24683, at \*7 (S.D.N.Y. Feb. 29, 2016) (quoting *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970).

Defendants are entitled to summary judgment with respect to Leckie's claims of deliberate indifference as to Jones and Ling. Leckie does not demonstrate that he was incarcerated

2021 WL 84234

in conditions that posed a substantial risk of harm, because prior to this attack he testified that he did not fear for his life or safety; further, Leckie had not complained about his attackers, raised concerns about his safety in Housing Area 6B, or otherwise provided notice to Ling or Jones that he was at a substantial risk of harm.

### b. Failure to Intervene

Leckie's complaint also appears to allege a deliberate indifference claim against both Ling and Jones for failing to intervene when the fight broke out. "The failure of a correction officer to oversee prisoners, intervene in an attack, or otherwise fail to abide by prison safety protocols may under certain circumstances create a condition which poses a substantial risk of serious harm thus constituting a sufficiently serious constitutional violation." *See Molina*, 2017 WL 1609021, 2017 U.S. Dist. LEXIS 65195 at *7 (collecting cases). Specifically, "failing to intervene is a Fourteenth Amendment violation where the officer acted with deliberate indifference to a substantial risk of serious harm to an inmate." *Rosen v. City of N.Y.*, 667 F. Supp. 2d 355, 359–60 (S.D.N.Y. 2009) (quoting *Farmer*, 511 U.S. at 828, 114 S.Ct. 1970 (internal quotation marks omitted)). "In the context of a failure to intervene claim, an officer displays deliberate indifference when he has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate without risk to himself, yet fails to intervene." *Id.* at 360.

Here, the undisputed facts show that Ling responded to the altercation – which both Leckie and Ling estimated lasted about a minute – by promptly activating the alarm, summoning a Probe Team, and separating Leckie from the other inmates. Additionally, the undisputed record establishes that Jones was not in the immediate vicinity of the altercation but responded promptly to the institutional alarm. There is nothing in the record to indicate that either Ling or Jones failed to intervene in the incident, let alone that they did so with deliberate indifference. Accordingly, Defendants are entitled to summary judgment with respect to Leckie's deliberate indifference claims against Ling and Jones.

### II. Excessive Force

Though Defendants construe Leckie's complaint as stating only a deliberate indifference claim under § 1983, Leckie's complaint can also be construed as alleging a § 1983

excessive force claim pursuant to the Due Process Clause of the Fourteenth Amendment. "[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 576 U.S. 389, 397, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015). Though for excessive force claims brought under the Eighth Amendment "the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," *Cole v. Fischer*, 379 F. App'x 40, 42 (2d Cir. 2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 6-7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)), "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less maliciously and sadistically," *Kingsley*, 576 U.S. at 400, 135 S.Ct. 2466 (internal quotation marks omitted). Accordingly, to prevail in a Fourteenth Amendment excessive force claim, a pre-trial detainee must demonstrate only that the challenged actions "are not rationally related to a legitimate nonpunitive governmental purpose or that the actions appear excessive in relation to that purpose." *Id.* at 398, 135 S.Ct. 2466.

**\*6** Here, Defendants have failed to show that no reasonable juror could find in Leckie's favor with respect to his excessive use of force claim against Jones. In Leckie's deposition testimony, he states that after Jones announced they were going to have an exciting day, she brought several other inmates out into the hallway and spoke to them, then brought them back into the day room where they immediately attacked Leckie while using homophobic slurs. Jones's own affidavit does not contradict this account: she states only that she did not speak to Leckie during her security check but is silent regarding whether she spoke with other inmates. A reasonable juror could conclude, based on the record, that when Jones spoke with those inmates outside of the day room, she incited them to assault Leckie, and that her statement about having "exciting day" was an allusion to the attack she intend to instigate. Inciting violence is not rationally related to any legitimate government purpose. Accordingly, Leckie's § 1983 excessive use of force claim against Jones survives summary judgment.

### III. Qualified Immunity

Defendants argue only that Ling and Jones are entitled to qualified immunity with respect to the deliberate indifference claims but are silent regarding the claim of excessive force. An individual defendant is entitled to qualified immunity if 1) his or her actions did not violate clearly established law, or 2) it was objectively reasonable to believe that his or her actions did not violate such law. *Warren v. Keane*, 196 F. 3d 330 (2d

Cir. 1999); *see also Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996) (same). "A right is clearly established if the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (internal quotation marks omitted)). Where a right is clearly established, "the defendants may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established prohibition." *Id.* (quoting *In re State Police Litig.*, 88 F.3d 111, 123 (2d Cir. 1996)).

Jones is not entitled to qualified immunity for her alleged application of excessive force. It is well established that pre-trial detainees cannot be subject to punitive force under the Fourteenth Amendment, and no reasonable official would believe that inciting violence against a bisexual detainee, as Jones is alleged to have done here, falls within the scope of acceptable activity under the Due Process Clause. Accordingly, this argument must fail.

### IV. Municipal Liability

A municipality cannot be held liable as a "person" within the meaning of 42 U.S.C. § 1983 unless the municipality itself was somehow at fault. *Oklahoma City v. Tuttle*, 471 U.S. 808, 810, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *see also Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "The plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries.... Second, the plaintiff must establish a causal connection—an 'affirmative link'—between the policy and deprivation of his constitutional rights.' " *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985), *cert. denied*, 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 685 (1987) (citing *Tuttle*, 471 U.S. at 824 n.8, 105 S.Ct. 2427). Here, Leckie does not identify a policy or custom in his complaint, nor does he provide any other basis for finding the City of New York liable for the allegations contained therein. Summary judgment is therefore granted with respect to Leckie's claims against the City of New York.

### CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is granted with respect to the deliberate indifference claims against Jones and Ling, and all claims against the City of New York. This action is recommitted to Magistrate Judge Bloom for all remaining pre-trial matters, including settlement discussions if appropriate.

**\*7** SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 84234

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Charles v. Rockland County Office of the Sheriff, Not Reported in Fed. Supp. (2019)

2019 WL 1299804

2019 WL 1299804
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Johnnie CHARLES, Plaintiff,

v.

ROCKLAND COUNTY OFFICE OF THE SHERIFF,
Louis Falco III, Anthony J. Volpe, Lt. John Byron,
Richard McNichol, and Hasson Doswell, Defendants.

16 CV 166 (VB)
|
Signed 03/21/2019

Copy Mailed by Chambers 3-21-19 DH

**Attorneys and Law Firms**

Johnnie Charles, Beacon, NY, pro se.

Seamus Patrick Weir, Tarshis, Catania, Liberth, Mahon
and Milligram, Newburgh, NY, Edward Francis Kealy, for
Defendants Rockland County Office of the Sheriff, Louis
Falco, III, Chief of Corrections Anthony J. Volpe, Lt. John
Byron, Hasson Doswell.

Michael Howard Sussman, Sussman & Watkins, Goshen, NY,
for Defendant Richard McNichol.

## OPINION AND ORDER

Vincent L. Briccetti, United States District Judge

 *1 Plaintiff Johnnie Charles, an inmate proceeding pro
se and in forma pauperis, brings this action under 42
U.S.C. § 1983, against the Rockland County Sheriff's
Office,[1] Sheriff Louis Falco III, Chief of Corrections
Anthony Volpe, Lieutenant ("Lt.") John Byron, Corrections
Officer ("C.O.") Hasson Doswell (collectively, the "Rockland
County defendants"), and former C.O. Richard McNichol,[2]
alleging violations of plaintiff's constitutional rights.

[1]    Incorrectly sued herein as Rockland County Office
       of the Sheriff.

[2]    McNichol is no longer employed as an RCCF
       corrections officer, so the Court will not refer to
       him as a corrections officer here.

Now pending are cross motions for summary judgment from
the Rockland County defendants (Doc. #181), McNichol
(Doc. #190), and plaintiff (Docs. ## 218, 222).

For the reasons set forth below, the Rockland County
defendants' motion and McNichol's motion are GRANTED,
and plaintiff's motion is DENIED.

The Court has subject matter jurisdiction pursuant to 28
U.S.C. § 1331.

## BACKGROUND

All parties submitted briefs, statements of material facts,
declarations, and supporting exhibits. Together, they reflect
the following relevant background.

All events giving rise to this action occurred when plaintiff
was a pre-trial detainee at the Rockland County Correctional
Facility ("RCCF").

I. May 11, 2015, Assault
On May 11, 2015, at about 5:30 p.m., plaintiff was fulfilling
his duties as a "facility trustee," sweeping, cleaning, and
serving meals to other inmates in the housing unit of RCCF's
B-Wing. C.O. Doswell was also on the floor of the B-Wing,
and McNichol was in the control room. McNichol noticed that
inmate James Sanders's cell food slot appeared to be closed,
so from the control room, McNichol automatically opened
Sanders's cell door in order for someone to retrieve Sanders's
tray. Sanders suddenly ran onto the floor with his hard-
plastic meal tray, struck plaintiff in the back of the head, and
continued to punch plaintiff when he collapsed to the floor.
From the initial blow, plaintiff was knocked unconscious and
does not recall the incident. (Doc. #184-4 ("Pl. June 20, 2017
Dep.") at 22).

Within seconds, C.O. Doswell ran to stop Sanders's assault,
directed Sanders into his cell, and locked him in. Meanwhile,
from the control room, McNichol called for all officers
to respond, and numerous corrections officers arrived to
secure the cell block. These reactions are confirmed by
video surveillance footage from a camera inside the control
room, which shows a disturbance through the control
room windows, an officer immediately running toward
the disturbance, and seventeen seconds later, several other
officers responding. (Doc. #184-12, at 17:43:08–17:43:25).

Charles v. Rockland County Office of the Sheriff, Not Reported in Fed. Supp. (2019)

2019 WL 1299804

Plaintiff was taken to Nyack Hospital for a head laceration, which required six staples. Plaintiff suffered a concussion, which he claims has resulted in daily headaches, dizziness, and other symptoms.

Plaintiff never had any interactions with Sanders before the assault on May 11, 2015. (Pl. June 20, 2017, Dep. at 18). According to plaintiff, Sanders had never spoken to or threatened plaintiff, and plaintiff had never complained to Jail officials about Sanders. (Id.). At his deposition plaintiff said he had no enemies. (Id.).

**\*2** Furthermore, Sanders had no prior known history of assault at RCCF. (Doc. #184-6 at ECF p. 29). Sanders was on disciplinary lock-in at the time of the assault, but officers instituted Sanders's lock-in because Sanders had failed to comply with a direct order. (Id. at ECF p. 69).

II. Grievances

Two days after the assault, on May 13, 2015, plaintiff submitted a grievance that "stems from negligence, unsafe, and violating of compilation of codes." (Doc. #184-6 at ECF p. 42). Lt. Byron denied the grievance, finding it was vague and unclear. On May 26, 2015, plaintiff submitted a revised grievance requesting an investigation into his attack and asking for additional protective measures to prevent future attacks. Lt. Byron found the grievance was "very vague and rambles on." (Id. at ECF p. 55). On May 28, 2015, Lt. Byron met with plaintiff to discuss his grievances and determined that plaintiff complained that security measures failed to prevent his attack, and that he wanted an investigation into the incident and additional protective measures to prevent a similar incident in the future. (Id.). Lt. Byron sent this information to Chief Volpe.

On June 4, 2015, Chief Volpe sustained plaintiff's grievance, ordered RCCF personnel to conduct an internal investigation, and turned the matter over to the Sheriff's Police Division for an external investigation. (Doc. #184-6 at ECF p. 58).

**DISCUSSION**

I. Legal Standard

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as

a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations omitted). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. Dawson v. Cty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

**\*3** On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004). The Court need only consider evidence that would be admissible at trial. Nora Bevs., Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

Case 5:22-cv-00216-GTS-TWD   Document 7   Filed 04/13/22   Page 69 of 227

Charles v. Rockland County Office of the Sheriff, Not Reported in Fed. Supp. (2019)

2019 WL 1299804

II. Failure to Protect and Failure to Intervene

Defendants argue there is no evidence of defendants' failure to prevent plaintiff's assault on May 11, 2015, because defendants had no reason to suspect that plaintiff faced a risk of harm.

The Court agrees.

It is well settled that "[p]rison officials have a duty to ... protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 828 (1994) (internal quotation omitted). Because plaintiff was a pretrial detainee at all relevant times, the Court analyzes his failure to protect claim under the Due Process Clause of the Fourteenth Amendment, rather than under the Eighth Amendment. See Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017) (quoting Iqbal v. Hasty, 490 F.3d 143, 168 (2d Cir. 2007) ); Taylor v. City of New York, 2018 WL 1737626, at *12 (S.D.N.Y. Mar. 27, 2018) (applying Darnell to failure-to-protect claims).[3]

[3]   Because plaintiff is proceeding pro se, he will be provided with copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

To establish that defendants failed adequately to protect plaintiff, plaintiff must satisfy two prongs: an objective prong and a mens rea prong.[4] As relevant here, under the mens rea prong, a pretrial detainee must demonstrate "that the defendant-official acted intentionally ... or recklessly failed to act with reasonable care to mitigate the risk that the condition posed ... even though the defendant-official knew, or should have known," of the risk. Darnell v. Pineiro, 849 F.3d at 35. The Fourteenth Amendment's mens rea prong "is defined objectively" and "can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." Id.

[4]   Although defendants do not explicitly concede that the assault was "sufficiently serious," as the objective prong of the Due Process Clause requires, Darnell v. Pineiro, 849 F.3d at 29–30 the only basis on which they seek summary judgment is that plaintiff provides no evidence as to the mens rea prong.

In the Eighth Amendment context, which requires subjective awareness of a risk, courts have routinely denied failure-to-protect claims when a defendant did not know an inmate faced an attack by another inmate. Parris v. New York State Dep't Corr. Servs., 947 F. Supp. 2d 354, 363 (S.D.N.Y. 2013) (finding plaintiff must allege "defendants knew of a prior altercation between the plaintiff and his attacker, or of threats that had been made against the plaintiff); Fernandez v. New York City Dep't of Correction, 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010). The same rationale can apply to failure-to-protect claims under the Fourteenth Amendment. Although Fourteenth Amendment claims only require that defendants have an objective awareness (i.e., that defendant should have known), that standard is not satisfied when the surprise attack was a surprise to everyone involved, including plaintiff.

*4  Plaintiff identifies no evidence in the record that would allow a reasonable juror to find, at the very least, that defendants should have known plaintiff faced an impending attack by Sanders or any other inmate. First, plaintiff admits he did not fear Sanders specifically. In fact, plaintiff never had any interactions with inmate Sanders before the assault on May 11, 2015. Sanders had never spoken to, much less threatened, plaintiff. Plaintiff certainly did not complain to RCCF officers about Sanders. Second, plaintiff offers no reason why defendants should have suspected Sanders was a threat generally. Sanders had no prior history of violence at RCCF. Indeed, plaintiff concedes as much when he describes Sanders's attack as sudden and unexpected. (Am. Comp. ¶ 62). Third, plaintiff does not allege he faced a general risk from other inmates in RCCF. According to plaintiff, he had no enemies.

Plaintiff argues that in remotely accessing Sanders's cell, McNichol acted with reckless disregard to plaintiff's safety, because Sanders was on disciplinary lock-in and McNichol violated internal procedures by not notifying C.O. Doswell that he (McNichol) was remotely opening the cell. However, plaintiff offers no facts to suggest McNichol should have known this action would endanger plaintiff. McNichol had no reason to suspect Sanders would become violent. Sanders had no known prior history of assault at RCCF, and was on disciplinary lock-in, not for a violent offense, but for failing to comply with a direct order.

Even if McNichol's failure to notify C.O. Doswell violated internal rules, that failure does not rise to the level of a constitutional violation. Therefore, plaintiff fails to

Case 5:22-cv-00216-GTS-TWD   Document 7   Filed 04/13/22   Page 70 of 227

Charles v. Rockland County Office of the Sheriff, Not Reported in Fed. Supp. (2019)

2019 WL 1299804

demonstrate McNichol acted with reckless disregard to plaintiff's safety.

Finally, to the extent plaintiff argues defendants failed to intervene once the attack began (Pl. Br. at 23), the record definitively shows corrections officers immediately responded to the incident. Video footage depicts C.O. Doswell immediately running toward the assault with several additional officers arriving seventeen seconds later. Plaintiff cannot contradict that account himself, as he concedes he does not remember any part of the incident. Plaintiff's "unsubstantiated speculation" that C.O. Doswell did not respond immediately does not raise a genuine issue of material fact. See Brown v. Eli Lilly & Co., 654 F.3d at 358.

Accordingly, defendants are entitled to summary judgment on plaintiff's Fourteenth Amendment claims for failure to protect and failure to intervene.

III. Denial of Access to the Courts
To the extent plaintiff asserts a claim against defendants for failure to accept his grievances, the Court construes this as a denial of access to the courts claim, and this claim is dismissed.

As a preliminary matter, notwithstanding the First Amendment's guarantee of the right to petition the government for redress, "inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983." Cancel v. Goord, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001). Therefore, construing plaintiff's claim as a denial of access to the courts, plaintiff must demonstrate "that the defendant took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim." Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003) (alterations in original) (internal quotation omitted).

Plaintiff presents no evidence that he was hindered in his efforts to pursue a legal claim. To the contrary, the undisputed facts demonstrate plaintiff filed a grievance stemming from the May 11, 2015, assault, and Chief Volpe sustained plaintiff's grievance, ordering both internal and external investigations.

Accordingly, plaintiff's claim concerning defendants' failure to accept his grievances is dismissed.

IV. Retaliation
 **5** Defendants argue plaintiff fails as a matter of law to demonstrate he was subject to retaliation for filing grievances concerning the May 11, 2015, assault.

The Court agrees.

To prove a retaliation claim under the First Amendment, "a prisoner must demonstrate the following: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation omitted). Regarding the second element, "only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." Nelson v. McGrain, 596 F. App'x 37, 38 (2d Cir. 2015) (summary order) (quoting Davis v. Goord, 320 F.3d at 353). Moreover, in view of "the ease with which claims of retaliation may be fabricated, [courts] examine prisoners' claims of retaliation with skepticism and particular care." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995).

Plaintiff's amended complaint is not a model of clarity or specificity. He alleges corrections officers "verbally harassed" him and filed "false misbehavior reports" against him. (Am. Compl. ¶ 66). In the body of his complaint, plaintiff alleges only that officers said he would not succeed in this lawsuit and "was not going to be getting any money and that nothing [was] going to be done." (Id.) Plaintiff also attached sixty-seven pages of infractions and grievances to his amended complaint as "Exhibit Z." (Doc. #184-1 at ECF pp. 178-244). After thoroughly reviewing these infractions and grievances, it is clear to the Court that plaintiff fails to raise a genuine issue of material fact as to whether defendants took adverse actions against him.

Plaintiff claims (i) corrections officers verbally harassed him; (ii) an officer once limited plaintiff's access to the law library computer; (iii) the same officer gave plaintiff an infraction for refusing to lock-in; (iv) an officer gave plaintiff an infraction for refusing to change cells; and (v) an officer gave plaintiff an infraction for verbally harassing staff.

These alleged acts do not constitute adverse actions as a matter of law. Vague, non-specific allegations of verbal harassment "do not constitute adverse actions sufficient to state a retaliation claim." Ross v. Westchester Cnty. Jail, 2012

2019 WL 1299804

WL 86467, at *7 (S.D.N.Y. Jan. 11, 2012). The temporary inability to get access to a library computer is a minor inconvenience and does not constitute an adverse action. Olutosin v. Lee, 2018 WL 4954107, at *10 (S.D.N.Y. Oct. 12, 2018). In addition, although the filing of false misbehavior reports can constitute an adverse action, plaintiff offers no evidence these misbehavior reports were actually false. To the contrary, in the attached grievances, plaintiff concedes that he disobeyed direct orders when he refused to lock-in or change cells. And, after a hearing, plaintiff was found guilty of verbally harassing staff.

Furthermore, even if these were adverse actions, plaintiff fails to offer any evidence from which a reasonable juror could infer a causal connection between those actions and his prior grievance. Plaintiff fails to say who falsely filed grievances against him, how these officers were connected to the May 11, 2015, assault, and why they sought to retaliate against him.

*6 Therefore, plaintiff fails to raise a genuine issue of material fact that defendants took adverse action against him or that a causal connection exists between that action and his prior grievance.

Accordingly, defendants are entitled to summary judgment on plaintiff's First Amendment retaliation claims.

V. Monell Claim

Because plaintiff has not made out a claim for a constitutional violation, Rockland County [5] and the defendants in their official capacity is entitled to summary judgment on plaintiff's Monell claim.

[5]    Although plaintiff proceeds against the Rockland County Sheriff's Office, plaintiff's Monell claim lies against Rockland County itself. Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Hayes v. Cty. of Sullivan, 853 F. Supp. 2d 400, 438 (S.D.N.Y. 2012). The

Court therefore construes plaintiff's Monell claim as a claim against Rockland County.

To impose liability on a municipality in a Section 1983 action, a plaintiff must establish that the municipality's formal or informal policies caused the denial of the plaintiff's constitutional rights. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978) ("Monell"). Municipalities are not liable for injuries inflicted solely by their employees or agents. Id.

Here, plaintiff has not produced any evidence upon which a reasonable factfinder could find that his constitutional rights were violated. In the absence of any denial of a constitutional right, no Monell claim lies against a municipality. Mittelman v. Cty. of Rockland, 2013 WL 1248623, at *16 (S.D.N.Y. Mar. 26, 2013) (citing Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983) ).

Accordingly, defendants are entitled to summary judgment on plaintiff's Monell claim.

## CONCLUSION

Defendants' motions for summary judgment are GRANTED.

Plaintiff's motion for summary judgment is DENIED.

The Clerk is instructed to terminate the motions (Docs. ##181, 190, 218, 222) and close this case.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1299804

---

    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 6891830
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Anthony HOUSE, Plaintiff,

v.

CITY OF NEW YORK, et al., Defendants.

18 Civ. 6693 (PAE) (KNF)

|

Signed 11/24/2020

**Attorneys and Law Firms**

Devon M. Radlin, Law Offices of Devon M. Radlin, New York, NY, for Plaintiff.

Valerie Elizabeth Smith, United States Attorney's Office, San Francisco, CA, Sonya Gidumal Chazin, Koehler & Isaacs LLP, Mostafa Khairy, New York City Law Department, New York, NY, for Defendants.

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

 **\*1**  This case involves claims under 42 U.S.C. § 1983 by a pretrial detainee that his jailers violated his due process rights under the Fourteenth Amendment when they failed to protect him against a December 2017 assault. Plaintiff Anthony House brings § 1983 claims against the City of New York and New York City Department of Correction ("DOC" and, together, the "City") and Correction Officer Romel Seepaul, Shield # 18686 ("Seepaul"). House also brings state-law claims against the City for negligent hiring and *respondeat superior*. Defendants now move for summary judgment. For the following reasons, the Court grants defendants' motions.

**I. Background**

 **A. Factual Background** [1]

[1]    This factual account draws primarily from the parties' submissions in support of and in opposition to the City's and Seepaul's motions for summary judgment, including the parties' Joint Statement of Undisputed Facts, Dkt. 68 ("JSF"), the City's Local Rule 56.1 statement, Dkt. 78 ("Defs. 56.1")

(incorporated by reference by defendant Seepaul, *see* Dkt. 86), House's response to defendants' Local Rule 56.1 statement, Dkt. 90 ("Pl. 56.1"), the City's reply to House's Local Rule 56.1 statement, Dkt. 97 ("Defs. Reply 56.1") (incorporated by reference by defendant Seepaul, *see* Dkt. 99), and the Declarations (some with accompanying exhibits) of Valerie Smith, Dkt. 79 ("Smith Decl.") and Devon Radlin, Dkt. 88 ("Radlin Decl.").

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence and are denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

**1. House's Arrest, Intake, and Housing Conditions**

On October 13, 2017, House was arrested for criminal contempt in the first degree and assault in the second degree on a peace officer using a weapon. JSF ¶ 1; Defs. 56.1 ¶ 1. After his arrest, and at all relevant times, House was held at the Vernon C. Bain Correctional Center ("VCBC") in DOC's custody as a pretrial detainee. JSF ¶ 2; Defs. 56.1 ¶¶ 3, 13, 15.

VCBC is part of DOC's Riker's Island Complex. JSF ¶ 2. House was held in housing area 2BB, a dorm-style complex that does not have cells and, at the time, housed 55 inmates. Smith Decl., Ex. G ("Defs. Seepaul Tr.") at 12 (excerpt of Seepaul deposition); Pl. 56.1 ¶ 13. It is undisputed that at all relevant times, Seepaul was responsible for supervising the housing area of 2BB. [2]

2

    The parties dispute the exact period during which Seepaul supervised the 2BB dormitory. *See* Pl. 56.1 ¶ 51 (claiming June 2017 to the present); Defs. Reply 56.1 ¶ 51 (claiming June 2017 to September 25, 2019).

**\*2** DOC maintains an Inmate Handbook, which sets out, among other things, the procedures for filing formal grievances that inmates must use under DOC's Inmate Grievance Resolution Program ("IGRP"). Defs. 56.1 ¶ 5; Smith Decl., Ex. D ("Inmate Handbook") (excerpt of handbook). To file a formal grievance, the inmate must complete the "Inmate Grievance Interview Slip" or an "Inmate Grievance Form." Defs. 56.1 ¶ 6. Either must be submitted within 10 days of the incident about which the inmate complains. *Id.* ¶ 7. Certain complaints are "not grievable" and are not subject to the grievance procedure. These include (1) "complaints of assault or harassment by a staff person, which the IGRC will refer to the commanding officer for necessary action"; (2) "issues that are in litigation"; and (3) "issues that do not directly affect [the complaining party]." Inmate Handbook at 1633. The parties dispute whether a complaint about a correction officer's failure to protect an inmate from an assault by another inmate is subject to the IGRP. Defs. 56.1 ¶ 10; Pl. 56.1 ¶ 10.

The parties further dispute whether, while in custody, DOC provided House with a copy of the handbook and thus whether he was aware of the IGRP. Defs. 56.1 ¶ 4; Pl. 56.1 ¶ 4. The City contends that House received and signed for at least one copy. *See* Defs. 56.1 ¶ 4; Smith Decl., Ex. C ("Handbook Receipt"). House attests that he did not receive a copy of the handbook upon arrival at VCBC or during his earlier (2005 and 2009) detentions at the Riker's Island complex. *See* Pl. 56.1 ¶ 4; Radlin Decl., Ex. 1 ("Pl. House Tr.") at 19–20 (excerpt of House deposition testimony). House further disputes the authenticity and content of the Handbook Receipt. *See* Dkt. 89 ("House Opp.") at 8.

### 2. House's Interaction with Officers and Inmates Prior to the December 30, 2017 Assault

House testified that in late November 2017, he had a conversation with another inmate, P.M.,[3] who was also housed in 2BB, which became a verbal altercation. Pl. House Tr. at 62–67. The altercation concerned a gang prosecution involving one of P.M.'s friends. *Id.* at 62. P.M. did not threaten House. *Id.* at 64. House did not report this incident to Seepaul

or any other officer. *Id.* Between this verbal altercation and the December 30, 2017 assault that forms the basis of his claims, House did not have any further altercations with P.M. *Id.* at 64–65.

3

    The Court identifies non-party inmates by their initials.

House testified that, in early December, about three weeks before the December 30, 2017 assault, he told Seepaul that he did not "feel comfortable" in 2BB and asked to be moved to a different jail or dorm. Smith Decl., Ex. E ("Defs. House Tr.") at 26; Defs. 56.1 ¶ 35; Pl. 56.1 ¶ 35. The parties dispute whether House told Seepaul that he was worried about being jumped or whether he stated only that he was generally uncomfortable. *Compare* Defs. 56.1 ¶ 35, *with* House Opp. at 2 (quoting Pl. House Tr. at 26, 45). Questioned at his deposition whether he had told Seepaul that someone was "after [him]," House responded that he had done so, but that he had not identified that person. Defs. House Tr. at 167. However, when asked whether he told Seepaul anything other than that he felt uncomfortable, House said he had not. *Id.* at 27. House explained that he had not known, at the time, who might want to jump him. *Id.* at 45. House testified that Seepaul said that he would speak to his area supervisor and that Seepaul told House that he, Seepaul, had "a feeling" that he knew who House was talking about. *Id.* at 26–27. House further testified that he believed that Seepaul knew that inmates were planning to jump him, and even which inmates were planning to do so, based on the fact that he had heard from other inmates that Seepaul had discussed House's sanitation job with P.M. *Id.*[4]

4

    The record as to when the first threat against House occurred is unclear. In his brief, House states that his first notice of potential threats against him occurred three weeks before the assault and spurred this discussion with Seepaul. *See* House Opp. at 14. But House's testimony put his first discussion with a fellow inmate about a possible attack a week later —two weeks before the incident. Defs. House. Tr. at 25. Consequently, the parties dispute whether, three weeks before the incident, House told Seepaul that he was merely feeling unsafe or whether he had heard about threats to his safety. *Compare* House Opp. at 14, *with* Dkt. 96 ("City Reply") at 6.

**\*3** Seepaul testified that he did not recall ever having any conversations with House about such subjects prior to December 30, 2017. Defs. Seepaul Tr. at 31; Dkt. 52-3

("Supp. Seepaul Tr.") at 28. [5] Seepaul did not recall having spoken to House prior to December 30, 2017, and denied that any discussion along these lines occurred, including that he ever told House that he knew who might be a threat to his safety or that he knew there to be an issue between House and P.M. Supp. Seepaul Tr. at 28–29; Defs. Seepaul Tr. at 51. Seepaul further denied that any other officer briefed him about House. Defs. Seepaul Tr. at 46. [6] He also denied having told House that he would speak to his captain about the situation. Supp. Seepaul Tr. at 28–29. Before the December 30, 2017 assault, Seepaul had never witnessed any physical altercations or other aggression between House and P.M. or D.J, another inmate involved in House's assault. Defs. 56.1 ¶ 38; Pl. 56.1 ¶ 38.

[5]   Although both the City and House cite to excerpts of Seepaul's deposition in their respective briefs, neither party excerpted the cited page. This page was not taken from the 56.1 statement but from a prior filing on the docket of this case. The parties do not dispute that this page is a true and correct portion of Seepaul's deposition transcript.

[6]   Consistent with this denial, Seepaul did not notify his superior of a request by House to be moved. Supp. Seepaul Tr. at 28–29.

House testified that approximately two weeks before December 30, 2017, he told another officer, identified in the complaint as "John Doe," that he did not "feel comfortable" in 2BB and asked to be moved. Smith Decl., House Tr. at 25; Defs. 56.1 ¶ 35; Pl. 56.1 ¶ 35. House testified that "John Doe" responded that he would inform the area captain. Defs. House Tr. at 25. House did not testify to having specifically told the John Doe officer that his life or safety had been threatened. Defs. House Tr. at 25. "John Doe" has not been identified and there is no corroboration for House's claim to have reached out to "John Doe."

House never requested to be placed into protected custody. Defs. 56.1 ¶ 35; Pl. 56.1 ¶ 35. Nor did House file an Inmate Grievance Interview Slip or an Inmate Grievance Form. Defs. 56.1 ¶ 11; Pl. 56.1 ¶ 11. Before the December 30, 2017 incident, neither DOC nor Seepaul had received any written notice reflecting a threat to House's safety or hostility between House and any inmate (including those involved in the incident: A.R., P.M. and D.J.). JSF ¶¶ 13–15.

### 3. The December 30, 2017 Incident

On December 30, 2017, House remained housed in unit 2BB of VCBC. JSF ¶ 3. Seepaul was one of two officers in charge of supervising inmates in 2BB. Id. ¶ 4; Defs. 56.1 ¶ 16; Pl. 56.1 ¶ 16. Seepaul was responsible for the inmate housing area in 2BB, where he was assigned to the correction officer desk. Defs. 56.1 ¶ 17. Officer O'Neil was responsible for supervising 2BB and 2BA, using a monitor situated in a space between the dorms known as "the Bubble." Defs. Seepaul Tr. at 13, 63–64; Pl. 56.1 ¶¶ 16, 18. O'Neil was capable of viewing both monitors simultaneously from that position. Defs. Seepaul Tr. at 64.

House testified that, at lunch on December 30, 2017, another inmate, E.S., advised him to be careful because someone was going to jump him. Pl. House Tr. at 24. House was "not really worried" by E.S.'s statement. Id. Nevertheless, House testified that, at about 5:30 p.m. that day, during Seepaul's rounds, House told Seepaul that he did not "feel safe" in 2BB and wanted to be moved. Id. at 28, 76. House testified that Seepaul laughed and said, "I don't know." Id. at 28. Seepaul testified that he did not remember having any conversation with House on December 30, 2017 and did not notify his captain or the movement officer. See Supp. Seepaul Tr. at 28; Defs. Seepaul Tr. at 19.

House testified that, on December 30, 2017, at approximately 9:30 p.m., he had another conversation with E.S. and another unidentified inmate, during which they discussed their criminal cases. Pl. House Tr. at 47. During this discussion, another inmate, A.R., who was in a nearby bed, told House that "people were tired of [House]" and that House "was acting crazy" and should "pack his things" and "get out of here." Id. at 47–51; Defs. 56.1 ¶ 19. House testified that he told A.R. that he was waiting for "the officer to do something about it." Pl. House Tr. at 47. This escalated into a verbal altercation. Defs. 56.1 ¶ 19; see also Smith Decl., Ex. H ("VCBC Video"). House testified that A.R. began to get "aggressive" and began "punching" his fists together. Pl. House Tr. at 48. At this point, however, House did not yet find A.R. threatening and had the opportunity to walk away but did not do so. Pl. House Tr. at 48; Defs. 56.1 ¶ 20. House testified that A.R. began "coming towards [House] in an aggressive way," with "his fists bal[led]." Pl. House Tr. at 51. House observed at this point that Seepaul was not at the correction officer desk. Defs. 56.1 ¶¶ 21–23; Pl. 56.1 ¶¶ 21–23; Defs. House Tr. at 72. Seepaul testified that he had left his post

for approximately 15 minutes around this time, to use the bathroom and that he asked Officer O'Neil to "keep an eye on the dorm" from the Bubble. Defs. Seepaul Tr. at 32, 53, 55. Seepaul does not dispute that it was against DOC policy to leave his post without securing another officer to cover it. *Id.* at 53–54.

**\*4** House then punched A.R. in the face. JSF ¶ 5; VCBC Video; Defs. 56.1 ¶ 23; Pl. 56.1 ¶ 23. House testified that he attacked A.R. before anyone had attacked him to protect himself because he felt that A.R. was going to jump him, and because Seepaul had abandoned his post. *See* Pl. 56.1 ¶ 24; Pl. House Tr. at 47–48. Before this altercation, House had not suspected that A.R. was going to attack him. Pl. House Tr. at 52. The parties dispute whether House's attack on A.R. is fairly termed a "surprise" attack. Defs. 56.1 ¶ 25; Pl. 56.1 ¶ 25.

Immediately after House punched A.R., inmates P.M. and D.J. assaulted House from behind. JSF ¶¶ 6–7; VCBC Video. Their assault on House lasted approximately 30 seconds. VCBC Video; Defs. 56.1 ¶ 27. Surveillance cameras captured both House's attack on A.R. and P.M. and D.J.'s ensuing assault of House. JSF ¶ 8; VCBC Video.

Seepaul had not secured another officer to relieve him before leaving his post for the bathroom and did not personally see the attacks by House on A.R. or by P.M. and D.J. on House. Defs. 56.1 ¶¶ 41–43. O'Neil, monitoring both the 2BB and 2BA housing areas on the monitors in the Bubble, alerted Seepaul that a fight had broken out in 2BB. Defs. Seepaul Tr. at 33–34. Seepaul then entered the housing area, turned on the lights, and ordered the inmates to stop fighting. Defs. House Tr. at 59; Defs. Seepaul Tr. at 34, 47–48. The inmates complied. Defs. House Tr. at 59; Defs. Seepaul Tr. at 34. As a result of this altercation House sustained, *inter alia*, a fracture to his right eye socket, a skull fracture, and a nose fracture, necessitating a surgery in 2018. Pl. House Tr. at 83–86, 92.

Following the incident, House received medical attention. JSF ¶ 9. House did not file an Inmate Grievance Interview Slip or an Inmate Grievance Form. Defs. 56.1 ¶ 12; Pl. 56.1 ¶ 12.

### 4. Seepaul's Training and Discipline

Seepaul was trained at the Correction Officers' Academy ("CO Academy"). Defs. 56.1 ¶ 39. At the CO Academy and on the job, Seepaul was trained to respond to an inmate's reports of threats to his safety, to handle inmate fights, and

to not leave his post unattended. *Id.* Defendants admit that Seepaul was aware that he was not permitted to leave his post unless another officer was available to relieve him. *Id.* at ¶ 40. The parties dispute whether Seepaul received training on the IGRP, the inmate grievance resolution program, Pl. 56.1 ¶ 53; Defs. Reply 56.1 ¶ 53, or on protective custody, Pl. 56.1 ¶ 54; Defs. Reply 56.1 ¶ 54.

After the December 30, 2017 incident, DOC investigated Seepaul's actions. Defs. 56.1 ¶ 45. Seepaul was charged with and pled guilty to charges of abandonment of post and "efficient performance of duties." *Id.* ¶ 46; Pl. 56.1 ¶ 46. As punishment, Seepaul received a command discipline and lost one vacation day. Def. 56.1 ¶ 46–47; Pl. 56.1 ¶ 46–47.

[Redacted]

### B. Procedural History
On July 25, 2018, House filed an initial Complaint. Dkt. 1. On October 19, 2018, the City answered. Dkt. 13. On December 18, 2018, the Court held an initial pretrial conference and approved the parties' case management plan. Dkt. 18. On January 8, 2019, consistent with that plan, House filed an amended complaint, adding Seepaul as a defendant. Dkt. 21 ("Am. Compl."). On January 22, 2019, the City answered. Dkt. 24. On April 22, 2019, Seepaul filed an answer and a cross-claim against the City for indemnification. Dkt. 38 ("Seepaul Answer"). On May 14, 2019, the City answered Seepaul's cross-claims. Dkt. 41 ("City Cross-Claims Answer").

**\*5** On August 29 and 30, 2019, Seepaul and the City, respectively, filed pre-motion letters in anticipation of motions for summary judgment. Dkts. 44–45. On October 11, 2019, House responded to both letters. Dkt. 50. On November 12, 2019, the Court held a pre-motion conference to set the briefing schedule for the motions for summary judgment. *See* Dkt. 67. On December 6, 2019, the parties filed a Joint Statement of Undisputed Facts. *See* JSF. On January 10, 2020, the City filed a motion for summary judgment on House's claims against the City and DOC. Dkts. 75, 78–80. On February 3, 2020, Seepaul filed a motion for summary judgment. Dkts. 84–86. Seepaul's motion incorporated by reference the Rule 56.1 Statement submitted by the City and the City's arguments, Dkt. 86, and addressed House's conspiracy claim against Seepaul in his individual capacity, Dkt. 85. On February 14, 2020, House filed an opposition to both defense motions for summary judgment. Dkts. 88–90.

2020 WL 6891830

On March 2, 2020, the City and Seepaul filed their respective replies. Dkts. 95–100. [7]

[7]   While the summary judgment motions were briefed, the parties litigated House's bid to obtain Seepaul's disciplinary records. On October 15, 2019, House moved to compel production of these records and for discovery sanctions. Dkts. 51–53. On October 16, 2020, the Court denied the motion without prejudice, based on House's failure to comply with the Court's individual rules. Dkt. 55. On October 17, 2019, House, now compliant with those rules, filed a letter seeking Seepaul's disciplinary file, reopening of discovery, and sanctions against Seepaul. Dkt. 58. On October 21, 2019, Seepaul replied, arguing that House's motion was belated, and that N.Y. Civil Rights Law ("NYCRL") § 50-a protected his disciplinary record from disclosure. Dkt. 60. On October 22, 2019, the Court ordered production of Seepaul's disciplinary record, but subject to a protective order to safeguard its confidentiality, and denied House's motion for sanctions. Dkt. 62. On October 25, 2019, the Court clarified that records involving similar incidents on Seepaul's part need be produced. Dkt. 66.

On July 14, 2020, after the repeal of NYCRL § 50-a, the Court ordered the unsealing of any sealed filings related to Seepaul's disciplinary records. Dkt. 103. On July 24, 2020, the City moved for reconsideration, Dkt. 110–12, which House opposed, Dkt. 113. On July 28, 2020, the Court stayed its decision unsealing filings referring to Seepaul's disciplinary history pending the outcome of a separate lawsuit concerning the scope of the repeal of NYCRL § 50-a. Dkt. 114.

In this decision, as a publicly issued version, the Court has redacted references to Seepaul's disciplinary history, other than that arising from the incident at issue in this case.

## II. Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

**\*6** "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III. Discussion

House brings three claims under § 1983, each alleging a violation of his Fourteenth Amendment due process rights: (1) a claim against Seepaul for failure to protect House from assault; (2) a *Monell* claim against the City for failure to protect House from assault; and (3) a claim that Seepaul and the John Doe officer conspired to violate House's constitutional rights. House also brings state law claims against the City, seeking to hold it liable for Seepaul's violations of law under negligent hiring and *respondeat superior* theories.

The Court first examines the City's arguments that the John Doe officer and the DOC are not legally proper defendants. The Court next considers defendants' argument that House failed to exhaust his administrative remedies. The Court then examines whether there is sufficient evidence to support each of House's claims.

### A. Proper Defendants

Case 5:22-cv-00216-GTS-TWD   Document 7   Filed 04/13/22   Page 77 of 227

**1. John Doe Officer**

The City first moves to dismiss the § 1983 claim against individual defendant John Doe, because House has not been able to identify him. *See* Dkt. 80 ("City Mem.") at 4.

To sustain a § 1983 action against an individual defendant, a "plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013); *see also Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010). Using "John Doe" in lieu of an individual defendant's name does not adequately identify that person. *See Coward v. Town & Vill. of Harrison*, 665 F. Supp. 2d 281, 300 (S.D.N.Y. 2009). However, "courts typically resist dismissing suits against John Doe defendants 'until the plaintiff has had some opportunity for discovery to learn the identities of responsible officials.' " *Id.* (quoting *Kearse v. Lincoln Hosp.*, No. 07 Civ. 4730, 2009 WL 1706554, at *3 (S.D.N.Y. June 17, 2009)); *see also Warren v. Goord*, 476 F. Supp. 2d 407, 413–14 (S.D.N.Y. 2007) (court "will not dismiss the claim against John Doe until plaintiff has had sufficient discovery to name the defendant").

However, "where a plaintiff has had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discover the defendant's name, ... the plaintiff simply cannot continue to maintain a suit against the John Doe defendant." *Cruz v. City of New York*, 232 F. Supp. 3d 438, 448 (S.D.N.Y. 2017) (*quoting Coward*, 665 F. Supp. 2d at 300). Here, discovery is complete, Dkt. 49 (extending close of fact discovery to October 21, 2019), yet House has neither moved to substitute the name of an individual officer nor indicated that he has learned who that person is. And House, in opposing the City's summary judgment motion, does not address his claims against the John Doe defendant, or argue that his ability to discover the identity of that defendant has been thwarted. *Cf. Cruz*, 232 F. Supp. 3d at 448 (dismissing § 1983 claims against John Doe defendant where plaintiff had not made efforts to discover true name or defend continued use of "John Doe" in opposition to summary judgment motion).

**\*7** Accordingly, the Court dismisses the claims against the John Doe defendant. This ruling is without prejudice to House's right to bring a later separate lawsuit against an identified person for the violations alleged. *See, e.g., Coward*, 665 F. Supp. 2d at 302 (dismissing John Doe claim without prejudice for failure to obtain, after to discovery, identity).

**2. New York City Department of Correction**

The City next moves to dismiss the claims against DOC on the grounds that DOC is not a suable entity. *See* City Mem. at 4–5. The New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law." N.Y. City Charter Ch. 17 § 396. It is well-established that "where a plaintiff has named the Department of Correction[ ] as a defendant, he has sued a non-suable entity." *Adams v. Galletta*, 966 F. Supp. 210, 212 (S.D.N.Y. 1997); *see also Johnson v. Dobry*, 660 F. App'x 69, 72 (2d Cir. 2016) (summary order); *Walker v. City of New York*, 367 F. Supp. 3d 39, 46 n.2 (S.D.N.Y. 2019) (distinguishing DOC, which is non-suable, from the Health and Hospitals Corporation, which by statute is suable). Accordingly, the City is the proper defendant in this action, not DOC. The Court accordingly dismisses House's claims against DOC. [8]

[8]    In any event, House appears to have abandoned his claims against DOC, as he does not address these in his opposition to the City's motion. *See Jackson v. Fed. Express*, 766 F.3d 189, 195, 197–98 (2d Cir. 2014) (where a party is represented by counsel, "a partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims").

**B. Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under ... Federal law[ ] by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Complete exhaustion of administrative remedies is required. *See Porter v. Nussle*, 534 U.S. 516, 524 (2002) ("All 'available' remedies must now be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.' "). This exhaustion requirement applies to all federal claims relating to prison life, *id.* at 516, regardless of the relief offered by the administrative process

or sought by the prisoner, *Booth v. Churner*, 532 U.S. 731, 740–41 (2001).

The PLRA contains an exception, however, to an inmate's obligation to exhaust administrative remedies: An inmate must exhaust only those remedies that are available. *See Ross v. Blake*, 136 S. Ct. 1850, 1853 (2016). The Supreme Court has identified three circumstances under which an administrative remedy is unavailable to an inmate: (1) when the remedy "operates as a simple dead end"; (2) when the remedy is "so opaque that it becomes, practically speaking, incapable of use," *i.e.*, "no ordinary prisoner could navigate" the process; and (3) "when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." *Id.* at 1853–54. "Whether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements." *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015).

**\*8** Before the Supreme Court's decision in *Ross*, the Second Circuit had suggested that failure to inform an inmate-turned-plaintiff of the grievance procedure could raise a question of material fact as to whether that administrative remedy had been available to him. *See Ruggiero v. County of Orange*, 467 F.3d 170, 178 (2d Cir. 2006). Consistent with that guidance, in several cases, courts in this District had found that issues of fact precluded pretrial resolution of the defense of exhaustion. *See Arnold v. Goetz*, 245 F. Supp. 2d 527, 538 (S.D.N.Y. 2003) (inmate's claims of ignorance of administrative remedy raised question of fact whether the remedy was available); *Burgess v. Garvin*, No. 01 Civ. 10994 (GEL), 2004 WL 527053, at \*3 (S.D.N.Y. Mar. 16, 2004) ("Courts have held that remedies are not available where prisoners are not informed of their existence." (citing *Arnold*, 245 F. Supp. 2d at 538)). Courts in this Circuit, however, have read the 2016 *Ross* decision to "limit[ ] meaningfully the scope of the availability inquiry" by narrowing the "special circumstances" that can support a finding that a remedy was unavailable. *See Vidro v. Erfe*, No. 3:18 Civ. 00567 (CSH), 2019 WL 4738896, at \*8 (D. Conn. Sept. 26, 2019). These have held that an inmate's unawareness of an administrative remedy does not make it unavailable unless the inmate was unaware due to "machination, misrepresentation, or intimidation" on the part of prison administrators. *See id.*; *see also Galberth v. Washington*, No. 14 Civ. 691 (KPF), 2017 WL 3278921, at \*11 (S.D.N.Y. July 31, 2017), *aff'd*, 743 F. App'x 479 (2d Cir. 2018) (holding that *Ross* heightened the unavailability showing articulated in *Ruggerio*).

Here, it is undisputed that House did not, at any point, file an Inmate Grievance Interview Slip or an Inmate Grievance Form with respect to his fear of other inmates or, more specifically and relevant here, the assault by P.M. and D.J. Defs. 56.1 ¶ 11; Pl. 56.1 ¶ 11. This, the City argues, requires a finding that he has failed to administratively exhaust his claims. And House, the City argues, was aware of his administrative remedies because he received a copy of the Inmate Handbook, which describes the IGRP, as reflected in a receipt signed by House so indicating. *See* City Mem. at 5–7; Handbook Receipt. House, for his part, claims unawareness of the IGRP. He disputes receiving the handbook, asserting that the Handbook Receipt does not so establish because the signatures on it, including his, are not dated, witnessed, or verified. *See* House Opp. at 8; Handbook Receipt; Smith Decl. ¶ 3. The City responds that even if there is a factual dispute whether House received the handbook, House was otherwise aware of the IGRP. *See Ruggiero*, 467 F.3d at 178 (finding that a factual dispute as to whether the inmate received a copy of the handbook was not material where the inmate was otherwise aware of the grievance procedure). To this end, the City points to an Inmate Grievance Form, dated November 14, 2017, submitted by House regarding his medical care at Rikers. *See* Dkt. 95 ("Smith Reply Decl."), Ex. K ("House Grievance Form").

The parties also dispute whether the IGRP remedy applies to inmate-on-inmate assaults. *See* Defs. 56.1 ¶ 10; Pl. 56.1 ¶ 10. The Inmate Handbook, in describing the grievance process, identifies types of complaints that are "not grievable" and thus not subject to that process: (1) "complaints of assault or harassment by a staff person, which the IGRC will refer to the commanding officer for necessary action"; (2) "issues that are in litigation"; and (3) "issues that do not directly affect [the complaining party]." Inmate Handbook at 1633. The City argues that because a correction officer's failure to protect an inmate from an assault by another inmate does not fall within any listed exception, a complaint about such conduct is subject to the IGRP (*i.e.*, it is grievable). Defs. 56.1 ¶ 10. House construes the handbook's silence as to the specific circumstance of a correction officer's failure to protect an inmate from assault from an inmate as not clearly making such conduct grievable.

The Court's assessment is that summary judgment is warranted for the City, based on House's failure to exhaust.

Case 5:22-cv-00216-GTS-TWD   Document 7   Filed 04/13/22   Page 79 of 227

**\*9**  On one point in the analysis, House is correct—his claims fall outside the IGRP process. To reach this result, the Court takes judicial notice of the IGRP Directive, N.Y.C. DOC Directive 3376 (effective Sept. 10, 2012) ("IGRP Directive"), which codifies the IGRP procedures. *See Taylor v. City of New York*, No. 16 Civ. 7857 (NRB), 2018 WL 1737626, at \*4 n.5 (S.D.N.Y. Mar. 27, 2018) (judicial notice of IGRP Directive is "common practice" in this District); *see also* City Mem. at 6 n.4 (inviting Court to take judicial notice of the IGRP Directive). The IGRP Directive sets out species of grievances that are not subject to the IGRP process, including "allegations of physical or sexual assault or harassment by either staff or inmates[.]" IGRP Directive § IV(B)(2)(b). Interpreting this section of the IGRP Directive, courts in this Circuit have "held that claims involving a correctional officer's failure to protect an inmate from another inmate's attack falls within that IGRP process exception." *Alicea v. City of New York*, No. 16 Civ. 7347 (LAP), 2020 WL 1528478, at \*3 (S.D.N.Y. Mar. 31, 2020); *see Taylor v. Swift*, 21 F. Supp. 3d 237, 241–44 (E.D.N.Y. 2014) (claim that "prison officials stood idly by" while inmate was assaulted by another inmate not subject the IGRP).[9] And the IGRP directive, rather than the PLRA, governs whether an inmate has properly exhausted all administrative remedies. *See Jones v. Bock*, 549 U.S. 199, 218 (2007). On the basis of this authority, the Court holds that claims such as House's—that a correctional officer failed to protect an inmate from another inmate's attack—falls within that exception. House therefore was not required to exhaust the entire IGRP process.[10] *See Alicea*, 2020 WL 1528478, at \*3.

[9]  The court in *Swift* interpreted an earlier version of the IGRP directive, subject to which "allegations of assault or harassment by either staff or inmates" were "non-grievable" under the IGRP process. *See* N.Y.C. DOC Directive 3375R-A § II(C)(2) (effective Mar. 13, 2008).

[10]  In support of their claim that failure-to-protect claims based on inmate-on-inmate assaults are subject to the entire IGRP, the City cites *Cicio v. Wenderlich*, 714 F. App'x 96 (2d Cir. 2018) (summary order). But in that case, a *pro se* appeal, the text of the IGRP Directive was not before the Second Circuit. The City also cites *Jhagroo v. Carty*, No. 17 Civ. 416 (PKC) (SJB), 2019 WL 1922287 (E.D.N.Y. Apr. 29, 2019). But *Jhagroo*, in examining the procedure as outlined in the IGRP Directive, did not consider whether any exceptions

in § IV(B)(2)(b) applied to a correction officer's failure to protect an inmate from assault. *Id.* at \*2.

That, however, does not ultimately carry the day for House because, even when the exception applies and the full suite of IGRP procedures are not required, an inmate must still file a formal grievance to exhaust all remedies. *Id.* (even "when an IGRP exception applies, the inmate must still file a grievance to satisfy his exhaustion requirement, though he need not go through the rest of the IGRP processes."). It is undisputed that House did not file a formal grievance. Defs. 56.1 ¶ 11; Pl. 56.1 ¶ 11. And House does not claim that prison officials attempted to thwart his knowledge of the grievance process. *See Ross*, 136 S. Ct. at 1854; *Vidro*, 2019 WL 4738896, at \*8. Thus, even if House did not receive a copy of the Inmate Handbook—and his objection that no date appears along his signature on the Handbook Receipt falls well short of refuting the evidence of such receipt—the IGRP was still available to him, because he not adduced evidence that prison officials attempted to use "machination, misrepresentation, or intimidation" to deny him access to the handbook or to the prison remedial processes that it describes. Moreover, even treating it as factually disputed whether House actually received the Inmate Handbook, there is independent evidence that House was aware of the IGRP process and how to complete and submit an Inmate Grievance Form. He did so on November 15, 2017, just a month before the assault. *See* House Grievance Form; *see also Ruggiero v. 467* F.3d at 178 (whether plaintiff received inmate handbook not a material fact where he was otherwise aware of the grievance procedures).

Accordingly, summary judgment is properly granted on all claims against the City, based on House's failure to exhaust administrative remedies.[11] *Truss v. City of New York*, No. 18 Civ. 6353 (GHW), 2019 WL 2435623, at \*3 (S.D.N.Y. June 11, 2019) (dismissing inmate-plaintiff's claims for failure to exhaust administrative remedies); *Lowman v. Baird*, No. 16 Civ. 6518 (VSB), 2017 WL 6403519, at \*4–7 (S.D.N.Y. Dec. 14, 2017) (same); *Prescott v. Annetts*, No. 09 Civ. 4435 (CM), 2010 WL 3020023, at \*7 (S.D.N.Y. July 22, 2010) (same).

[11]  This ruling does not extend to House's claims against Seepaul. Failure to exhaust administrative remedies is an affirmative defense to a § 1983 claim. *Jones*, 549 U.S. at 216; *see also Johnson v. Testman*, 380 F.3d 691, 696 (2d Cir. 2004) (defendant can waive affirmative defense of plaintiff's failure to exhaust administrative

remedies by failing to raise it in answer). Unlike the City, Seepaul did not raise exhaustion as an affirmative defense in his answer. Nor did he later move to amend his answer to include exhaustion.

### C. Section 1983 Claims

**\*10** House brings three § 1983 claims: (1) against Seepaul, for failure to protect House; (2) a *Monell* claim against the City based on Seepaul's failure to protect House; (3) against Seepaul and the John Doe officer, for conspiracy to deprive House of his right to be free of unconstitutional conditions of confinement, namely, from the "unlawful and illegal assault of his person by other inmates." Am. Compl. ¶¶ 23–32. For the reasons noted, summary judgment is properly granted to the City on the *Monell* claim because House has not exhausted his administrative remedies. In any event, for the following reasons, summary judgment is properly granted to the defense on each of House's claims because, viewing the disputed facts in the light most favorable to House, the evidence adduced would not entitle him to relief.

#### 1. Legal Standards Governing § 1983 Claims

Section 1983 provides redress for a deprivation of federally protected rights by persons acting under color of state law. 42 U.S.C. § 1983. To prevail on a § 1983 claim, a plaintiff must establish (1) the violation of a right, privilege, or immunity secured by the Constitution or laws of the United States (2) by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155–56 (1978).

##### a. Personal Liability Under § 1983

To establish personal liability under § 1983, a plaintiff must show that the defendant was "personally or directly involved in the violation," *Simpson v. Town of Warwick Police Dep't*, 159 F. Supp. 3d 419, 431 (S.D.N.Y. 2016) (quoting *Harris v. Westchester Cnty. Dep't of Corr.*, No. 06 Civ. 2011 (RJS), 2008 WL 953616, at *9 (S.D.N.Y. Apr. 3, 2008)), that is, that there was "personal participation by one who has knowledge of the facts that rendered the conduct illegal," *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001); *accord Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an

award of damages under § 1983." (internal quotation marks and citation omitted)).

##### b. Municipal Liability Under § 1983

Municipal liability in a § 1983 action may not be based on *respondeat superior* or vicarious liability. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, to hold a municipality liable under § 1983 for the unconstitutional actions of its employees, a plaintiff must prove that there was a municipal policy or custom that directly caused the plaintiff to be subjected to a constitutional violation. *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007); *see Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) ("[C]onstitutional torts committed by city employees without official sanction or authority do not typically implicate the municipality in the deprivation of constitutional rights, and therefore the employer-employee relationship is in itself insufficient to establish the necessary causation." (internal quotation marks and citation omitted)).

A plaintiff can establish the existence of a policy or custom by demonstrating:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (internal citations omitted) (collecting cases); *Calderon v. City of New York*, 138 F. Supp. 3d 593, 611–12, No. 14 Civ. 1082 (PAE), 2015 WL 5802843, at *14

(S.D.N.Y. Oct. 5, 2015), *reconsideration in part granted on other grounds*, 2015 WL 6143711 (S.D.N.Y. Oct. 19, 2015); *Spears v. City of New York*, No. 10 Civ. 3461 (JG), 2012 WL 4793541, at *11 (E.D.N.Y. Oct. 9, 2012).

### 2. **House's Failure-to-Protect Claims** [12]

[12]  Seepaul adopts the City's arguments on these claims. *See* Dkt. 85 ("Seepaul Mem.") at 1.

**\*11** House was a pretrial detainee, and thus his "claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). [13]  That is because pretrial detainees have not been convicted of a crime, and therefore "may not be punished in any manner—neither cruelly and unusually nor otherwise." *Id.* (internal quotations and citations omitted).

[13]  The City and House agree on this point. *See* City Mem. at 8; House Opp. at 10.

"The Constitution imposes a duty on prison officials to 'take reasonable measures to guarantee the safety of the inmates.' " *Luckey v. Jonas*, No. 18 Civ. 8103 (AT) (KNF), 2019 WL 4194297, at *3 (S.D.N.Y. Sept. 4, 2019) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Prison officials have a particular duty to protect other inmates from "violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833.

However, not every injury sustained in an inmate-on-inmate assault "translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. Rather, a prison official's failure to protect a pretrial detainee rises to the level of a Fourteenth Amendment violation only "where the officer acted with 'deliberate indifference to a substantial risk of serious harm to an inmate.' " *Rosen v. City of New York*, 667 F. Supp. 2d 355, 359–60 (S.D.N.Y. 2009) (quoting *Farmer*, 511 U.S. at 828). "[M]ere negligence" is not sufficient. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996).

The Second Circuit has identified two showings an inmate must make to establish a claim for deliberate indifference to unconstitutional conditions of confinement: A pretrial detainee must satisfy (1) "an 'objective prong' showing that the challenged conditions were sufficiently serious to

constitute objective deprivations of the right to due process"; and (2) a "*mens rea* prong" that shows "that the officer acted with at least deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 29. Courts in this District have held that this "*Darnell* framework" applies to failure-to-protect claims. *See, e.g.*, *Brown v. Warden NYCDOC MDC*, No. 20 Civ. 2144 (LLS), 2020 WL 1911186, at *3 n.3 (S.D.N.Y. Apr. 17, 2020); *Luckey*, 2019 WL 4194297, at *3; *Taylor*, 2018 WL 1737626, at *12.

#### a. Personal Liability of Seepaul

The City does not appear to challenge either that, in leaving his post, Seepaul was acting under the color of state law, or that Seepaul was personally involved in the events giving rise to House's injuries. Rather, the City argues that there is no underlying constitutional violation because the evidence cannot establish (1) that House was subject to conditions sufficiently serious to satisfy the objective prong, and (2) that Seepaul acted with the deliberate indifference required by the subjective prong. City Mem. at 9–13; City Reply at 4–8.

#### i. Objective Prong: Substantial Risk of Serious Harm

Under the Due Process Clause, there is no "static test" as to whether the evidence establishes sufficiently serious conditions to satisfy the "objective prong." *Darnell*, 849 F.3d at 30. A prison official's failure to "intervene in an attack ... may under certain circumstances create a condition which poses a substantial risk of serious harm thus constituting a sufficiently serious constitutional violation." *Molina v. County of Westchester*, No. 16 Civ. 3421 (VB), 2017 WL 1609021, at *3 (S.D.N.Y. Apr. 28, 2017); *see also Luckey*, 2019 WL 4194297, at *4. In evaluating whether the risk of an inmate being harmed by another inmate is " 'sufficiently serious,' to trigger constitutional protection, the focus of inquiry must be, not the extent of the physical injuries sustained in an attack, but rather the existence of a 'substantial risk of serious harm.' " *Blake v. Kelly*, No. 12 Civ. 7245 (ER), 2014 WL 4230889, at *5 (S.D.N.Y. Aug. 26, 2014) (quoting *Heisler v. Kralik*, 981 F. Supp. 830, 837 (S.D.N.Y. 1997)). A previous altercation may support the factual finding of a substantial risk of serious harm, but there is no requirement of a prior altercation. *Luckey*, 2019 WL 4194297, at *4.

**\*12** House emphasizes that a plaintiff may fulfill the objective prong by demonstrating a "generalized risk" of

harm in the prison facility. *See Ross v. City of New York*, No. 12 Civ. 8545 (LGS), 2014 WL 3844783, at *5 (S.D.N.Y. Aug. 4, 2014), *rev'd and remanded on other grounds*, No. 14-3327 (2d Cir. July 20, 2015); *see also* House Opp. at 11. But House has not adduced such evidence here. He has not identified any evidence that VCBC or the 2BB dorm were particularly violent such that leaving an inmate unsupervised for any period of time could pose a substantial risk of serious harm to an inmate. House notes that DOC's policy required Seepaul to secure coverage before leaving his post to demonstrate a generalized risk. House Opp. at 11. But that policy was of general application. House does not point to evidence supporting any factor that courts have found probative in finding that a dorm or other prison facility presented a generalized risk of substantial harm to all inmates, *e.g.*, that it was a "maximum security cell block," "known to be populated by gang members," a place in which inmates "tend to fight whenever they feel like it," or one in which prisoner cells had not been searched for weapons. *Ross*, 2014 WL 3844783, at *4.

Lacking such evidence, to establish the objective prong, House must adduce evidence that there was a particularized, substantial risk of serious harm to himself. To this end, House first asserts in his brief that, according to his deposition testimony, he had heard from inmates, shortly after his verbal altercation with P.M., about threats to his life and safety, and that he had communicated these threats to Seepaul. *See* House Opp. at 2, 12, 14. That, however, overstates House's deposition testimony. [14] House testified to having had a verbal argument with P.M. in late November 2017. Pl. House Tr. at 62–67. But he testified that P.M. did not threaten him during this altercation and that he had not reported the argument to Seepaul. *Id.* at 64. House also states in his brief that "[s]hortly after this argument, [House] began to hear threats to watch himself from fellow inmates." House Opp. at 2. Questioned in his deposition on this point, House identified two such instances: (1) about two weeks before the incident, House heard that someone was going to jump him; and (2) on December 30, 2017, E.S. told him to "be careful" because someone was going to jump him. Defs. House Tr. at 24–25, 45.

[14]     House's brief repeatedly states that threats had been made on his life. House Opp. at 2, 12, 14–15. But he does not point to any admissible evidence to this effect, including any aspect of his deposition testimony recounting threats on his life, let alone

that he communicated threats of this nature to Seepaul.

The parties debate the extent of Seepaul's knowledge of the threats. Although relevant to the *mens rea* rather than the objective prong, House, even viewing the evidence in the light most favorable to him, did not convey these facts to Seepaul. House testified that he had the first relevant conversation about such matters with Seepaul approximately three weeks before the December 30, 2017 incident. At that time, he told Seepaul that he was "uncomfortable" and that someone was "after [him]," in response to which, House testified, Seepaul replied that he had "a feeling" about who House was referring to. Defs. House Tr. at 26–27, 167. House's testimony places that discussion before House first heard that someone was going to jump him. [15] And he did not anywhere testify that he had explicitly told Seepaul that he feared that someone would to "jump" him. *Compare* Defs. House Tr. at 26 (House testifying that he told Seepaul he did not "feel comfortable" in 2BB and asked to be moved), *with id.* at 167 (House testifying, in response to a question as to whether he told Seepaul someone was "after" him, that he did so). The second occurred at approximately 5:30 pm on December 30, 2017, wherein, during Seepaul's rounds, House told Seepaul that he did not "feel safe" in 2BB and wanted to be moved. Pl. House Tr. at 28, 76. House did not attest to any other conversations with Seepaul. It was the John Doe officer to whom House testified he spoke after he had been told by an unidentified inmate, two weeks before the December 30, 2017, that he might be jumped. Defs. House Tr. at 25.

[15]     As noted, the record is unclear as to whether the first instance in which House heard of a possible threat against him was approximately three, or two, weeks before the assault. *See supra* p. 4 n.4.

**\*13** In all events, the question as to the objective prong is whether the two, or possibly three, statements made to House, taken in aggregate with House's injuries, would permit a reasonable jury to find that a substantial risk of serious injury to himself existed prior to the attack. Both statements were unspecific. As to the first statement, House testified only that he heard that someone was going to jump him. Def. House Tr. at 25. He did not identify the person who related the potential threat to him, the identity of the potential attacker(s), or the reasons for the attack, and he was not told that an attack was imminent. *Id.* House told the John Doe officer that he was "uncomfortable" and wanted to be moved but did not say that he feared for his life or safety or that he had been threatened. *Id.* House's

conversation with E.S. was slightly more pointed in that E.S. told House to "watch his back" because someone was going to jump him. *Id.* at 24. But the conversation contained no more detail, and House himself testified that he "was not really worried about it" at the time, telling Seepaul during his rounds that evening only that he did not feel comfortable in 2BB. *Id.* at 24, 28. And while House testified to having made at least two requests to be moved, *see* Defs. House Tr. at 25–26, he did not request protective custody, *see* Defs. 56.1 ¶ 35; Pl. 56.1 ¶ 35.

These circumstances present a close question. In the Court's assessment, a reasonable jury, crediting House's account, could find either way on whether a substantially serious risk of harm to House existed. But on the City's summary judgment motion, that requires sustaining House's claim, as to the objective prong, because House is the non-moving party. In particular, House has adduced admissible evidence of two unspecific but still consequential verbal threats to his safety, two instances in which he requested to be relocated, and a verbal altercation with P.M., one of his eventual assailants. Crediting his testimony, House had told Seepaul that someone was "after [him]," Defs. House Tr. at 167, indicating that, in real time, he perceived a true risk to himself. To be sure, the parties debate at length the extent of Seepaul's knowledge of the threats and the reasonableness of his actions. *See* House Opp. at 12–15; City Reply at 5–7. But those questions bear on the subjective prong of the analysis. While a reasonable juror could find against House on the objective prong even crediting his account in full, such a juror could also find that, in the period immediately before the December 30, 2017 attack, House faced a substantially serious threat of being jumped and incurring serious harm.

Moreover, House did sustain serious injuries as a result of his altercation with A.R., P.M., and D.J., including a fracture to his right eye socket, a skull fracture, and a nose fracture, necessitating a surgery in 2018. Pl. House Tr. at 83–86, 92. And, as House notes, courts in this District have held that sufficiently severe injuries may constitute *per se* showings of a sufficiently serious condition of confinement. *See, e.g.*, *Knowles v. New York City Dep't of Corr.*, 904 F. Supp. 217, 221 (S.D.N.Y. 1995).

But those cases are inapposite here. As the City points out, in each such case, the inmate was the victim of an undisputedly unprovoked attack. *See id.* (inmate unexpectedly slashed across face, requiring 60 stitches to close); *Warren v. Goord*, 579 F. Supp. 2d 488, 491, 94 (S.D.N.Y. 2008) (inmate slashed

across cheek with a razor while watching television); *Perez v. Ponte*, 236 F. Supp. 3d 590, 600, 625–26 (E.D.N.Y. 2017), *report and recommendation adopted*, No. 16 Civ. 645 (JFB) (AKT), 2017 WL 1050109 (E.D.N.Y. Mar. 15, 2017) (inmate slashed across face from behind).

By contrast, here, it is undisputed that the plaintiff, House, instigated the physical altercation. House contends that he punched A.R. in an effort to protect himself because Seepaul was not at his post and A.R.'s comportment led him to suspect an imminent attack. House Opp. at 24; Pl. House Tr at 47–48. As House recounted at his deposition: A.R. told him to "pack up" and "get out of here"; House at that point had the opportunity to walk away but did not do so; A.R. began "punching" his fists together; while House initially did not find this threatening, A.R. then "became aggressive" and began "coming towards [House] in an aggressive way," with "his fists bal[le]d," at which point House punched A.R. in, effectively, a preemptive strike. *Id.* at 47–51. P.M. and D.J. then assaulted House, an attack that lasted approximately 30 seconds. JSF ¶¶ 6–7; VCBC Video. The parties dispute whether House was justified in throwing the first punch as a means of self-defense, or whether he was an unjustified aggressor. City Mem. at 14; House Opp. at 24; City Reply at 6–7.

**\*14** In these circumstances, House's injuries, while relevant to the risk of harm, cannot be treated as *per se* proof that before the attack, he faced conditions posing a substantial risk of serious harm. That is because on one view of the facts, an attack would not have come about had House not thrown the first punch, hitting A.R. in the face. *See, e.g.*, *Louis-Charles v. Courtwright*, No. 9:11 Civ. 147 (GLS) (TWD), 2014 WL 457951, \*6 (N.D.N.Y. Feb. 4, 2014) ("an inmate's own violent tendencies are not the type of 'substantial risk of serious harm' protected by the Constitution"); *see also Pecuch v. Platt*, No. 13 Civ. 6102 (FPG), 2015 WL 6505109, at \*3 (W.D.N.Y. Oct. 27, 2015). But viewing the facts in the light most favorable to House as the non-movant, as the Court must, the inference is viable that, had he not thrown the first punch, House would still have been attacked and suffered comparable injuries within the period when Seepaul was away from his post. Notably too, the inmates who attacked House, P.M. and D.J., had not been struck by House. House struck A.R. who, House testified, had been "aggressively" advancing on him. A reasonable jury could view the other inmates' intercession as consistent with a preexisting intention to join A.R. in jumping House.

Considering the facts in the light most favorable to the non-movant, a reasonable jury could find that, shortly before the attack, House faced a meaningful risk of being jumped by hostile inmates and experiencing significant injures, and thus was confined in conditions which presented substantial risk of serious harm. The Court therefore cannot grant defendants' motions for summary judgment to the extent they are based on the objective prong. The Court accordingly turns to defendants' next argument—that the evidence would not permit a reasonable jury to decide the subjective prong, focused on Seepaul's *mens rea*, in favor of House.

### ii. *Mens Rea* Prong: Requisite Culpability

To satisfy the *mens rea* prong of the deliberate indifference analysis, "the pretrial detainee must prove that the defendant-official acted intentionally ... or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. The Second Circuit has recently clarified that, although this second prong has sometimes been called the "subjective prong," in the context of a pretrial detainee's challenge under the Due Process Clause of the Fourteenth Amendment, the *mens rea* prong (unlike in the context of a challenge under the Eighth Amendment) is objective in nature. *Id.* at 35–36. A detainee must demonstrate that the prison official acted purposefully or with an objectively reckless disregard of the risk to the inmate; mere negligence is insufficient. *Id.* at 36; *see also Kingsley v. Hendrickson*, 576 U.S. 389, 396 (2015) ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.").

Here, House contends that Seepaul should have been aware of a generalized risk to his safety, like the risk inmates faced in *Ross*, 2014 WL 3844783. *See* House Opp. at 16–17. But that argument fails because, as discussed in connection with the objective prong, House has not adduced evidence to support that 2BB presented a generalized risk to inmate safety. The contrast with the prison in *Ross* is stark. There, despite being aware that his post was along a "maximum security cell block," "known to be populated by gang members," in which inmates "tend to fight whenever they feel like it," and that prisoners' cells had not been searched for weapons, *Ross*, 2014 WL 3844783, at *4, the correction officer abandoned his post without securing coverage. *Id.* at *5. Leaving his post in such a fraught environment could be found, the district court,

held, to reflect a reckless disregard for the generalized risk presented to all inmates. *Id.*

To sustain his claim, House therefore must demonstrate that there is a genuine issue of material fact as to whether Seepaul, in leaving his post, recklessly disregarded a substantial risk specific to House. The evidence is insufficient, however, to permit a reasonable jury to conclude that a reasonable officer in Seepaul's shoes would have appreciated a serious risk of substantial harm to House. House has not adduced evidence remotely comparable to that in *Ross* on this point.

**\*15** House's attempt to do so turns on the two complaints he claims to have made to Seepaul. First, House testified that he told Seepaul approximately three weeks before the December 30, 2017 incident that he did not "feel comfortable" in 2BB and asked to be moved to either a different jail or dorm. Defs. House Tr. at 26; Defs. 56.1 ¶ 35; Pl. 56.1 ¶ 35. Although House's counsel now depicts his testimony as being that he told Seepaul at this time that someone was going to jump him and/or that his life or safety had been threatened, *see, e.g.*, House Opp. at 17–21, House's deposition testimony bears no resemblance to that portrait. [16] Rather, at various points, House testified that he told Seepaul that he did not "feel comfortable in the house, and [he] wanted to move, either to a different jail or to a different location," or that he did not "feel safe." Defs. House Tr. at 26–28; 45. But House never testified that he then told Seepaul that someone had threatened him or was going to jump him. At most, House testified that he had told Seepaul that someone was "after [him]." *Id.* at 167. But he did not testify that he feared for his life or safety at this time.

[16]    The City claims that House never testified that he feared for his life or safety or that he thought he was going to be jumped. City Reply at 6. Although House never testified that he specifically told Seepaul he was going to be jumped, he did testify to having told Seepaul someone was "after [him]" approximately three weeks before the assault. Defs. House Tr. at 167. Further, although House never testified to having told an officer his life was threatened or that he feared for his life, he did testify to having told Seepaul on December 30, 2017, that he did not "feel safe." *Id.* at 28.

House testified that Seepaul replied that he had a "feeling" he knew who House was referring to. *Id.* at 26. Even accepting that testimony as true, it does not establish that Seepaul should

appreciated that there was a substantial risk to House's safety. The exchange as recounted by House does not reveal the name of the person whom Seepaul ostensibly had in mind. And House does not explain why this bare exchange bespeaks an appreciation on Seepaul's part that House was thereby in serious danger. Notably, by his account, House did not report to Seepaul his verbal altercation with P.M. and has not adduced evidence that Seepaul knew of this altercation, Pl. House Tr. at 64, or of House's alleged report a week later—approximately two weeks before the assault—to the John Doe officer. On the contrary, although House's brief claims that he reported a "threat" to Seepaul at the time he told Seepaul he did not "feel comfortable," in fact, when deposed, House identified the first indirect threat to him as having been made two weeks before the assault, a threat which he reported to the John Doe officer. Defs. House Tr. at 25. Even assuming that House had been threatened three weeks prior and reported this threat to Seepaul, this would still be insufficient. A report that an inmate was "threatened by [a certain inmate] ... and that he 'feared for his safety' " lacks the requisite detail to notify a corrections officer that an inmate faces a substantial risk of serious harm. *Morgan v. Dzurenda*, 956 F.3d 84, 90 (2d Cir. 2020). [17] House's exchange with Seepaul on or around December 9, 2017—three weeks before the assault—thus falls far short of permitting an inference that Seepaul appreciated that House was in serious danger.

[17] Although *Morgan* involved a claim of deliberate indifference under the Eighth Amendment, the reasoning is equally applicable to a claim under the Fourteenth, as the Second Circuit concluded that the threat was insufficient to have put the officers on notice of a substantial threat. Actual knowledge was not at issue.

Second, House testified that after his conversation with E.S. at lunch on December 30, 2017, in which E.S. told House to "watch his back," House—at approximately 5:30 p.m., during Seepaul's rounds—told Seepaul that he did not "feel safe" in 2BB and wanted to be moved. Pl. House Tr. at 28, 76. When questioned whether he told Seepaul anything other than that he did not feel safe, House answered, "[t]hat's about it." *Id.* at 28. House testified that, in response, Seepaul laughed and said, "I don't know." *Id.* at 28.

**\*16** Even crediting House's account of this conversation and viewing it in conjunction with the earlier exchange, this exchange between House and Seepaul also falls far short of supporting a finding that a reasonable officer in Seepaul's

position would have appreciated a substantial risk to House's safety. The information known to Seepaul was highly limited. There is no evidence that he was aware of House's altercation with P.M. Seepaul's response that he had a "feeling" he might know to whom House was referring cannot so establish, except by speculation. There is thus no basis on which to infer that Seepaul, before the attack, was aware of the context of House's spare complaints—a brewing hostility between P.M. and House. House, notably, had not reported his verbal altercation with P.M. *See Desulma v. City of New York*, No. 98 Civ. 2078 (RMB) (RLE), 2001 WL 798002, at *7 (S.D.N.Y. July 6, 2001) (corrections officer had "no reason to infer the existence of a threat of harm, much less a life-threatening danger," to inmate where there had not been any prior altercations, even where inmate had asked for protective measures).

And House's second statement to Seepaul—to the effect that he did not "feel safe" and wanted to be moved—was sparse. It was devoid of any details that would give a reasonable officer a non-speculative basis to perceive a serious risk to an inmate's safety. It is fairly likened to the general complaint found insufficient in *Haughton v. Clinton*, No. 15 Civ. 1160 (JPO), 2015 WL 9244398 (S.D.N.Y. Dec. 17, 2015). There, an inmate's statement to his jailer that he "feared for his safety" was held insufficient, without more, to sustain a deliberate indifference claim. *See id.* at *2. [18] Notably, in speaking with Seepaul the day of the incident, House did not relate the threat he had received from E.S. Pl. House Tr. at 28, 76. Indeed, House testified that after following his discussion with E.S., he was "not really worried." *Id.* at 24.

[18] Although *Haughton* was decided before the Second Circuit's clarification in *Darnell* that the *mens rea* prong in cases brought under the Fourteenth Amendment utilizes an objective rather than a subjective standard for recklessness, the reasoning in the case would lead to the same conclusion if applied under the objective standard.

Also unsubstantiated is House's suggestion that Seepaul was aware of the problematic dynamics between House and other inmates. House notes that Seepaul made an effort to speak to each inmate on his rounds each day. House Opp. at 11; *see also* Radlin Decl., Ex. 2 ("Pl. Seepaul Tr.") at 30 (testifying that Seepaul would ask inmates about how things were going, their cases, and their families). But House has not pointed to any evidence that these discussions brought to the fore the deteriorating relations between House and other inmates. [19]

19      Although not necessary to this decision, Seepaul's
        unrefuted testimony is that he intervened with
        dispatch once O'Neil notified him about the fight
        in 2BB. Seepaul entered the housing area and
        ordered House, P.M., and D.J. to stop fighting.
        Defs. Seepaul Tr. at 33–34, 47–48. Seepaul gave
        two commands to the fighting inmates to "[g]et off"
        and "move" before he used mace, which caused
        P.M. and D.J. to comply. Defs. House Tr. at 59–60.

In the end, a responsible and diligent officer in Seepaul's
shoes ought to have followed up after hearing an inmate's
general expression of concern about safety. Were the
governing standard one of negligence, the outcome on
defendants' motion for summary judgment might well be
different. Indeed, Seepaul's departure from his station for
approximately 15 minutes, to use the restroom, was a
knowing violation of DOC policy, Defs. Seepaul Tr. at 53–
54, that itself was itself a separate form of negligence.
But, presented only with an inmate's conclusory and
unsubstantiated statement that he did not feel safe or that some
might be "after" him, Seepaul was not objectively reckless in
failing to appreciate, at the time, that there was a serious threat
to House's safety, whether presented by P.M., D.J., A.R., or
other inmates. *See, e.g.*, *Morgan*, 956 F.3d at 90 (general
complaints to officer that inmate had been "threatened" by a
certain inmate and "feared for his safety" were not sufficient
to notify officers of substantial risk of harm); *Desulma*,
2001 WL 798002, at *7 (officer did not have requisite *mens
rea* for deliberate indifference where inmate had requested
protective measures and where officer had observed prior
verbal altercations with attackers); *Shand v. Chapdelaine*, No.
3:19 Civ. 755 (CSH), 2019 WL 2302513, at *4 (D. Conn.
May 30, 2019) (dismissing failure-to-protect claims against
officers to whom inmate had reported that he "feared for
his safety and his life is in danger," while sustaining claims
against officers to whom inmate had reported numerous
specific verbal and written threats that other inmates were
"going to get him"); *Wilson v. Campbell*, No. 06 Civ. 175
(GLS) (RFT), 2008 WL 902187, at *5 (N.D.N.Y. Mar. 31,
2008) ("A general, conclusory statement that an inmate fears
for his safety, without more, is insufficient information from
which an inference can be drawn that such inmate's a
safety is actually at risk."). Negligence in failing to stay
with an inmate where the risk of harm to the inmate was
not reasonably clear to the officer and where the officer's
failure to act was—on the record before the Court—"an
isolated omission" falls short of supporting the finding of
recklessness necessary to establish deliberate indifference.

*See Zimmerman v. Macomber*, No. 95 Civ. 882 (DAB), 2001
WL 946383, at *6 (S.D.N.Y. Aug. 21, 2001).

**\*17** Accordingly, for this independent reason, summary
judgment on House's failure-to-protect claim against Seepaul
is warranted.

### iii. Qualified Immunity

Even if House had shown a genuine dispute of material fact
as to whether Seepaul had acted with deliberate indifference
in abandoning his post, Seepaul would be entitled to
qualified immunity. Under the doctrine of qualified immunity,
"government officials performing discretionary functions
generally are shielded from liability for civil damages
insofar as their conduct does not violate clearly established
statutory or constitutional rights of which a reasonable person
would have known." *Harlow v. Fitzgerald*, 457 U.S. 800,
818 (1982). Even where a constitutional right is clearly
established, summary judgment on a defendant's entitlement
to qualified immunity is also appropriate where, "even
though plaintiff's federal rights and the official's permissible
actions were clearly delineated at the time of the action
complained of, it was nonetheless 'objectively reasonable' for
the defendant official 'to believe that his acts did not violate
those rights.' " *Rodriguez v. Phillips*, 66 F.3d 470, 475 (2d
Cir. 1995) (quoting *Robison v. Via*, 821 F.2d 913, 921 (2d Cir.
1987)). To be entitled to qualified immunity, "the defendant
official must produce such uncontroverted facts that a jury
—drawing all inferences favorable to plaintiff—would have
to conclude it was objectively reasonable for defendant to
believe his actions did not violate an established federally
protected right." *Id.*

Here, it is undisputed that House had clearly delineated
constitutional rights to be protected from "violence at the
hands of other prisoners" and to have prison officials employ
"reasonable measures to guarantee the safety of the inmates."
*Farmer*, 511 U.S. at 828, 832; *see also Liverpool v. Davis*,
442 F. Supp. 3d 714, 734 (S.D.N.Y. 2020). But, for the
same reasons that the evidence does not permit a finding in
House's favor on the *mens rea* prong, it does not permit a
finding that a prison official in Seepaul's situation would have
appreciated that his conduct in leaving his post for 15 minutes
deprived House of his constitutional rights. While Seepaul's
conduct breached his duty and is properly termed negligent,
that infraction equally ran to the detriment of all inmates
on Seepaul's watch. House, for the reasons reviewed above,

has not adduced evidence that would have led an officer in Seepaul's circumstances to appreciate that he was thereby exposing House to a substantial risk of serious harm, so as to rise to the level of an infringement of his due process rights.

In opposing qualified immunity, House relies on the fact that Seepaul knew that leaving his post for any period of time without securing coverage violated DOC policy. Defs. 56.1 ¶ 40; Pl. Seepaul Tr. at 53–54. [20] House argues that Seepaul's knowledge of this precludes a finding of qualified immunity. House Opp. at 29. That is wrong. A finding that an official violated an administrative rule is not tantamount to appreciation that another person's constitutional rights were thereby violated. *See, e.g., Davis v. Scherer*, 468 U.S. 183, 194 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."); *Drew v. Connolly*, 536 F. App'x 164, 165–66 (2d Cir. 2013) (summary order) (violation of "written Departmental policy" does not necessarily violate an individual's constitutional rights so as to the deprive officer of qualified immunity); *Cox v. Village of Pleasantville*, 271 F. Supp. 3d 591, 600 (S.D.N.Y. 2017) (failing to comply with policy not a *per se* violation as constitutional rights as "[i]nternal policy may very well go above-and-beyond the bare-minimum requirements imposed by law," and an officer is not "more or less liable based on his or her compliance with departmental policy"). And, in the specific context here of a violation of a regulation governing the conduct of jailers, House has not cited any authority that a knowing violation of DOC policy, without more, establishes *per se* that the offending officer knew or should have known his actions were unlawful or likely to lead to the deprivation of an inmate's constitutional rights. *See, e.g., Holland v. City of New York*, 197 F. Supp. 3d 529, 549 (S.D.N.Y. 2016) ("An alleged violation of a prison policy, directive, or regulation, in and of itself, does not give rise to a federal claim, because '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' ") (quoting *Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990)) (alterations in original); *Lopez v. Reynolds*, 998 F. Supp. 252, 259 (W.D.N.Y. 1997) ("A prison inmate does not have a viable § 1983 claim based solely on prison officials' failure to adhere to the requirements of prison regulations, directives or policy statements."); *see also Chalco v. Belair*, No. 3:15 Civ. 340 (VLB), 2018 WL 5892655, at *6 (D. Conn. Nov. 9, 2018) (an internal police department policy is "not a clearly established law" sufficient to deprive the officer of qualified immunity).

[20] In connection with this incident, Seepaul pled guilty to abandoning his post and to "efficient performance of duty." Defs. 56.1 ¶ 46; Pl. 56.1 ¶ 46. In his deposition, Seepaul admitted being aware that, in leaving his post uncovered, he was violating DOC regulations. Pl. Seepaul Tr. at 53–54.

**\*18** Accordingly, Seepaul is entitled to qualified immunity.

### b. Monell *Liability of the City*

For the reasons reviewed above, House's § 1983 claim against the City fails because he failed to exhaust administrative remedies and because its premise (that Seepaul violated House's constitutional rights) is not supported by sufficient evidence. But, even assuming that House's claim against Seepaul of deliberate indifference to unconstitutional conditions of confinement had survived summary judgment, and even if House had exhausted his administrative remedies, summary judgment would still be warranted for the defense on House's attempt to extend liability to the City under *Monell*.

In his complaint, House alleges two theories of *Monell* liability against the City: (1) failure to train; and (2) failure to discipline or supervise. The Court examines each of these theories in turn, finding as to each that House has failed to adduce admissible evidence sufficient to establish his claim.

### i. Failure to Train

"A plaintiff may plead a *Monell* claim based on a failure to train only by pleading that a City's 'failure to train its subordinates ... is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need.' " *Nelson v. City of New York*, No. 18 Civ. 4636 (PAE), 2019 WL 3779420, at *16 (S.D.N.Y. Aug. 9, 2019) (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)); *see also Brandon*, 705 F. Supp. 2d at 277 (*Monell* liability can be predicated on a "failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference"). Deliberate indifference in the context of a failure-to-train theory requires the plaintiff to "submit evidence that defendants knew to a moral certainty that the City would confront a given situation; the situation

presented the City with a difficult choice or there was a history of its mishandling the situation; and the wrong choice by the City would frequently cause the deprivation of plaintiffs' rights." *Nelson*, 2019 WL 3779420, at *16 (quoting *Reynolds*, 506 F.3d at 192).

Here, the City argues House did not adequately plead this claim. City Mem. at 15–16. The City, however, did not move to dismiss, and the issue at this stage is therefore whether House has come forward with evidence sufficient to substantiate that claim.

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (internal quotations and citations omitted). House has not adduced any evidence of such a pattern. House instead asserts that Seepaul was "not trained as to situations regarding [protective custody] with inmates," a lapse which, House argues, a jury could find directly caused House's constitutional injury. House Opp. at 22.

House's attempt to thus ground his *Monell* claim fails for three reasons. First, factually House mischaracterizes Seepaul's testimony. Seepaul testified that although he did not receive formal training at the CO Academy on protective custody, it was "fair to [s]ay that [he] received some training" as to this subject, whether at the CO Academy or on the job. Pl. Seepaul Tr. at 57–58. Second, House's premise for focusing on this species of training is faulty. There is no evidence that House ever requested protective custody. *See* Defs. House Tr. at 68. And the cursory and general concern about safety that House articulated to Seepaul was far from that necessary to put an officer on notice of a need to place House in special custody. Third, insofar as House suggests a deficiency in the City's training of correction officers with respect to defusing conflict among inmates, House has not adduced any competent evidence of deficient training in that area.

*19 To be sure, in narrow circumstances, a single incident of failure to train an official can be sufficient to show deliberate indifference. *Connick*, 562, U.S. at 64. But that theory of *Monell* liability is sustainable only where "the unconstitutional consequences of failing to train [are] so patently obvious that a city should be liable under [Section] 1983 without proof of a pre-existing pattern of violations." *Breitkopf v. Gentile*, 41 F. Supp. 3d 220, 253 (E.D.N.Y. 2014) (quoting *Connick*, 562 U.S. at 64). Courts in this Circuit and others have found that the single-incident theory is available only when the evidence reflects a complete lack of any training or where the training is so inadequate that it amounts to a "lack of training." *Id.* at 254–55 (collecting cases). House has not come forward with any evidence on which a jury could make such a finding. On the contrary, Seepaul testified to having received "some training" and that he understood that if an inmate had requested protective custody, he was to "notify [his] immediate supervisor." Pl. Seepaul Tr. at 58.

House's *Monell* theory, to the extent based on deficient training, therefore fails.

ii. Failure to Supervise or Discipline

A plaintiff may also hold a municipality liable for "a persistent failure" to discipline or supervise its officials, because "such a pattern 'could give rise to an inference of unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*.' " *Nelson*, 2019 WL 3779420, at *16 (quoting *Batista v. Rodriguez*, 702 F.2d 393, 399 (2d Cir. 1983)). The Supreme Court, however, has imposed "stringent causation and culpability requirements" to establish liability based on such a theory, holding that the requirements set out in *City of Canton v. Harris*, 489 U.S. 378, 387 (1989), a failure-to-train case, equally apply to "failure-to-supervise and failure-to-discipline claims." *Calderon*, 138 F. Supp. 3d at 614 (quoting *Reynolds*, 506 F.3d at 192). In *City of Canton*, the Supreme Court held that the city's failure to train an officer constitutes a municipal policy only where the failure to act has caused the constitutional harm and "only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Reynolds*, 506 F.3d at 192 (quoting *City of Canton*, 489 U.S. at 387).

House falls far short of satisfying this standard. He does not offer any evidence of a persistent failure to supervise or discipline officers for failure to protect inmates. Nor can House argue that Seepaul was not disciplined. On the contrary, as House acknowledges, Seepaul, as a result of his abandoning his post without securing coverage, was charged with and pled guilty to charges of abandonment of post and "efficient performance of duties." Pl. 56.1. ¶ 46; Defs. Reply 56.1 ¶ 46. As punishment, Seepaul received a command discipline and lost one vacation day. Pl. 56.1 ¶¶ 46–47; Defs. Reply 56.1 ¶¶ 46–47.

House instead seizes on Seepaul's prior disciplinary history to argue that the City should have been aware that Seepaul was apt to violate detainees due process rights. House Opp. at 22–23. The evidence that House musters towards that end, however, is unequal to the task. [Redacted] House has not identified any substantiated complaint regarding a failure by Seepaul to protect an inmate from potential harm. To the extent a viable *Monell* claim theoretically could be brought against the City based on its persistent failure to discipline a prison official on whose watch an inmate-on-inmate attack occurred, the evidence here falls far short. Seepaul's disciplinary history would not have put the City on sufficient notice to make it obvious that Seepaul would likely act in the future with deliberate indifference to a substantial risk of serious harm to an inmate such as House. *See Stern v. City of New York*, No. 12 Civ. 5210 (NGG) (RER), 2015 WL 3827653, at *8 (E.D.N.Y. June 19, 2015) (dismissing failure-to-supervise claim where officer's disciplinary history did not contain any similar incidents to the one suffered by plaintiff).

**\*20** Summary judgment is therefore warranted for the City on House's *Monell* claim.

### 3. Conspiracy Claim

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). A plaintiff may make this showing "through 'either direct or circumstantial evidence.' " *Randle v. Alexander*, 170 F. Supp. 3d 580, 591 (S.D.N.Y. 2016) (alternations omitted) (quoting *Stein v. Janos*, 269 F. Supp. 2d 256, 261 (S.D.N.Y. 2003)). "To survive a motion for summary judgment, plaintiff's evidence of a Section 1983 conspiracy must, at least, reasonably lead to the inference that the defendants positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Stein*, 269 F. Supp. 2d at 261–62 (internal quotations and citations omitted).

In the Amended Complaint, House alleged that Seepaul and the John Doe officer had conspired to "cover[ ] up the actions of each other." Am. Compl. ¶ 28. Summary judgment is warranted for the defense on this claim, for two reasons.

First, with discovery complete, House has not identified the John Doe officer, or adduced any evidence of a conspiracy —or even any relevant dealings—between Seepaul and that person. Second, House did not address that claim in his brief opposing Seepaul's motion for summary judgment, *see* Seepaul Mem. at 4–5; *see generally* House Opp., and therefore has abandoned that claim, *see Jackson*, 766 F.3d at 195, 197–98 (partial response to summary judgment motions that mentioned some claims and not others may constitute abandonment of the unmentioned claims); *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 392 (S.D.N.Y. 2013) ("A court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.").

### D. State Law Claims

House also brings state-law claims against the City under theories of negligent hiring, retention, and supervision, and *respondeat superior*. Am. Compl. ¶¶ 30–37; House Opp. at 25–26.

Where summary judgment has been entered for the defense on a plaintiff's federal claims, the Court has the discretion to elect no longer to exercise supplemental jurisdiction over pendent state law claims as to which there is no independent basis for federal jurisdiction. *See* 28 U.S.C. § 1367(c). In such cases, the "basis for retaining jurisdiction [over the state law claims] is weak." *Baylis v. Marriott Corp.*, 843 F.2d 658, 664 (2d Cir. 1988). But, where, as here, the state law claims arise from a common nucleus of operative facts, discovery is complete, and there are no novel or unresolved questions of state law, a federal court may, in the service of the "values of judicial economy, convenience, fairness, and comity," exercise supplemental jurisdiction to decide the remaining state law claims. *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 170 (2d Cir. 2014) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Here, because the Court finds that House's state law claims are "easily rejected on well-established principles," deciding these claims in this Court "will save future, needless litigation in state court." *Morales v. City of New York*, 59 F. Supp. 3d 573, 583 (S.D.N.Y. 2014) (internal quotations and citations omitted).

**\*21** In general, under New York law, a plaintiff cannot succeed on both a claim for negligent hiring, training, and retention and a theory of *respondeat superior* because the former requires that an employee acted outside the scope of his employment, while the latter requires that an employee acted within the scope of his employment. *See Rowley v. City*

*of New York*, No. 00 Civ. 1793 (DAB), 2005 WL 2429514, at *12 (S.D.N.Y. Sept. 30, 2005). [21] Whether an employee was acting within the scope of his employment "depends heavily on the facts and circumstances of the particular case, and thus is appropriate for a jury." *Rowley*, 2005 WL 2429514, at *13. The City does not concede that Seepaul was acting within the scope of his employment, *see* Seepaul Answer ¶ 38; City Cross-Claims Answer ¶ 2, and neither party has offered admissible evidence or argument on this point. The Court, however, need not resolve whether Seepaul was acting within the scope of his employment because House has not adduced sufficient evidence to establish all remaining elements of either claim. Accordingly, summary judgment is warranted for the City on both state claims. [22]

[21]   Some New York courts have recognized a limited exception where a plaintiff seeks punitive damages from the employer based on gross negligence in hiring or retaining the employee. *See, e.g.*, *Karoon v. N.Y.C. Transit Auth.*, 241 A.D.2d 323, 324 (1st Dep't 1997). Although the Complaint does seek punitive damages, House has not adduced evidence of gross negligence here.

[22]   The City raises additional defenses to House's state law claims: that (1) House's Notice of Claim was deficient; (2) House has not complied with the requirement for a hearing under *Gen. Mun. Law § 50-h*; and (3) the City is entitled to immunity. *See* City Reply at 14. Because the Court finds insufficient evidence to establish the elements of these claims, there is no occasion to consider these defenses.

### 1. Negligent Hiring, Retention, Supervision, and Training

Under New York law, to succeed on a claim for negligent hiring, retention, or supervision, a plaintiff must show that the "employee committed an independent act of negligence outside the scope of employment, where the [employer] was aware of, or reasonably should have foreseen, the employee's propensity to commit such an act." *Seiden v. Sonstein*, 127 A.D.3d 1158, 1160–61 (2d Dep't 2015); *see also Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (negligent hiring, retention, or supervision theory requires that the employer "knew or should have known of the employee's propensity for the conduct which caused

the injury prior to the injury's occurrence") (internal citation or quotations omitted). Although the municipality, "[h]aving assumed physical custody of inmates, ... owes a duty of care to safeguard inmates, even from attacks by fellow inmates, ... this duty does not render the municipality an insurer of inmate safety, and negligence cannot be established by the mere occurrence of an inmate assault." *Barnette v. City of New York*, 96 A.D.3d 700, 701 (2d Dep't 2012) (quoting *Sanchez v. State of New York*, 99 N.Y.2d 247, 252 (2002)). Liability is still limited to "risks of harm that are reasonably foreseeable," including both "what the City defendants actually knew and what the City defendants should have known." *Id.*

House's sole argument that the City reasonably should have been aware of Seepaul's alleged propensity to fail to protect inmates is Seepaul's prior disciplinary record. House Opp. at 25. However, this argument fails for the same reason House's federal failure-to-discipline claim fails: Seepaul's prior disciplinary record, [Redacted] does not contain any substantiated failure-to-protect complaints that would have put the City on notice of Seepaul's alleged propensity to fail to protect inmates. Consequently, House's negligent hiring, retention, or supervision claim fails regardless of whether Seepaul acted within the scope of his employment. Because House cannot show that the City was aware that Seepaul had a propensity for failing to protect inmates, his negligent hiring claim must be dismissed. *See, e.g.*, *Pinkney v. City of New York*, 52 A.D.3d 242, 243 (2008) (negligent hiring, retention, training or supervision claim must be dismissed where there is an "absence of evidence that it knew or should have known of any propensity" by the officer to commit the negligent act); *Barnette*, 96 A.D.3d at 701 (dismissing negligent supervision claim where plaintiff had neither actual nor constructive notice of risk of assault on plaintiff).

### 2. *Respondeat Superior*

**\*22** Under the doctrine of *respondeat superior*, an "employer may be liable when [its] employee acts negligently or intentionally, so long as the tortious conduct is generally foreseeable and a natural incident of the employment," and the employee is acting in the scope of his employment. *Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933 (1999).

House conclusorily states that Seepaul "was acting in the scope of his employment, and it was foreseeable that [the City's] employee would have acted in this matter breaching his duty to plaintiff." House Opp. at 26. Although

House does not cite any admissible evidence in support of this claim, assuming that House is referring to Seepaul's disciplinary record, this argument fails for the same reasons House's federal failure-to-discipline and state negligent hiring, retention, and supervision claims fail. These unrelated disciplinary actions would not put the City on reasonable notice that Seepaul may momentarily abandon his post and fail to protect an inmate, and therefore his actions were not foreseeable.

**CONCLUSION**

For the foregoing reasons, the Court grants defendants' motions for summary judgment. The Clerk of Court is respectfully directed to terminate the motions pending at dockets 75 and 84 and to close this case.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 6891830

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Matthews v. Barq, Not Reported in Fed. Supp. (2019)

2019 WL 1025828

Case 5:22-cv-00216-GTS-TWD    Document 7    Filed 04/13/22    Page 92 of 227

2019 WL 1025828
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Hashim MATTHEWS, Plaintiff,

v.

BARQ, et al., Defendants.

9:18-CV-0855 (TJM/CFH)
|
Signed 03/04/2019

**Attorneys and Law Firms**

HASHIM MATTHEWS, 03-A-3590, Plaintiff, pro se, Attica
Correctional Facility, Box 149, Attica, NY 14011.

**DECISION AND ORDER**

Thomas J. McAvoy, Senior United States District Judge

**I. INTRODUCTION**

**\*1** The Clerk has sent to the Court for review an amended
complaint submitted by pro se plaintiff Hashim Matthews
asserting claims pursuant to 42 U.S.C. § 1983 ("Section
1983"),[1] together with an application to proceed in forma
pauperis ("IFP"), a motion for preliminary injunctive relief,
and a motion for appointment of counsel. *See* Am. Compl.;
Dkt. No. 21 ("Fifth IFP Application"); Dkt. No. 22 ("Fourth
Preliminary Injunction Motion"); Dkt. No. 23 ("Motion
for Counsel").[2] Plaintiff, who is incarcerated at Attica
Correctional Facility ("Attica C.F."), has not paid the filing
fee for this action.

[1]     After plaintiff filed his complaint, he filed a
        document he captioned as an "amended complaint"
        in which he included new factual allegations
        about the Deputy Superintendent of Great Meadow
        Correctional Facility ("Great Meadow C.F."),
        whom he named as a defendant. Dkt. No. 14.
        Thereafter, plaintiff filed a document captioned
        as a "motion to amended [sic]" together with a
        document captioned as an "amended complaint,"
        which also included factual allegations about
        the Deputy Superintendent of Great Meadow
        C.F. and named him as a defendant. Dkt. No.
        24; Dkt. No. 24-1. Pursuant to Rule 15(a) of

the Federal Rules of Civil Procedure, a party
may amend his complaint once as a matter of
course, and may thereafter amend with leave
of the Court. The Court therefore considers the
complaint amended to included the allegations in
the "amended complaint" submissions. For the
sake of clarity, the Clerk is directed to file a
copy of these submissions (Dkt. No. 14; Dkt. No.
24-1) immediately following the signature page
of the complaint (Dkt. No. 1), and docket these
combined submissions (Dkt. No. 1, Dkt. No. 14,
Dkt. No. 24-1) as the amended complaint. The
Court will refer to these combined submissions
as the amended complaint ("Am. Compl.") in this
Decision and Order.

[2]     Plaintiff filed with his original complaint a motion
for a preliminary injunction and one page of
an application to proceed IFP. *See* Dkt. Nos. 2,
3. Plaintiff's initial application to proceed IFP
was not certified or accompanied by the inmate
authorization form required to proceed IFP in this
District. As a result, plaintiff's initial application
to proceed IFP was denied as incomplete and
the action was administratively closed. Dkt. No.
4. Thereafter, plaintiff filed a second application
to proceed IFP, together with a letter request for
injunctive relief, and this action was re-opened.
Dkt. Nos. 8, 9, 10. By Decision and Order filed
October 23, 2018, plaintiff's second application
to proceed IFP was denied as incomplete and
his requests for injunctive relief (Dkt. Nos. 3,
8) were denied without prejudice based on his
failure to comply with the filing fee requirements.
Dkt. No. 11. Plaintiff then filed a third application
to proceed IFP, together with his first "amended
complaint" submission and a second motion for
a preliminary injunction. Dkt. No. 13 ("Third
Preliminary Injunction Motion"); Dkt. No. 14;
and Dkt. No. 15 ("Third IFP Application").
Before the Court undertook a review of the
Third IFP Application, plaintiff filed a fourth
application to proceed IFP, together with an inmate
authorization form. Dkt. No. 17 ("Fourth IFP
Application"); Dkt. No. 18 ("Inmate Authorization
Form"). By Decision and Order filed January 30,
2019, plaintiff's Third IFP Application and Fourth
IFP Application were denied as incomplete, and
plaintiff's Third Preliminary Injunction Motion was
denied without prejudice based on plaintiff's failure

Case 5:22-cv-00216-GTS-TWD    Document 7    Filed 04/13/22    Page 93 of 227

to comply with the filing fee requirements. Dkt. No. 19. Plaintiff then timely and properly filed the Fifth IFP Application. Dkt. No. 21.

## II. IFP APPLICATION

**\*2** Upon review, the Court finds that plaintiff's Fifth IFP Application (Dkt. No. 21) is properly completed and signed, and demonstrates economic need. *See* 28 U.S.C. § 1915(a)(2). Plaintiff has also filed the inmate authorization form required in this District. Dkt. No. 18. Accordingly, the Fifth IFP Application is granted.

## III. SUFFICIENCY OF THE AMENDED COMPLAINT

### A. Governing Legal Standard

Section 1915(e) directs that, when a plaintiff seeks to proceed in forma pauperis, "(2) ... the court shall dismiss the case at any time if the court determines that – ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [3] Thus, even if a plaintiff meets the financial criteria to commence an action in forma pauperis, it is the court's responsibility to determine whether the plaintiff may properly maintain the complaint that he filed in this District before the court may permit the plaintiff to proceed with this action in forma pauperis. *See id.*

[3]     To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

Likewise, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A; *see also Carr v. Dworin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both sections 1915 and 1915A are available to evaluate prisoner pro se complaints).

In reviewing a pro se complaint, the court has a duty to show liberality toward pro se litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution ... in ordering sua sponte dismissal of a pro se complaint *before* the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted). Therefore, a court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Although the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2) ). Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id.* (internal quotation marks and alterations omitted).

### B. Summary of the Amended Complaint

**\*3** The amended complaint asserts alleged wrongdoing that occurred, if at all, while plaintiff was incarcerated at Eastern Correctional Facility ("Eastern C.F.") and Great Meadow C.F. *See generally* Am. Compl. The following facts are set forth as alleged by plaintiff in his amended complaint.

On March 20, 2015, defendant Corrections Sergeant A.J. Ciorciari from Eastern C.F. "was overseeing an unusual incident which had involved the plaintiff." Am. Compl. at 4. Defendant Ciorciari "ask[ed] plaintiff about the altercation several times[.]" *Id.* Plaintiff did not respond. *Id.* As a result, defendant Ciorciari "raise[d] his voice" and struck plaintiff in the head. *Id.* Defendant Ciorciari then called plaintiff homophobic and racial slurs and threatened to tell "gang

Matthews v. Barq, Not Reported in Fed. Supp. (2019)

2019 WL 1025828

members" about the crime for which plaintiff is "locked up" because they would "slice and dice" plaintiff if they knew. *Id.* at 4-5.

On March 23, 2015, plaintiff "receive[d] a misbehavior report issued by defendant Ciorciari, in which he threatened inmates into becoming his confidential informants against the plaintiff." Am. Compl. at 5. A "couple" of days later, defendant Corrections Sergeant Barq from Eastern C.F. interviewed plaintiff about a complaint he filed against defendant Ciorciari regarding "the attack on plaintiff." *Id.* During the interview, defendant Barq sought to "demonstrate" on plaintiff's body where plaintiff claimed he was hit by defendant Ciorciari while "simultaneously questioning him about the incident." *Id.* After "striking" plaintiff, defendant Barq stated, "I don't care if [defendant Ciorciari] did punch you [because] [a]s far as I'm concerned this didn't happen." *Id.*

On March 31, 2015, defendant Corrections Officer Rossy conducted a search of plaintiff's cell in plaintiff's absence. Am. Compl. at 6. As plaintiff was being escorted back to his cell, he was "warned" by the escorting official not to file a complaint because "the place was a mess." *Id.* Plaintiff arrived at his cell to see his personal belongings "scattered, shattered and destroyed." *Id.*

Defendant Rossy handed plaintiff a form to sign acknowledging items taken from the cell. Am. Compl. at 6. Plaintiff "reluctantly" signed the form. *Id.* Among the items removed from plaintiff's cell were "personal letters[,]" which included a letter addressed to the Inspector General's Office that was stamped and sealed. *Id.* Plaintiff received "a ticket for this situation." *Id.*

During plaintiff's disciplinary hearing for "this erroneous infraction," plaintiff explained why he was in possession of certain items he was charged with having stolen. Am. Compl. at 6. Off the record, the hearing officer stated, "I know you didn't steal that stuff." *Id.* The hearing officer then advised plaintiff that he was being found guilty of possessing contraband because of the letter addressed to the Inspector General. *Id.*

On April 20, 2015, while plaintiff was on "transfer status," his belongings were placed in "departmental regulated draft bags" and catalogued by Corrections Officers Travis and Meinecke (not named as defendants). Am. Compl. at 7. The next morning, while plaintiff was in the "draft waiting area," defendant Barq advised plaintiff, in the presence of the transport officer (not a defendant), that plaintiff's "legal bag" would not be allowed on the transport bus. *Id.* The transport officer "intervened" and indicated that there was "plenty of room" for the bag. *Id.* Nonetheless, defendant Barq "commanded" the transport officer to remove plaintiff's legal bag from the bus. *Id.* Defendant Barq then handed plaintiff two disbursement forms and ordered him to fill them out if he wanted his legal bags.

**\*4** After completing the disbursement forms, plaintiff asked defendant Barq when he would receive his legal bag. Am. Compl. at 7. Defendant Barq responded, "you'll get it when we mail it." *Id.* "Plaintiff insisted that he required possession of his legal bag due to pending litigation." *Id.* Defendant Barq then threatened plaintiff with a "ticket" and plaintiff boarded the bus. *Id.*

Plaintiff's legal bag did not arrive at "the next penitentiary" where plaintiff was transferred for "nearly a month[.]" Am. Compl. at 7. When the legal bag arrived, several items were missing. *Id.*

At some point after plaintiff was transferred out of Eastern C.F., he was transferred to Five Points Correctional Facility ("Five Points C.F."). Am. Compl. at 11. During plaintiff's incarceration at Five Points C.F., defendant Deputy Superintendent Thoms oversaw inmate grievances and was assigned to perform "a 'quasi' welfare check" throughout the facility. *Id.* Plaintiff provided defendant Thoms with "proof" that he was experiencing "property problems." *Id.* at 16. Because plaintiff had filed "various missives" concerning defendant Thoms and was housed in the "SOP unit[,]" defendant Thoms "never made any attempt to resolve [plaintiff's] issues." *Id.* at 11.

At some point plaintiff was transferred from Five Points C.F. to Great Meadow C.F. Am. Compl. at 11. Following plaintiff's arrival at Great Meadow C.F., he was "once again deprived of legal material which was not transported with other personal belongings." *Id.* "Plaintiff filed a formal complaint regarding the matter, then was told to file a claim." *Id.* at 16. "The security personnel ... given charge to investigate the claim said plaintiff can only obtain recourse through a grievance." *Id.* at 16-17. "However, when the grievance supervisor conducted [his] investigation plaintiff was [again] instructed to file a claim." *Id.* at 17.

Plaintiff contacted the Deputy Superintendent "in order to ascertain an actual answer[.]" Am. Compl. at 17. Upon doing

Matthews v. Barq, Not Reported in Fed. Supp. (2019)
Case 5:22-cv-00216-GTS-TWD   Document 7   Filed 04/13/22   Page 95 of 227
2019 WL 1025828

so, plaintiff was advised by defendant Thoms that "as a former resident of the S.O.P. unit he cannot request[ ] ... any relief whatsoever." *Id.* [4]

> [4]   Plaintiff identifies Great Meadow C.F. as the address where defendant Thoms is employed. Am. Compl. at 11, 16. As a result, the Court assumes for purposes of this Decision and Order that defendant Thoms was working at Great Meadow C.F. when he allegedly denied plaintiff's request for relief regarding missing property.

Construed liberally, plaintiff alleges the following claims: (1) Eighth Amendment excessive force claims against defendants Ciorciari and Barq; (2) Fourteenth Amendment due process claims against defendants Ciorciari and Rossy based on the issuance of false misbehavior reports; (3) Fourteenth Amendment due process claims against defendants Barq and Thoms based on their failure to adequately investigate plaintiff's complaints; (4) First Amendment retaliation claims against defendants Ciorciari, Barq, Rossy, and Thoms; (5) a Fourth Amendment unlawful cell search claim against defendant Rossy; (6) a First Amendment access-to-courts claim against defendant Barq; (7) a First Amendment interference with mail claim against defendant Rossy; (8) destruction of property claims against defendants Rossy and Barq; (9) an Eighth Amendment conditions-of-confinement claim against defendant Thoms; and (10) Fourteenth Amendment equal protection claims against each of the defendants. [5]

> [5]   Although plaintiff also purports to assert a Fifth Amendment "double jeopardy" claim against defendant Rossy and a Fifth Amendment claim against defendant Thoms, *see* Am. Compl. at 8, 11, the Court does not construe the amended complaint to assert a cognizable Fifth Amendment claim against any named defendant.

**\*5**  Plaintiff seeks monetary damages as well as declaratory and injunctive relief. Am. Compl. at 9, 12-13. [6] For a complete statement of plaintiff's claims, reference is made to the amended complaint.

> [6]   To the extent plaintiff seeks "restoration of good time," such relief is not available to plaintiff in this action. *See, e.g., Wolff v. McDonnell*, 418 U.S. 539, 554 (1974) (habeas is the appropriate remedy for seeking restoration of good time credits lost

as a result of prison disciplinary proceedings); *Wilkinson v. Dotson*, 544 U.S. 74, 79 (2005) ("Because an action for restoration of good-time credits in effect demands immediate release or a shorter period of detention, it attacks the very duration of ... physical confinement, and thus lies at the core of habeas corpus[.]" (internal citations and quotation marks omitted) ).

### C. Nature of the Action

Plaintiff brings this action pursuant to Section 1983, which establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

It is well settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) ); *Iqbal,* 556 U.S. at 676. "[A] Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* No. 04-CV-7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986) ) (other citation omitted). "[V]icarious liability is inapplicable to ... § 1983 suits." *Iqbal* 556 U.S. at 676.

### 1. Excessive Force Claims

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This includes punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). The Eighth Amendment's prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotations omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) ). [7]

Matthews v. Barq, Not Reported in Fed. Supp. (2019)
Case 5:22-cv-00216-GTS-TWD    Document 7    Filed 04/13/22    Page 96 of 227
2019 WL 1025828

7    In this regard, while "a *de minimis* use of force
will rarely suffice to state a constitutional claim,"
*Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir.
1993), the malicious use of force to cause harm
constitutes an Eighth Amendment violation per
se because in such an instance "contemporary
standards of decency are always violated." *Blyden*,
186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9).
The key inquiry into a claim of excessive force is
"whether force was applied in a good-faith effort to
maintain or restore discipline, or maliciously and
sadistically to cause harm." *Hudson*, 503 U.S. at
7 (citing *Whitley v. Albers*, 475 U.S. 312, 321-22
(1986) ); *see also Johnson v. Glick*, 481 F.2d 1028,
1033 (2d Cir. 1973).

**\*6** "To determine whether a defendant acted maliciously,
several factors should be examined including, 'the extent of
the injury and the mental state of the defendant, as well as
the need for the application of force; the correlation between
that need and the amount of force used; the threat reasonably
perceived by the defendants; and any efforts made by the
defendants to temper the severity of a forceful response.' "
*Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (quoting
*Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) ).

### (i) Ciorciari

Mindful of the Second Circuit's direction that a pro se
plaintiff's pleadings must be liberally construed, the Court
finds that a response to plaintiff's excessive force claim
against defendant Ciorciari is warranted. In so ruling, the
Court expresses no opinion as to whether this claim can
withstand a properly filed dispositive motion.

### (ii) Barq

Plaintiff alleges that defendant Barq "demonstrate[d]" on
plaintiff's body where defendant Ciorciari struck him, while
"simultaneously questioning him about the incident." Am.
Compl. at 5. The amended complaint lacks any details about
the force used by defendant Barq in "striking" plaintiff, the
manner in which defendant Barq contacted plaintiff, or
any injuries plaintiff suffered as a result of the interaction.
Without such details, the amended complaint lacks allegations
which plausibly suggest that defendant Barq's act of touching

plaintiff was done maliciously to cause harm. *See Hudson*,
503 U.S. at 9 ("[N]ot ... every malevolent touch by a prison
guard gives rise to a federal cause of action."); *Cosby v.
Russell*, No. 9:10-CV-0595 (TJM/DEP), 2012 WL 1514836,
at \*8 (N.D.N.Y. Feb. 8, 2012) ("The allegation that defendant
Russell sat on plaintiff's legs after he complained of pain
is insufficient to state a plausible deliberate indifference
claim ... [where] ... [b]y plaintiff's own admission, he was
non-compliant with orders ... requiring that some modicum
of force be applied"), *report and recommendation adopted by*
2012 WL 715250 (N.D.N.Y. Mar. 5, 2012); *Headley v. Fisher*,
No. 06-CV-6331, 2008 WL 1990771, at \*4 (S.D.N.Y. May 7,
2008) (inmate's allegation that corrections official "grabbed
his shoulder, cursed in his face, slapped him twice and pushed
him in his cell" after inmate was directed to do as the official
told him was not sufficient to demonstrate that the official
"acted maliciously and sadistically to cause harm rather than
in a good faith effort to maintain or restore discipline").

Accordingly, plaintiff's Eighth Amendment claim against
defendant Barq is dismissed pursuant to 28 U.S.C. § 1915(e)
(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim
upon which relief may be granted.

### 2. False Misbehavior Report Claims

It is well-settled that the issuance of a false misbehavior
report does not state a constitutional claim for relief. *Boddie
v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (It is well
settled that "a prison inmate has no general constitutional
right to be free from being falsely accused in a misbehavior
report.") (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d
Cir. 1986), *cert. denied*, 485 U.S. 982 (1988) ); *accord,
Pittman v. Forte*, No. 9:01-CV-0100, 2002 WL 31309183,
at \*5 (N.D.N.Y. July 11, 2002) (Sharpe, M.J.); *see also
Santana v. Olson*, No. 07-CV-0098, 2007 WL 2712992, at \*2
(W.D.N.Y. Sept. 13, 2007) ("[T]he filing of a false behavior
report by a correctional officer does not state a claim for
relief."); *Husbands v. McClellan*, 957 F. Supp. 403, 406-07
(W.D.N.Y. 1997) (claim that plaintiff had contraband placed
in his cell and received a false misbehavior report, even if
true, does not state a constitutional violation).[8]  In addition,
"[t]he filing of a false report does not, of itself, implicate the
guard who filed it in constitutional violations which occur
at a subsequent disciplinary hearing." *Williams v. Smith*, 781
F.2d 319, 324 (2d Cir. 1986) (rejecting prisoner's "but for"
argument as to guard who prepared misbehavior report but
was not involved in Tier III hearing) (citation omitted).

Matthews v. Barq, Not Reported in Fed. Supp. (2019)

2019 WL 1025828

8     A constitutional violation could occur in this situation if plaintiff were not provided adequate due process in the disciplinary proceeding, and then the claim is not based on the truth or falsity of the misbehavior report but instead on the conduct of the hearing itself. *See Freeman*, 808 F.2d at 951; *see also Santana v. Olson*, No. 07-CV-0098, 2007 WL 2712992, at *2 (W.D.N.Y. Sept. 13, 2007). In this case, plaintiff has not asserted a disciplinary due process claim.

**\*7** Accordingly, plaintiff's claims against defendants Ciorciari and Rossy based on them allegedly issuing him false misbehavior reports are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 3. Failure-to-Investigate Claims

"[T]he law is ... clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally*, No. 9:09-CV-1198 (DNH/ATB), 2011 WL 856426, at *9 (N.D.N.Y. Feb. 4, 2011) (citing *Bernstein v. New York*, 591 F. Supp. 2d 448, 460 (S.D.N.Y. 2008) (collecting cases) ); *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989) (The Due Process Clause "generally confers no affirmative right to governmental aid, even where that aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."). "In order for a constitutional violation to have occurred, the investigation *itself* must have resulted in a deprivation of a constitutional right." *Pine*, 2011 WL 856426, at *9 (emphasis in original).

In this case, the amended complaint lacks any allegations which plausibly suggest that plaintiff was deprived of a constitutional right as a result of either defendant Barq's investigation of plaintiff's complaint against defendant Ciorciari, or defendant Thoms's refusal to investigate plaintiff's complaint of missing property. [9] Accordingly, plaintiff's failure-to-investigate claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

9     The law is equally well-settled that if an "official is confronted with a violation that has already occurred and is not ongoing, then the official will

not be found personally responsible for failing to 'remedy' a violation." *Harnett v. Barr*, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008); *see also Young v. Kihl*, 720 F. Supp. 22, 23 (W.D.N.Y. 1989) ("[T]he wrong ... [must] have been capable of mitigation at the time the supervisory official was apprised thereof ... Without such caveat, the personal involvement doctrine may effectively and improperly be transformed into one of respondeat superior."); *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001) ("[A] 'failure to remedy' theory of liability is not available with respect to discrete and completed violations.").

### 4. Retaliation Claims

Courts must approach claims of retaliation " 'with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official–even those otherwise not rising to the level of a constitutional violation– can be characterized as a constitutionally proscribed retaliatory act.' " *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ). To state a plausible claim, a plaintiff asserting a First Amendment retaliation claim must advance "non-conclusory" allegations establishing "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action." *Davis*, 320 F.3d at 352 (quoting *Dawes*, 239 F.3d at 492). "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).

#### (i) Ciorciari

**\*8** Liberally construed, plaintiff alleges that defendant Ciorciari assaulted him on March 20, 2015, and thereafter issued him a false misbehavior report, because plaintiff refused to provide defendant Ciorciari with information about his involvement in an altercation that defendant Ciorciari was "overseeing." Am. Compl. at 4-5. The Second Circuit recently held that "the First Amendment protects an inmate's refusal both to serve as a prison informant and to provide false information." *Burns v. Martuscello*, 890 F.3d 77, 89 (2d Cir. 2018) (noting that "[s]afety risks as well as legitimate

**Matthews v. Barq, Not Reported in Fed. Supp. (2019)**

Case 5:22-cv-00216-GTS-TWD  Document 7  Filed 04/13/22  Page 98 of 227

2019 WL 1025828

concerns about personal loyalty play a role in the decision to divulge information and incriminate others").

Accordingly, at this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, *see e.g. Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court finds that this retaliation claim survives sua sponte review and requires a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

#### (ii) Barq

Plaintiff alleges that defendant Barq expressed indifference to plaintiff's complaint against defendant Ciorciari, and physically contacted plaintiff's body while questioning him about the incident. Am. Compl. at 5. Plaintiff further alleges that defendant Barq refused to allow plaintiff to travel with his legal bag during his transport to another facility approximately one month later, and thereafter "tamper[ed]" with the legal bag. *Id.* at 5, 7.

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that a response to this claim is warranted. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

#### (iii) Rossy

Liberally construed, the amended complaint asserts a retaliation claim against defendant Rossy based on allegations that he "destroyed" certain items of plaintiff's personal property during a cell search, confiscated a letter addressed to the Inspector General's Office, and issued plaintiff a misbehavior report for possessing contraband in response to seeing the letter addressed to the Inspector General's Office. Am. Compl. at 6.

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that this retaliation claim survives sua sponte review and requires a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

#### (iv) Thoms

Liberally construed, the amended complaint asserts a retaliation claim against defendant Thoms based on allegations that he ignored complaints made by plaintiff about unidentified "issues" during his incarceration at Five Points C.F., and refused to investigate plaintiff's complaint regarding missing legal material upon his arrival at Great Meadow C.F., because plaintiff "filed various missives" concerning defendant Thoms. Am. Compl. at 11.

As an initial matter, plaintiff's allegation that defendant Thoms failed to investigate his complaints, without more, does not satisfy the adverse action requirement. *See Houston v. Schriro*, No. 11-CV-7374, 2013 WL 4457375, at *10 (S.D.N.Y. Aug. 20, 2013) ("Ignoring grievances cannot support a First Amendment retaliation claim.") (citing *Islam v. Goord*, No. 05-CV-7502, 2006 WL 2819651, at *6 (S.D.N.Y. Sept. 29, 2006) (prison official's failure to investigate prisoner's complaint is not sufficiently adverse to support First Amendment retaliation) ). Furthermore, plaintiff does not identify when he filed "missives" concerning defendant Thoms in relation to when defendant Thoms allegedly ignored his complaints and denied his missing property grievance. Nor does plaintiff allege any facts which plausibly suggest that defendant Thoms was aware that plaintiff filed "missives" about him. Thus, there exists no basis for the Court to infer a casual connection between the alleged "missives" plaintiff filed concerning defendant Thoms and the alleged inaction by defendant Thoms with respect to plaintiff's complaints.

**\*9** Accordingly, plaintiff's retaliation claim against defendant Thoms is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

#### 5. Unlawful Cell Search Claim

"The Fourth Amendment is inapplicable to the unwarranted search of an inmate's prison cell, as inmates have no reasonable expectation of privacy in such a place." *Cucchiara v. Auburn Corr. Facility*, No. 9:18-CV-0605 (DNH/TWD), 2018 WL 3471280, at *3 (N.D.N.Y. July 19, 2018) (citing, *inter alia, Hudson v. Palmer*, 468 U.S. 517, 526 (1984) ("hold[ing] that society is not prepared to recognize as

Matthews v. Barq, Not Reported in Fed. Supp. (2019)

2019 WL 1025828

legitimate any subjective expectation of privacy that a prisoner might have in his prison cell ...” and thus the Fourth Amendment does not apply to cell searches); *Demaio v. Mann*, 877 F. Supp. 89, 95 (N.D.N.Y. 1995) (“Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights.”) ).

Accordingly, plaintiff's unlawful cell search claim against defendant Rossy is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 6. Access-To-Courts Claim

Interference with a prison inmate's legal mail “implicates [his] rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution.” *Davis*, 320 F.3d at 351. The “right of access to the courts,” requires States “to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights.” *Bounds v. Smith*, 430 U.S. 817, 828 (1977), *modified on other grounds, Lewis v. Casey*, 518 U.S. 343, 350 (1996); *see also Bourdon v. Loughren*, 386 F.2d 88, 92 (2d Cir. 2004). “However, this right is not ‘an abstract, freestanding right....’ and cannot ground a Section 1983 claim without a showing of ‘actual injury.’ ” *Collins v. Goord*, 438 F. Supp. 2d 399, 415 (S.D.N.Y. 2006) (quoting *Lewis*, 518 U.S. at 351).

To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating that (1) the defendant acted deliberately, and (2) the plaintiff suffered an actual injury. *Lewis*, 518 U.S. at 353; *Konigsberg v. Lefevre*, 267 F. Supp. 2d 255, 261 (N.D.N.Y. 2003) (“Prison officials may only be held liable for such injury if they frustrated or impeded a prisoner's efforts to pursue a non-frivolous legal claim.”).

“A hypothetical injury is not sufficient to state a claim for violation of the right of access to the courts.” *Amaker v. Haponik*, No. 98-CV-2663, 1999 WL 76798, at *3 (S.D.N.Y. Feb. 17, 1999). Instead, a plaintiff must demonstrate “actual injury” by establishing that the denial “hindered his efforts” to pursue a non-frivolous legal claim. *Lewis*, 518 U.S. at 349, 351-53; *see also O'Diah v. Fischer*, No. 9:08-CV-941 (TJM/DRH), 2012 WL 987726, at *12 (N.D.N.Y. Feb. 28, 2012) (recommending denial of motion to dismiss access-to-courts claim where plaintiff alleged that “he provided Hahn,

Shaw, Swierk and Moscicki his legal mail at various times in June of 2008, but that they intentionally failed to send the mail out” and his “Article 78 case filed in Cayuga County was [subsequently] dismissed”), *report and recommendation adopted by* 2012 WL 976033 (N.D.N.Y. Mar. 22, 2012). “Mere ‘delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.’ ” *Davis*, 320 F.3d at 352 (citing *Jermosen v. Coughlin*, 877 F. Supp. 864, 871 (S.D.N.Y. 1995) ).

**\*10** The Supreme Court has stated that in order to allege a denial of access to the courts claim, “the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint....” *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). The underlying claim “must be described well enough to apply the ‘nonfrivolous’ test and to show that the ‘arguable’ nature of the underlying claim is more than hope.” *Id.* at 415-16. “[T]he complaint should state the underlying claim in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued, and a like plain statement should describe any remedy available under the access claim and presently unique to it.” *Id.* at 417-18 (footnote omitted).

Here, plaintiff alleges that defendant Barq denied him access to a legal bag prior to his transport to another facility, and that certain legal materials within the bag were subsequently removed. Am. Compl. at 7. Plaintiff, however, fails to allege any facts which plausibly suggest that he suffered an “actual injury” in any court proceeding as a result of these alleged acts of wrongdoing.

Accordingly, plaintiff's access-to-courts claim is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 7. Free-Flow-of-Mail Claim

“In addition to the right of access to the courts, a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment.” *Davis*, 320 F.3d at 351. A prisoner's mail may only be restricted to further “ ‘one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.’ ” *Id.* (quoting *Washington*

Case 5:22-cv-00216-GTS-TWD   Document 7   Filed 04/13/22   Page 100 of 227

Matthews v. Barq, Not Reported in Fed. Supp. (2019)

2019 WL 1025828

*v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986) ). "The First Amendment protects prisoners' access to mail directly, unlike the right of access to courts, which protects prisoners' access to mail only derivatively and with respect to given claims." *Bellezza v. Holland*, No. 09-CV-8434, 2011 WL 2848141, at *6 (S.D.N.Y. July 12, 2011).

As courts have attempted to balance the competing interests implicated when facilities place restrictions on prison mail, the courts have "consistently afforded greater protection to legal mail than to non-legal mail[.]" *Davis*, 320 F.3d at 351. "While a prisoner has a right to be present when his legal mail is opened, ... an isolated incident of mail tampering is usually insufficient to establish a constitutional violation." *Davis*, 320 F.3d at 351 (citations omitted). However, in *Washington v. James*, the Second Circuit found that "as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Davis*, 320 F.3d at 351 (citing *Washington*, 782 F.2d at 1139); *see also Turner v. Safley*, 482 U.S. 78, 84-91 (1987) (prison regulations impinging constitutional rights must be "reasonably related to legitimate penological interests").

Here, plaintiff alleges that defendant Rossy confiscated "letters" during a cell search, including one addressed to the Inspector General's Office. Am. Compl. at 6. Plaintiff's allegation of a single instance of mail tampering, without more, is insufficient to plausibly suggest an ongoing practice of censorship unjustified by a substantial government interest. Moreover, the amended complaint is devoid of any allegations which plausibly suggest that the alleged tampering unjustifiably chilled plaintiff's right of access to the courts or impaired any legal representation received. *See Davis*, 320 F.3d at 351 ("[A]n isolated incident of mail tampering is usually insufficient to establish a constitutional violation. Rather, the inmate must show that prison officials 'regularly and unjustifiably interfered with the incoming legal mail.' ") (quoting *Cancel v. Goord*, No. 00-CV-2042, 2001 WL 303713, at *6 (S.D.N.Y. Mar. 29, 2001) ); *Romano v. Lisson*, 711 Fed. App'x 17, 19 (2d Cir. 2017) (summary order) (affirming dismissal of free-flow-of-mail claim without prejudice where the complaint made "only one reference" to tampering with legal mail); *Chavis v. Chappius*, No. 06-CV-543S, 2015 WL 1472117, at *14 (W.D.N.Y. Mar. 31, 2015) (dismissing free-flow-of-mail claim based on allegation that corrections official "confiscated a piece

of his outgoing mail addressed to the Inspector General" because "[e]ven assuming plaintiff's letter to the Inspector General was legal mail, there are no factual allegations that DePasquale's action actually 'hindered [plaintiff's] efforts to pursue a legal claim' or otherwise prejudiced a legal action as required to state a claim for denial of access to the courts due to interference with legal mail ... [and] plaintiff does not allege that this defendant 'regularly and unjustifiably' interfered with his personal mail" (internal citations omitted) ); *Banks v. Annucci*, 48 F. Supp. 3d 394, 410-11 (N.D.N.Y. 2014) ("A single instance of mail tampering that does not result in the plaintiff suffering any damage is generally insufficient to support a constitutional challenge.") (citing *Morgan v. Montanye*, 516 F.2d 1367, 1371 (2d Cir. 1975) ); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 346 (N.D.N.Y. 2010) ("[C]ourts in the Second Circuit have never held an isolated incident of mail tampering to violate an inmate's First Amendment rights.").

**\*11** Accordingly, plaintiff's free-flow-of-mail claim against defendant Rossy is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 8. Destruction of Property Claims

The Supreme Court has held that the unauthorized intentional destruction of prisoner's property may not be the basis for due process claims if sufficient post deprivation remedies are available to address the claim. *Hudson v. Palmer*, 468 U.S. 517, 531 (1984) (citing *Parratt v. Taylor*, 451 U.S. 527, 541 (1981) ); *see also Rivera-Powell v. New York City Board of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) ("When the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides meaningful post deprivation remedy."). "New York in fact affords an adequate post-deprivation remedy in the form of, *inter alia*, a Court of Claims action." *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001); *Davis v. New York*, 311 Fed. App'x 397, 400 (2d Cir. 2009) (summary order) ("The existence of this adequate post-deprivation state remedy would thus preclude [plaintiff's] due process claim under § 1983 [for lost personal property].").

In the instant case, plaintiff claims that certain of his personal property was lost or destroyed following a cell search and his transfer out of Eastern C.F. Am. Compl. at 6-7. Plaintiff has failed to allege that adequate post-deprivation

Case 5:22-cv-00216-GTS-TWD   Document 7   Filed 04/13/22   Page 101 of 227

Matthews v. Barq, Not Reported in Fed. Supp. (2019)

2019 WL 1025828

remedies to recover the value of his destroyed property were unavailable. [10] Thus, the amended complaint is devoid of any allegations which plausibly suggest that plaintiff was denied due process when his personal property was allegedly lost or destroyed.

[10]   To the extent plaintiff's claim is based on the destruction of legal materials, as stated above, plaintiff has failed to allege facts which plausibly suggest that he suffered an actual injury in any court proceeding.

Accordingly, plaintiff's destruction of property claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 9. Conditions-of-Confinement Claim

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. The Second Circuit, in addressing the needs protected by the Eighth Amendment, has stated that sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds sub nom. Bell v. Wolfish, 441 U.S. 520 (1979); Lareau v. Manson, 651 F.2d 96, 106 (2d Cir. 1981). To demonstrate that the conditions of confinement constitute cruel and unusual punishment in violation of the Eighth Amendment, a plaintiff must satisfy both an objective and subjective element. See Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996). A plaintiff must demonstrate that (1) the conditions of confinement resulted in "unquestioned and serious deprivations of basic human needs," Anderson v. Coughlin, 757 F.2d 33, 35 (2d Cir. 1985); see also Jolly, 76 F.3d at 480, and (2) the defendants acted with "deliberate indifference." Wilson v. Seiter, 501 U.S. 294, 303-04 (1991).

*12 Here, the amended complaint alleges that defendant Thoms "exhibited deliberate indifference towards plaintiff" by "utiliz[ing]" plaintiff's conviction to "create a volatile environment for the plaintiff, which was a primary reason for plaintiff's property mishaps." Am. Compl. at 11. These allegations are entirely conclusory. Moreover, the amended complaint is devoid of any allegations which plausibly suggest that plaintiff suffered an "unquestioned and serious

deprivation" of a "basic human need" as a result of the actions of defendant Thoms.

Accordingly, plaintiff's Eighth Amendment claim against defendant Thoms is dismissed pursuant to 28 U.S.C. 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 10. Equal Protection Claims

The Equal Protection Clause requires that the government treat all similarly situated people alike. City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). Specifically, the Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " Bizzarro v. Miranda, 394 F.3d 82, 86 (2d Cir. 2005) (quoting LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980) ). To state a viable claim for denial of equal protection, a plaintiff generally must allege "purposeful discrimination ... directed at an identifiable or suspect class." Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir. 1995). In the alternative, under a "class of one" theory, plaintiff must allege that he has been intentionally treated differently from others similarly situated, with no rational basis for the difference in treatment. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); DeMuria v. Hawkes, 328 F.3d 704, 706 (2d Cir. 2003).

#### (i) Ciorciari

Plaintiff alleges that defendant Ciorciari struck him in the head and then subjected him to racial and homophobic slurs while questioning him about his involvement in an altercation. Am. Compl. at 4-5. "Courts in this circuit and elsewhere have held that officers' use of racial epithets may be regarded as direct evidence of racial animus and, when combined with physical abuse or other unlawful actions, may establish an equal protection violation." Ali v. Connick, 136 F. Supp. 3d 270, 280 (E.D.N.Y. 2015); see also Cole v. Fischer, 379 Fed. App'x 40, 43 (2d Cir. 2010) ("When the verbal harassment and simultaneous physical abuse alleged in the amended complaint are considered together, we have little trouble concluding that plaintiff's allegations were sufficient

Matthews v. Barq, Not Reported in Fed. Supp. (2019)

2019 WL 1025828

to state a § 1983 claim for discrimination on the basis of race and religion."). Accordingly, at this stage of the proceeding, the Court finds that a response from defendant Ciorciari to plaintiff's equal protection claim is warranted. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

### (ii) Thoms

Plaintiff alleges that defendant Thoms refused to clarify whether plaintiff should file a claim or grievance regarding missing property, and instead advised plaintiff that he could not seek "any relief whatsoever" for his missing property (after plaintiff had already done so) because he was "a former resident of the S.O.P. unit[.]" Am. Compl. at 16-17.

It is unclear from the amended complaint upon which basis plaintiff claims he was unequally treated by defendant Thoms. To the extent plaintiff claims that he was discriminated against based on his conviction as a sex offender, the law is well-settled that "[s]ex offenders do not comprise a suspect or quasi-suspect class for Equal Protection purposes." *Travis v. New York State Div. of Parole*, No. 96-CV-759 (TJM/GLS), 1998 WL 34002605, at *4 (N.D.N.Y. Aug. 26, 1998); *see also Selah v. N.Y.S. Docs Com'r.*, No. 04-CV-3273, 2006 WL 2051402, at *6 (S.D.N.Y. July 25, 2006) ("Neither sex offenders nor the mentally ill are a suspect class warranting heightened equal protection scrutiny.").

**\*13** Moreover, assuming that plaintiff has intended to assert an equal protection claim under a "class of one" theory, the amended complaint is devoid of any allegations that plaintiff was intentionally treated differently from others similarly situated, with no rational basis for the difference in treatment. *See Village of Willowbrook*, 528 U.S. at 564. In fact, the amended complaint fails to identify any similarities between plaintiff and others, let alone adverse treatment experienced by plaintiff compared to persons similarly situated. *See Thomas v. Pingotti*, No. 9:17-CV-0300 (GTS/DEP), 2017 WL 3913018, at *7 (N.D.N.Y. Sept. 6, 2017) ("Conclusory allegations of disparate treatment or a plaintiff's personal belief of discriminatory intent are patently insufficient to plead a valid claim under the Equal Protection clause."); *see also Butler v. Bridgehampton Fire Dist.*, No. 14-CV-1429, 2015 WL 1396442, at *4-5 (E.D.N.Y. Mar. 25, 2015) (dismissing the plaintiff's equal protection claim under the selective enforcement and class of one theories because the complaint "only discuss[ed] the harmful actions [the

defendants] took with respect to [the] [p]laintiff, but there [was] no discussion whatsoever of any similarities between [the] [p]laintiff and others"); *Tuitt v. Chase*, No. 9:11-CV-0776 (DNH/TWD), 2014 WL 2927803, at *8 (N.D.N.Y. June 27, 2014) ("While Plaintiff cursorily alleges that he 'suffered adverse treatment f[ro]m other inmates because he attempted to resolve ... issues through the use of grievances,' he does not identify any particular similarly situated individuals who received different treatment.... Such cursory allegations do not meet the plausibility standard required by *Twombly* and *Iqbal*."); *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 434-35 (S.D.N.Y. 2013) (dismissing the plaintiff's equal protection claim under theories of selective enforcement and class of one where the plaintiff "simply" alleged that the defendants "singled out [the] plaintiff, in part, because of his exercise of constitutional rights" (internal quotation marks omitted) ).

Furthermore, it appears that plaintiff's equal protection claim against defendant Thoms is based solely on defendant Thoms's alleged failure (because of the nature of plaintiff's conviction) to either confirm that plaintiff could file a claim for the value of his missing property or order an investigation into plaintiff's missing property. To the extent plaintiff's claim is based on the former, the amended complaint is devoid of any allegations which plausibly suggest that defendant Thoms interfered with plaintiff's ability to pursue post-deprivation remedies. Indeed, the amended complaint lacks any allegations regarding whether plaintiff even attempted to file an action in the New York State Court of Claims regarding his missing property.

To the extent plaintiff's claim is based on defendant Thoms's alleged failure to order an investigation into plaintiff's missing property, as noted, "the law is ... clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine*, 2011 WL 856426, at *9; *see also Shell v. Brzezniak*, 365 F. Supp. 2d 362, 370 (W.D.N.Y. 2005) ("inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures do [ ] not give rise to a cognizable § 1983 claim.") (citing *Cancel v. Goord*, No. 00-CV-2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) ). Thus, "the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Shell*, 365 F. Supp. 2d at 370.

Matthews v. Barq, Not Reported in Fed. Supp. (2019)

2019 WL 1025828

Accordingly, plaintiff's equal protection claim against defendant Thoms is dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) f or failure to state a claim upon which relief may be granted.

### (iii) Rossy and Barq

The amended complaint lacks any allegations which plausibly suggest that either defendant Rossy or defendant Barq discriminated against plaintiff based on him belonging to an identifiable or suspect class, or intentionally treated him differently from others similarly situated. Rather, plaintiff's equal protection claims against defendants Rossy and Barq are entirely conclusory. *See Iqbal*, 556 U.S. at 678 (concluding that a pleading that only "tenders naked assertions devoid of further factual enhancement" will not survive sua sponte review) (internal quotations and alterations omitted); *Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation ... requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."); *Thomas*, 2017 WL 3913018, at \*7.

 **\*14** Accordingly, plaintiff's equal protection claims against defendants Rossy and Barq are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

## IV. FOURTH PRELIMINARY INJUNCTION MOTION

"In general, district courts may grant a preliminary injunction where a plaintiff demonstrates 'irreparable harm' and meets one of two related standards: 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.' " *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (quoting *Lynch v. City of N.Y.*, 589 F.3d 94, 98 (2d Cir. 2009) (internal quotation marks omitted) ).

With respect to the first factor, "as a general matter, there is a presumption of irreparable harm when there is an alleged deprivation of constitutional rights." *V.W. by & through Williams v. Conway*, 236 F. Supp. 3d 554, 588 (N.D.N.Y. 2017) (internal quotation marks and citation omitted); *see also The Bronx Household of Faith v. Board of Education*

*of the City of New York*, 331 F.3d 342, 349 (2d Cir. 2003) (holding that "where a plaintiff alleges injury from a rule or regulation that directly limits [a First Amendment right], the irreparable nature of the harm may be presumed").

With respect to the second factor, when the moving party seeks a "mandatory injunction that alters the status quo by commanding a positive act," the burden is heightened. *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (citing *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010) (internal quotation marks omitted) ). A mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Cacchillo*, 638 F.3d at 406 (citing *Citigroup Global Mkts.*, 598 F.3d at 35 n.4) (internal quotation marks omitted); *see also Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995) (a plaintiff seeking a mandatory injunction must make a "clear" or "substantial" showing of a likelihood of success on the merits of his claim).

The same standards used to review a request for a preliminary injunction govern consideration of an application for a temporary restraining order. *Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992); *Perri v. Bloomberg*, No. 06-CV-0403, 2008 WL 2944642, at \* 2 (E.D.N.Y. Jul. 31, 2008). The district court has wide discretion in determining whether to grant preliminary injunctive relief. *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005).

In this case, plaintiff seeks a temporary restraining order and preliminary injunction enjoining defendants "and all other persons acting in concert ... with them from issuing plaintiff faulty facility rule violations, ... honoring erroneous institutional infractions, ... corroborating [sic] fabricated misbehavior reports ... [and engaging in] wrongful confinement harassment, discrimination and retaliation[.]" *See* Fourth Preliminary Injunction Motion at 1.

 **\*15** Plaintiff's motion must be dismissed for several reasons. First, plaintiff is currently incarcerated at Attica C.F. *See* Fourth Preliminary Injunction Motion at 2. Neither plaintiff's pleadings nor the Fourth Preliminary Injunction Motion contain any allegations that plaintiff has suffered any wrongdoing at Attica C.F. Thus, plaintiff has failed to

Case 5:22-cv-00216-GTS-TWD   Document 7   Filed 04/13/22   Page 104 of 227

Matthews v. Barq, Not Reported in Fed. Supp. (2019)

2019 WL 1025828

demonstrate a "clear and substantial" showing of a likelihood of success on any claim arising out of his confinement at Attica C.F. *See Amaker v. Fischer*, 453 Fed. App'x 59, 63-64 (2d Cir. 2011) (affirming denial of motion for preliminary injunction based on lack of standing, noting that "[t]o establish standing for a claim for the denial of access to the courts, an inmate must show that he has suffered an 'actual injury' traceable to the challenged conduct of prison officials[,]" and the plaintiff "failed to show that he suffered an 'actual injury' as a result of the personal property limitation placed on him by DOCS's policy"); *Hancock v. Essential Res., Inc.*, 792 F. Supp. 924, 928 (S.D.N.Y. 1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."); *Ivy Mar Co. v. C.R. Seasons Ltd.*, 907 F. Supp. 547, 561 (E.D.N.Y. 1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction.").

Second, none of the defendants named in this action are alleged to be employed at Attica C.F., and none of the claims that remain in this action bear any relationship to plaintiff's treatment at that facility. *See Candelaria v. Baker,* No. 00-CV-0912, 2006 WL 618576, at *3 (W.D.N.Y. Mar. 10, 2006) ("To prevail on a motion for preliminary injunctive relief, the moving party must establish a relationship between the injury claimed in the motion and the conduct giving rise to the complaint." (internal quotation marks and citations omitted) ); *see also Scarborough v. Evans*, No. 9:09-CV-0850 (NAM/DEP), 2010 WL 1608950, at *2 (N.D.N.Y. Apr. 20, 2010) (motion for preliminary injunction alleging use of excessive force and denial of medical care by non-parties denied where complaint alleged denial of mental health care and proper conditions of confinement); *Lewis v. Johnston*, No. 9:08-CV-0482 (TJM/ATB), 2010 WL 1268024, at *3 (N.D.N.Y. Apr. 1, 2010) (denying motion for injunctive relief based upon actions taken by staff at Great Meadow Correctional Facility in 2010, where the complaint alleged wrongdoing that occurred at Franklin and Upstate Correctional Facilities in 2006 and 2007); *Mitchell v. New York State Dep't of Corr. Servs.*, No. 06-CV-6278, 2011 WL 5326054, at *3 (W.D.N.Y. Nov. 3, 2011) (denying plaintiff's request for preliminary injunctive relief because "the facts underlying the request for injunctive relief [were] essentially unrelated to the underlying facts of the claims in this action, except for the fact that they arise in the prison context"); *McClenton v. Menifee*, No. 05-CV-2844, 2006 WL 2474872, at *17 (S.D.N.Y. Aug. 22, 2006) (denying motion for preliminary injunction where the underlying claim "[was] not included in the complaint and there [was] no showing that the plaintiff [had] exhausted his administrative remedies with respect to [that] claim").

Third, to the extent that plaintiff seeks injunctive relief against unnamed staff at Attica C.F. who are not defendants in the present action, injunctive relief is available against non-parties only under very limited circumstances, none of which are present here. *See* Fed.R.Civ.P. 65(d)(2); *Doctor's Associates, Inc. v. Reinert & Duree, P.C.*, 191 F.3d 297, 302-03 (2d Cir. 1999); *United States v. Regan*, 858 F.2d 115, 120 (2d Cir. 1988); *see also In re Rationis Enterprises, Inc. of Panama*, 261 F.3d 264, 270 (2d Cir. 2001) ("A court may not grant a final, or even an interlocutory, injunction over a party over whom it does not have personal jurisdiction.").

Accordingly, for the foregoing reasons, plaintiff's Fourth Preliminary Injunction Motion (Dkt. No. 22) is denied. [11]

[11]    Plaintiff is advised that concerns regarding his current conditions of confinement at Attica C.F. should be addressed through administrative channels at that facility and the New York State Department of Corrections and Community Supervision and, if necessary, by means of a properly filed action.

## V. MOTION FOR COUNSEL

**\*16** There is no right to appointment of counsel in civil matters. *Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir. 1994). Title 28 of United States Code Section 1915 specifically provides that a court may request an attorney to represent any person "unable to afford counsel." 28 U.S.C. § 1915(e)(1). Appointment of counsel must be done carefully in order to preserve the "precious commodity" of volunteer lawyers for those litigants who truly need a lawyer's assistance. *Cooper v. A. Sargenti, Inc.*, 877 F.2d 170, 172-73 (2d Cir. 1989).

In *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335 (2d Cir. 1994), the Second Circuit reiterated the factors that a court must consider in ruling upon such a motion. In deciding whether to appoint counsel, the court should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider a number of other factors in making its determination. *See id.* at 1341 (quoting *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986) ); *Sawma v. Perales*, 895 F.2d 91, 95 (2d Cir. 1990). Among these are

Case 5:22-cv-00216-GTS-TWD   Document 7   Filed 04/13/22   Page 105 of 227
Matthews v. Barq, Not Reported in Fed. Supp. (2019)
2019 WL 1025828

[t]he indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues, and any special reason ... why appointment of counsel would be more likely to lead to a just determination.

*Hodge*, 802 F.2d at 61. None of these factors are controlling, however, and each case should be decided on its own facts. *Id.*

This action was only recently commenced. The defendants that remain in this case after the Court's initial review have not yet responded to the allegations contained in plaintiff's amended complaint, and the only facts upon which this Court may base its decision as to whether this lawsuit is of substance are those portions of plaintiff's amended complaint wherein he states the facts surrounding his claims. Where a plaintiff does not provide a Court with evidence, as opposed to mere allegations, relating to his or her claims, such party does not meet the first requirement imposed by the Second Circuit relative to applications seeking appointment of pro bono counsel. *See Harmon v. Runyon*, No. 96-CV-6080, 1997 WL 118379 (S.D.N.Y. Mar. 17, 1997).

Moreover, there is nothing in the record which demonstrates that plaintiff is not able to effectively pursue this action. While it is possible that there will be conflicting evidence implicating the need for cross-examination if this case proceeds to trial, "this factor alone is not determinative of a motion for appointment of counsel." *Velasquez v. O'Keefe*, 899 F. Supp. 972, 974 (N.D.N.Y. 1995) (McAvoy, C.J.) (citing *Hodge*, 802 F.2d at 61). Further, if this case survives a dispositive motion filed by defendants, it is highly probable that this Court will appoint trial counsel at the final pretrial conference. This Court is not aware of any special reason why appointment of counsel at this time would be more likely to lead to a just determination of this litigation.

In light of the foregoing, the Court denies plaintiff's Motion for Counsel without prejudice.

# VI. CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that plaintiff's Fifth IFP Application (Dkt. No. 21) is **GRANTED**. The Clerk shall provide the Superintendent of the facility that plaintiff has designated as his current location with a copy of plaintiff's inmate authorization form (Dkt. No. 18) and notify that official that plaintiff has filed this action and is required to pay to the Northern District of New York the entire statutory filing fee of $350.00 pursuant to 28 U.S.C. § 1915; and it is further

**\*17** **ORDERED** that the Clerk provide a copy of plaintiff's inmate authorization form (Dkt. No. 18) to the Financial Deputy of the Clerk's Office; and it is further

**ORDERED** that the Clerk is directed to file a copy of the submissions captioned as "amended complaint" (Dkt. Nos. 14, 24-1) immediately following the signature page of the complaint (Dkt. No. 1) and docket these combined submissions as the amended complaint; and it is further

**ORDERED** that the following claims **SURVIVE** sua sponte review and require a response: (1) plaintiff's Eighth Amendment excessive force claim against defendant Ciorciari; (2) plaintiff's First Amendment retaliation claims against defendants Ciorciari, Barq, and Rossy; and (3) plaintiff's Fourteenth Amendment equal protection claim against defendant Ciorciari; and it is further

**ORDERED** that all remaining claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; [12] and it is further

[12]    Should plaintiff seek to pursue any of the claims dismissed without prejudice, he must file a second amended complaint in accordance with Rule 15(a) of the Federal Rules of Civil Procedure. Any amended pleading, which shall supersede and replace the amended complaint in its entirety, must allege claims of misconduct or wrongdoing against each named defendant which plaintiff has a legal right to pursue, and over which jurisdiction may properly be exercised. Any amended complaint filed by plaintiff must also comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure.

2019 WL 1025828

**ORDERED** that defendant Thoms is **DISMISSED without prejudice** as a defendant for the reasons set forth above; and it is further

**ORDERED** that, upon receipt from plaintiff of the documents required for service, the Clerk shall issue summonses and forward them, along with copies of the complaint, to the United States Marshal for service upon defendants Ciorciari, Barq, and Rossy. The Clerk shall also forward a copy of the summons and complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that defendants Ciorciari, Barq, and Rossy, or their counsel, file a response to plaintiff's claims against them as provided for in Rule 12 of the Federal Rules of Civil Procedure after service of process on them; and it is further

**ORDERED** that plaintiff's Fourth Preliminary Injunction Motion (Dkt. No. 22) is **DENIED without prejudice** for the reasons stated above; and it is further

**ORDERED** that plaintiff's Motion for Counsel (Dkt. No. 23) is **DENIED without prejudice** to renew at some future time for the reasons stated above; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in his address; plaintiff's failure to do so will result in the dismissal of this action**; and it is further

 *18 **ORDERED** that the Clerk shall serve a copy of this Decision and Order on plaintiff.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1025828

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 953616
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

James HARRIS, Plaintiff,

v.

WESTCHESTER COUNTY DEPARTMENT OF
CORRECTIONS, Commissioner Rocco Pozzi,
individually and as the commissioner of the westchester
county dept. of corrections, Warden Anthony Amicucci,
individually and as the senior administrator of the
westchester county jail, Sgt. macabbee, individually and
as a supervising officer, Sgt. Hargraves, individually and
as a supervising officer, Captain Orlando, individually
and as the facility grievance coordinator, P.A. Oduro,
individually and as health care provider, Defendants.

No. 06 Civ.2011(RJS).
|
April 3, 2008.

**Attorneys and Law Firms**

James Harris, pro se.

Jane Hogan Felix, Esq., Westchester County Attorney's
Office, White Plains, NY, for Defendants.

MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge.

 **\*1** Plaintiff James Harris, an incarcerated individual
proceeding *pro se,* brings this action pursuant to 42 U.S.C.
§ 1983 to recover damages for alleged violations of
his constitutional rights in connection with a slip-and-fall
accident in his cell on December 16, 2005. Defendants now
move to dismiss plaintiff's complaint for failure to state a
claim under Rule 12(b)(6) of the Federal Rules of Civil
Procedure. Plaintiff has failed to submit an opposition to
defendants' motion.

For the following reasons, defendants' unopposed motion to
dismiss is granted in part and denied in part.

I. BACKGROUND

Plaintiff asserts three claims relating to his alleged slip-and-
fall on a puddle of water in his cell at the Westchester
County Jail on December 16, 2005. First, plaintiff asserts that,
following his fall, defendants were negligent in investigating
plaintiff's grievances regarding the conditions that caused
him to slip in his cell. Second, plaintiff asserts that
defendants failed to maintain constitutionally adequate living
conditions in plaintiff's cell. Finally, plaintiff asserts that
defendants failed to provide adequate medical treatment
for injuries plaintiff allegedly sustained as a result of the
fall. Plaintiff asserts these claims against the Westchester
County Department of Corrections (the "WDOC"), as well as
the WDOC's Commissioner, the Warden of the Westchester
County Jail, and several individual employees of the WDOC.

On May 16, 2006, defendants filed the instant motion to
dismiss. Thereafter, plaintiff failed to submit a response
to defendants' motion. Following reassignment of this case
to the undersigned on September 4, 2007, the Court
directed plaintiff to submit a letter regarding his intent to
oppose defendants' motion. [1] (Oct. 3, 2007 Order.) Plaintiff
submitted a letter to the Court on October 29, 2007, but failed
to address the Court's request and stated that he "figured" the
Court would "be waiting for my release to contact me." (PL's
Oct. 29, 2007 Ltr.)

[1]    The entirety of the Court's orders were sent by mail
to the respective addresses provided to the Court by
plaintiff.

Subsequently, by order dated November 7, 2007, the Court
warned plaintiff that his incarceration did not excuse him from
his obligation to prosecute this action, and directed him to
submit a letter by November 19, 2007, indicating (1) whether
he has received defendants' moving papers relating to their
motion to dismiss the complaint and, (2) if he has received
such materials, whether he intends to oppose defendants'
motion. (Nov. 7, 2007 Order.)

By letter dated November 19, 2007, plaintiff indicated that
(1) he had not received a copy of defendants' moving papers
because they were sent to his civilian address rather than to
the correctional facility where he was incarcerated at that
time; and (2) he intends to oppose "any motion to dismiss my
complaint." (PL's Nov. 19, 2007 Ltr. at 1.)

Harris v. Westchester County Dept. of Corrections, Not Reported in F.Supp.2d (2008)

2008 WL 953616

By Order dated December 3, 2007, the Court directed defendants to serve a copy of their motion to dismiss, and the papers in support thereof, upon plaintiff. The Court also directed plaintiff to submit his opposition to defendants' motion by February 1, 2008, and warned the parties that "[n]o further extensions or alterations of the briefing schedule shall be granted." (Dec. 3, 2007 Order.)

**\*2** Thereafter, defendants filed an affidavit of service indicating that plaintiff was served with a copy of the moving papers on December 10, 2007, at the most recent address provided to the Court by plaintiff. At this time, over eight weeks from the deadline for plaintiff's opposition, plaintiff has not responded to defendants' motion, requested an extension of time to do so, or otherwise been in contact with the Court. [2]

[2]

It may be that plaintiff's failure to comply with the December 3, 2007 Order, and his continued failure to communicate with the Court, is an indication that he no longer wishes to prosecute this action. However, in an abundance of caution and because plaintiff has previously stated his intention to oppose any motion to dismiss (*See* Pl.'s Nov. 19, 2007 Ltr. at 1), the Court will address defendants' motion on the merits.

Defendants assert the following grounds for dismissal: (1) plaintiff has failed to exhaust the appropriate administrative remedies prior to filing the instant action; (2) plaintiff has failed to sufficiently allege a violation of his constitutional rights under Section 1983; and (3) plaintiff has failed to sufficiently allege that the individually named defendants were personally involved in the alleged violations of plaintiff's rights.

## II. LEGAL STANDARDS

### A. Rule 12(b)(6)

The plaintiff's failure to oppose a 12(b)(6) motion, by itself, does not merit dismissal of a complaint. *See McCall v. Pataki,* 232 F.3d 321, 322 (2d Cir.2000); *see also Maggette v. Dalsheim,* 709 F.2d 800, 802 (2d Cir.1983). "[A]lthough a party is of course to be given a reasonable opportunity to respond to an opponent's motion, the sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and

knowledge of the law. If a complaint is sufficient to state a claim on which relief can be granted, the plaintiffs failure to respond to a Rule 12(b)(6) motion does not warrant dismissal." *McCall,* 232 F.3d at 322-23. Thus, in deciding an unopposed motion to dismiss, a court is to "assume the truth of a pleading's factual allegations and test only its legal sufficiency" pursuant to the following standards. *Id.* at 322.

In reviewing a motion to dismiss under Rule 12(b)(6), the court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006). The plaintiff must satisfy "a flexible 'plausibility standard.' " *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1969 (2007). The Court, therefore, does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id* at 1974. Moreover, as plaintiff is appearing *pro se,* the Court shall " 'construe [his complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests.' " *Weixel v. Bd. of Educ. of the City of N.Y.,* 287 F.3d 138, 146 (2d Cir.2002) (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)); *see also Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007) ( "The policy of liberally construing *pro se* submissions is driven by the understanding that '[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.' ") (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)).

### B. Prison Litigation Reform Act

**\*3** The Prison Litigation Reform Act ("PLRA") provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Harris v. Westchester County Dept. of Corrections, Not Reported in F.Supp.2d (2008)

2008 WL 953616

42 U.S.C. § 1997e(a); *see Porter v. Nussle,* 534 U.S. 516, 524 (2002) (observing that the PLRA is intended to "reduce the quantity and improve the quality of prisoner suits"). The PLRA's exhaustion requirement is intended to afford "corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Id.* at 525. The Supreme Court has made clear that "the PLRA's exhaustion requirement applies to all inmate suits about prison life ...." *Id.* at 532.

The failure to exhaust administrative remedies is an affirmative defense and the defendant therefore bears the burden of proving that claims have not been exhausted. *See Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999) ("[A] defendant in a prisoner § 1983 suit may also assert as an affirmative defense the plaintiff's failure to comply with the PLRA's requirements"). In *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004), the Second Circuit observed that the district court must engage in a three-part inquiry in addressing the defendant's argument that a prisoner failed to exhaust. First, the court determines whether administrative remedies were "available" to the prisoner. *Id.* (citing *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004)). Second, the court considers whether the defendants "have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it." *Id.* (citing *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004)). Third, the court looks to whether the defendant's "own actions inhibit[ed] the inmate's exhaustion of remedies," and if so, whether such actions "may estop one or more of the defendants from raising" the defense. *Id.* (citing *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004)). "If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements." *Id* (internal quotation marks and citations omitted).

III. DISCUSSION

A. Exhaustion of Administrative Remedies Under the PLRA

Defendants' exhaustion argument merits only brief consideration by the Court. "[F]ailure to exhaust is an affirmative defense under the PLRA, and ... inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock,* 127 S.Ct. 910, 921 (2007). "An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint." *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 75 (2d Cir.1998). Thus, a Rule 12(b)(6) motion is the proper vehicle to assert an exhaustion defense *only* where the plaintiff's failure to exhaust is "apparent from the face of the complaint ...." *McCoy v. Goord,* 255 F.Supp.2d 233, 249 (S.D.N.Y.2003); *see e.g., Perez v. Westchester County Dept. of Corrs.,* No. 05 Civ. 8120(RMB), 2007 WL 1288579, at *3 (S.D.N.Y. Apr. 30, 2007) ("Defendants may raise the affirmative defensive of non-exhaustion in their answer, but Plaintiffs' failure to exhaust does not amount to failure to state a claim.") (internal quotation marks and citations omitted); *Voorhees v. Goord,* No. 05 Civ. 1407(KMW)(HBP), 2006 WL 1888638, at *7 (S.D.N.Y. Feb. 24, 2006) (observing that the exhaustion issue may be resolved at the motion to dismiss stage where non-exhaustion "is discernible from the complaint and its attachments").

**\*4** In this case, the complaint alleges that plaintiff filed certain grievances (*see* Compl. ¶ 6), and that these grievance were "denied and exhausted" (*id.* ¶ 11). However, plaintiff fails to allege that he filed any appeals, or otherwise took specific steps to exhaust the administrative remedies available to him.

Such gaps in the complaint do not provide a basis for dismissal at this stage of the case. Plaintiff is *not* required to plead exhaustion to survive a motion to dismiss. *See Jones,* 127 S.Ct. at 921. Moreover, defendants have plainly failed to discharge their burden of proving non-exhaustion. Defendants offer nothing more than bare assertions in their brief regarding plaintiff's purported failure to exhaust, and have failed to provide *any* information regarding their own grievance procedures. *See Brown v. Austin,* No. 05 Civ. 9443(PKC), 2007 WL 2907313, at *3 (S.D.N.Y. Oct. 3, 2007).

Accordingly, "[b]ecause the Court cannot undertake the *Hemphill* inquiry until the factual record is developed, dismissal of the action at this early stage is premature." *Brown,* 2007 WL 2907313, at *3 (internal citation omitted). Therefore, defendants' motion to dismiss on exhaustion grounds is denied. The Court notes, however, that the exhaustion issue may look quite different at a later stage of this case, and nothing herein is intended to prejudice

defendants' right to renew their motion on exhaustion grounds.

Furthermore, the Court notes that plaintiff alleges, *inter alia,* that "lengthy [and] detailed grievances have continuously been shot down for illegitimate and furtive reasons. Correspondences ... go unanswered and ignored .... Further efforts are met with indifference and the administration ... sit on their hands or pass it down to their subordinates ..." (*See* Compl. ¶¶ 9, 10, 11.) Plaintiff specifically alleges that (1) on December 16, 2005, plaintiff told defendant Macabbee, the supervising correctional officer, that he was "going to grieve" against Macabbee, to which Macabbee allegedly replied, "Whatever. But its [sic] not going anywhere. Who do you think is going to investigate it?" (*id.* ¶ 5); and (2) on December 19, 2005, plaintiff attempted "unsuccessfully five times" to file a grievance, but alleges that "no supervising officer wanted to recieve [sic] the grievance" and only accepted it "after much debate" (*id.* ¶ 6). [3] However, because the Court has denied defendants' motion on exhaustion grounds, and because neither party has briefed the issue, the Court declines to reach the question of whether plaintiff has plausibly alleged that defendants impeded his ability to pursue administrative remedies. *See Hemphill,* 380 F.3d at 686 ("To the extent that the plaintiff lacked 'available' administrative remedies, the PLRA's exhaustion requirement is inapplicable.").

[3]    Neither party has provided the full names of defendants Macabbee, Hargraves, Orlando, or Oduro.

### B. Failure to State A Claim

Defendants also argue that plaintiff has failed to sufficiently allege a claim under Section 1983. To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws; (2) by a person acting under the color of state law. *See* 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993).

**\*5** Construing the complaint to raise the strongest arguments it suggests, the Court reads the complaint as alleging three claims: (1) defendants were "intentionally negligent" in responding to plaintiff's grievances; (2) defendants failed to maintain constitutionally adequate living conditions

in plaintiff's cell; and (3) defendants were deliberately indifferent to plaintiffs serious medical needs. For the following reasons, the Court grants defendants' motion as to the first two claims, and grants in part and denies in part defendants' motion as to the third claim. The Court also grants defendants' motion to dismiss plaintiff's *Monell* claims.

### 1. Grievances Claim

First, the Court dismisses plaintiff's claim regarding defendants' handling of grievances filed by plaintiff. The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741 (1983). However, "inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures [do] not give rise to a cognizable § 1983 claim." *Shell v. Brezniak,* 365 F.Supp.2d 362, 369-70 (W.D.N.Y.2005) (citing *Cancel v. Goord,* No. 00 Civ.2042(LMM), 2001 WL 303713, at \*3 (S.D.N.Y. Mar. 29, 2001) ("[I]nmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983.... Thus, [the plaintiff's] claim that the Defendants violated his First Amendment right of access to the courts and right to petition the government for redress by failing to process his grievances lacks merit and is dismissed with prejudice.")); *see, e.g., Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003) ("Prison grievance procedures do not confer any substantive right upon an inmate ...."); *see also Anderson v. Duke,* No. 04 Civ. 0030(NAM), 2008 WL 238557, at \*7 (N.D.N.Y. Jan. 28, 2008); *Carroll v. Callanan,* No. 05 Civ. 1427(LEK), 2007 WL 965435, at \*6 (N.D.N.Y. Mar. 30, 2007). Rather, in the event that prison officials ignore a grievance that raises constitutional claims, the proper avenue to seek relief is the course taken by plaintiff here: directly petitioning the government for redress of his claims. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991); *accord Johnson v. Barney,* No. 04 Civ. 10204(LBS), 2007 WL 900977, at \*1 (S.D.N.Y. Mar. 22, 2007) ("While a prisoner's right to meaningful access to the courts is clearly protected by the First Amendment right to petition the government, the same cannot be said for a prison grievance system.") (internal citation omitted); *Lumaj v. Williams,* No. 03 Civ. 1849(PKC), 2004 WL 1207894, at \*6 (S.D.N.Y. June 2, 2004).

2008 WL 953616

Accordingly, the Court finds that plaintiffs claim regarding defendants' allegedly negligent mishandling of grievances cannot, as a matter of law, support a claim under Section 1983. Therefore, defendants' motion to dismiss this claim is granted with prejudice.

### 2. Living Conditions Claim

**\*6** The Court denies defendants' motion to dismiss plaintiff's claim concerning his living conditions. "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.... For this reason, although a pretrial inmate mounting a constitutional challenge to environmental conditions must show deliberate indifference, it may generally be presumed from an absence of reasonable care." [4] *Benjamin v. Fraser,* 343 F.3d 35, 49 (2d Cir.2003) (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199-200 (1989)) (internal quotation marks and additional citation omitted). Accordingly, where a pretrial detainee alleges "a protracted failure to provide safe prison conditions, the deliberate indifference standard does not require the detainees to show anything more than actual or imminent substantial harm." *Id.* at 51 (emphasis omitted); *accord Webster v. City of New York,* 333 F.Supp.2d 184, 199-200 (S.D.N.Y.2004).

[4]     The Second Circuit has found that challenges by pretrial detainees "to the environmental conditions of their confinement are properly reviewed under the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishment Clause of the Eighth." *Benjamin v. Fraser,* 343 F.3d 35, 49-50 (2d Cir.2003). Here, defendants specifically assert that plaintiff was a "pretrial detainee" at all relevant times. (Defs.' Mem. at 7.)

Here, plaintiff has sufficiently pled a violation of his Due Process rights arising from the living conditions of his prison cell. Plaintiff identifies the following allegedly unsafe condition: the ceiling of his cell leaks when it rains, and, on December 16, 2005, this leak created "a puddle of water on the floor [of his cell]" that allegedly caused plaintiff to slip-and-fall. (Compl.¶ ¶ 1, 5.) According to plaintiff, he has repeatedly notified defendants of this condition but his complaints have been ignored. (*See id.* ¶¶ 10-11.)

Given the "obviousness of the risk posed" by a leaking ceiling that previously resulted in a puddle on the floor of plaintiff's cell, thereby allegedly causing plaintiff to fall and to suffer serious injuries to his lower back and wrist, the Court finds that plaintiff has plausibly alleged a risk of "actual or imminent substantial harm" arising from an unsafe prison condition. *Benjamin,* 343 F.3d at 50; *see Ingram v. Steel,* No. 04 Civ. 5918(DLC), 2006 WL 2349241, at \*3 (S.D.N.Y. Aug. 15, 2006). [5] Therefore, accepting plaintiffs allegations as true and drawing all reasonable inferences in his favor, the Court finds that plaintiff has stated a plausible claim for relief based on a violation of his Due Process rights. [6]

[5]     In *Ingram,* the district court found that the plaintiff had sufficiently pled a living conditions claim where "the only specific condition she identifie[d]" was " 'a large hole' in the shower area that had been covered over with plywood ...." *Ingram,* 2006 WL 2349241, at\*3.

[6]     The Court notes, once again, that this finding is predicated on plaintiff's status as a *pretrial* rather than an *post-trial* inmate. As the Second Circuit observed in *Iqbal v. Hasty,* 490 F.3d 143, 169 (2d Cir.2007), in the pretrial detainee context, it has "explicitly rejected analogies to the Eighth Amendment [analysis that applies to post-trial detainees] that would require a showing of wantonness on the part of the prison official, or a showing that the alleged conditions were so inhumane as to constitute cruel and unusual punishment." (internal citations omitted).

### 3. Medical Needs Claim

The Court grants in part and denies in part defendants' motion to dismiss plaintiffs claims regarding the denial of adequate care to address his serious medical needs. Pretrial detainees' claims concerning the alleged denial of adequate medical care also implicate the Due Process Clause. *See City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244-45 (1983); *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). The Second Circuit has found that "an unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Weyant,* 101 F.3d at 856. Thus, "the official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a

serious medical condition and did so because of his deliberate indifference to that need." *Id.*

**\*7** The standard for deliberate indifference has both an objective and a subjective prong. *See, e.g., Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993). The objective prong requires that the alleged deprivation of care be sufficiently serious in objective terms: the plaintiff's condition must present a "condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (internal quotation marks and citation omitted). In determining whether a claimed injury is a "serious" medical condition, "factors that have been considered include [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks and citation omitted).

The subjective prong requires a showing that the defendants were aware of plaintiff's serious medical needs and consciously disregarded a substantial risk of serious harm. *Hathaway,* 37 F.3d at 66. In other words, "the charged official must act with a sufficiently culpable state of mind." *Id.*

Here, plaintiff has sufficiently alleged facts to support a plausible claim against defendant Macabbee for deliberate indifference to his serious medical needs. As to the objective "condition of urgency" prong, *id.,* plaintiff alleges that, as a result of his slip-and-fall, he suffered injuries to his "lower back area and his wrist," which rendered him immobile, at least for some period of time immediately following the accident, and that he did not receive adequate treatment for these injuries for at least three days following the incident. (Compl.¶¶ 2-4, 8.) Therefore, accepting plaintiff's allegations as true, this Court is unable to conclude, as a matter of law, that plaintiff's alleged injuries could not have resulted in " 'chronic and substantial pain' " that significantly affected his "daily activities." *See Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (quoting *Chance,* 143 F.3d at 702); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) (finding that while ordinarily a tooth cavity is not a serious injury, if left untreated, it can cause pain and degeneration and thus be considered serious).

Moreover, as to the subjective knowledge prong, plaintiff alleges that, immediately following his slip-and-fall on

December 16, 2005, he was taken to the facility's clinic, where defendant Macabbee allegedly told the physician's assistant on duty, defendant Oduro, that plaintiff was "faking" and directed Oduro to "give [plaintiff] a few Motrins and send him back." (Compl.¶ 4.) Plaintiff alleges that, as a result of Macabbee's instructions, Oduro "never once look[ed] at [plaintiff's] injuries nor touched them .... He just took defendant Macabbe[e]'s bias[ed] instructions on facevalue." [7] (*Id.*) Prior to this visit, plaintiff alleges that defendant Macabbee witnessed the facility's "Emergency Medical Cadre" transport plaintiff from his cell-where plaintiff was allegedly lying on the floor immobilized as a result of his slip-and-fall-to the facility's health clinic. (*See id.* ¶ 3.)

[7]    Thereafter, according to plaintiff, he did not receive further medical attention until December 19, 2006, when x-rays were taken of plaintiff and he received an "upgrade[ ]" in his medications to address his "severe lower back pain." (Compl.¶ 8.)

**\*8** Thus, plaintiff has sufficiently alleged that Macabbee-who had arrived at the scene of plaintiff's accident, and was thus aware of plaintiffs serious medical needs-sought to deny or delay plaintiff's access to medical care by informing Oduro that plaintiff was "faking." (*See id.* ¶ 4.) Therefore, while it is a close question in light of plaintiffs sparse allegations concerning defendant Macabbee's conduct, the Court finds that, at this stage of the case, plaintiff has sufficiently alleged facts plausibly supporting a claim that defendant Macabbee "intentionally den[ied]" plaintiff "access to medical care ..." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *see also Jernow v. Wendy's Int'l, Inc.,* No. 07 Civ. 3971(LTS), 2007 WL 4116241, at \*4 ("Although Plaintiff's allegations of injury are weak, they are sufficient for the purposes of surviving a 12(b)(6) motion to dismiss, where all inferences must be drawn in favor of the plaintiff).

However, plaintiff has failed to sufficiently allege that defendant Oduro consciously disregarded a substantial risk of harm to plaintiff. Plaintiff alleges that Oduro failed to provide adequate medical treatment to plaintiff because Oduro "took ... [at] facevalue" Macabbee's statement that plaintiff was "faking" his injuries. (Compl.¶ 4.) Plaintiff does *not* allege that Oduro, in fact, knew of plaintiff's serious medical needs and consciously disregarded a substantial risk of serious harm to plaintiff. *Hathaway,* 37 F.3d at 66.

Therefore, accepting plaintiff's allegations as true and drawing all reasonable inferences in his favor, plaintiff has

failed to plausibly allege that Oduro "acted with a sufficiently culpable state of mind" so as to support a claim of deliberate indifference. *Hathaway,* 99 F.3d at 553. Indeed, plaintiff's allegations regarding Oduro establish, at best, that Oduro was negligent in failing to provide adequate treatment to plaintiff and/or in accepting Macabbee's characterization of plaintiff's condition.[8] However, even "negligence constituting medical malpractice" does not violate an inmate's constitutional rights. *Patrick v. Amicucci,* No. 05 Civ. 5206(GEL), 2007 WL 840124, at \*6 (S.D.N.Y. Mar. 19, 2007) (internal citations omitted). Rather, an act of malpractice will amount to deliberate indifference only if "the malpractice involves culpable recklessness, *i.e.,* an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." *Chance,* 143 F.3d at 703. Here, plaintiff has plainly failed to allege that Oduro acted with a sufficiently culpable state of mind in providing medical treatment to plaintiff on December 16, 2005. *See Houston v. County of Westchester Dep't of Corr.,* No. 06 Civ. 3395(DC), 2006 WL 3498560, at \*6 (S.D.N.Y. Dec. 5, 2006) ("A medical malpractice claim is insufficient to support an inadequate medical care claim under the Fourteenth Amendment standard for pretrial detainees ....") (internal citation omitted).

[8]   The Court notes that defendants have submitted evidence relating to a medical examination of plaintiff purportedly conducted by defendant Oduro following plaintiff's slip-and-fall. (*See* Felix Decl. Ex. B.) The Court is not permitted to consider such evidence upon consideration of defendants' motion under Rule 12(b) (6). *See Beacon Enters., Inc. v.Menzies,* 715 F.2d 757, 767 (2d Cir.1983).

 \*9   Accordingly, defendants' motion is granted as to the medical needs claim against Oduro, and that claim is dismissed.

### 4. Defendants' Personal Involvement

Defendants assert that plaintiff has failed to sufficiently allege certain defendants' personal involvement in the alleged violations of plaintiff's rights. (*See* 12-16.) Specifically, defendants assert that defendants Oduro, Orlando, Pozzi, Amicucci, Hargraves, and Macabbee should be dismissed from the action on this ground.

"Proof of an individual defendant's personal involvement in the alleged wrong is, of course, a prerequisite to his liability on a claim for damages under § 1983." *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) (internal citations omitted). In other words, under Section 1983, liability may not be imposed on a theory of *respondeat superior. Hemmings v. Gorczyk,* 134 F.3d 104, 109 n. 4 (2d Cir.1998). "The bare fact that [a defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [a] claim." *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995).

Thus, to state a claim for damages under Section 1983, the plaintiff must allege sufficient facts to demonstrate that defendants were personally or directly involved in the violation, that is, that there was "personal participation by one who ha[d] knowledge of the facts that rendered the conduct illegal." *Provost v. City of Newburgh,* 262 F.3d 146, 155 (2d Cir.2001). "The personal involvement of a supervisor may be established by showing that he (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated." *Iqbal,* 490 F.3d at 152 (citing *Colon,* 58 F.3d at 873).

Defendants' motion is granted as to defendants Oduro, Orlando, Rocco A. Pozzi, the Commissioner of the WDOC, Anthony Amicucci, the Warden of the County Jail. As to defendant Oduro, plaintiff has failed, for the reasons discussed *supra,* to plausibly allege that Oduro was personally involved in a violation of plaintiff's constitutional rights. As to defendant Orlando, plaintiff has failed to assert any factual allegations regarding improper conduct by this defendant, or even to mention him in the body of the Complaint.

As to defendants Pozzi and Amicucci, plaintiff alleges that he sent letters to these defendants regarding the living conditions in his cell, and that they failed to act on plaintiff's letters. (*See* Compl. ¶ 11.) However, it is well-settled that allegations regarding the "mere receipt" of a letter, complaint or grievance from an inmate, and the recipient's subsequent inaction, is insufficient to establish a claim of personal involvement by a correctional supervisor. *Islam v. Fischer,* No. 07 Civ. 3225(PKC), 2008 WL 110244, at \*3 (S.D.N.Y. Jan. 8, 2008); *see, e.g., Islam v. Fischer,* No. 07 Civ. 3225(PKC), 2008 WL 110244, at \*3 (S .D.N.Y.

Jan. 9, 2008) ("The mere receipt of a letter, complaint or grievance from an inmate is insufficient to establish a claim of personal involvement by a correctional supervisor") (internal citation omitted); *Rivera v. Goord,* 119 F.Supp.2d 327, 344 (S.D.N.Y.2000) (same); *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability.") (internal citations omitted). Thus, in this case, because plaintiff fails to allege *any* conduct by defendants Pozzi and Amicucci beyond the receipt of plaintiffs letters, plaintiffs claims under Section 1983 against these defendants must be dismissed.

 **\*10** "Personal involvement will be found, however, where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint." *Johnson,* 234 F.Supp.2d at 363. Here, plaintiff alleges that defendant Hargraves received and *acted* upon plaintiffs grievances. (*See* Compl. ¶ 9.) Specifically, according to plaintiff, defendant Hargraves conducted the investigation of plaintiff's living conditions and corresponded with plaintiff regarding the purportedly "frivolous" nature of plaintiff's grievances. (*Id.*) These allegations sufficiently allege defendant Hargraves's personal involvement in the alleged living conditions violation so as to withstand defendants' motion to dismiss. *See Williams v. Fisher,* No. 02 Civ. 4558(LMM), 2003 WL 22170610, at \*10 (S.D.N.Y. Sept. 18, 2003).

Defendants' motion is also denied as to defendant Macabbee. As discussed *supra,* plaintiff sufficiently alleges that Macabbee sought to intentionally deny plaintiff access to medical treatment, thus creating a risk of actual or imminent harm to plaintiff, so as to withstand defendants' motion to dismiss. (Compl.¶¶ 4-5.)

5. *Monell* Claims

Finally, defendants argue that plaintiff's claims against the WDOC should be dismissed. It is well-settled that municipalities, such as a county department of corrections, may not be liable under § 1983 for constitutional torts committed by its employees under a *respondeat superior* theory. *See Villante v. Dep't of Corrs. of City of New York,* 786 F.2d 516, 519 (2d Cir.1986). Rather, to prevail against a municipality, a plaintiff must demonstrate that his injury resulted from a municipal policy, custom, or practice. *See Coon v. Town of Springfield, Vt.,* 404 F.3d 683, 686

(2d Cir.2005) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978)). "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester,* 93 F.3d 38, 44 (2d Cir.1996) (citing *Sorlucco v. NY. City Police Dep't,* 971 F.2d 864, 870 (2d Cir.1992)). Instead, a policy, custom, or practice of the municipal entity "may be inferred from acts or omissions of a municipality's supervisory officials serious enough to amount to gross negligence or deliberate indifference to the constitutional rights of the plaintiff." *Villante,* 786 F.2d at 519.

Plaintiff has also brought claims against the individual defendants in their official capacities. Similarly, for these claims to survive, plaintiff must sufficiently allege that his injuries resulted from a municipal policy, custom or practice. *See Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993) ("[T]here must be proof of such a custom or policy in order to permit recovery on claims against individual municipal employees in their official capacities, since such claims are tantamount to claims against the municipality itself") (citing *Hafer v. Melo,* 502 U.S. 21 (1991)).

 **\*11** Here, plaintiff fails to allege that he was harmed by a municipal custom or policy, or to allege facts from which it could be plausibly inferred that such a custom or policy caused his alleged injuries. On its face, the complaint alleges violations of plaintiff's rights solely attributable to the acts of individual employees of the WDOC, and does not assert that such injuries were the product of a municipal policy or custom. Moreover, the complaint cannot plausibly be construed as asserting a *Monell* claim based on the alleged "indifference" of the "administration" to plaintiffs complaints. (*See* Compl. ¶ 11 .) Although plaintiff alleges that defendants Pozzi and Amicucci took no action following their receipt of plaintiff's grievance letters (*see id.*), he does not allege that this inaction constituted, or was the product of, a municipal policy or custom, nor does he link such inaction to a violation of his constitutional rights. Put simply, even under the liberal pleading standards applicable to a *pro se* litigant, the complaint does not contain factual allegations sufficient to support a plausible inference that his injuries resulted from a municipal custom, policy, or practice.

Accordingly, plaintiff's claims against the WDOC are dismissed. Similarly, plaintiff's claims against the defendants in their official capacity are dismissed and his claims are construed to be against the defendants solely in their individual capacities.

IV. Conclusion

For the foregoing reasons, defendants' motion is granted in part and denied in part. Specifically, defendants' motion to dismiss is GRANTED as to (1) plaintiffs claim concerning defendants' handling of plaintiffs grievances, (2) all of plaintiffs claims against defendants Orlando, Oduro, Pozzi, and Amicucci; and (3) plaintiff's *Monell* claims against WDOC and the individual defendants in their official capacities. Plaintiffs grievances claim is dismissed with prejudice. Plaintiff's claims against defendants Oduro, Orlando, Pozzi, and Amicucci, as well as plaintiffs *Monell* claims, are dismissed without prejudice to re-filing. Defendants' motion is DENIED in all other respects.

Within thirty days of the date of this Order, plaintiff shall submit either (1) an amended complaint, *see Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999) ("[T]he court should not dismiss without granting leave to amend at least once when a liberal reading of the [*pro se* ] complaint gives any indication that a valid claim might be stated."), or (2) a letter indicating his intention to prosecute this action on the basis of the complaint as it is composed following the disposition of the instant motion. If plaintiff fails to submit either of these two items within thirty days. the Court shall dismiss this action for failure to prosecute under Rule 41(b) of the Federal Rules of Civil Procedure.

Finally, the Court notes that, in the event that plaintiff continues to press his claims, defendants may submit a more focused motion for summary judgment on "the narrow issue of exhaustion and the relatively straightforward questions about the plaintiff's efforts to exhaust, whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused," *McCoy,* 255 F.Supp.2d at 251, provided that defendants comply with Local Civil Rule 56.2 concerning "Notice to *Pro Se* Litigants Opposing Summary Judgment." In the event that defendants wish to pursue this course, they should submit a pre-motion conference letter to the Court at the appropriate time.

 **\*12**  The Clerk of the Court shall terminate the motion docketed as document number 4.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 953616

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 303713
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Frankie CANCEL and Melvin Owens, Plaintiffs,

v.

Glenn S. GOORD, Commissioner of New York State
Department of Correctional Services, et al. Defendants.

No. 00 CIV 2042 LMM.
|
March 29, 2001.

*MEMORANDUM AND ORDER*

MCKENNA, J.

 **\*1** Frankie Cancel and Melvin Owens (collectively "Plaintiffs"), inmates at Fishkill Correctional Facility ("Fishkill"), bring this pro se civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Glenn S. Goord, Commissioner of the New York State Department of Correctional Services ("DOCS"); Anthony Annucci, Deputy Commissioner of DOCS; Jennifer Jones, Staff Attorney at DOCS; William Mazzuca, Fishkill Superintendent; Robert Ercole, Fishkill Deputy Superintendent; Robert Erbert, Fishkill Deputy Superintendent, Administration; Ada Perez, Fishkill Deputy Superintendent, Programs; Stephan Lowry, Fishkill Captain; Lewis Goidel, Fishkill Inmate Grievance Program ("I.G.P.") Supervisor; Christine O'Dell, Fishkill Senior Mail Clerk; Sandie Breen, Fishkill Mail Clerk; and John/Jane Doe[s], unknown Members of the Fishkill Mail Room Staff (collectively "Defendants") for unconstitutionally implementing the inmate grievance program and for deliberately tampering and interfering with their regular and legal mail. The Plaintiffs seek injunctive relief as well as compensatory and punitive damages from each Defendant individually and in their official capacities. The Defendants filed a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons set forth below the Defendants' motion is granted in part and denied in part. [1]

[1]    Plaintiffs' independently move pursuant to Fed.R.Civ.P. 37(d) for an order compelling defendants to comply with Plaintiffs' interrogatories. As Defendants do not oppose this

motion, and because the court has partially denied Defendants' motion to dismiss, Plaintiffs' motion is granted. Defendants are hereby required to respond to Plaintiffs' interrogatories, except those regarding the Inmate Grievance Program, within sixty days of the date hereof.

Statement of Facts [2]

[2]    The facts set forth herein are adduced from a liberal reading of Plaintiffs' complaint. *See Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1998).

On Friday August 28, 1998 Plaintiff Cancel received a piece of legal mail marked as such from the Criminal Term Clerk's Office of the Supreme Court in the State of New York which had been opened outside his presence. (Am.Compl.¶ 22.) The letter had been opened by Defendants O'Dell, Breen, and unknown members of Fishkill mail room staff even though it was clearly marked as privileged legal mail. (*Id.* ¶¶ 22–24.)

On August 31, 1998 Cancel filed a grievance with the Fishkill I.G .P. Supervisor, Defendant Goidel, regarding the August 28 legal mail incident. (*Id.* ¶¶ 25–26.) Goidel failed to process Cancel's grievance. (*Id.*) Subsequently, on October 5, 1998 Cancel filed a second grievance, this time against Goidel for refusing to process Cancel's original grievance. (*Id.* ¶¶ 27–26.) This second grievance was not processed. (*Id.*) On October 19, 1998 Cancel wrote a letter to the I.G.P. Director informing him of Goidel's refusal to process the two grievances. (*Id.*) Subsequently, on November 2, 1998 both grievances were processed (*Id.* ¶ 29) and on November 19, 1998 Cancel received a grievance decision by Defendant O'Dell who wrote that "such mistakes should not occur in the future." (*Id.* ¶ 36.) Despite this statement both Cancel's legal mail and regular mail were continually interfered with. (*Id.* ¶ 37.)

On December 4, 1998 Cancel put together a complaint pursuant to New York State Civil Service Law § 75 seeking a hearing, disciplinary action and the removal of Goidel for his improper actions and unlawful manner of running the I.G.P. [3] (*Id.* ¶ 33.) On December 9, 1998 the complaint was mailed to Defendants Goord and Goidel. (*Id.* ¶¶ 33–35.) The complaint was ignored by both of these Defendants. (*Id.*) On December 14, 1998 Cancel sent a letter with a copy of the complaint to Defendant Annucci who also did not respond. (*Id.* at 35.)

[3]    New York Civil Service Law § 75 provides a cause of action for civil service employees unlawfully

2001 WL 303713

removed. Although neither party addressed this claim in their motion papers, the Court notes that § 75 specifically delineates five categories of persons who may maintain a cause of action for removal. Because Cancel does not fall into one of these five categories he has no standing to bring suit under this provision.

**\*2** On June 28, 1999 Cancel filed another grievance stating that both his regular and legal mail were being withheld. (*Id.* ¶ 38.) Subsequent to the filing of this grievance, but on the same day, Cancel received sixteen pieces of regular mail that had been withheld for several weeks by Defendants Mazzuca, O'Dell, Breen and unknown members of the Fishkill mail room staff. (*Id.*) Cancel filed a grievance about this interference with his regular mail recommending there be an investigation; however, his recommendation was denied. (*Id.* ¶ 39.)

On December 21, 1999 Cancel received another piece of legal mail which had not been processed or handled as legal mail because it was opened outside his presence. (*Id.* ¶ 40.) Cancel filed a complaint regarding this incident and attached photocopies of the legal mail that had been opened outside his presence. (*Id.* ¶ 41.)

On April 17, 2000 Cancel notarized two documents for a personal Family Court matter concerning his son, placed the legal documents in an envelope, sealed it, placed stamps on it and placed it in the outgoing mail addressed to "the other party in the matter." (*Id.* ¶ 49.) The envelope was intercepted, opened and photocopied by Mazzuca, O'Dell, Breen and unknown members of the Fishkill mail room staff and the photocopies were placed in Cancel's file. (*Id.* ¶¶ 49–51.) On July 12, 2000 Cancel met with a member of the Parole board who had Cancel's file which contained a memo from Mazzuca with the Family Court documents attached. (*Id.* ¶ 51.) Defendants continue to withhold Cancel's legal and regular mail. (*Id.*)

On November 5, 1999 Plaintiff Owens picked up a piece of legal mail that had been opened and photocopied outside his presence and had been withheld for about a week. (*Id.* ¶ 45.) As a result, Owens was unable to "research and file a timely Criminal motion for which he received an adverse decision." (*Id.*) The Defendants responsible for withholding this piece of legal mail were Mazzuca, Ercole, Erbert, Perez, O'Dell, Breen and unknown members of the Fishkill mail room staff. (*Id.*) Owens filed a grievance for the opening and

photocopying of his legal mail denying him access to the courts, but it was denied. (*Id.* ¶ 47.)

Legal Standard

On a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), the court must accept as true all well pleaded factual allegations set forth in the complaint and must draw all positive inferences in favor of the pleader. *Hudson v. Greiner,* No. 99 Civ. 12339, 2000 U.S. Dist. LEXIS 17913, at [*]4 (S.D.N.Y. Dec. 12, 2000). A case should only be dismissed when "it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957)). A plaintiff must do more than plead mere "conclusory allegations or legal conclusions masquerading as factual conclusions" to survive a motion to dismiss. *Gebhardt v. Allspect, Inc.,* 96 F.Supp.2d 331, 333 (S.D.N.Y.2000).

**\*3** Furthermore, since the Plaintiffs are proceeding pro se their submissions should be judged on a more lenient standard than that accorded to formal pleadings drafted by lawyers. *McNeil v. United States,* 508 U.S. 106, 113 (1993). The court must make some reasonable allowances so that a pro se plaintiff does not forfeit his rights by virtue of a lack of legal training. *Hudson,* 2000 U .S. Dist. LEXIS 17913, at [*]3. However, proceeding pro se does not altogether relieve a plaintiff from the usual pleading requirements. *Id.* at [*]4.

Plaintiffs' Civil Rights Claims

A plaintiff has a civil cause of action under § 1983 against:

> Every person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action

2001 WL 303713

at law, suit in equity, or other proper proceedings for redress.

42 U.S.C. § 1983.

Plaintiffs bring this action under § 1983 alleging that Defendants violated their rights under the First, Fourth, Sixth and Fourteenth Amendments by unconstitutionally implementing the inmate grievance programs and by deliberately tampering and interfering with their regular and legal mail thereby denying them access to the courts and impinging on their rights to free speech.

Discussion

1. Denial of Access to Grievances and the Unlawful Operation of the Inmate Grievance Program
The amended complaint alleges that Defendant Goidel failed to process Cancel's grievance complaints and that the improper and unlawful running of the I.G.P. violated Cancel's First Amendment right to petition the government for redress and right of access to the courts. (Am.Compl.¶ 52.) Cancel also claims that Defendants Goord, Annucci, Mazzuca, Ercole, Perez, Erbert and Lowry failed to take action to "curb the unlawful practices of Defendant Goidel" even though they were aware that his unlawful conduct proximately caused the above constitutional violation. (*Id.* ¶ 53.)

While there is a First Amendment right of meaningful access to the courts and a right to petition the government for redress, *e.g* ., *Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741 (1983) (finding that "the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances"), inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983. *Justice v. Coughlin, III,* No. 94–CV–1287, 1996 U.S. Dist. LEXIS 15341, at *11 (N.D.N.Y. July 1, 1996). When an inmate sets forth a constitutional claim in a grievance to prison officials and the grievance is ignored, the inmate has the right to directly petition the government for redress of that claim. *Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983. *Id.*

**\*4** Thus, Cancel's claim that the Defendants violated his First Amendment right of access to the courts and right to petition the government for redress by failing to process his grievances lacks merit and is dismissed with prejudice.

Cancel also claims that Goidel's failure to process his grievances and his unlawful and unfair running of the inmate grievance program violates New York State Correction Law § 139 which sets forth prison grievance procedures. (Am.Compl.¶ 52.) First, the failure to process a grievance in a timely manner only entitles an inmate to review at the next appeal level in the grievance process. *See Cliff v. Goodman,* 710 N.Y.S.2d 718 (App.Div.2000) (citing 7 NYCRR § 701.8 (2001)). Second, under New York law a claim generally challenging the constitutionality of the inmate grievance program does not constitute an actual controversy reviewable in an Article 78 proceeding or otherwise. *Matter of Hall v. State of N.Y. Dept. of Corr.,* 453 N.Y.S.2d 58 (App.Div.1992). When Cancel's grievances were ignored by Goidel, Cancel sought review at the next level and his grievances were subsequently processed. Further, Cancel's general dissatisfaction with the inmate grievance program does not constitute an actual controversy reviewable by the Court. *Id.* Therefore, Cancel's claim that Goidel's actions violated New York State Corrections Law § 139 is dismissed with prejudice.

2. Denial of Access to the Courts as a Result of Legal Mail Tampering
Prisoners have a First Amendment right of access to the courts, and where there is a deliberate and malicious interference with that right they may seek redress from the court. *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986). To state a valid § 1983 claim for denial of access to the courts due to interference with an inmate's legal mail, an inmate must allege that a defendant's deliberate and malicious interference actually impeded his access to the court or prejudiced an existing action. *Lewis v. Casey,* 518 U.S. 343, 349 (1996). Therefore, in order to survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim. *Id.* at 351. In other words "the plaintiff must show that a 'non-frivolous legal claim had been frustrated or was being impeded' due to the actions of prison officials." *Warburton v. Underwood,* 2 F. Supp .2d 306, 312 (W.D.N.Y.1998) (quoting *Lewis,* 518 U.S. at 353); *see also Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997).

Cancel v. Goord, Not Reported in F.Supp.2d (2001)

2001 WL 303713

Plaintiff Cancel does not state a cognizable § 1983 claim for denial of access to the courts because he has not alleged any actual injury resulting from Defendants' actions. Cancel alleges three instances where his legal mail was handled inappropriately. [4] Cancel must show that because Defendants opened his outgoing and incoming legal mail he was prejudiced in a legal action he sought to pursue. Because Cancel has not alleged such an injury, his claim under the First Amendment for denial of access to the courts is dismissed with leave to amend the complaint with allegations, if true, that (1) Defendants' interference with Cancel's legal mail injured him by prejudicing him in a legal action; and (2) that the outgoing envelope containing the Family Court documents mailed on April 17, 2000 was clearly identifiable as legal mail. [5]

[4]     Liberally construing Plaintiffs' complaint, the Court assumes that the Family Court documents Cancel mailed on April 17, 2000 were in an envelope addressed to a person or entity that would clearly identify the letter as legal mail or that the envelope was marked as "legal mail." Plaintiff only alleges that he sent these Family Court documents to "the other party in the matter" (Am.Compl.¶ 49) and the Court assumes for the purpose of this motion only that the envelope in question was clearly identified as legal mail.

[5]     "[T]he court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999) (quoting *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991)).

*\*5* As to Plaintiff Owens' claim with respect to legal mail, the amended complaint alleges that because Owens' mail was opened and withheld for about a week he was "unable to research and file a timely response to a Criminal motion for which he received an adverse decision." (Am.Compl.¶ 45.) A delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation. *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (citing *Jones v. Smith,* 784 F.2d 149, 151–52 (2d Cir.1986)). However, if Owens' adverse judgment to his otherwise meritorious Criminal motion was the result of the named Defendants' opening and withholding of his legal mail then he has stated a claim under § 1983 for denial of

access to the courts. For purposes of this motion, the Court accepts all allegations as true and draws all positive inferences in favor of Plaintiff. *See Hudson,* 2000 U.S. Dist LEXIS 17913, at *\** 3. Therefore, Defendants' motion is denied as to Plaintiff Owens' claim under the First Amendment for denial of access to the courts.

3. Violation of the First Amendment Right to Free Speech for Interference with Cancel's Mail

Cancel alleges that Defendants' continuous actions of opening and reading his incoming legal mail, the temporary withholding of his regular mail and the opening and photocopying of his outgoing legal mail impinges on his constitutional right to free speech. (Am.Compl.¶¶ 54, 60, 63.) Inmates unquestionably have a First Amendment right of free speech to send and receive mail, *Wolfish v. Levi,* 573 F.2d 118, 130 (2d Cir.1978), *rev'd in part on other grounds sub nom., Bell v. Wolfish,* 441 U.S. 520 (1979), and a prison official's interference with an inmate's mail may violate his First Amendment right to free speech, which includes the "right to be free from unjustified governmental interference with communication." *Brewer v. Wilkinson,* 3 F.3d 816, 820 (5th Cir.1993).

The boundary between an inmate's First Amendment right to free speech and the ability of prison officials to open or otherwise interfere with an inmate's mail is not precise. However, when analyzing such claims courts have consistently made distinctions between outgoing and incoming mail and legal and non-legal mail based on the various rights and interests at stake. *See Taylor v. Sterrett,* 532 F.2d 462, 475 (5th Cir.1976) (holding that the governmental interest in monitoring incoming mail is more substantial than its interest regarding outgoing mail); *see also Lewis,* 518 U.S. at 353 (holding that prison regulations or practices that affect a prisoner's legal mail are of particular concern because of the potential for interference with a prisoner's right of access to the courts).

With respect to the first distinction, the Supreme Court has recognized that "the implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989). Therefore, the penological interests for interference with outgoing mail must be more than just the general security interest which justifies most interference with incoming mail. *Davidson v. Scully,* 694 F.2d 50, 53 (2d Cir.1982).

2001 WL 303713

**\*6** As to the second distinction, many courts have held that a prisoner's legal mail is entitled to a higher degree of protection than his regular mail. *See Morgan v. Montanye,* 516 F.2d 1367, 1368 (2d Cir.1975) (holding that although prison officials can inspect an inmate's general correspondence, different procedures apply to an inmate's legal mail which should be treated as confidential material); *see also Taylor,* 532 F.2d at 475. Therefore, prison polices or practices which interfere with legal mail on a regular basis whether incoming or outgoing must be supported by a legitimate penological interest other than mere general security concerns which permit interference with regular mail. *Washington,* 782 F.2d at 1139 (citing New York State Department of Corrections Directive 4421).

A. Incoming Mail

1. Withholding of Incoming Non–Legal Mail

Cancel alleges that Defendants withheld his incoming non-legal mail and relies on a single instance when he received sixteen pieces of regular mail on the same day he filed a grievance about the opening of his legal mail. (Am.Compl.¶ 38.) These sixteen pieces of regular mail had been withheld for several weeks. (*Id.*) Prison regulations or practices affecting a prisoner's receipt of non-legal mail must be "reasonably related to legitimate penological interests," *Abbott,* 490 U.S. at 409 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)), and "prison security is a sufficiently important governmental interest to justify limitations on a prisoner's [F]irst [A]mendment rights." *Gaines v. Lane,* 790 F.2d 1299, 1304 (7th Cir.1986). However, this general security interest will not justify a regular pattern and practice of such interference absent other prison concerns with regards to a particular inmate. *Rowe v. Shake,* 196 F.3d 778, 782 (7th Cir.1999).

This Court agrees with the reasoning of the Seventh Circuit in *Rowe* that in order for an inmate to state a claim for interference with incoming non-legal mail he must show a pattern and practice of interference that is not justified by any legitimate penological concern. *Id.* Because Cancel only alleges that prison officials withheld his regular mail on one occasion, rather than showing a pattern and practice of such behavior, his First Amendment free speech claim for the withholding of his regular incoming mail is dismissed with leave to amend the complaint to include specific allegations, if true, establishing such a pattern and practice.

2. Opening and Withholding of Incoming Legal Mail

Cancel alleges two occasions upon which the Defendants opened his incoming legal mail outside his presence. (Am.Compl.¶¶ 22, 40.) Although legal mail is "privileged" and is afforded a higher degree of protection, there still must be a showing that prison officials regularly and unjustifiably interfered with the incoming legal mail rather than merely showing an isolated incident. *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986).

**\*7** In *Washington,* the Second Circuit held that more than one incident of interference with legal mail could give rise to a constitutional claim if it indicated ongoing activity. 782 F.2d at 1139; *see also Bieregu v. Berman,* 59 F.3d 1445, 1452 (3d Cir.1995) (finding that an allegation that prison officials had opened an inmate's incoming legal mail on fifteen occasions was sufficient to show a pattern and practice of deliberate interference). However, in the present case Plaintiff proffers only two instances of opening incoming legal mail with no indication that such practices are ongoing. Without alleging additional facts to establish a pattern and practice that rises to the level of constitutionally impermissible censorship, Plaintiff's complaint is deficient. Therefore, Cancel's claim that Defendants violated his First Amendment right to free speech for interference with his incoming legal mail is dismissed with leave to amend the complaint to include specific allegations, if true, that establish the requisite pattern and practice of interference. [6]

6       Plaintiffs' also allege that in October 1999 Defendant Lowery ordered mail sent to any inmate by the Legal Aid Society regarding contemplated litigation against the New York State Parole Board to be confiscated if seen. (Am.Compl.¶ 42.) In addition, Defendant Ercole also instructed the Fishkill mail room staff to confiscate all mail envelopes larger than regular size, to transfer the contents to a facility envelope and then forward it to the inmate to whom it is addressed. (*Id.* ¶ 43.) Plaintiffs make these allegations in their complaint without stating that they personally were to receive this letter from the Legal Aid Society or that Ercole's policy affected their mail in any way. Because there is no allegation that Plaintiffs' mail was affected by either policy they have no standing to bring a suit for these allegations and they are not addressed by the Court. Plaintiffs' are given leave to amend the complaint to allege, if that be the case,

2001 WL 303713

that these polices affected their personal legal mail. If such allegations are made they will be considered in establishing a pattern and practice of interference with legal mail.

**B. Outgoing Legal Mail**

Cancel's claim that prison officials interfered with his outgoing legal mail poses a different question. As previously stated, the Supreme Court has explicitly recognized that there are "differing penological concerns with respect to outgoing and incoming mail." *Brewer v. Wilkinson,* 3 F.3d 816, 825 (5th Cir.1993) (citing *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989)). The Second Circuit has held that prison officials can only open an inmate's outgoing legal mail if there is a "rational justification" for doing so. *Davidson,* 694 F.2d at 54 (citing *Wolfish,* 573 F.2d at 130.). The Fifth Circuit has applied the same standard to an instance where an inmate's outgoing legal mail was opened and censored without a "legitimate penological interest" and found the practice to violate the inmate's First Amendment right to free speech. *Brewer,* 3 F.3d at 825.

In the present case, Defendants have failed to state any rational justification for opening and photocopying Cancel's outgoing legal mail. Because interference with outgoing legal mail cannot be based on a general prison security interest, Defendants must provide additional justification for their actions. Therefore, because Defendants have interfered with Cancel's outgoing legal mail without providing any legitimate penological interest, Cancel has stated a valid claim under the First Amendment right to free speech.[7] Defendants' motion to dismiss Cancel's claim for violation of his First Amendment right to free speech is denied with respect to his outgoing legal mail.

[7]    As originally stated in footnote 4, the Court again presumes that the Family Court documents were placed in an envelope marked or addressed in such a way that it could be identified as legal mail. If in fact this document was not privileged legal mail, this First Amendment free speech claim may require a different analysis.

**4. Money Damages Barred by 42 U.S.C. § 1997e(e) of the Prison Litigation Reform Act**

Defendants argue that the money damages Plaintiffs seek are barred by 42 U.S.C. § 1997e(e) of the Prison Litigation Reform Act because the complaint does not allege any

physical injury. (Defs.' Mem. at 8–9.) Section 1997e(e) states, "[n]o federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in the custody without a prior showing of physical injury." *Id.*

**\*8** The plain language of the statute does not prohibit a plaintiff's First Amendment claim. Section 1997e(e) specifically prohibits federal civil action[s] for mental or emotional injury without a showing of physical injury. In this case Plaintiffs do not allege any claim of mental or emotional distress for which they are seeking redress. Furthermore, the few courts that have addressed this issue have held that:

> the deprivation of First Amendment rights entitles a plaintiff to judicial relief wholly aside from any physical injury he can show, or any mental or emotional injury he may have incurred. Therefore, § 1997e(e) does not apply to First Amendment claims regardless of the form of relief sought.

*Reynolds v. Goord,* No. 98 Civ. 6722, 2000 U.S. Dist LEXIS 2140, at \*23 (S.D.N.Y. Mar. 1, 2000) (quoting *Canell v. Lightner,* 143 F.3d 1210, 1213 (9th Cir.1998)). Therefore, § 1997e(e) is not applicable to the present case and does not bar Plaintiffs from seeking recovery for First Amendment claims of denial of access to the courts and violation of free speech.

**5. Lack of Personal Involvement of Defendants**

The personal involvement of defendants in an alleged constitutional violation is a prerequisite under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). A plaintiff must allege that each defendant was directly and personally responsible for the purported conduct and establish fault and causation on the part of each defendant. *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883 (2d Cir.1987).

Defendants move to dismiss all claims against Defendants Goord, Annucci, Jones, Mazzuca, Ercole, Perez and Erbert for lack of personal involvement. Plaintiffs' amended complaint as to Owens' legal mail claim alleges that Defendants Mazzuca, Ercole, Perez, and Erbert were personally involved in the opening and withholding of his legal mail. Additionally, Mazzuca is implicated in Cancel's claim for violating his First

2001 WL 303713

Amendment right to free speech. Accepting these allegations as true, the Defendants' motion to dismiss for lack of personal involvement against Mazzuca, Ercole, Perez, and Erbert is denied.

As to Defendants Goord, Annucci and Jones, in a § 1983 action supervisors cannot be held liable under the theory of respondeat superior for the acts of their subordinates. *Id.* at [*] 7. A supervisor can only be found to be personally involved if there is evidence that there was: (1) direct participation in the alleged constitutional violation, (2) failure to remedy a wrong after learning of it, (3) creation or maintenance of a policy under which unconstitutional violations occurred, (4) gross negligence in managing subordinates who committed the unconstitutional acts, or (5) deliberate indifference by failing to act on information indicating that constitutional violations were occurring. *Id.; see also Colon,* 58 F.3d at 873. Allegations that a supervisor ignored an inmate's grievance letter of protest and request for an investigation is insufficient to find that a supervisor is personally involved in the alleged constitutional violations. *Kinch v. Artuz,* No. 97 Civ. 2419, 1997 U.S. Dist. LEXIS 13998, at [*] 8 (S.D.N.Y. Sept. 15, 1997).

**\*9** Plaintiffs' amended complaint contains no allegations relating to the personal involvement of Defendants Goord, Annucci and Jones either through direct participation, maintenance of a policy or deliberate disregard for Plaintiffs' rights. Plaintiffs' sole claim against these three Defendants is that they were sent grievances and complaints by Cancel which were ignored. Plaintiffs' claims as to these three Defendants are dismissed with prejudice.

Conclusion

For the above stated reasons the Defendants' motion is granted in part and denied in part as follows:

(1) Cancel's claims against Goidel under the First Amendment right to petition the government for redress and right of access to the courts for failure to process grievances and for the unlawful running of the I.G.P. are dismissed with prejudice.

(2) Cancel's claims against Defendants Goord, Annucci, Mazzuza, Ercole, Perez, Erbert and Lowry for failure to curb the unlawful practices of Goidel in his unlawful running of the I.G.P. are dismissed with prejudice.

(3) Cancel's claim that Goidel's actions violated New York State Corrections Law § 139 is dismissed with prejudice.

(4) Cancel's claim under the First Amendment for denial of access to the courts is dismissed with leave to amend the complaint with allegations that (a) Defendants' interference with Cancel's legal mail injured him by prejudicing him in a legal action; and (b) that the outgoing envelope containing the Family Court documents mailed on April 17, 2000 was clearly identifiable as legal mail.

(5) Defendants' motion is denied as to Owens' claim under the First Amendment for denial of access to the courts against Mazzuca, Ercole, Perez, Erbert, O'Dell, Breen and unknown members of the Fishkill mail room staff.

(6) Cancel's claim under the First Amendment right to free speech for the withholding of his regular incoming mail is dismissed with leave to amend the complaint with specific allegations that establish a pattern and practice of interference.

(7) Cancel's claim that Defendants violated his First Amendment right to free speech for interference with his incoming legal mail is dismissed with leave to amend the complaint with specific allegations that establish a pattern and practice of interference with Cancel's incoming legal mail.

(8) Defendants' motion is denied as to Cancel's claim under the First Amendment for a violation of free speech for interference with his outgoing legal mail against Mazzuca, O'Dell, Breen and unknown members of the Fishkill mail room staff.

(9) Defendants' motion to dismiss the claims against Mazzuca, Ercole, Perez, and Erbert for lack of personal involvement is denied.

(10) Defendants' motion to dismiss the claims against Goord, Annucci and Jones for lack of personal involvement is granted with prejudice.

(11) The Court also considered Plaintiffs' claim that Defendants' actions violated Article 14 and 17 of the International Covenant on Civil and Political Rights ("ICCPR"). (Am.Compl.¶ 54, 55, 58, 60.) However, courts have uniformly held that the ICCPR is not self-executing and does not give rise to a private right of action. *See Beazley v. Johnson,* No. 99–41383, 2001 WL 118393, at [*] 18– [*] 19 (5th

**Cancel v. Goord, Not Reported in F.Supp.2d (2001)**

2001 WL 303713

Cir.2001) (citing additional cases). Therefore, the Court sua sponte dismisses Plaintiffs' claims under the ICCPR.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 303713

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 130409
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Alexander WILLIAMS Jr., Plaintiff,

v.

The CITY OF NEW YORK et al., Defendants.

19-CV-3347 (LJL) (JLC)
|
Signed 01/14/2022

**Attorneys and Law Firms**

Alexander Williams, E. Elmhurst, NY, Pro Se.

John Anthony Passidomo, City of New York Law Department, Joshua Alan Weiner, Pro Hac Vice, Herzfeld & Rubin, P.C., Qiana Charmaine Smith, NYC Law Department, Office of the Corporation Counsel, New York, NY, for Defendants Dep. Rivera, C.O. Alexander, Capt. Mathis, City of New York, C.O. Ramirez, A. Padillo.

**REPORT AND RECOMMENDATION**

JAMES L. COTT, United States Magistrate Judge.

**Table of Contents**

*1  **I. BACKGROUND**...——
**A. Factual Background**...——

1. Williams is a pretrial detainee on lockdown status...——

2. Williams reports mistreatment...——

a. Mail interference and tampering...——

i. Alexander reads outgoing mail (January–February 2019)...——

ii. MDC staff interfere with Williams' mail (March–April 2019; April 2020)...——

iii. Deputy Rivera holds outgoing legal mail (June–July 2019)...——

iv. Williams has trouble sending mail and accessing social services (Sept.–Dec. 2019; Jan.–Aug. 2020)...——

v. Incoming packages are opened outside of Williams' presence...——

b. Denial of access to the law library and to lawyers...——

i. Williams is allegedly denied contact with his criminal defense attorneys...——

ii. Williams is unable to use the law library...——

iii. Miscellaneous access to court issues...——

c. Retaliation...——

d. April 2020 Use of Force incident...——
3. CLO 104/19 found not in compliance with Minimum Standards...——

4. Williams files civil lawsuits in federal and state courts...——

**B. Procedural History**...——

**II. DISCUSSION**...——
**A. Legal Standards**...——

1. Summary Judgment...——

2. Cross-Motions for Summary Judgment...——

3. *Pro Se* Litigants...——

**B. The Parties' Submissions Pursuant to Local Rule 56.1**...——

**C. Analysis**...——

1. Mail Interference and Free Speech...——

a. Alexander is not liable for reading Williams' outgoing mail...——

b. Alexander is entitled to qualified immunity...——

c. Williams has not established a cognizable claim of mail interference...——
2. Denial of Access to the Courts...——

a. Mail tampering as claimed here did not prevent access to courts...——

b. The lack of access to the law library and instances in which Williams could not speak with his attorneys did not prevent access to the courts...——

c. Williams does not have a claim based on his grievances not being processed...——
3. Retaliation...——

a. Williams faced adverse action...——

b. Causal connection between protected acts and adverse action exists...——
4. Excessive Force and Deliberate Indifference...——

a. Defendant Gorritz did not use excessive force...——

b. Defendants were not deliberately indifferent to Williams' medical needs...——
5. Derivative Claims...——

**III. CONCLUSION...**——

**To the Honorable Lewis J. Liman, United States District Judge:**

Plaintiff Alexander Williams Jr., proceeding *pro se*, brings this Section 1983 action against the City of New York and 16 individual defendants from the New York City Department of Corrections ("DOC") in their personal and official capacities, including Deputy Rivera, Correctional Officer Alexander, Captain Bernard Mathis, Correctional Officer Ramirez, M.D.C. Civilian Grievance Supervisor A. Padillo, Correctional Officer Martinez (Shield #1769), Mailroom Civilian T. Green, Captain John Hernandez, Deputy Shannon, ADW Harvey, Warden B.B. Suarez, C.O. Wells, Dep. Galloway, Dep. Warden Bailey, C.O. Sandra Espinoza, and Captain Goritz (collectively, "Defendants").[1] Williams alleges that Defendants violated his constitutional rights under the First and Fourteenth Amendments during his pretrial incarceration at the Manhattan Detention Complex. Specifically, Williams alleges mail tampering or interference, denial of access to the courts, retaliation, excessive force, and deliberate indifference to medical needs.

[1]      Defendant names are listed and spelled as provided in Williams' pleadings, with the exception of Correction Officer Ramirez, who was added as a defendant by court order at Dkt. No. 16. Williams did not identify all defendants by full names. Defendants spell Officer Goritz as Officer "Gorritz" throughout their filings; as such, that is the spelling used by the Court in this Report.

**\*2** Before the Court are Williams' motion for summary judgment and Defendants' cross-motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons discussed below, I recommend that Williams' motion be denied in its entirety and Defendants' cross-motion be granted, except as to the retaliation claims against defendants Mathis and Wells.

**I. BACKGROUND**

**A. Factual Background**

The following facts are taken from Defendants' Local Civil Rule 56.1 Statement, the pleadings, as well as the affidavits, declarations, exhibits, and supporting materials submitted by the parties. The pleadings in this case include complaints filed by Williams in two other lawsuits later consolidated into the current action before the Court.[2] The operative complaint in the first case, Case No. 19-CV-3347, is the amended complaint, filed on May 24, 2019 ("Compl. 1"). Williams filed the complaint in the second case, Case No. 19-CV-8737, on September 20, 2019 ("Compl. 2"). In the third case, Case No. 20-CV-3992, a second amended complaint was filed on July 21, 2020 ("Compl. 3"). The facts are undisputed except as noted.

[2]      The details of this consolidation are described in the Procedural History section below. See also Dkt. Nos. 58, 88.

1. <u>Williams is a pretrial detainee on lockdown status</u>

Williams is a pretrial detainee at the Manhattan Detention Complex ("MDC"). He was designated as an "intended contraband recipient" ("ICR") from January 18, 2019 through February 7, 2020, and was re-designated as such in June 2020. Defendants' Local Rule 56.1 Statement ("Rule 56.1"), Dkt. No. 158, ¶¶ 2-3. ICR is a security classification used to identify inmates who have "participated in the promotion of prison contraband." Declaration of Qiana Smith-Williams dated February 26, 2021 ("Smith-Williams Decl."), Dkt. No.

160, Exh. J. [3] Inmates identified as ICR receive "special attention" during scheduled and non-scheduled searches; while "excessive and/or unauthorized property" is to be confiscated, inmates are to be provided with an appropriate receipt. *Id.*

[3]   Defendants filed the Declaration of Qiana Smith-Williams in Support of Defendants' Motion for Summary Judgment twice. At Dkt. No. 159, they attached Exhibits A-H, and at Dkt. No. 160, they attached Exhibits I-P.

Williams has been housed in Unit 9 North since January 18, 2019, pursuant to two different lockdown orders. Although undated in the record, the parties agree that the first order is from January 2019. Plaintiff's Memorandum of Law ("Pl. Mem."), Dkt. No. 148, Exh. B; [4] Smith-Williams Decl., ¶ 10 and Exh. I. The second order was issued on January 22, 2020. Smith-Williams Decl., ¶ 4 and Exh. C. The state court issued these lockdown orders after being "presented with clear and convincing evidence that [Williams] ha[d] solicited the aid of other persons to threaten, intimidate, and cause serious physical injury or death to witnesses," and because he "pose[d] a continuing, significant risk to the safety of persons whom he perceives as being potential witnesses against him." Smith-Williams Decl., Exh. C.; Pl. Mem. Exh. B.

[4]   Williams' memorandum of law, Dkt. No. 148, includes Exhibits A-C, and the four attachments to his memorandum of law, Dkt Nos. 148-1 through 148-4, contain Exhibits D-P.

According to the lockdown orders, Williams was to be "housed in a highly secure area," "preferably the lockdown area," and was to be "separated from all other inmates ... to prevent him, to the extent possible, from communicating with or passing material to other inmates." Pl. Mem. Exh. B; Rule 56.1 ¶ 8. Williams' first lockdown order in January 2019 barred him from visits other than with his criminal defense attorney, Jeffrey Chabrowe, and precluded him from any telephone calls other than to his attorney. Pl. Mem. Exh. B. His second lockdown order allowed contact with private investigators, and certain named attorneys and investigators, including Julie Clark, Kevin Hinckson, and David Barrett. Smith-Williams Decl. Exh. C. The court orders did not specifically limit Williams' "access to legal research, the law library or anything related to research. His access to a tablet for the sole purpose of legal research would be permissible [according to the language of the order], provided the tablet

does not have access to dialing out or email." Dkt. No. 148–1 at 1 (Pl. Mem. Exh. C) (Email from Assistant District Attorney Ernest Chin ("ADA Chin") to the NYC Board of Corrections and Williams' criminal defense attorneys, October 22, 2020).

**\*3**  The MDC promulgated Command Level Order 104/19 ("CLO 104/19") concerning various procedures for inmates on lockdown status, effective April 12, 2019. Dkt. No. 148 (Pl. Mem. Exh. A). Although a NYC Department of Corrections 2009 policy provides that "[o]utgoing inmate privileged correspondence shall not be opened or read except pursuant to a lawful search warrant," Pl. Mem. Exh. D, CLO 104/19 states in relevant part:

- "[T]he Manhattan Detention Complex [will] comply with the mandates of all Court Orders dealing with inmates housed in this facility";

- "[T]he restrictions imposed on 'Lockdown Status' inmates by the Court supersedes any rights these inmates may ordinarily have under the Minimum Standards";

- "Inmates will make all requests for Law Library materials in writing. These requests will be forward[ed] to the security office who will obtain copies of the requested materials and place [them] in the inmates blue storage bin";

- "The assigned Captain will collect all letters written by the inmate. The Captain will turn the mail over to the security office. Under no circumstances will any inmate in Court Ordered Lockdown status be permitted to send out any written correspondence or any other type of communication";

- "The court ordered inmates are barred from Visits and Telephone calls to anyone other than their attorney of record. The Correction Officer ... shall make the telephone call using a P.I.N. number [not known to inmates]";

- "Inmates will be afforded a ten minute shower, three (3) times per week";

- "Any incoming mail for the inmates housed in court ordered areas will be forwarded to the MDC Security Office. No mail shall be forwarded to these inmates until approved by the Commanding Officer."

Dkt. No. 148 at 30-34 (Pl. Mem. Exh. A).

## 2. Williams reports mistreatment

Between January 2019 and July 2020, Williams claims to have experienced (1) mail interference and tampering; (2) denial of access to the law library and to his lawyers; (3) retaliation; (4) excessive force; and (5) deliberate indifference to his medical needs stemming from a use of force incident in April 2020. Each of these claims will be discussed in turn.

### a. Mail interference and tampering

#### i. Alexander reads outgoing mail (January–February 2019).

On January 21, 2019, Williams claims he observed Correctional Officer Alexander ("Alexander"), the recall officer for 9 North, reading his outgoing legal mail. Compl. 1 at p. 4; Rule 56.1, ¶¶ 36-37. [5] Alexander told Williams to place his open mail in his cell slot, and after he collected it, Alexander sat at a desk in the housing unit, read it, gave it back to Williams to be closed, then took it to be mailed. Rule 56.1, ¶ 37. Williams alleges Alexander read either 85 or 86 letters, 64 of which were "privileged" (including being addressed to Williams' lawyers, doctors, private investigators, banks, credit reporting agencies, and the DOC). Pl. Mem. at ¶ 22; Rule 56.1, ¶ 40. Williams contends that he confronted Alexander about reading his mail a few times. On one occasion, Williams claims, he inquired as to why his mail was handled differently from other detainees, to which Alexander responded that his supervisors Deputy Rivera ("Rivera") and Captain Mathis ("Mathis") told him that a court order required this treatment. Compl. 1 p. 4. After March 2019, Alexander was no longer the recall officer responsible for Williams' mail, and Defendants contend his mail was no longer read. Rule 56.1, ¶ 44. According to Williams himself, Alexander was the only officer who read his outgoing legal mail; he does not allege specific instances of any officers besides Alexander reading his mail. *See* Compl. 1 p. 4.

[5]     For all references to page numbers in complaints, the page number cited refers to the ECF filing number.

#### ii. MDC staff interfere with Williams' mail (March–April 2019; April 2020).

**\*4** Williams filed four grievances between March 20 and 22, 2019 concerning various mail interference issues, including that his mail was "pre-screened" before being sent out, that his mail was being turned over to security, and that Mathis informed him he was not allowed to receive his incoming mail until it was "logged." Compl. 1 Exhs. B, C. Williams further alleged that on March 25, 2019, one correction officer refused to take his mail to the mailroom, though he was eventually able to mail the documents. Rule 56.1, ¶¶ 54-55.

The Office of Constituent and Grievance Services ("OCGS") at DOC resolved one of the March 2019 grievances Williams filed, responding that

> Based on [Williams'] Court Order and the Department[']s Guidelines in the handling of inmates Correspondence[,] although there [aren't] any listed restrictions to whom [Williams] can send or receive mail/correspondence[,] the information in [Williams'] court order specifies a risk of compromising the security and/or the safety of any person or persons outside the facility. Based on these findings the reading of [Williams'] Correspondence/Mail is deemed appropriate.

Compl. 1 Exh. B; Dkt. No. 148-1 at 30 (Pl. Mem. Exh. E). In another grievance response in March 2019, OCGS further wrote that

> Williams' housing area is designated Court Order Lock Down and there is a procedure put in place to [handle] the incoming and outgoing mail. This command level order specifies that the receiving or sending of all outgoing and incoming correspondence shall be based upon the content of the inmate's order and collected by the 9 North Captain and turned over to the Security Office.

Compl. 1 Exh. C. The record is not clear as to what "command level order" OCGS referred, as CLO 104/19 was promulgated in April 2019, a month after this response.

On March 26, 2019, Williams attempted to call the internal reporting line, 311, to determine if there was any available information through that mechanism regarding his mail tampering grievances. Dkt. No. 148–3, Pl. Mem. Exh. O. However, he was denied the ability to do so, *id.*, pursuant to the court order limiting his phone calls to his criminal defense attorney. Pl. Mem. Exh. B.

Williams contended in an April 26, 2019 grievance that on that day, "no one from security came upstairs to deliver and/or take out mail," and he was informed that documents sent to federal courthouses were not received. Dkt. No. 148–3, Pl. Mem. Exh. M. Williams filed another grievance on April 29, 2019, complaining that on April 25, 2019, he had been denied the right to send out mail. *Id.*

Finally, Williams reported another incident a year later, in April 2020. Compl. 3, ¶ 3. At that time, Williams had mailed to his home a large yellow envelope with mixed legal and financial records; but it arrived at its destination with a sticker notifying the recipient that the package had been opened. *Id.* Williams does not allege which individual opened the envelope. *Id.*

### iii. Deputy Rivera holds outgoing legal mail (June–July 2019).

On June 25, 2019, Williams alleges that he attempted to mail four envelopes, each containing a summons and complaint to serve defendants in a New York state court lawsuit. Compl. 2, ¶ 5. He submitted the envelopes to the recall officer to be mailed pursuant to policy and was approved for the release of inmate funds to purchase the necessary certified return receipts. Compl. 2, ¶¶ 5-6 and Exh. C. On July 2, 2019, he discovered that the outgoing mail was taken to Deputy Rivera instead of being sent out. Compl. 2, ¶ 8. On that day, Assistant Deputy Warden Peoples informed Williams that Rivera had directed him to package his mail with two other envelopes being sent to the New York City Comptroller's office. Compl. 2, ¶ 19. All six envelopes containing outgoing legal mail were returned to Williams, who noticed one of them had been opened and closed with scotch tape. Compl. 2, ¶¶ 20-23.

*5 Williams then successfully mailed the documents to his wife, who was able to serve them on the defendants in his state court case. Compl. 2, ¶¶ 29-30. He filed two grievances regarding this mail being held, on July 2 and July 9, 2019, respectively. Compl. 2, ¶¶ 25-26, Exhs. F, G. Williams filed another grievance on August 5, 2019, about his mail having been held, and subsequently two Freedom of Information Law ("FOIL") requests seeking information about the July mail incident. Compl. 2, Exhs. L, Q.

### iv. Williams has trouble sending mail and accessing social services (Sept.–Dec. 2019; Jan.–Aug. 2020).

Williams reported that on or about September 3, 2019, legal mail he sent out in July 2019 from MDC had been returned to him marked as "refuse[d]." Compl. 2, ¶¶ 39-45. In a September 14, 2019 grievance, Williams noted that legal mail he had sent in August 2019 arrived back to him, stamped "return to sender." Pl. Mem. Exh. L. Williams further tried to send out approximately 19 pieces of mail to "various banking institutions concerning matters for him and his wife," which he later referred to as "19 pieces of outgoing legal mail," all of which were returned to him without being allowed to be sent out. Compl. 2, ¶¶ 42-44; Rule 56.1 ¶ 47. His mail was subsequently collected. Rule 56.1, ¶ 47. Williams alleged in a September 10, 2019 grievance that Mailroom Officer Martinez "refused to allow mail out because it has [officer] names on it." Compl. 2, Exh. X. On September 18, 2019, Williams filed a grievance because CO Billie had allegedly spread out his mail and copied addresses off of it, leaving it out for other officers to copy as well. *Id.*

On November 2, 2019, Williams sent outgoing legal mail to the personnel office at MDC, but according to the grievance he filed, "Mailroom Civilian T Green and CO Espino[s]a refused it stating that they are not accepting the mail knowing that it must be lawsuits inside." Pl. Mem. Exh. M.

Williams contends that on about November 5, 2019, he learned from a Department of Social Services ("DSS") worker that DSS would no longer come to the 9-North unit to pick up certified mail due to Command Order 104/19, and that security would take over collecting the mail. Compl. 3, ¶ 9. Williams was concerned that the security staff would have access to personal information and obstruct outgoing legal mail. Compl. 3, ¶ 9. Since that time, Williams claims that he had problems accessing his funds required to send certified mail. Pl. Mem. at ¶¶ 58-60.

On December 24, 2019, Mathis allegedly threatened Williams, as described in more detail below. In the one or two months following this purported threat, Williams reported that "it was hell [to] send[ ] mail out." Rule 56.1, ¶ 49. Despite Mathis' threat, all of the mail purportedly obstructed was eventually sent out, and none of it led to any missed court deadlines. Rule 56.1, ¶¶ 51-52.

In January 2020, Williams reported that no social services request forms (necessary for accessing funds to send certified mail) were available in his unit, despite Deputy Galloway stating that a box to collect these forms would be placed there. Rule 56.1, ¶¶ 61-62; Pl. Mem. Exh. N. In August 2020, Williams again reported that his unit did not have a social service box so he had no means to get this request to the right staff. Pl. Mem. Exh. N. Any mail held in the mailroom waiting for financial approval was ultimately sent out, however, and Williams never had a case dismissed due to mail sitting in the mailroom waiting to be sent as certified mail. Rule 56.1, ¶¶ 63-64.

v. *Incoming packages are opened outside of Williams' presence.*

**\*6** Williams claims that Officer Sandra Espinosa ("Espinosa") had an "unwritten policy that packages and anything that has a tracking number" be opened in the mailroom and delivered to the inmate in a brown paper bag. Compl. 3, ¶18. On January 29, 2020, Williams received mail sent certified by his wife, delivered to him in a package pursuant to this alleged unwritten policy. *Id.* He remembers documents were missing from the package. *Id.*; Pl. Mem. at ¶ 51. Williams filed a grievance about this issue in late January 2020. Pl. Mem. Exh. N. In August 2020, Williams received packages the contents of which were first logged by Officer Perez, Pl. Mem. Exh. K, purportedly outside of Williams' presence. Pl. Mem. at ¶ 53.

Defendants note that the policy for emptying the contents of all packages into brown paper bags is applicable to all inmates housed at the MDC. Rule 56.1, ¶ 66; Smith-Williams Decl. Exh. H at IV.13 ("The contents of all acceptable packages and all acceptable items shall be transferred to brown kraft bags which shall be properly marked and closed to ensure that each inmate receives his/her respective goods without loss of permissible items."). [6] That policy also directs that "sealed correspondence, enclosed in packages opened for inspection,

shall not be opened except in the presence of the intended inmate or pursuant to a lawful search warrant or the warden's written order ..." Smith-Williams Decl. Exh. H at IV.9.

[6]     Defendants cite this statement as "Ex. H section IV.B.13.," but there is no "B" under Section IV on the Exhibit in question. Rule 56.1, ¶ 66.

b. *Denial of access to the law library and to lawyers*

i. *Williams is allegedly denied contact with his criminal defense attorneys.*

Under the lockdown order, Williams is allowed two calls a day, but can only call individuals identified in the order, and the officer on duty dials the number to be called. Rule 56.1, ¶¶ 68-71. Citing to Williams' deposition, Defendants note that there were "two or three occasions on which he was unable to call his criminal defense attorney," but that he "cannot identify the individual who prevented him from doing so." Rule 56.1, ¶ 72. In his papers, however, Williams describes four incidents during which he claims he was denied the ability to speak with his lawyers. First, on March 22, 2019, he was not permitted to make a phone call to Jeffrey Chabrowe, the criminal defense attorney listed on his lockdown order at the time. Pl. Mem. Exhs. B, O. Following a grievance complaint, OCGS confirmed on March 25, 2019 that it had been in contact with MDC Security, and Williams would subsequently be permitted to contact his attorney. Pl. Mem. Exh. O. Second, on July 2, 2019, Williams reported in a grievance that an officer not named as a defendant in this case, Officer Bethea, "stood in front of [Williams'] cell and denied [him] from calling [his] lawyer. Compl. 2, Exh. F.

Third, in early 2020, MDC staff did not permit Williams to contact his criminal defense attorney Julie Clark. On January 22, 2020, the state court issued the aforementioned second lockdown order, which noted that Williams was barred from visits or phone calls with anyone other than his attorneys or investigators, including Clark. Smith-Williams Decl., ¶ 4 and Exh. C. Clark remained unable to speak with Williams for weeks after that order was issued, however. Pl. Mem. Exh. P. Williams first filed a grievance about this issue on January 25, 2020. Pl. Mem. Exh. P. On January 31, 2020, Clark reported to ADA Chin in an email that she was "frustrated" that she was still unable to speak with Williams by telephone. Pl. Mem. Exh. P. According to Williams, on February 4, 2020, Security Captain John Hernandez spoke with Williams about his call

list not yet including Clark, and Hernandez said to him: "I will update your list after they give you life N[****]." Pl. Mem. Exh. P (sworn affidavit). Williams filed an Article 78 proceeding in New York State Supreme Court on February 28, 2020, after which time Clark was eventually added to his call list. Pl. Mem. at ¶ 63; Pl. Mem. Exh. P.

**\*7** Fourth, in early July 2020, Williams reported in a grievance that he was unable to call his attorney due to a problem with the PIN required for calling out. Compl. 3, Exh. B.

Williams testified at his deposition that he was generally unable to help his attorney marshal his defense when he was denied these calls, but that these incidents "did not cause him to miss any deadlines in his criminal matter." Rule 56.1, ¶¶ 73-74.

Similarly, Williams claims he was denied in-person visits with his criminal defense attorney up to five times, in which the attorney arrived and Williams was notified he had a counsel visit, but an escort never came to take him to the meeting. Rule 56.1, ¶ 75. Williams does not know who was responsible for this denial. Rule 56.1, ¶ 77. According to Williams, these incidents delayed some court proceedings, but ultimately did not cause him to miss any deadlines or otherwise negatively impact his criminal matter. Rule 56.1, ¶ 78.

### ii. Williams is unable to use the law library.

Williams claims that he was not allowed to visit the law library on multiple occasions. Between March 16, 2019 and the filing of his first lawsuit on April 15, 2019, Williams regularly requested to visit the law library to research case law concerning his criminal case, and was able to physically go to the MDC law library "once or twice," but was otherwise told to use the law library request form instead. Rule 56.1, ¶¶ 30-33; Compl. 1, p. 5. According to Williams, in using a request form, he was only able to request copies of particular cases, but was unable to conduct research and shepardize cases. Compl. 1, p. 5. Additionally, a language barrier allegedly existed between Williams and the legal coordinator. Compl. 1, p. 5, Exh. J. Williams alleges three incidents during this time period:

1) In late March 2019, Williams asked Mathis to escort him to the law library, and Mathis directed him to fill out a request form. Compl. 1, p. 5 (indicating this

incident occurred on March 29, 2019); Compl. 1, Exh. J (indicating in a grievance that this incident occurred on March 27, 2019).

2) On April 4, 2019, Williams filed a grievance stating that he needed time in the law library or kiosk but was not allowed. Compl. 1, Exh. J.

3) On April 6, 2019, Williams filed a grievance stating that he requested to be escorted to the law library and was told by an Officer "Deleroasa" that detainees in 9-North are not allowed access to the law library. Compl. 1 Exh. I.

Williams contends that on April 23, 2020, ADW Harvey ordered the housing unit captain not to allow him to use the law library in order to prevent him from using the typewriter. Compl. 3, ¶ 47. On October 26, 2020, the NYC Board of Corrections ("BOC") responded to an appeal Williams filed, recommending that the DOC grant his request for a tablet with Lexis Nexis capabilities in his housing area or access to the MDC law library. Pl. Mem. Exh. Q.

### iii. Miscellaneous access to court issues

Separately, Williams contends that he was not permitted to watch and study discovery tapes sent to him to prepare for trial, first in May 2020 and then again in July 2020. Compl. 3, Exhs. A, B.

### c. Retaliation

Following the initial grievances regarding mail tampering in early 2019, fellow inmate Samuel Ceruti attested in a signed declaration to the fact that on March 26, 2019, Mathis came to the unit with other officers in an "aggressive manner," and told Williams "if he kept b[****]ing about his mail that he would stop all of his mail." Compl. 1 Exh. F. Then, on April 13, 2019, Williams claimed that Officer "Festa" [name unclear] made a sexual advance, which resulted in an investigation. Compl. 2, Exh. R.

**\*8** In the months following the July 2019 incident in which his envelopes were held at the MDC, Williams reports a number of experiences he believes were retaliatory. First, he believes certain grievances which he filed after July 2, 2019 were not properly collected, and contends that he never received a response for others – he specifically alleges that

Supervisor Padillo ("Padillo") failed to answer a grievance. Compl. 2, ¶¶ 32-34, Exhs. M, N, O. Second, Williams reports that on August 6, 2019 a cell search occurred during which a correctional officer not named as an individual defendant in this lawsuit, "Louis," told Williams he was looking for information on the lawsuit. Compl. 2, ¶ 35, Exh. P. When the cell search ended and the team left, Williams discovered he was missing legal documents related to a complaint on which he was working. *Id.* Third, Williams reports three distinct incidents during the summer of 2019 with another officer, Bethea: [7]

> 1) On July 2, 2019, while discussing why his mail was held, Bethea allegedly told him: "You do have a fat ass" and something to the effect of "I couldn't allow you to serve my [officers]" or "I can't allow you to sen[d] that [mail] out against my officer." Compl. 2, Exhs. F, R, Y (Sub-Exhibits A-C). Bethea then "stood in front of [Williams'] cell and denied [him] from calling [his] lawyer..." Compl. 2, Exh. Y at ¶¶ 25-30, Exh. E.

> 2) On July 8, 2019, Williams claims that Bethea "stuck out his middle finger to him," and stated that he "could do whatever he wanted." Compl. 2, Exh. Y ¶ 42.

> 3) On August 26, 2019, Bethea allegedly began to "antagonize" and "threaten" Williams. Compl. 2, ¶38; *See* Compl. 2, Exhs. S, T. He reportedly said to Williams either "N[****] Dep Rivera is my peoples and I could f[***] with your mail any day that I want," or "Dep. Rivera is my people I will f[***] with your mail all day boy." Compl. 2, Exhs. S, T. Bethea reportedly followed that up with "I have a baby on the way that is the only reason why I didn't f[***] your a[**] up but if you don't drop your complaint I am going to make sure that none of your mail leaves this building." Compl. 2, Exhs. S, T.

[7]   Williams did not name Officer Bethea as an individual defendant in this lawsuit. He filed a state court complaint against Bethea, and requests in his pleadings that the Court "convert" his state complaint to be included in this federal lawsuit. Compl. 2 p. 12. The relevant state court complaint is attached as an exhibit to his federal court complaint, so the Court has a record of the allegations. Compl. 2, Exh. Y. Typically, a plaintiff seeks to add a defendant through the amendment process set forth in Federal Rule of Civil Procedure 15(c). That is not the case here, as

Williams made this request in the pleading itself. While the constructive notice doctrine provides that the Court may impute knowledge of the suit to a new defendant through his attorney if the attorney also represented the officials originally sued "so long as there is some showing that the attorney[ ] knew that the additional defendant[ ] would be added," *Abdell v. City of New York*, 759 F. Supp. 2d 450, 455 (S.D.N.Y. 2010) (cleaned up), that doctrine is not applicable here. Williams has not moved to amend any of the numerous complaints he has filed in this Court for the purposes of adding a defendant, as occurred in *Abdell*. He could have named Bethea when he filed his complaint originally, but chose not to do so. Defendants do not refer to Bethea in any of their motion papers. Thus, neither Bethea nor Defendants' attorneys were constructively on notice that he might be included, and to do so at the summary judgment stage – without offering Bethea a chance to answer the complaints against him or choose to be included in the current defense – would offend notions of fair play. Thus, in the interest of justice, the Court considers the state court complaint as an exhibit duly provided for purposes of the motion, but does not believe that Officer Bethea should be added as a named defendant at this stage of the proceedings.

**\*9**  Williams noted in a grievance he filed that on July 8, 2019, Mathis told him he was "upset" because of a FOIL submission Williams had made. Pl. Mem. Exh. M.

On September 20, 2019, Williams contends that C.O. Wells and C.O. Mason searched Williams' cell and took legal documents needed for ongoing civil litigation. Pl. Mem. Exh. L. He claims that these are the same officers that attempted to attack him in July 2019 when he requested that his mail be returned. Pl. Mem. Exh. L.

Williams reported that on December 24, 2019, Mathis came to his housing area and threatened him, saying that "if he didn't take him out of [civil complaint No. 19-CV-3347] that he was going to make his stay at MDC hard and that he would no longer send and/or receive mail," after which he called for a probe team that ultimately did not arrive. Smith-Williams Decl. Exh. B, 46: 8-25; Compl. 3, ¶ 12. According to Williams, he dismissed the complaint against Mathis following this encounter, "even though that was not what he really wanted." Compl. 3, ¶ 13. Then again in January 2020, Williams contends Mathis returned to his housing unit

2022 WL 130409

to do a cell search "of just him," while threatening him about the lawsuit and ordering the officer conducting the search to seize any legal papers with Mathis' name on it. Compl. 3, ¶ 21.

Finally, Williams alleges that his cell was searched on April 22, 2020 while he was being seen by doctors. Compl. 3, ¶ 42. He contends that during this search, financial documents and legal papers were taken from his cell. Compl. 3, ¶ 42. Williams alleges that the next day, on April 23, 2020, ADW Harvey ordered the housing unit captain not to allow him to use the law library in order to prevent him from using the typewriter as a deterrent to typing any form of complaint or grievance. Compl. 3, ¶ 47.

### d. April 2020 Use of Force incident

On April 22, 2020, Williams engaged in a conversation with a number of officers, including Captain Gorritz, regarding his lawyer not being listed as an approved phone call, and mail being opened outside of his presence. Compl. 3, ¶¶ 24-28; Rule 56.1, ¶ 79. Defendants contend that Williams was "gesturing with his hands in an aggressive manner." Rule 56.1, ¶ 80. Gorritz removed her personal chemical agent – the pepper spray she kept on her person – and spoke to Williams. Rule 56.1, ¶ 81; *see* Def. Mem. at 19. Williams contends that Gorritz stated: "you must be dumb," and informed Williams that the staff was tired of his complaints and suits, and ordered an Officer "Colleymore" to tackle Williams. Compl. 3, ¶¶ 28-21. Defendants claim that Williams "pulled an object out of his pants," backed away from the officers aggressively, and ran to the janitor's closet where he had access to brooms, mops, water, and a dust pan. Rule 56.1, ¶¶ 82-83. According to Williams, he was afraid he was in danger, and so he ran away, the closest place being the supply closet, which he left upon realizing his cell door may be open and he could try to safely run there. Compl. 3, ¶ 32. At this point, the parties agree that four correctional officers moved in front of Williams when he opened the door to the supply closet to leave. Compl. 3, ¶ 33.; Rule 56.1, ¶ 84.

**\*10** Williams alleges that Captain Gorritz was behind the four by at least two feet, from which position she began to spray her chemical agent, hitting Williams "and each of the four officers." Compl. 3, ¶ 33. Williams alleges that he felt the spray being deployed against him for 15 seconds. Compl. 3, ¶ 34. Defendants allege that Gorritz, as the fifth officer, "moved to the front of the group of officers and sprayed a single, two-second burst of chemical agent towards [Williams'] face."

Rule 56.1, ¶ 85. Defendants note that Williams "dodged" some of the spray by lowering his head. Rule 56.1, ¶ 86.

The parties agree that after Gorritz deployed the chemical agent, Williams ran in the direction of his cell, and officers cuffed him. Compl. 3, ¶ 35; Rule 56.1 ¶ 86. Williams claims he overheard Captain Gorritz yell: "I...gotta figure a way to write myself out of this whenever I order you to take a n[****] down that's what y'all do." Compl. 3, ¶ 35. Defendants contend that Williams was not shoved into a wall by the non-defendant officers who handcuffed him. Rule 56.1, ¶ 91.

Williams was taken down to the intake area of the facility and placed in a shower. Compl. 3, ¶36; Rule 56.1, ¶¶ 93-94. Williams contends that once in the shower, he was not allowed to wash his body and decontaminate himself because the shower head was capped off, blocking water or solution from coming out. Compl. 3, ¶ 36. He claims Captain Gorritz as intake captain had knowledge of the lack of water. Compl. 3, ¶ 36. He also claims that he was in the intake area until 3:15 p.m. without being able to decontaminate himself, and that his first shower after the chemical agent was deployed against him was eight hours later. Compl. 3, ¶¶ 39, 45. During this time, according to Williams, ADW Harvey said to him: "I don't care if you die, you['ve] been suing my staff so if you sue me make sure you spell my name correctly because I have 30 years in so I will retire before anything," and that she would "continue to order her officers to f*** with the plaintiff['s] legal mail until they make sure the plaintiff gets life." Compl. 3, ¶ 38.

Defendants contend that Williams "did not exhibit any signs that he was suffering any of the commonly known effects of [a] chemical agent during the twelve consecutive minutes that he is on video after he was sprayed." Rule 56.1, ¶ 96. Williams was treated at the medical clinic approximately two hours after the chemical agent was used. Rule 56.1, ¶ 97. Williams alleges that he informed the doctors that his "left eye vision was not the same as it was before being sprayed," and that his left shoulder and wrist were in pain. Compl. 3, ¶ 39. Defendants note that Williams "did not complain of an asthma attack," and "denied having a headache, blurry vision, [or] dizziness." Rule 56.1, ¶¶ 97-98. Defendants further observe that the medical record demonstrates Williams had no respiratory distress, and that he only complained of left shoulder and wrist pain. Rule 56.1, ¶¶ 99-100. An x-ray revealed no fractures or dislocation were present in Williams' shoulder and wrist, Rule 56.1, ¶¶ 101-02, and the doctors prescribed aspirin. Compl. 3, ¶ 39.

### 3. CLO 104/19 found not in compliance with Minimum Standards

As briefly mentioned above, on October 26, 2020, the BOC responded to an appeal Williams filed, recommending that the DOC grant his request for a tablet with Lexis Nexis capabilities in his housing area or access to the MDC law library. Pl. Mem. Exh. Q. Specifically, the BOC found that requiring Williams to request specific materials he wanted rather than allowing him to visit the law library violated BOC Minimum Standard 1-08, and his court order would permit access to a tablet for the sole purpose of legal research. [8] Further, the BOC noted that DOC Minimum Standards 1-03(b)(1) require that the DOC provide daily showers to inmates, and the CLO only permits three showers per week. Pl. Mem. Exh. Q.

[8]     While 1-08 was suspended following the COVID-19 Emergency Executive Order, many of Williams' limitations predate this March 16, 2020 order. Pl. Mem. Exh. Q.

**\*11** In its decision, the BOC recommended that the DOC "rescind" CLO 104/19 for violating BOC Minimum Standards, because "[w]hile DOC must limit conditions of confinement in response to a court order, DOC must comply with all Minimum Standards that are not limited by such order ... in this case, it appears DOC has placed blanket restrictions on each person in [Williams'] housing area without regard to [their] specific court order." Pl. Mem. Exh. Q; *see* Pl. Mem. Exh. A.

### 4. Williams files civil lawsuits in federal and state courts.

In addition to the three federal lawsuits consolidated into this case, Williams filed two other federal civil cases related to his treatment while in detention, Case Nos. 19-CV-9528 and 20-CV-0516. Rule 56.1, ¶ 19. Likewise, Williams has also filed three state court civil actions pertaining to his mistreatment during detention, bearing index numbers 2019/101616, 2019/100910, 2020/100314. Rule 56.1, ¶ 20. In Case No. 2019/100910, Williams had to serve three defendants and the New York City Law Department; they were timely served and as of the filing of defendants' moving papers, the case was still pending. Rule 56.1, ¶¶ 22-26. [9]

[9]     A search of the New York State Unified Court System at https://iapps.courts.state.ny.us/webcivil/FCASSearch does not result in any mention of the three cases Defendants identify. However, Williams filed two additional cases against the City of New York: 100412/2020 and 100981/2020.

**B. Procedural History**

Williams filed a complaint against Alexander, Mathis, Rivera, and the DOC on April 15, 2019. Dkt. No. 2. He amended his complaint on May 24, 2019. Dkt. No. 9. On July 24, 2019, the Court dismissed the DOC as a defendant and added the City of New York and Correctional Officer Ramirez as defendants. Dkt. No. 16.

Williams brought a second federal lawsuit against the City of New York, T. Green, Martinez, and A. Padillo on September 20, 2019. Case No. 19-CV-8737 at Dkt. No. 2. On March 24, 2020, the Court consolidated the two lawsuits into a single action. Dkt. No. 58.

On May 21, 2020, Williams brought a third federal lawsuit against Deputy Warden Bailey, Deputy Galloway, the City of New York, Sandra Espinosa, Captain Gorritz, ADW Harvey, Captain Hernandez, Mathis, Deputy Shannon, B.B. Suarez, and C.O. Wells. Case No. 20-CV-3992 at Dkt. No. 2. In this third lawsuit, Williams filed an amended complaint on June 16, 2020, and a second amended complaint on July 21, 2020. Case No. 20-CV-3992 at Dkt. Nos. 8, 12. On August 27, 2020, the Court consolidated this third lawsuit into the current case. Dkt. No. 88.

On February 5, 2021, Williams moved for summary judgment on all claims. On April 5, 2021, Defendants filed opposition papers. Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Def. Opp."), Dkt. No. 173. Williams filed reply papers on April 19, 2021. Plaintiff's Response to Defendants' Memorandum Opposing His Summary Judgment Motion ("Pl. Rep."), Dkt. No. 176.

On February 26, 2021, Defendants cross-moved for summary judgment on all claims. Motion for Summary Judgment, Dkt. No. 156; Notice to *Pro Se* Litigant Pursuant to Local Rule 56.2, Dkt. No. 157; Rule 56.1; Smith-Williams Decl.; Defendants' Memorandum of Law ("Def. Mem."), Dkt. No. 161. On March 22, 2021, Williams filed opposition papers. Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl. Opp."), Dkt. No. 168. Defendants filed reply

papers on April 26, 2021. Defendants' Reply Memorandum of Law ("Def. Rep."), Dkt. No. 179. [10]

[10]     Williams also submitted letters dated May 3 and 12, 2021 (Dkt. Nos. 181 and 182) responding to Defendants' reply papers. Such submissions are properly characterized as sur-replies, which are generally disfavored. *See, e.g., Soto v. Wright,* No. 11-CV-2289 (PAC) (JLC), 2012 WL 265962, at *2 n.3 (S.D.N.Y. Jan. 26, 2012) (quotation omitted) (sur-replies generally not permitted because "such a procedure has the potential for placing a court in the position of refereeing an endless volley of briefs"), *adopted by* 2012 WL 639166 (Feb. 28, 2012). The Court, however, has reviewed these submissions as well in light of Williams' *pro se* status.

**\*12** This case has been referred to me for both general pretrial supervision and to provide reports and recommendations on any dispositive motions, such as the current motions. Dkt. Nos. 18, 110.

## II. DISCUSSION

### A. Legal Standards

#### 1. Summary Judgment

Pursuant to Rule 56 of the Federal Rule of Civil Procedure, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Liverpool v. Davis,* 442 F. Supp. 3d 714, 722 (S.D.N.Y. 2020) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). " 'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud,* No. 12-CV-5486 (VB), 2013 WL 1681261, at *1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson,* 477 U.S. at 248). Summary judgment may only be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." *Ford v. Phillips,* No. 05-CV-6646 (NRB), 2007 WL 946703 at *4 (S.D.N.Y. Mar. 27, 2007) (cleaned up).

On a summary judgment motion, the court's responsibility is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Wilson v. Nw. Mut. Ins. Co.,* 625 F.3d 54, 60 (2d Cir. 2010)). "[W]here there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial." *Bellotto v. Cty. of Orange,* 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 281 (2d Cir. 2006)).

"It is the movant's burden to show that no genuine factual dispute exists." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool,* 2020 WL 917294, at *4 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986)). The court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vermont Teddy Bear Co.,* 373 F.3d at 244 (*citing Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir. 2003)). "In applying this standard, the court should not weigh evidence or assess the credibility of witnesses. These determinations are within the sole province of the jury." *Frost v. New York City Police Dep't,* 980 F.3d 231, 242 (2d Cir. 2020) (quoting *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir. 1996)).

At the same time, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252. "[T]he non-movant 'must do more than simply show that there is some metaphysical doubt as to the material facts.' " *Vidal v. Valentin,* No. 16-CV-5745 (CS), 2019 WL 3219442, at *5 (S.D.N.Y. July 17, 2019) (quoting *Matsushita Elec. Indus. Co.,* 475 U.S. at586). Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties" is not sufficient to defeat an "otherwise properly supported motion for summary judgment." *Anderson,* 477 U.S. at 247–48. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted).

**\*13** Finally, no party may prove a fact by relying on "conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.,* 247 F.3d 423, 428 (2d Cir. 2001). "Where ... a plaintiff's case depends in part on his own

statements and observations, such statements must 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.' " *Bartley v. Collins*, No. 95-CV-10161 (RJH), 2006 WL 1289256, at *3 (S.D.N.Y. May 10, 2006) (quoting *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004); Fed. R. Civ. P. 56(e))). "Thus, hearsay statements that would be inadmissible at trial, conclusory assertions, and mere denials contained in those affidavits are insufficient to create a genuine issue of material fact." *Id.* (cleaned up).

### 2. Cross-Motions for Summary Judgment

These standards also apply to cross-motions for summary judgment. *Gilani v. Teneo, Inc.*, No. 20-CV-1785 (CS), 2021 WL 3501330, at *10 (S.D.N.Y. Aug. 4, 2021) (citing *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)); *C & A Carbone, Inc. v. Cty. of Rockland, N.Y.*, No. 08-CV-6459 (ER), 2014 WL 1202699, at *5 (S.D.N.Y. Mar. 24, 2014). "Generally, in deciding cross-motions for summary judgment, 'each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.' " *Id.* (quoting *Morales*, 249 F.3d at 121; *see Chartis Seguros Mex., S.A. de C.V. v. HLI Rail & Rigging, LLC*, 3 F. Supp. 3d 171, 179 (S.D.N.Y. 2014)). However, where the motion and cross-motion "seek a determination of the same issues," as is the case here, the court considers them together. *Id.*

### 3. Pro Se Litigants

In the Second Circuit, "when a court considers a motion for summary judgment, 'special solicitude' should be afforded a pro se litigant." *Falls v. (Police Officer) Detective Michael Pitt*, No. 16-CV-8863 (KMK), 2021 WL 1164185, at *10 (S.D.N.Y. Mar. 26, 2021) (collecting cases). The submissions of the *pro se* litigant should be construed liberally and interpreted to raise the strongest arguments they suggest. *Id.* (citing *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006). "[T]he submissions of a pro se plaintiff are held to a less stringent standard than those drafted by an attorney and must be liberally construed for the benefit of the plaintiff." *Ford*, 2007 WL 946703, at *4 (cleaned up). At the same time, "proceeding *pro se* does not relieve a litigant from the usual requirements of summary judgment." *Best v. Drugs*, No. 14-CV-2648 (CM), 2017 WL 218251, at *3 (S.D.N.Y. Jan. 11, 2017).

### B. The Parties' Submissions Pursuant to Local Rule 56.1

As an initial matter, Defendants argue that the facts set forth in their Statement of Material Facts pursuant to Local Civil Rule 56.1(c) should be deemed admitted because Plaintiff failed to submit a response as required by Rule 56.1. Def. Rep. at 2.

Local Civil Rule 56.1 requires any motion for summary judgment to be accompanied by a statement of material facts itemized into numbered paragraphs followed by a citation to the evidence in support of those facts that would be admissible. Local Civ. R. 56.1(a) & (d). The rule provides that "[e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Civ. R. 56.1(c). Therefore, a party's failure to comply with Local Rule 56.1 "is grounds for deeming admitted the facts contained in [the opposing party's] Rule 56.1 statement." *Prunella v. Carlshire Tenants, Inc.*, 94 F. Supp. 2d 512, 513 n.1 (S.D.N.Y. 2000). Further, "[a] party who declines to respond to a Rule 56.1 statement in the proper form eschews its right to have the Court search the record to determine whether the allegedly undisputed fact is in fact disputed." *Keawsri v. Ramen-Ya Inc.*, No. 17-CV-2406 (LJL), 2021 WL 3540671, at *3 (S.D.N.Y. Aug. 10, 2021) (citing *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001)).

***14** Here, both Williams' motion and his opposition papers are procedurally defective, because he has not supported them with a Local Rule 56.1 Statement, and " '[f]ailure to submit such a statement may constitute grounds for denial of the motion.' " *Suares v. Cityscape Tours, Inc.*, No. 11-CV-5650 (AJN), 2014 WL 969661, at *5 (S.D.N.Y. Mar. 12, 2014) (quoting Local Civil Rule 56.1(a)). "Without proper factual support, [plaintiff] cannot demonstrate there are no genuine issues of material facts, or that [he] is entitled to judgment as a matter of law." *Id.*

However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules" and may instead "opt to conduct an assiduous review of the record even where one of the parties has failed to file such a [Rule 56.1] statement." *Holtz*, 258 F.3d at 73 (quoting *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000)) (internal quotation marks omitted and further citation omitted). "[T]he court can also disregard legal conclusions or unsubstantiated opinions in

a Local Rule 56.1 statement." *Weider Health & Fitness v. AusTex Oil Ltd.*, No. 17-CV-2089 (RMB) (OTW), 2018 WL 8579820, at *2 (S.D.N.Y. Dec. 19, 2018), *adopted by* 2019 WL 1324049 (Mar. 25, 2019). Further, "where a pro se plaintiff fails to submit a proper Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) (cleaned up). In *Wali*, for example, plaintiff submitted opposition papers containing a "host of materials" but no 56.1 statement. *Wali*, 678 F. Supp. 2d at 178. So too in this case did Defendants properly follow Local Rule 56.1, and Williams responded with voluminous opposition papers and materials but with no Rule 56.1 statement. "The court is not obligated, however, to accept a pro se litigant's factual assertions where they contradict his own previous statements or are otherwise 'beyond belief.'" *Adeniji v. New York State Off. of State Comptroller*, No. 18-CV-761 (PAE) (BCM), 2021 WL 3911373, at *17 (S.D.N.Y. Aug. 31, 2021) (quoting *Shabazz v. Pico*, 994 F. Supp. 460, 470 (N.D.N.Y. 1998)), *vacated on other grounds by Reynoso v. Harrison*, 205 F.3d 1324 (2d Cir. 2000)).

Given the foregoing, as in *Wali*, "in light of the [plaintiff's] pro se status, the Court [will conduct] an independent review of all of the evidence submitted by both parties, so as to ascertain whether the record actually reveals any material, disputed issues of fact." *Wali*, 678 F. Supp. 2d at 178.

**C. Analysis**

The parties cross-move for summary judgment on all of Williams' claims, which are brought under 42 U.S.C. § 1983. *See* Pl. Mem. at 17 and Def. Mem. at 1. Section 1983 provides redress for the deprivation of federally protected rights by persons acting under color of state law. To prevail on a Section 1983 claim, a plaintiff must establish (1) the violation of a right, privilege, or immunity secured by the Constitution or laws of the United States (2) by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978). Williams contends that Defendants violated his rights under the First and Fourteenth Amendments through the following claims, which will be discussed in turn: (1) mail tampering and interference; (2) denial of access to the courts; (3) retaliation; (4) excessive force; and (5) deliberate indifference to medical needs.

1. Mail Interference and Free Speech

**\*15** "Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). Prisoners have the right to be present when legal mail is opened. *Id.* Here, Williams' mail interference complaints can be read to assert both a First Amendment free speech claim, and a separate access to courts claim. The latter will be discussed in the next section of the Report.

A prisoner's "right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Id.* Outgoing legal mail is "subject to greater constitutional protection [than other forms of mail] because of the lesser security concerns presented." *Id* at 352 (cleaned up). "To show this right is violated, a 'prisoner must show that the interference with his mail was both *regular* and *unjustified*.'" *Genao v. City of New York*, No. 20-CV-2441 (LJL), 2021 WL 2111817, at *5 (S.D.N.Y. May 25, 2021) (quoting *Antrobus v. City of New York*, No. 11-CV-2524 (RA), 2014 WL 1285648, at *4 (S.D.N.Y. Mar. 27, 2014)). "The First Amendment protects prisoners' access to mail directly, unlike the right of access to courts, which protects prisoners' access to mail only derivatively and with respect to given claims." *Bellezza v. Holland*, No. 09-CV-8434 (RWS), 2011 WL 2848141, at *6 (S.D.N.Y. Jul. 12, 2011). Although one isolated instance of mail tampering does not amount to a constitutional violation, "as few as two [such] incidents ... could constitute an actionable violation." *Davis*, 320 F.3d at 351. That said, "district courts have generally required specific allegations of invidious intent or of actual harm where the incidents of tampering are few and thus the implication of an actionable violation is not obvious on its face." *Washington v. Falco*, No. 20-CV-3009 (VB), 2021 WL 797658, at *10 (S.D.N.Y. Mar. 1, 2021) (citing *Davis*, 320 F.3d at 351).

Williams contends that Defendants restricted his right to the free flow of incoming and outgoing mail, *see* Pl. Mem. at ¶¶ 2, 4, 6, which the Court construes to include not only when Alexander read Williams' outgoing mail, but also the numerous other incoming and outgoing mail problems that Williams reported.

a. Alexander is not liable for reading Williams' outgoing mail.

On January 21, 2019, Williams observed Alexander reading his outgoing legal mail. Compl. 1 p. 4; Rule 56.1, ¶¶ 36-37. Alexander told Williams to place his open mail in his cell slot, and after he collected it, Alexander sat at a desk in the housing unit, read it, gave it back to Williams to be closed, then took it to be mailed. Rule 56.1, ¶ 37. Williams alleges Alexander read either 85 or 86 letters, 64 of which were "privileged" (including being addressed to plaintiff's lawyers, doctors, private investigators, banks, credit reporting agencies, and the NYC Department of Corrections). Pl. Mem. at ¶ 22; Rule 56.1, ¶ 40. In his deposition testimony, Williams described Alexander's practice in reviewing mail as follows:

> Anyone who had sent out mail, he would tell you to leave the mail in your slot ... in an [open envelope], he sits down at the desk, he reads it, gives it back to you and then allows you to close it, and then he takes the mail wherever he takes the mail to. That went on [from January 21, 2019] until I believe February 13[th] ... he read everybody's mail that was going out ... [on] February 1, 2019 probably a piece of my mail was read."

**\*16** Smith-Williams Decl., Exh. A, at 52: 14-20, 56: 3-4, 74: 21-22.

The crux of this dispute pertains to both how many times Alexander read Williams' outgoing legal mail, and the reasonableness of his actions. On the former issue, the only relevant evidence is Williams', as Defendants never offer their own evidence for the Court to consider concerning Alexander's practices or views at the time in question. Defendants do not counter Williams' factual assertions. They provide no evidence to demonstrate that Alexander did not read Williams' mail, or that he believed his actions were pursuant to court order. Rather, they contend that the record does not provide sufficient evidence that Alexander "regularly and unjustifiably" read Williams' mail. Def. Mem. at 15. They argue that Alexander did not concede to reading all of Williams' mail, and Williams did not witness him reading all of the mail he logged in the mailbox, meaning there is no evidence of this practice occurring regularly. Def. Rep. at 2-3; Rule 56.1, ¶¶ 40-42. Further, they contend *arguendo* that even if he did open and read the mail regularly,

Alexander did not do so unjustifiably, because he did so pursuant to a court lockdown order that found Williams to "pose a continuing, significant risk to the safety of persons whom he perceives as being potential witnesses against him." Def. Rep., at 4; Rule 56.1.

Defendants' arguments have merit. Not only does Williams fail to provide evidence of more than one specific incident of Alexander reading his mail, it is not clear from the record whether that mail was even legal mail. Further, "[n]otwithstanding [legal mail] protection[s], 'interception of [an inmate's] prison correspondence does not violate that individual's First or Fourth Amendment rights if prison officials had 'good' or 'reasonable' cause to inspect the mail.' " *Acevedo v. Fisher,* No. 12-CV-6866 (RA) (AJP), 2015 WL 7769486, at \*6 (S.D.N.Y. Dec. 2, 2015) (quoting *United States v. Felipe,* 148 F.3d 101, 108 (2d Cir. 1998)), *adopted by* 2016 WL 884909 (Mar. 2, 2016). As Defendants argue, the language of the January 2019 lockdown order, finding that Williams "solicited the aid of other persons to threaten intimidate and cause serious physical injury or death to witnesses" and "pose[d] a continuing significant risk to the safety of persons whom he perceives as being potential witnesses against him," is such that a reasonable officer in Alexander's position could conclude that the court order established good cause to intercept and read Williams' mail. Def. Rep. at 5; Rule 56.1 ¶ 7.

### b. Alexander is entitled to qualified immunity.

Even if the language of the lockdown order did not constitute good cause to inspect the mail, Alexander is entitled to qualified immunity from suit. A government official may be entitled to immunity if (1) his conduct "did not violate clearly established law," or (2) it was "objectively reasonable" for that official to believe that the action he took did not violate the law. *Naumovski v. Norris*, 934 F.3d 200, 210 (2d Cir. 2019). Not only could a reasonable officer conclude that the lockdown order established good cause to inspect the mail, but as the court in *Acevedo* further observed, "there is no clearly established law in the Second Circuit as to what constitutes good cause to intercept and read inmate non-legal mail." *Acevedo*, 2015 WL 7769486, at \*7.

**\*17** Williams argues that Defendants' reliance on *Acevedo* is misplaced because one of the Defendants was denied summary judgment as to the plaintiff's legal mail claim. Pl. Opp. at 16. It is true that the *Acevedo* court was "hard

pressed to understand the substantial government interest served by monitoring [his] outgoing *legal* mail." *Acevedo*, 2015 WL 7769486, at *10 (emphasis added). The same is true here – sending mail to one's attorney or government agencies is not likely to pose a significant risk to the safety of potential witnesses. *See id.* Even though the question in *Acevedo* concerned a mail watch instituted by the facility and the question before this Court relates to the decision of one officer, the analysis in *Acevedo* is persuasive, and demonstrates that qualified immunity is appropriate for defendants like Alexander who raise it as a defense. Just as "an officer of reasonable competence could [conclude] that it was constitutionally permissible for a mail watch to extend to an inmate's legal mail," so too could an officer of reasonable competence conclude that the court's lockdown order here necessitated a review of Williams' outgoing mail, regardless of its status. *Id.*

Because Alexander is not liable for reading Williams' mail and, alternatively, is entitled to qualified immunity, summary judgment should be granted to Defendants on this claim.

### c. Williams has not established a cognizable claim of mail interference.

Defendants are likewise entitled to summary judgment on the remainder of Williams' First Amendment mail tampering claims. Success on a Section 1983 claim requires that "the defendant was personally involved in alleged deprivation of his constitutional rights." *Genao*, 2021 WL 2111817, at *7 (*citing Zamakshari v. Dvoskin*, 899 F. Supp. 1097, 1109 (S.D.N.Y. 1995)). Any claims related to mail interference incidents in which Williams did not name an individual defendant in this case are not cognizable. However, Mathis, Green, Espinosa, Martinez, and Rivera are all named explicitly in the record as defendants involved in mail tampering. Compl. 1, Exhs. B, C, F; Compl. 2, ¶ 8, Exh. X; Pl. Mem. Exh. M. [11]

[11]    On September 18, 2019, Williams filed a grievance alleging that C.O. Billie had spread out Williams' mail and copied addresses off of it, while leaving the mail out for other officers to copy as well. Compl. 2, Exh. X. However, C.O. Billie is not a named defendant in this case.

Mathis is alleged to have specifically threatened Williams, after which time Williams had problems sending out mail. In

March 2019, he allegedly told Williams that his mail was only allowed to be given to him after being "logged," Compl. 1 Exhs. B, C, and allegedly threatened him on March 26, 2019 that "if he kept b[****]ing about his mail that he would stop all of his mail." Compl. 1, Exh. F. On December 24, 2019, Mathis allegedly threatened Williams again, and in the one or two months following this threat, Williams testified at his deposition that "it was hell [to] send[ ] mail out." Rule 56.1, ¶ 49; Smith-Williams Decl., Exh. B at 48:25-49:5.

These incidents with Mathis do not constitute a cognizable mail interference claim. Williams does not provide any factual basis to explain what he meant by "it was hell [to] send[ ] mail out.". There is nothing in the record to describe if any mail was lost, or read, or otherwise interefered with, if there was in fact an instance of mail tampering and if so, if Mathis was responsible for it.

The claims against Green, Espinosa, Martinez, and Rivera similarly do not constitute cognizable claims for mail tampering. On November 2, 2019, Williams claimed that he tried to send outgoing legal mail to the personnel office at the facility, but Green and Espinosa refused it, "stating that they are not accepting the mail knowing that it must be lawsuits inside." Pl. Mem. Exh. M. The only other mail tampering claim involving either of these two defendants concerns the policy to open packages in the mailroom and deliver them in brown paper bags. On January 29, 2020, Williams claims that he received mail sent certified by his wife, but documents were missing from the package. Compl. 3, ¶18; Pl. Mem. at ¶ 51. However, Williams does not claim that Espinosa was responsible for any alleged missing documents. Williams further claimed in a September 10, 2019 grievance that Mailroom Officer Martinez "refused to allow mail out because it has [officer] names on it." Compl. 2, Exh. X.

**\*18** Finally, in July 2019, Rivera is alleged to have directed Peoples to hold onto outgoing legal mail Williams was attempting to send in order to serve defendants in a state court lawsuit. Compl. 2, ¶ 8. Williams alleges that six envelopes containing outgoing legal mail, including one envelope that had been opened and closed with scotch tape, were returned to him, but does not allege that Rivera was responsible for the opened envelope. Compl. 2, ¶¶ 20-23.

Because one instance of mail tampering, as is the allegation against each of these individual defendants read in its best light, generally does not amount to a constitutional violation,

Williams cannot succeed on a mail tampering claim against any of them. *See Davis*, 320 F.3d at 351.

For these reasons, Defendants are entitled to summary judgment on Williams' First Amendment mail tampering claims.

### 2. Denial of Access to the Courts

Individuals in detention "have a constitutional right of access to the courts," *Gunn v. Malani*, No. 20-CV-2681 (KMK), 2021 WL 5507057, at *5 (S.D.N.Y. Nov. 23, 2021) (quoting *Bourdon v. Loughren*, 386 F.3d 88, 92 (2d Cir. 2004)). The Second Circuit has explained that "[t]he constitutional right of access to the courts assures that prisoners, including pretrial detainees, have the tools they need in order to defend against criminal charges, attack their convictions and sentences (directly or collaterally), and bring civil rights claims challenging the conditions of their confinement." *Bourdon*, 386 F.3d at 89 n.1.

However, a right of court access claim based on interference with mail requires that the incidents either: 1) "suggest an ongoing practice of censorship unjustified by a substantial government interest" or 2) "have unjustifiably chilled the prisoner's right of access to the court or impaired his legal representation." *Fredricks v. Parilla*, No. 21-CV-1893 (LTS), 2021 WL 2227095, at *2 (S.D.N.Y. Jun. 1, 2021) (*citing Davis*, 320 F.3d at 351). "To succeed on an access to courts claim, a plaintiff must show that the defendant caused the plaintiff injury or, put less succinctly, that the defendant took or was responsible for actions that had the actual effect of frustrating the plaintiff's effort to pursue a legal claim." *Oliva v. Town of Greece*, 630 F. App'x 43, 45 (2d Cir. 2015) (collecting cases). A "hypothetical injury" is not sufficient on a claim for a violation of access to the courts. *Amaker v. Haponik*, No. 98-CV-2663 (JGK), 1999 WL 76798, at *3 (S.D.N.Y. Feb. 17, 1999) (denial of access to the courts claim dismissed because inmate suffered no actual injury). Rather, the plaintiff must demonstrate that defendants actually hindered his efforts to pursue a nonfrivolous legal claim. *Penz v. Fields*, No. 21-CV-005 (VB), 2021 WL 5507249, at *3 (S.D.N.Y. Nov. 23, 2021). "For example, a plaintiff might allege 'the loss or inadequate settlement of a meritorious case, or the loss of an opportunity to seek some particular order of relief.' " *Id.* (*citing Christopher v. Harbury*, 536 U.S. 403, 413–14 (2002)).

Williams argues that his constitutional right of access to the courts was denied as a result of the following: 1) mail tampering and interference; 2) denial of the ability to marshal a legal defense through access to the law library and phone calls and visits with his lawyer; and 3) denial of the right to exhaust administrative remedies by the failure to process grievances. As discussed below, Defendants have demonstrated that Williams was not hindered in any meaningful way in pursuing litigation, and have established that any alleged denial of access did not result in an actual injury to Williams.

#### a. Mail tampering as claimed here did not prevent access to courts.

**\*19** First, Williams contends that the interference with his legal mail rose to the level of a constitutional violation of his right of access to the courts and to marshal a defense. To succeed on a claim that interference with legal mail denied a plaintiff the right of access to the courts, the defendant's conduct must 1) be deliberate and malicious, and 2) as discussed above, result in actual injury to the plaintiff "such as the dismissal of an otherwise meritorious legal claim." *Davis,* 320 F.3d at 351 (citing *Cancel v. Goord*, No. 00-CV-2042 (LMM), 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001)) (cleaned up); *see also Bellezza v. Holland*, 730 F. Supp. 2d 311, 314 (S.D.N.Y. 2010). Actual injury requires: (1) a valid underlying cause of action separate from the right-of-access claim; and (2) frustration or hindrance of the litigation caused by the defendant's actions. *Fredricks*, 2021 WL 2227095, at *2 (citing *Christopher*, 536 U.S. at 415).

Here, the record demonstrates any alleged mail tampering did not result in actual injury to Williams, as none of his litigation has been frustrated or hindered. In *Davis v. Goord,* the court dismissed the plaintiff's constitutional claim for violating his right to send and receive legal mail because the plaintiff failed to allege either an ongoing policy or any harm suffered from the tampering. *Davis*, 320 F.3d at 346. Likewise, Williams does not provide evidence of any actual harm suffered from the tampering, as he was "ultimately able to send [and receive his] intended mail" despite the challenges he described. Def. Mem. at 10; Rule 56.1, ¶¶ 24, 51, 53, and 63. While Williams sought an extension in one case, a "delay in being able to ... communicate with the courts does not rise to the level of a constitutional violation." *Jermosen v. Coughlin*, 877 F. Supp. 864, 871 (S.D.N.Y. 1995) (citing *Jones v. Smith*, 784 F.2d 149, 151–52 (2d Cir. 1986)); Rule 56.1 ¶ 78. Further, the record is clear that Williams has filed and continued to litigate five actions in federal court and three in state court, without

any missed deadlines. Rule 56.1, ¶¶ 19–20; *see Fredricks,* *2021 WL 2227095, at *2* ("A review of the dockets in those cases shows that Plaintiff is apparently receiving court mail on a regular basis and timely responding to orders and other submissions in those matters. In light of this litigation history and ongoing filing activity, Plaintiff will be hard-pressed to show a violation of his constitutional right to either access the courts or to the free flow of legal mail.").

Because Williams has not shown that he "missed any deadlines or faced any other, specific legal injuries as a result of the alleged interference," and because Defendants have demonstrated that in fact he has not faced any legal injuries in his access to courts, summary judgment should be granted in favor of Defendants on the issue of denial of access to the courts based on mail tampering. *See, e.g. Ford,* 2007 WL 946703, at *13 (denying plaintiff's motion and granting defendants' motion on denial of court access claim).

b. The lack of access to the law library and instances in which Williams could not speak with his attorneys did not prevent access to the courts.

Next, Williams contends that he was denied access to the courts when he was unable to use the law library or a kiosk to conduct research because the alternative provided to him was unacceptable, and also on account of the times he was denied the chance to speak with his lawyers. As an initial matter, "[a] state is not constitutionally obligated to provide a pretrial detainee with additional legal resources, such as a law library, when that detainee is already represented by counsel." *Hayes v. County of Sullivan,* 853 F. Supp. 2d 400, 436 (S.D.N.Y. Mar. 30, 2012) (quoting *Kowalyshyn v. Willett,* No. 10-CV-752 (SRU), 2011 WL 1793257, at *4 (D. Conn. May 11, 2011)) (cleaned up). Williams has been represented by attorneys throughout the period of his incarceration, and as such can be considered to have full access to courts for the purpose of marshaling his defense. *See* Rule 56.1, ¶ 12.

 **\*20**  Moreover, the Supreme Court has required actual injury in regard to the use of law libraries:

> [A]n inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense ... [rather, he

> must] demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim. He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint.

*Lewis v. Casey,* 518 U.S. 343, 351 (1996).

None of those circumstances applies here. Williams describes having regularly requested to visit the law library to research case law concerning his ongoing criminal case, and reports that he was able to physically go to the MDC law library "once or twice," but was otherwise told to use the law library request form instead to request case law. Rule 56.1, ¶¶ 30-33; Compl. 1, p. 5.

Williams argues that using the law library request form is not an adequate substitute for visiting the law library or using a Lexis Nexis kiosk to conduct his own research. Compl. 1, p. 5. While that may be true, it is not material to the constitutional claim at hand. Like the plaintiff in *Washington v. Falco*, Williams is discontented with a law library substitute for legal research. *Washington,* 2021 WL 797658, at *8 (dismissing denial of access to the courts claim). In that case, the prison switched from a traditional law library to kiosk units, which the plaintiff alleged were "overcrowded and difficult to access." *Id.* The kiosks were "constantly in use" for various activities unrelated to legal research, and because of this the prison was denied him his right to a law library. *Id.* at *1, *8. Here, Williams complains the switch from a traditional law library to his required use of a law library request form is not appropriate as he does not feel safe discussing his legal matters with anyone at the MDC, and the request form is not a useful substitute for research without prior knowledge of what he needs.

While the purported deficiency with the law library substitute in the two cases is different, the material fact on which both

of these cases turn is the same: in each, the plaintiff "fails to allege he suffered any actual injury during his pursuit of legal relief." *Washington*, 2021 WL 797658, at *8. In *Washington v. Falco,* the plaintiff did not "allege which specific, nonfrivolous legal challenges were affected by his inability to access the kiosks; which particular deadlines, if any, he missed due to such actions; or what specific documents, such as motions or pleadings, he was prevented from filing." *Id.* Similarly, Williams neither alleges nor provides evidence of any legal challenges affected by his inability to properly use a law library substation, deadlines missed, or papers he was prevented from filing. Thus, judgment as a matter of law is appropriate here, just as dismissal was approppriate in *Washington*. [12]

[12]    Williams holds out the BOC's recommendation in October 2020 as evidence of Defendants' violations of rights conferred upon him by the BOC Minimum Standards guidance via their issuance and compliance with CLO 104/19. Pl. Opp. ¶ 11; Smith-Williams Decl., Exh A, p. 14; Pl. Mem. Exh. Q. However, such an allegation does not independently amount to a cognizable claim under Section 1983 to be vindicated in federal court. "[A]n official's failure to follow a prison directive does not constitute a violation of a prisoner's federal constitutional rights." *Kruppenbacher v. Annucci*, No. 20-CV-0110 (LLS), 2021 WL 412281, at *3 (S.D.N.Y. Feb. 3, 2021) (*citing Holcomb v. Lykens,* 337 F.3d 217, 224 (2d Cir. 2013)); *see also Rivera v. Wohlrab*, 232 F. Supp. 2d 117, 123 (S.D.N.Y. Nov. 6, 2002) ("Regardless of any alleged violations of internal regulations, the law is settled that the failure to follow a DOCS Directive or prison regulation does not give rise to a federal constitutional claim"). This contention is more appropriately litigated, if at all, in state court.

**\*21** Finally, there are no material facts in dispute concerning the instances in which Williams was denied the right to speak with his attorneys via telephone or in person. The parties agree that Williams believes he was denied in-person visits with his attorney up to five times, but that he does not identify the individual responsible. Rule 56.1, ¶ 75. Whether there were "two or three" – Rule 56.1, ¶ 72 – or up to four incidents during which he was denied the right to speak with his attorney on the phone – Compl. 2, Exh. F; Pl. Mem. Exhs. B, O; Compl. 2, Exh. F; Pl. Mem. Exh. P; Compl. 3, Exh. B – no injury occurred as required to state

a claim for relief. Williams conceded at his deposition that there were no deadlines missed in his criminal case due to missing a visit with his attorney, and that even though some proceedings took place later than they might have, nothing was missed in his criminal case as a result of the allegedly denied meetings. Smith-Williams Decl. Exh. B at 19:17-20:7. When his attorney Julie Clark was not added to his call list as required by the January 22, 2020 lockdown order, she was eventually added to his call list after Williams filed an Article 78 proceeding in state court, thus rectifying the situation. Pl. Mem. at ¶ 63; Pl. Mem. Exh. P. In general, Williams claims he was unable to help his attorney marshal his defense when he was denied these calls, but these incidents "did not cause him to miss any deadlines in his criminal matter." Rule 56.1, ¶¶ 73-74; Smith-Williams Decl. Exh. B at 16: 6-11.

Because Williams incurred no injury on account of any of the aforementioned denials, he cannot succeed as a matter of law and therefore summary judgment for Defendants is appropriate on this claim as well.

### c.  Williams does not have a claim based on his grievances not being processed.

Williams contends that he "never received a response on the appeal request [of his grievances, which] prevent[ed] him from appealing the grievances to C.O.R.C.... ultimately prevent[ing] him access to the court due to lack of exhaustion." Pl. Mem. at ¶¶ 4, 47. Additionally, according to Williams, grievances he placed in the grievance box on July 2 and 9, 2019, were not collected. Rule 56.1 ¶ 29; Smith-Williams Decl. Exh. B at 21: 17-25. Even if true, Williams does not have a legitimate theory of recovery based on such facts, and summary judgment should also be granted for Defendants on this claim.

The First Amendment protects a prisoner's right to petition the government for the redress of grievances. *Harris v. Westchester Cty. Dep't. of Corr.*, No. 06-CV-2011 (RJS), 2008 WL 953616, at *5 (S.D.N.Y. Apr. 3, 2008). When a prisoner submits a grievance to a correctional officer who never files it, an administrative remedy is unavailable if the regulations "do not adequately outline the process to appeal or otherwise exhaust administrative remedies." *Ford v. Aramark*, No. 18-CV-2696 (NSR), 2020 WL 377882, at *4 (S.D.N.Y. Jan. 23, 2020) (quoting *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 124 (2d Cir. 2016)). However, the Fourteenth Amendment does "not provide ... a constitutionally protected

right to file a grievance or receive process with respect to a filed grievance." *Kruppenbacher,* 2021 WL 412281, at 4. Access to administrative remedies is therefore not a constitutionally-protected right, and a violation of prison grievance procedure is not a cognizable Section 1983 claim. *See, e.g.* George v. Cty. of Westchester, No. 20-CV-1723 (KMK), 2021 WL 4392485, at *4 (S.D.N.Y. Sept. 24, 2021) (collecting cases); *see also Harris,* 2008 WL 953616, at *5 (inmate grievance programs created by state law are not required by the Constitution; therefore, allegations that prison officials violated those procedures do not give rise to a cognizable Section 1983 claim).

Rather, "in the event that prison officials ignore a grievance that raises constitutional claims, the proper avenue to seek relief is ... directly petitioning the government for redress of his claims." *Id.* Williams therefore cannot bring an independent claim that he was denied the right to petition the government for redress, as that is "belied by the fact of his bringing this lawsuit." *Crispin v. Westchester Cty.,* No. 18-CV-7561 (VB), 2019 WL 2419661, at *4 (S.D.N.Y. Jun. 10, 2019) (citing *Harris,* 2008 WL 953616, at *5). [13]

[13]    Distinct from Williams' First Amendment right vindicated based on his filing a federal lawsuit, the Prison Litigation Reform Act ("PLRA") mandates that prisoners exhaust administrative remedies before bringing an action related to prison life in federal court. *See, e.g., Williams v. King,* 56 F. Supp. 3d 308, 320–21 (S.D.N.Y. 2014). The failure to exhaust administrative remedies is an affirmative defense created by the PLRA. *See, e.g. id.* at 321. Williams claims that Defendants made the argument that he failed to exhaust all of his remedies before initiating civil litigation. Pl. Mem. at ¶ 48. However, upon review of the record, Defendants have not raised an affirmative defense to this effect.

**\*22** For these reasons, summary judgment should be granted to Defendants on this claim.

### 3. Retaliation

Williams' complaints can be read to allege a number of retaliation claims, including cell searches, mail tampering, and threats. To succeed on a First Amendment retaliation claim, a plaintiff "must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected [conduct] and the adverse action." *Vasquez v. Cty. of Rockland,* No. 13-CV-3652 (SLC), 2020 WL 883514, at *7 (S.D.N.Y. Feb. 24, 2020) (cleaned up). Courts should "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly,* 794 F.3d 290, 295 (2d Cir. 2015) (internal quotation marks omitted).

Williams contends that officers retaliated against him for filing grievances and lawsuits against the officers at the MDC. Pl. Mem. at ¶ 6. As an initial matter, many of the incidents Williams alleges as retaliation do not involve named defendants in this case, and as such are not properly considered in this lawsuit. [14] Similarly, the retaliation complaints against Padillo and others for not responding to grievances are not cognizable claims as discussed above.

[14]    For example, the incidents involving Bethea in July and August of 2019, Compl. 2, Exhs. S, T, and Y, and the cell search by officer "Louis," Compl. 2, ¶ 35, Exh. P, do not give rise to cognizable claims for retaliation as neither is a named defendant.

Regarding the remaining claims, it is settled law that the filing of grievances is a constitutionally protected act. *See, e.g., Vidal,* 2019 WL 3219442, at *7 (collecting cases). Thus, the first prong is met, and the issues to be decided are whether any triable issue of fact exists with regards to the second and third prongs – whether any named defendants took adverse actions against Williams, and if so, whether a causal connection existed between the conduct and that action.

#### a. Williams faced adverse action.

In the prison context, an adverse action is any "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir. 2004); (quoting *Davis,* 320 F.3d at 353.). A plaintiff can demonstrate that retaliatory conduct meets that standard either by alleging that "he has been chilled from engaging in the First Amendment activities that triggered the retaliation," or

2022 WL 130409

alleging "a serious injury that is independent of a possible First Amendment chill." *Smith v. Maypes-Rhynders*, No. 07-CV-11241 (PAC)(MHD), 2009 WL 874439, at *4 (S.D.N.Y. Mar. 31, 2009). Whether an action is "sufficiently adverse to deter someone of ordinary firmness from exercising his rights is a question of fact." *Id.* (cleaned up) (for pleading purposes, filing of false disciplinary charges resulting in sanctions, "wonton destruction" of personal property, and stealing legal and personal papers are sufficiently adverse).

**\*23** First, although Williams argues that a number of cell searches are properly characterized as retaliatory actions, in only two are specific defendants identified. According to a signed declaration by fellow inmate Samuel Ceruti, on March 26, 2019, after a discussion about "many issues" with the mail, Mathis told Williams that "if he kept b[****]ing about his mail that he would stop all of his mail." Compl. 1, Exh. F. A few days later, Ceruti saw Mathis standing in front of Williams' cell in an "aggressive manner" while Williams complained about how personal photos were handled by officers searching his cell. *Id.* Next, on September 20, 2019, Williams contends that C.O. Wells and non-named defendant C.O. Mason searched Williams' cell and took legal documents needed for ongoing civil litigation. Pl. Mem. Exh. L. He contends that these are the same officers who attempted to attack him in July 2019 when he requested his mail be returned. Pl. Mem. Exh. L.

While cell searches alone often do not rise to the level of an adverse action, they may be actionable if combined with other "wrongful conduct" such as destruction of property. *See, e.g., Stewart v. Richardson*, No. 15-CV-9034 (VB), 2016 WL 7441708, at *5 (S.D.N.Y. Dec. 27, 2016). Likewise, "allegations that a defendant confiscated personal property and/or legal papers during the course of a cell search *have* been found sufficient to deter an inmate of ordinary firmness form exercising his constitutional rights." *Hammock v. Pierce*, No. 15-CV-9052 (NSR), 2018 WL 2108244, at *7 (S.D.N.Y. May 7, 2018) (cleaned up) (collecting cases) (denying defendants' motion for summary judgment on retaliation claim related to cell search and confiscation of property). As in *Hammock*, where the court found that confiscating legal documents during a cell search constituted a triable issue of fact, so too is the purported confiscation of Williams' documents during the cell search he describes.

Second, according to Williams, on December 24, 2019 Mathis came to his housing area and threatened him, saying that "if he didn't take him out of [civil complaint No. 19-CV-3347]

that he was going to make his [stay] at MDC hard and that he would no longer send and/or receive mail..." Smith-Williams Decl. Exh. B at 46: 10-13. "Verbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered." *Lunney v. Brureton*, No. 04-CV-2438 (LAK) (GWG), 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007), *adopted by* 2007 WL 2050301 (Jul. 18, 2007). Defendants argue the alleged threats Mathis made to Williams are not adverse actions. Def. Mem. at 18. However, the cases on which they principally rely are not analogous. In *Bartley,* for example, the defendants' threats against the plaintiff were found not to be an adverse action. *Bartley,* 2006 WL 1289256, at *6. In that case, the plaintiff's deposition testimony that multiple defendants threatened him and "encouraged him to abandon his lawsuit" was "conclusory" due to insufficient specificity with regard to the identification of any one defendant and the allegation not providing the time, date, place, or circumstances of the alleged remarks. *Id.* Further, the statements in plaintiff's complaint in *Bartley,* while more particularized, were unsworn and thus could not be relied upon for a summary judgment motion. *Id.* at *7. Likewise, in *Hofelich v. Ercole*, the determination that threats against a prisoner were not adverse actions turned in part on the fact that the plaintiff could not come forward with evidence of the threat beyond the allegation in the Amended Complaint. *Hofelich v. Ercole*, No. 06-CV-13697 (PKC), 2010 WL 1459740, at *2 (S.D.N.Y. Apr. 8, 2010). The plaintiff there could not set forth an approximate date, month, or season of the year when the threat was made, and nothing in his deposition filled in those gaps. *Id.* The context is different here. During a sworn deposition, Williams, unlike Bartley or Hofelich, specifically identified Mathis as the one threatening him, and his allegations are detailed as to the date, time, and place. These verbal threats may well rise to the level of an adverse action, and whether these threats are sufficiently detailed and specific to rise to the level of an adverse action are triable issues for a jury.

b. Causal connection between protected
acts and adverse action exists.

**\*24** Finally, the Court considers the issue of causal connection. "In considering whether a causal connection exists, a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a

hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff." *Thomas v. DeCastro*, No. 14-CV-6409 (KMK), 2019 WL 1428365, at \*9 (S.D.N.Y. Mar. 29, 2019) (citation and quotation marks omitted).

The Second Circuit has not enumerated a "bright line" test to determine the outer limits of a temporal relationship. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). In *Espinal*, six months between the protected activity and the adverse action was "sufficient to support an inference of a causal connection." *Id.* Here, Mathis initiated his threats eight months after the lawsuit was filed, but much closer in time to a number of grievances that Williams had filed, including one five months prior, on July 9, 2019, that referred to Mathis being upset that he had been named in a FOIL submission. Pl. Mem. Exh. M. Likewise, the cell search involving Wells was less than six months after Williams filed his initial lawsuit, and much closer in time to a number of other grievances. This temporal connection is sufficient to establish a causal connection, or at a minimum raises triable issues of fact

In light of the foregoing, on the retaliation issue, summary judgment for Williams should be denied, summary judgment for Mathis and Wells should also be denied, but summary judgment for all other Defendants should be granted.[15]

[15]  In a footnote, Defendants argue that they are entitled to qualified immunity for Williams' retaliation claims. Def. Mem. at 26, n. 23. "It is generally inappropriate to make substantive arguments in footnotes." *In re MF Global Holdings Ltd. Inv. Litig.*, No. 11-CV-7866 (VM), 2014 WL 8184606, at \*2 (S.D.N.Y. Mar. 11, 2014). Indeed, courts in this Circuit have made clear that arguments in footnotes are waived. *See Skibniewski v. Commissioner*, 2020 WL 5425343, at \*3, n.1 (W.D.N.Y. Sept. 10, 2020) (collecting cases). In any event, qualified immunity is not appropriate on the current record given the factual issues presented.

### 4. Excessive Force and Deliberate Indifference

Williams brings an excessive force claim against Officer Gorritz for deploying a chemical agent against him on April 22, 2020. Compl. 3, ¶¶ 24-35. He also appears to bring a claim that certain officers are liable for deliberate indifference to his medical needs following that incident. *See* Compl. 3, ¶¶ 36-45; Def. Mem. at 22.

#### a. Defendant Gorritz did not use excessive force.

As a pretrial detainee, Williams' excessive force claim is analyzed under the Fourteenth Amendment. *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (quoting *Graham v. Connor*, 490 U.S. 386, 392 n.6 (1989)) ("While the Eighth Amendment's protection does not apply 'until after conviction and sentence,' the right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment[.]"). To succeed on a constitutional claim of excessive force used against him, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015); *see also Darnell v. Pineiro*, 849 F.3d 17, 21 (2d Cir. 2017). The Supreme Court in *Kingsley* provided a non-exhaustive list of factors to consider when determining reasonableness, including "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397.

**\*25** Taking these factors into consideration, the use of force was objectively reasonable in this instance, and therefore no triable issue of fact exists. Williams argues that the pepper spray was deployed for fifteen seconds; however, he presents no evidence to support that allegation. Compl. 3, ¶ 34. Defendants, on the other hand, dispute Williams' characterization and, relying on a video of the incident, maintain that Gorritz "sprayed a single, two-second burst of chemical agent towards [Williams'] face." Rule 56.1, ¶ 85. When "the parties disagree as to the existence of a genuine dispute of a material fact, the Court may consult incontrovertible video evidence to determine whether summary judgment is nevertheless appropriate." *Davis v. Murphy,* No. 12-CV-3297 (PGG), 2018 WL 10070524, at \*8 (S.D.N.Y. Sept. 24, 2018) (cleaned up).

After reviewing the video, the Court concludes that no reasonable jury could find in favor of Williams on this claim. The time stamp on the video unequivocally demonstrates that Gorritz deployed her chemical agent from a short distance away from Williams, in one burst, which lasted for less than two full seconds. Smith-Williams Decl. Exh. D (Genetec

Video, Angle 191.70, 12:19:13-16). Courts "must make [a] determination [of whether an incident was objectively reasonable] from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397. Gorritz had just been engaged in a protracted discussion with an agitated Williams, who pulled an object out of his pants and then ran into the janitor's supply closet where he had access to a number of items that could be used as weapons. Rule 56.1, ¶ 83; Smith-Williams Decl. Exh. D (Genetec Video Angle 191.70, 12:17-19).

While a chemical agent, or pepper spray, "constitutes a significant degree of force" and its use can sometimes amount to a constitutional violation, "if the force was applied in a good-faith effort to maintain or restore discipline, it ... will not amount to excessive force under Second Circuit law." *Quinones v. Rollison*, No. 18-CV-1170 (AJN), 2020 WL 642018, at *4 (S.D.N.Y. Nov. 1, 2020) (internal citations omitted) (cleaned up). Williams produced no evidence to support his recounting of the events, in which Gorritz orders another officer to "tackle" Williams and Williams runs away out of fear. Compl. 3, ¶ 32. The security footage shows that the officers appear calm and not ready to attack. Genetec Video, Smith-Williams Decl. Exh. D Angle 191.70, 12:17-19. Even accepting Williams' allegations as true, Gorritz and the other officers still had a reasonable fear that Williams could become a threat given his sudden and unexpected "access to brooms, mops, water, and a dust pan." Rule 56.1, ¶¶ 82-83. On the video, Gorritz is the officer who has her chemical agent removed and ready to use; her decision had to be made in less than the second it took Williams to step halfway through the door, as the officers were within feet of him. Rule 56.1, ¶ 81; Genetec Video, Smith-Williams Decl. Exh. D Angle 191.70, 12:19. Had he been armed, she would not have had time to issue a warning. Under the circumstances, Gorritz's deployment is reasonable.

This assessment is further bolstered by the fact that Williams did not experience significant injury. Rule 56.1, ¶ 96; Compl. 3, ¶ 39. The use of pepper spray is not an actionable constitutional violation when the resulting harm is de minimis, such as when the recipient suffers only the expected side effects. *Williams v. City of New York*, No. 05-CV-10230 (SAS), 2007 WL 2214390, at *12 (S.D.N.Y. Jul. 26, 2007). Video footage portrays Williams as he ducks his head and the majority of the spray hits his arm. Genetec Video, Smith-Williams Decl. Exh. D Angle 191.70, 12:19. As in *Quinones*, so too here the officer's "use of force was not gratuitous"

and the "Plaintiff was not restrained," but rather able to immediately leave the scene. *Quinones*, 2020 WL 6420181, at *6 (emphasis omitted). Williams reported that he experienced pain in his left shoulder and wrist and noted that his left eye vision was different. Compl. 3, ¶ 39. However, an x-ray revealed no fractures or dislocation were present in Williams' shoulder and wrist, Rule 56.1, ¶¶ 101-02, and despite his asthma, the record indicates that he did not complain of an asthma attack or respiratory distress. Rule 56.1, ¶¶ 97-100.

**\*26** For these reasons, summary judgment should be granted for Defendants on the excessive force claim.

### b. Defendants were not deliberately indifferent to Williams' medical needs.

" '[D]eliberate indifference to a prisoner's serious illness or injury states a cause of action under [§] 1983.' " *Ross v. Willis*, No. 16-CV-6704 (PAE) (KNF), 2021 WL 3500163, at *17 (S.D.N.Y. Aug. 9, 2021) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)). A two-pronged test applies to such claims. First, the injury or illness must constitute a "serious medical condition." *Ross*, 2021 WL 3500163, at *17 (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). A serious medical condition is understood to be "one that may produce death, degeneration, or extreme pain." *Id.* (quoting *Holmes v. City of New York*, No. 17-CV-3874 (WHP), 2018 WL 4211311, at *6 (S.D.N.Y. Sept. 4, 2018)). The second prong is for the defendant to have "acted with deliberate indifference towards that medical condition, so as to either cause it or expose the plaintiff to risk from it." *Id.* (citing *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003)). Mere negligence is insufficient under this standard; rather, the defendant must have acted intentionally or recklessly failed to act with reasonable care. *Id.* (internal citations omitted).

After Gorritz deployed the pepper spray, the parties agree that Williams was eventually cuffed and taken to a decontamination shower. Compl. 3, ¶36; Rule 56.1, ¶¶ 93-94. However, there is a dispute regarding what took place in that shower. Williams claims the shower head was capped off, blocking any water or solution from coming out to decontaminate him. Compl. 3, ¶ 36. He also alleges that Gorritz had knowledge of this lack of water as the intake captain, but in the absence of any facts other than that conclusory statement on the basis of her job title, that assertion is unsupported by the record. Compl. 3, ¶ 36. In response to Williams' "allegation that he was not

2022 WL 130409

afforded a decontamination shower," Def. Mem. at 22, Defendants repeat throughout their motion papers the fact that officers "escorted Plaintiff to the intake area decontamination showers" and "left Plaintiff in the intake area decontamination shower," though do not address what happened in the shower. Rule 56.1 ¶¶ 93-94. The video evidence Defendants provide does not clarify the issue, as the viewer can see Williams go into a stall but does not hear any water running. *See* Handheld Video, Smith-Williams Decl., Ex. L at 00:27-3:18. Williams claims that he was in the intake area until 3:15 p.m. without being able to decontaminate himself, and that his first shower after the chemical agent was deployed against him was eight hours later. Compl. 3, ¶¶ 39, 45. However, the resolution of this issue is not material to the ultimate decision, as there was no resulting injury sufficient to rise to the level of a serious medical condition.

The first prong of a resulting "serious medical condition" is therefore not met here, as Williams does not allege any serious injury, and the records (including medical reports and video of Williams following the chemical agent deployment), demonstrate that he was not suffering from physical ailments that may "produce death, degeneration, or extreme pain." *Id.* Any "temporary discomfort caused by pepper spray or mace does not constitute a 'sufficiently serious' injury within the meaning of deliberate indifference." *Id.* at *18 (cleaned up).

 **\*27**  Because the first prong is not met, the second need not be reached.

Thus, summary judgment should be granted for Defendants as to the claims concerning deliberate indifference to medical needs.

### 5. Derivative Claims

Williams alleges that the City of New York is liable for constitutional violations committed by the named defendants against him under a theory of municipal liability, including for mail tampering, not responding to his grievance appeal request, and denial of access to his attorneys. Pl. Mem. at ¶¶ 64-70. His pleadings can also be read to raise a claim of respondeat superior. Compl. 2, p. 12.

As an initial matter, a municipality cannot be held liable on a respondeat superior theory, nor "solely because it employs a tortfeasor," but rather only where the municipality itself was the "moving force" behind the deprivation of the plaintiff's rights. *Bisignano v. Harrison Central School Dist.*, 113 F. Supp. 2d 591, 601 (S.D.N.Y. 2000) (internal citation omitted).

A municipality can only be held liable under Section 1983 if it is the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" which causes a constitutional deprivation. *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978). In order to hold a city liable under this theory, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). A "causal connection" between the policy and deprivation of the plaintiff's rights must exist. *Fernandez v. City of New York*, 457 F. Supp. 3d 364, 394 (S.D.N.Y. 2020) (citing *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)).

However, *Monell* "does not provide a separate cause of action," but rather it extends liability to a municipality where an underlying constitutional violation occurred. *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). As discussed in this Report, the Court recommends granting summary judgment for Defendants on the mail tampering, denial of access to courts, excessive force, deliberate indifference to medical needs, and retaliation claims. For the remaining retaliation claims against Mathis and Wells, Williams has not alleged a municipal policy or custom. Therefore, the Court likewise recommends finding for Defendants as a matter of law on the derivative claims.

### III. CONCLUSION

For the foregoing reasons, the Court recommends Williams' motion for summary judgment be denied, and Defendants' motion for summary judgment be granted, except as to the retaliation claims against defendants Mathis and Wells.

### PROCEDURE FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Lewis J. Liman, United States Courthouse, 500 Pearl Street, New York, NY 10007. Any requests for an extension of time for filing objections must be directed to

2022 WL 130409

Judge Liman. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

**All Citations**

Slip Copy, 2022 WL 130409

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 374578
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Damilola ANIMASHAUN, Plaintiff,

v.

Brian FISCHER, et al., Defendants.

9:19-CV-0820 (LEK/DJS)
|
Signed 01/23/2020

**Attorneys and Law Firms**

DAMILOLA ANIMASHAUN, Plaintiff, pro se, 389078, Baltimore County Detention Center, 720 Bosley Avenue, Towson, MD 21204.

**DECISION AND ORDER**

LAWRENCE E. KAHN, Senior United States District Judge

**I. INTRODUCTION**

 *1  The Clerk has sent to the Court for review an amended complaint submitted by pro se plaintiff Damilola Animashaun asserting claims pursuant to 42 U.S.C. § 1983 ("Section 1983"). By Decision and Order filed on October 24, 2019, this Court reviewed the complaint in accordance with 28 U.S.C. § 1915A(b), and found that it was subject to dismissal for failure to state a claim upon which relief may be granted. Dkt. No. 9 ("October 2019 Order"). [1]  In light of his pro se status, plaintiff was afforded an opportunity to submit an amended complaint. *Id.* at 14-16.

[1]      Because plaintiff paid the filing fee for this action, the Court also struck the inmate authorization form filed by plaintiff. *See* October 2019 Order at 1, 14-15.

Presently before the Court is plaintiff's amended complaint and letter request to update the amended complaint to name three additional individuals, each referenced in the amended complaint, as defendants. Dkt. No. 12 ("Am. Compl."); [2] Dkt. No. 13 ("Letter Request").

[2]      Plaintiff's amended complaint is comprised of a document entitled "Amendment of Complaint

per 10/24/2019 Court Order of the United States District Court Northern District of New York (U.S. District Judge Lawrence E. Kahn)" and a document entitled "Affidavit in Support of Claims in Damilola Animashaun vs Brian Fischer et al." Page citations to the amended complaint refer to the page numbers electronically generated by the Court's electronic filing system, CM/ECF.

**II. SUFFICIENCY OF THE AMENDED COMPLAINT**

**A. The Complaint and October 2019 Order**
In his original complaint, plaintiff asserted claims against the following individuals related to his confinement in a special housing unit ("SHU") at various correctional facilities beginning on August 18, 2016: (1) former DOCCS Commissioner Brian Fischer; (2) current DOCCS Commissioner Anthony J. Annucci; (3) "John Doe(s)"; (4) "Jane Doe(s)"; and (5) Elmira Correctional Facility Corrections Sergeant John Doe. *See generally,* Compl. The complaint was construed to assert Eighth Amendment claims against the named defendants. *See* October 2019 Order at 8.

Following review of the complaint pursuant to 28 U.S.C. § 1915A(b), plaintiff's Section 1983 claims were dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* October 2019 Order at 10-16.

**B. Review of the Amended Complaint**
Because plaintiff is proceeding in forma pauperis and is an inmate suing one or more government employees, his amended complaint must be reviewed in accordance with 28 U.S.C. § 1915A(b). The legal standard governing the dismissal of a pleading for failure to state a claim pursuant to 28 U.S.C. § 1915A(b) was discussed at length in the October 2019 Order and it will not be restated in this Decision and Order. *See* October 2019 Order at 1-2.

Plaintiff's amended complaint contains allegations similar to those set forth in the original complaint, but names certain individuals as defendants in place of the "John Doe(s)" and "Jane Does(s)," provides more detail regarding certain events that gave rise to his SHU confinement, and asserts new constitutional claims in addition to re-asserting Eighth Amendment claims based on his SHU confinement. *See generally,* Am. Compl. The following facts are set forth as alleged by plaintiff in his amended complaint, and as supplemented by his Letter Request. [3]

3      The amended complaint also makes reference to
       the exhibits attached to the original complaint (Dkt.
       No. 1-1) and supplemental submission in support of
       the original complaint (Dkt. No. 6-1), and requests
       that those exhibits be considered and filed with
       the amended complaint. Am. Compl. at 1, 17. The
       Court has considered those exhibits as part of its
       review of the amended complaint in accordance
       with 28 U.S.C. § 1915A. The Clerk is directed to
       attach a copy of those exhibits (Dkt. No. 1-1; Dkt.
       No. 6-1) to the amended complaint.


### 1. 2016 Incidents at Auburn Correctional
### Facility Giving Rise to SHU Confinement

 **\*2**  On or about August 18, 2016, a corrections official
at Auburn Correctional Facility "spat on [plaintiff] multiple
times then threw an unknown green liquid substance on
[plaintiff,] which caused [him] severe physical injuries[.]"
Am. Compl. at 19. The corrections officer then issued plaintiff
a " 'cover up' ticket" that "wrongly accused [plaintiff of]
disobeying the direct orders of an officer" and "falsely"
accused him of "squeez[ing] the contents [of a lotion bottle]"
on that officer. *Id.* at 18-19.

Following this incident, plaintiff was placed in SHU. Am.
Compl. at 18. The next day, defendant Corrections Officer
John Doe refused to accept a grievance from plaintiff
regarding the events of August 18, 2016. *Id.* at 2.

Thereafter, plaintiff attended a disciplinary hearing arising out
of the misbehavior report he received. Am. Compl. at 9. [4] At
the conclusion of the disciplinary hearing, defendant Hearing
Officer Mogavero sentenced plaintiff to six months of SHU
confinement, revoked certain of his privileges, and imposed
a $5.00 fine. *Id.* [5] On or around this date, plaintiff was also
sentenced to an additional 90 days of SHU confinement and
30 days of keeplock confinement for one or more other
disciplinary infractions. *Id.* at 23. [6]

4      Apparently after the events of August 18, 2016,
       and while plaintiff was awaiting his disciplinary
       hearing, he received two other disciplinary
       infractions. *See* Am. Compl. at 23.

5      Although the amended complaint does not
       name Hearing Officer Mogavero as a defendant,

plaintiff's Letter Request seeks to modify the
amended complaint to do so. *See* Letter Request at
1. The Letter Request also states that this individual
was "the hearing officer whom [sic] conducted
the Elmira Correction[al] Facility disciplinary
hearing" arising out of charges that plaintiff lied to
a corrections official at that facility regarding his
possession of an identification card. *Id.*

6      The amended complaint lacks any allegations
       explaining when plaintiff received these other
       disciplinary charges, what he was charged with,
       when he received a disciplinary hearing for these
       charges, or who acted as the hearing officer.


### 2. 2016 and 2017 Incidents at Southport Correctional
### Facility Giving Rise to SHU Confinement

On October 1, 2016, plaintiff was transferred to Southport
Correctional Facility. Am. Compl. at 20. During his time at
this facility, he received "multiple additional infractions[,]"
which resulted in him receiving disciplinary sentences that
included 8 months of SHU confinement and 30 days of
keeplock confinement. *Id.* [7]

7      Plaintiff alleges that the incidents giving rise to the
       disciplinary infractions occurred in October 2016,
       December 2016, and February 2017. Am. Compl.
       at 37. The amended complaint, however, lacks any
       allegations explaining what plaintiff was charged
       with, when he received disciplinary hearings for
       these charges, or who acted as the hearing officer
       at the hearings. The amended complaint also
       lacks any allegation that any hearing officer who
       imposed a sentence resulting in some portion of
       the additional 8 months of SHU confinement and
       30 days of keeplock was aware of plaintiff's
       mental health issues, or how much additional SHU
       confinement plaintiff already faced as a result of
       the disciplinary sentence(s) issued based on earlier
       events.


### 3. 2017 Incidents at Elmira Correctional
### Facility Giving Rise to SHU Confinement

In or around April, 2017, plaintiff was transferred to
Elmira Correctional Facility "to serve the 30 days keeplock
sanction." Am. Compl. at 20-21. On or about May 27, 2017,

plaintiff informed an unidentified corrections officer that he intended to take his own life and showed the officer a weapon he created and intended to use. *Id.* at 25; Dkt. No. 1-1 at 18. Plaintiff was then escorted to the mental health clinic and placed on suicide watch. Am. Compl. at 25.

**\*3** On or about May 30, 2017, plaintiff made a request to defendant John Doe Corrections Sergeant that he be placed in protective custody. Am. Compl. at 16; Dkt. No. 1-1 at 22. Plaintiff told Corrections Sergeant John Doe that he was "in fear for imminent danger pose[d] ... to [him] by [an inmate] porter Kendall Jones[.]" Am. Compl. at 16. Plaintiff stated that inmate Jones advised plaintiff that he intended to harm him. *Id.* Corrections Sergeant John Doe denied plaintiff's request for protective custody. *Id.* at 16, 26.

Thereafter, plaintiff was released from suicide watch and returned to his cell. Am. Compl. at 25-26. A few days later, and just three days prior to the completion of plaintiff's keeplock sentence, he was involved in an altercation with inmate Kendall. *Id.* Around this time, plaintiff also received a separate disciplinary charge for lying to a corrections officer about his possession of an identification card. *Id.* at 10-11, 37. As a result of the altercation, plaintiff received a misbehavior report, was subsequently found guilty of the charges after a disciplinary hearing, and sentenced to six months of SHU confinement. *Id.* at 21, 37. [8]

[8]    Plaintiff alleges that he received a separate hearing for the disciplinary charge of lying to the corrections official, and received a $5.00 fine at the conclusion of that hearing. Am. Compl. at 10-12. It is unclear whether plaintiff received any additional punishment as a result of this disciplinary charge.

### 4. 2017 Incidents at Southport Correctional Facility Giving Rise to SHU Confinement

On or about June 11, 2017, plaintiff was transferred back to Southport Correctional Facility. Am. Compl. at 27. During plaintiff's confinement at this facility, he was involved in at least four separate incidents that resulted in disciplinary charges against him. *Id.* at 37-38. One of those incidents involved plaintiff's refusal to return a food tray; another involved "lewd conduct." *Id.* at 38. It appears plaintiff may have also been involved in an altercation with an inmate. *Id.* at 30. [9]

[9]    The amended complaint lacks any allegations explaining who acted as the hearing officer(s) for these disciplinary charges, or the amount of SHU confinement, if any, plaintiff received as a result of these disciplinary charges. The amended complaint also lacks any allegation that the hearing officer(s) who imposed the disciplinary sentence(s) were aware of plaintiff's mental health issues, or how much additional SHU confinement plaintiff already faced as a result of prior disciplinary sentences.

### 5. 2018 Incidents at Downstate Correctional Facility Giving Rise to SHU Confinement

In or around March, 2018, plaintiff was transferred to Downstate Correctional Facility. Am. Compl. at 8. While plaintiff was on the transport bus, he was involved in an altercation with another inmate. *Id.* at 8, 38. As a result of the altercation, plaintiff received a misbehavior report, was subsequently found guilty of the charge(s) after a disciplinary hearing, and sentenced to an unidentified amount of SHU confinement. *Id.* [10]

[10]    Plaintiff alleges that he was involved in two incidents at Downstate Correctional Facility that resulted in two separate disciplinary hearings. Am. Compl. at 8. The amended complaint, however, fails to identify the charge(s) that gave rise to the other disciplinary hearing, or the outcome of that hearing.

### 6. 2018 Incidents at Upstate Correctional Facility Giving Rise to SHU Confinement

On or about March 23, 2018, plaintiff was transferred to Upstate Correctional Facility. Am. Compl. at 8, 12. Shortly after plaintiff's transfer, he was involved in an altercation with his assigned cell mate. *Id.* at 12, 30, 38. Thereafter, plaintiff was involved in another altercation with a different assigned cell mate. *Id.* at 12, 30. At other unidentified times during plaintiff's confinement at Upstate Correctional Facility, he apparently also received disciplinary infractions for requesting sexual favors from a nurse and engaging in a lewd act. *Id.* at 12-13.

**\*4** In total, plaintiff received disciplinary charges for five different incidents that occurred during his confinement

at Upstate Correctional Facility. [11] Am. Compl. at 8, 12-13, 38. Defendant Hearing Officer Cantwell presided over one or more of the disciplinary hearings arising out of these disciplinary charges. *Id.* at 8, 12. Plaintiff was apparently found guilty of the various disciplinary charges during separate disciplinary hearings, and sentenced to an unidentified amount of additional SHU confinement. *Id.* [12]

[11]    The amended complaint lacks any allegations regarding a fifth incident.

[12]    The amended complaint lacks any allegations indicating the amount of SHU confinement imposed on plaintiff after any of the these disciplinary hearings. The amended complaint also lacks any allegation that the hearing officer(s) who imposed the disciplinary sentence(s) were aware of plaintiff's mental health issues, or how much additional SHU confinement plaintiff already faced as a result of prior disciplinary sentences.

### 7. 2018 Incidents at Clinton Correctional Facility Giving Rise to SHU Confinement

On August 31, 2018, plaintiff was transferred to Clinton Correctional Facility for better mental health treatment. Am. Compl. at 21, 31. While plaintiff was in a van en route to Clinton Correctional Facility, he was involved in an altercation with one of the prison transport officers, which resulted in disciplinary charges against him. *Id.* at 31, 36.

Shortly after plaintiff's arrival, he received a daily prescription for 15 milligrams of Remeron to treat his depression and stress. *Id.* at 14, 21, 29, 32. A short time later, the dosage was increased to 30 milligrams, and plaintiff also received a daily prescription for 50 milligrams of Vistaril to treat his insomnia, stress, anxiety, and delusional state. *Id.* at 14.

Between September 24 and October 12, 2018, plaintiff received disciplinary charges for "spitting on an inmate[,] ... not leaving the shower area when told to do so, ... [and] lewd conduct." Am. Compl. at 8. Following each of the disciplinary charges against plaintiff during his confinement at Clinton Correctional Facility, he received a disciplinary hearing. *Id.* at 8, 12-13. Defendant Cantwell served as the hearing officer for one or more of these disciplinary hearings. *Id.* at 13. Apparently following each of the

disciplinary hearings, plaintiff was sentenced to additional "SHU/keeplock" confinement "despite [his] claims of mental illnesses[.]" *Id.* at 8, 14. [13]

[13]    The amended complaint lacks any allegations indicating the amount of SHU confinement imposed on plaintiff after any of these disciplinary charges, or that defendant Cantwell was aware of how much additional SHU confinement plaintiff already faced as a result of prior disciplinary sentences.

### 8. 2019 Incidents at Attica Correctional Facility Giving Rise to SHU Confinement

On or about October 16, 2018, plaintiff was transferred to Attica Correctional Facility. Am. Compl. at 21, 31-32. In or around February, 2019, plaintiff received a misbehavior report charging him with lewd conduct, interference with staff, and disobeying a direct order. *Id.* at 7. On or about February 20, 2019, plaintiff's disciplinary hearing arising out of these charges commenced before defendant Hearing Officer Burns. *Id.* Defendant Burns found plaintiff guilty of the charges in the misbehavior report and sentenced him to an unidentified amount of additional confinement in SHU. *Id.* [14]

[14]    The amended complaint lacks any allegations indicating the amount of SHU confinement imposed on plaintiff, or that defendant Burns was aware of plaintiff's mental health issues, or how much additional SHU confinement plaintiff already faced as a result of prior disciplinary sentences.

### 9. 2019 Incidents at Mid-State Correctional Facility Giving Rise to SHU Confinement

**\*5**  On or about April 2, 2019, plaintiff was transferred to Mid-State Correctional Facility. Am. Compl. at 22. On July 7, 2019, defendant Corrections Officer Annarino issued plaintiff a "disciplinary infraction" falsely charging him with using inappropriate language directed at her. *Id.* at 3-4. As a result of the disciplinary infraction, plaintiff was "placed on recreation deprivation" by defendant Corrections Sergeant Burns, which lasted approximately four (4) days. *Id.* at 3; Letter Request at 1-2. [15]

15    Plaintiff's Letter Request clarifies plaintiff's desire
to name Corrections Sergeant Burns as a defendant.
It is unclear whether this individual is the same
individual with the last name "Burns" who presided
over plaintiff's disciplinary hearing at Attica
Correctional Facility. However, because plaintiff
named Hearing Officer Burns as a defendant in
the "parties" section of the amended complaint,
and sought to add Corrections Sergeant Burns
as a defendant in his Letter Request, the Court
assumes that there are two individuals with the
last name "Burns" that plaintiff desires to name as
defendants.

On or about July 18, 2019, plaintiff's disciplinary
hearing arising out of the disciplinary infraction issued
by defendant Annarino commenced before defendant
Corrections Lieutenant Klein. Am. Compl. at 3. Defendant
Annarino testified during the hearing that plaintiff used
the inappropriate language described in the disciplinary
infraction. *Id.* at 4. However, defendant Annarino was unable
to identify any witness who could support her version of
events. *Id.*

Following defendant Annarino's testimony, plaintiff
requested "audio/video" footage from the date of the
charged incident to rebut defendant Annarino's testimony,
and defendant Klein postponed the hearing to "determine
if the audio was intelligible[.]" Am. Compl. at 4. Upon
reconvening the disciplinary hearing, defendant Klein stated
for the record that the "video part of the surveillance" from
July 7, 2019, was "not working[.]" *Id.* at 5. Plaintiff then
requested to call his "neighbors or the state actors known to
walk the area of the incident" to rebut defendant Annarino's
testimony. *Id.* Defendant Klein denied plaintiff's request and
found him guilty of the charges in the disciplinary infraction.
*Id.* Plaintiff's disciplinary sentence included revocation of his
"phone incentive," a $5.00 fine, and 30 days of keeplock
confinement. *Id.* at 5-6.

Following the disciplinary hearing, defendant Corrections
Officer Riley relocated plaintiff's cell to a cell with a less
preferable view, which adversely impacted plaintiff's mental
state. *Id.* at 6-7; Letter Request at 1. 16

16    The Letter Request clarifies plaintiff's desire to
name Corrections Officer Riley as the person
allegedly responsible for plaintiff's cell relocation.

In September, 2019, plaintiff's "progress into Phase 3 [of
the] Step Down Program" was delayed by one week by "the
counselors of the Step Down Program," defendants Diego,
Loomis, Martin, Strajack, Fischer, "Ms. C" and "Ms. A." Am.
Compl. at 6, 17. Because of the one-week delay in plaintiff's
progression to Phase 3 of the Step Down program, plaintiff's
access to commissary buy privileges was also delayed. *Id.* at
6.

On September 12, 2019, plaintiff was extradited to the
Baltimore County Detention Center. Am. Compl. at 17. On
October 27, 2019, plaintiff was placed in protective custody
at that facility. *Id.*

### 10. Supervisory Officials

Both current DOCCS Commissioner Anthony Annucci
and former DOCCS Commissioner Brian Fischer allowed
plaintiff's "prohibited extensive SHU/keeplock confinement
sentences" despite knowing that the Honorable Shira A.
Scheindlin preliminarily approved a settlement agreement
in *Peoples v. Fischer*, which prohibited "harsh and
disproportionate" SHU sentences. Am. Compl. at 42-44. 17

17    As noted in the October 2019 Order, in December,
2015, the Honorable Shira A. Scheindlin
preliminarily approved a settlement agreement in
the consolidated action, and conditionally certified
a class of all inmates in DOCCS custody who
were then serving, or would serve in the future,
a disciplinary confinement sanction in a SHU.
*See* October 2019 Order at 6-7 (citing *Peoples
v. Fischer*, No. 11-CV-02694 (S.D.N.Y.), Dkt.
Nos. 144, 329). On March 31, 2016, Judge
Scheindlin granted the final joint motion for
settlement approval, and in doing so, approved the
parties' settlement agreement. *Id.* (citing *Peoples
v. Fischer*, No. 11-CV-02694 (S.D.N.Y.), Dkt. No.
329).

### 11. Section 1983 Claims

**\*6** Liberally construed, the amended complaint asserts
the following Section 1983 claims against the defendants
in their individual and official capacities: (1) a First
Amendment free-flow-of-mail claim against defendant
Corrections Officer John Doe from Auburn Correctional

Facility; (2) Eighth Amendment conditions-of-confinement claims against defendants Annarino and Burns based on the revocation of plaintiff's recreation privileges; (3) an Eighth Amendment conditions-of-confinement claim against defendant Riley based on the relocation of plaintiff's cell; (4) Eighth Amendment conditions-of-confinement claims against defendants Mogavero, Cantwell, Klein, Hearing Officer Burns, Annucci, and Brian Fischer based on plaintiff's SHU confinement; (5) an Eighth Amendment failure-to-protect claim against defendant Corrections Sergeant John Doe from Elmira Correctional Facility; (6) Fourteenth Amendment due process claims against defendants Annarino and Corrections Sergeant Burns based on the revocation of plaintiff's recreation privileges; (7) a Fourteenth Amendment due process claim against defendants Diego, Loomis, Martin, Strajack, Fischer, "Ms. C" and "Ms. A" based on delaying plaintiff's progression through the "Step Down Program"; and (8) Fourteenth Amendment disciplinary due process claims against defendants Mogavero, Cantwell, Klein, and Hearing Officer Burns.

Plaintiff seeks monetary damages. Am. Compl. at 17. For a more complete statement of plaintiff's claims, reference is made to the amended complaint.

### C. Severance and Transfer of Failure-to-Protect Claim

Rule 21 of the Federal Rules of Civil Procedure permits the Court to sever any claim against a party and proceed with that claim separately. Fed. R. Civ. P. 21. In deciding whether to sever a claim, the Court should consider the following:

> (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.

Morris v. Northrop Grumman Corp., 37 F. Supp. 2d 556, 580 (E.D.N.Y. 1999). "A claim may be severed based upon lack of a significant relationship between defendants or solely for

the purpose of facilitating transfer. Where the administration of justice would be materially advanced by severance and transfer, a court may properly sever the claims against one or more defendants for the purpose of permitting the transfer of the action against other defendants." Cain v. New York State Bd. of Elections, 630 F. Supp. 221, 225-26 (E.D.N.Y. 1986). "A decision to sever lies within the discretion of the Court." Id. at 225.

Here, plaintiff's failure-to-protect claim arising out of his confinement at Elmira Correctional Facility is more appropriately heard in the Western District of New York ("Western District"), where that facility is located. The allegations pertaining to this claim involve a different defendant than the allegations pertaining to plaintiff's other claims, and the failure-to-protect claim is based on a discrete event, which bears no relationship to plaintiff's other claims or SHU confinement. Thus, the witnesses and documentary proof will be distinct. In addition, the Court is sensitive to the burden, upon both the individuals and the taxpayers of New York, of requiring individuals who are employed and most likely reside in the Western District to travel to the Northern District to defend against allegations that occurred in the Western District.

For the foregoing reasons, and because the amended complaint fails to state a cognizable claim against any other official from Elmira Correctional Facility for the reasons discussed more fully below, plaintiff's failure-to-protect claim arising out of wrongdoing that allegedly occurred at Elmira Correctional Facility (and the named defendant against whom this claim is asserted) is severed from this amended complaint and venue of the claim (and related defendant) is transferred to the Western District in the interests of justice and judicial efficiency. The Court makes no ruling as to the sufficiency of the failure-to-protect claim, thereby leaving that determination to the Western District of New York.

### D. Analysis of Plaintiff's Remaining Claims

**\*7** Plaintiff seeks relief pursuant to Section 1983, which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." German v. Fed. Home Loan Mortg. Corp., 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 508 (1990)); see also Myers v. Wollowitz, No. 6:95-CV-0272 (TJM/RWS), 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (finding that "[Section] 1983 is the vehicle by which individuals

may seek redress for alleged violations of their constitutional rights").

### 1. Official Capacity Claims

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. *Gollomp v. Spitzer,* 568 F.3d 355, 365-66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through Section 1983, *see Quern v. Jordan,* 440 U.S. 332, 343-45 (1979), and that New York State has not waived its immunity from suit on the claims asserted in plaintiff's amended complaint. *See generally Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 38-40 (2d Cir. 1977); *Dawkins v. State of New York,* No. 5:93-CV-1298 (RSP/GJD), 1996 WL 156764 at *2 (N.D.N.Y. 1996).

In addition, the Eleventh Amendment bars suits for damages against state officials acting in their official capacities. *See Kentucky v. Graham,* 473 U.S. 159, 169 (1985) (a claim for damages against state officials in their official capacity is considered to be a claim against the State and is therefore barred by the Eleventh Amendment); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir. 1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities.").

Accordingly, to the extent that plaintiff seeks monetary damages under Section 1983 against any defendant in his or her official capacity, such claims are dismissed with prejudice

pursuant to 28 U.S.C. § 1915A(b) as barred by the Eleventh Amendment. [18]

[18]     In *Ex Parte Young,* 209 U.S. 123 (1908), the Supreme Court established an exception to state sovereign immunity in federal actions where an individual brings an action seeking injunctive relief against a state official for an ongoing violation of law or the Constitution. Under the doctrine, a suit may proceed against a state official in his or her official capacity, notwithstanding the Eleventh Amendment, when a plaintiff, "(a) alleges an ongoing violation of federal law, and (b) seeks relief properly characterized as prospective." *See In re Deposit Ins. Agency,* 482 F.3d 612, 618 (2d Cir. 2007) (quotations and citations omitted); *see also Santiago v. New York State Dep't of Corr. Serv.,* 945 F.2d 25, 32 (2d Cir. 1991) (holding that such claims, however, cannot be brought directly against the state, or a state agency, but only against state officials in their official capacities). In this case, plaintiff has not sought injunctive relief or alleged facts which plausibly suggest the existence of an ongoing violation of law or the Constitution. *See generally,* Am. Compl.

### 2. Defendant Brian Fischer

**\*8**  The events giving rise to plaintiff's claims began in August, 2016. Publically available information on the DOCCS website makes clear that Brian Fischer retired as the Commissioner of DOCCS on April 30, 2013. *See* http://www.doccs.ny.gov/NewsRoom/external_news/2013-03-04_Fischer_Retirement_Letter. pdf (last visited Jan. 22, 2020). [19] Thus, there is no basis for the Court to plausibly infer that defendant Fischer was personally involved in any of the wrongdoing alleged in the amended complaint.

[19]     Pursuant to Fed. R. Evid. 201, a court may at any stage of a proceeding take judicial notice of "a fact that is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." This includes "information publicly announced

on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.' " *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n. 8 (S.D.N.Y. 2006) (quoting prior version of Fed. R. Evid. 201(b) amended in 2011 as part of the restyling of the Evidence Rules). The accuracy and authenticity of DOCCS's website cannot reasonably be questioned.

Accordingly, defendant Fischer, and all claims asserted against him, are dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 3. First Amendment Free-Flow-of-Mail Claim

"[A] prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). A prisoner's mail may only be restricted to further " 'one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.' " *Id.* (quoting *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986)). "The First Amendment protects prisoners' access to mail directly, unlike the right of access to courts, which protects prisoners' access to mail only derivatively and with respect to given claims." *Bellezza v. Holland*, No. 09-CV-8434, 2011 WL 2848141, at *6 (S.D.N.Y. July 12, 2011) (dismissing access-to-the-courts claim for failure to allege injury, but holding that plaintiff adequately alleged a violation of his right to send and receive mail). "It is thus not necessary to allege actual injury when asserting a violation of one's right to the free flow of mail." *Antrobus v. City of New York*, No. 11-CV-2524, 2014 WL 1285648, at *4 (S.D.N.Y. Mar. 27, 2014) (citations omitted).

As courts have attempted to balance the competing interests implicated when facilities place restrictions on prison mail, the courts have "consistently afforded greater protection to legal mail than to non-legal mail[.]" *Davis*, 320 F.3d at 351. "While a prisoner has a right to be present when his legal mail is opened, ... an isolated incident of mail tampering is usually insufficient to establish a constitutional violation." *Davis*, 320 F.3d at 351 (citations omitted). However, in *Washington v. James*, the Second Circuit found that "as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the

tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Davis*, 320 F.3d at 351 (citing *Washington*, 782 F.2d at 1139); *see also Turner v. Safley*, 482 U.S. 78, 84-91 (1987) (prison regulations impinging constitutional rights must be "reasonably related to legitimate penological interests").

**\*9** In this case, plaintiff alleges that on one occasion, defendant Corrections Officer John Doe refused to accept plaintiff's grievance for filing. Am. Compl. at 2. As an initial matter, inmates do not have a constitutional right to state grievance programs. *See Shell v. Brzeniak*, 365 F. Supp. 2d 362, 370 (W.D.N.Y. 2005) ("[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does [sic] not give rise to a cognizable § 1983 claim."); *Davis v. Buffardi*, No. 9:01-CV-0285 (PAM/GJD), 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) ("[P]articipation in an inmate grievance process is not a constitutionally protected right."); *Cancel v. Goord*, No. 00-CV-2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) (holding that "inmate grievance procedures are not required by the Constitution" and therefore failure to see to it that grievances are properly processed does not create a claim under Section 1983).

Furthermore, the amended complaint is devoid of any allegations which plausibly suggest that Corrections Officer John Doe's alleged refusal to accept plaintiff's grievance for filing on one occasion was part of an ongoing practice of censorship unjustified by a substantial government interest, or unjustifiably chilled plaintiff's right of access to the courts or impaired his legal representation. Moreover, the amended complaint lacks any allegations that Corrections Officer John Doe refused to deliver plaintiff's mail thereafter.

Accordingly, plaintiff's First Amendment free-flow-of-mail claim is dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 4. Eighth Amendment Conditions-of-Confinement Claims

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Although it is clear that the Eighth Amendment "does not mandate comfortable prisons," it does

not permit inhumane treatment of those in custody. *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) and *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). Prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

"Prison officials are liable under the Eighth Amendment for harm incurred by an inmate if they act with deliberate indifference to the inmate's safety." *Price v. Oropallo*, No. 13-CV-563, 2014 WL 4146276, at *8 (N.D.N.Y. Aug. 19, 2014). To satisfy the deliberate indifference standard, a plaintiff must show that (1) "he is incarcerated under conditions posing a substantial risk of serious harm," and (2) "the defendant prison officials possessed sufficient culpable intent." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer*, 511 U.S. at 834). The first prong is objective and requires that prison officials provide inmates with "basic human needs, one of which is 'reasonable safety.' " *Helling v. McKinney*, 509 U.S. 25, 30, 33 (1993) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199 (1989)). "The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry." *Hayes*, 84 F.3d at 620. In particular, "a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Id.* As the Supreme Court has made clear, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

### a. Annarino and Corrections Sergeant Burns

**\*10** Liberally construed, the amended complaint asserts a conditions-of-confinement claim against defendants Annarino and Corrections Sergeant Burns based on allegations that they engaged in conduct that deprived him of recreation on four consecutive days, even though plaintiff had yet to receive his disciplinary hearing on the charges in the misbehavior report issued by defendant Annarino. *See* Am. Compl. at 3-4; Letter Request at 1-2. Setting aside the conclusory nature of plaintiff's allegations, it is well-settled that the denial of recreation for such a limited number of days is not sufficiently severe and prolonged to rise to the level of an Eighth Amendment violation. *See,*

*e.g., Branham v. Meachum*, 77 F.3d 626, 630-31 (2d Cir. 1996) (finding that keeping inmate on lockdown and "full restraint" status without outdoor exercise for a period of approximately twenty-two days was insufficient to satisfy the subjective prong and therefore does not violate the Eighth Amendment); *Dumpson v. Goord*, No. 00-CV-6039, 2011 WL 4345760, at *9 (W.D.N.Y. Sep. 15, 2011) (denial of recreation for two weeks "does not reach the level of an objectively unconstitutional deprivation of exercise"); *Houston v. Goord*, No. 9:03-CV-1412 (GTS/DEP), 2009 WL 890658, at *15 (N.D.N.Y. Mar. 31, 2009) (declaring Eighth Amendment claim without merit because denial of opportunity to exercise outdoors for less than two weeks was de minimis); *Barnes v. Craft*, No. 9:04-CV-1269 (NAM/GHL), 2008 WL 3884369, at *9 (N.D.N.Y. Aug. 18, 2008) (denial of outdoor exercise "for six days [was] simply not sufficiently severe and prolonged to rise to the level of an Eighth Amendment violation"); *Gibson v. City of N.Y.*, No. 96-CV-3409, 1998 WL 146688, at *3 (S.D.N.Y. Mar. 25, 1998) (finding the "deprivation of the opportunity to participate in recreation for eight days in a sixty day period, even when coupled with the deprivation of an opportunity to exercise on two consecutive days" was not sufficiently serious); *Davidson v. Coughlin*, 968 F. Supp. 121, 131 (S.D.N.Y. 1997) (deprivation of outdoor exercise for fourteen days did not violate Eighth Amendment); *cf. Anderson v. Coughlin*, 757 F.2d 32, 36 (2d Cir. 1985) ("[A]n occasional day without exercise when weather conditions preclude outdoor activities ... is not cruel and unusual punishment.").

Accordingly, plaintiff's Eighth Amendment conditions-of-confinement claims against defendants Annarino and Corrections Sergeant Burns are dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### b. Riley

Plaintiff separately asserts a conditions-of-confinement claim against defendant Riley based on allegations that he moved plaintiff from a cell with a desirable view to a cell with a more limited and depressing view, which adversely impacted plaintiff's mental state at Mid-State Correctional Facility. Am. Compl. at 6-7; Letter Request at 1.

As an initial matter, plaintiff generally does not have a constitutional right to the cell of his choosing. *See, e.g., White v. Williams*, 9:12-CV-1775 (NAM/RFT), 2014 WL 1672634,

at *2 (N.D.N.Y. Apr. 28, 2014) ("[T]he law is clear that an inmate does not have a right to be confined to the prison of his own choosing or to a particular type of housing." (collecting cases)); *Cagle v. Gravlin*, No. 09-CV-0648 (FJS/GHL), 2010 WL 2088267, at *4 (N.D.N.Y. Apr. 29, 2010) ("I can find no case holding that a prisoner has a constitutional right either to the cell of his choice or to disobey a direct order."), *report and recommendation adopted by* 2010 WL 2087437 (N.D.N.Y. May 25, 2010); *Sheehan v. Beyer*, 51 F.3d 1170, 1174 (3d Cir. 1995) ("An inmate does not have a right to be placed in the cell of his choice."). Moreover, housing an inmate in a cell with an obstructed view of outdoor scenery "falls far short of the type of deprivation that would implicate a 'denial of the minimal civilized measure of life's necessities.' " *Taylor v. Halladay*, No. 9:09-CV-0385 (FJS/DEP), 2010 WL 3120036, at *7 (N.D.N.Y. July 1, 2010) (rejecting plaintiff's claim that his Eighth Amendment rights were violated when he was placed in a cell with a window covered up, which precluded his ability to look outside (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)), *report and recommendation adopted by* 2010 WL 3155730 (N.D.N.Y. Aug. 9, 2010); *see also Williams v. Adams*, 143 Fed. App'x 76 (9th Cir. 2005) (affirming summary judgment dismissing plaintiff's claim that frosted cell window deprived him of natural light and constituted an Eighth Amendment violation)).

Accordingly, plaintiff's Eighth Amendment conditions-of-confinement claim against defendant Riley is dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### c. Mogavero, Cantwell, Klein, and Hearing Officer Burns

**\*11**  Plaintiff asserts Eighth Amendment conditions-of-confinement claims against defendants Mogavero, Cantwell, Klein, and Hearing Officer Burns based on allegations that they wrongfully imposed excessive SHU sentences on him, in disregard of his mental health.

Generally speaking, confining an inmate in SHU, without more, and notwithstanding the restrictions that such confinement imposes on inmate life, does not constitute cruel and unusual punishment. *See Bowens v. Smith*, No. 9:11-CV-784, 2013 WL 103575, at *10 (N.D.N.Y. Jan. 8, 2013) ("Confinement in SHU, in itself, notwithstanding its additional restrictions on inmates, has not been held to constitute cruel and unusual punishment."), *report and*

*recommendation adopted by* 2013 WL 103596 (N.D.N.Y. Jan. 8, 2013); *Hamilton v. Fisher*, No. 9:10-CV-1066 (MAD/RFT), 2012 WL 987374, at *8 (N.D.N.Y. Feb. 29, 2012) (" '[N]ormal' conditions of SHU confinement do not constitute an Eighth Amendment violation." (citations omitted)), *report and recommendation adopted by* 2012 WL 987122 (N.D.N.Y. Mar. 22, 2012). "However, courts are also cognizant that 'the deleterious effects of isolated housing on inmates—especially to those assigned to long-term solitary confinement—are well-known and amply documented,' including the fact that prolonged solitary confinement 'can and does lead to significant psychological harm.' " *Smith v. Annucci*, No. 18-CV-06261, 2019 WL 539935, at *6 (W.D.N.Y. Feb. 11, 2019) (quoting *Peoples v. Annucci*, 180 F. Supp. 3d 294, 299 (S.D.N.Y. 2016)). "Accordingly, courts have found Eighth Amendment violations where inmates are held in solitary confinement for extended periods of time, such that the effects are 'grossly disproportionate' to the reasons for the isolation." *Smith*, 2019 WL 539935, at *6 (citing, *inter alia, Peoples v. Fischer*, 898 F. Supp. 2d 618, 621 (S.D.N.Y. 2012)).

As an initial matter, the allegations in the amended complaint make clear that the entirety of plaintiff's SHU confinement was disciplinary. *See generally*, Am. Compl. [20] Furthermore, plaintiff appears to accept guilt for multiple charges related to assaulting other inmates and staff, and engaging in lewd acts in front of staff. *See* Am. Compl. at 8, 12, 21, 25-26, 30-31, 36-38. Thus, this case is not analogous to those in which inmates have challenged their administrative SHU confinement after the completion of their disciplinary sentences as excessive. Rather, it appears to be plaintiff's claim that, after a certain unidentified period of time, imposing SHU confinement for disciplinary infractions constituted cruel and unusual punishment, regardless of the nature of his own actions that resulted in the SHU sentences. While the Court declines to blanketly accept such a nebulous contention, a further discussion is necessary to explain why the allegations in the amended complaint are insufficient to state an Eighth Amendment claim with respect to any of the imposed SHU sentences.

[20]  Part 301 of the New York Code, Rules and Regulations lists the grounds for special housing unit admissions, which include disciplinary, detention, administrative segregation, and protective custody.

### (i) 2016 SHU Sentences

With respect to plaintiff's initial SHU confinement, plaintiff alleges that in August, 2016, he began serving a six month SHU sentence while at Auburn Correctional Facility for "disobeying the direct orders of an officer" and "squeez[ing] the contents [of a lotion bottle]" on that officer. Am. Compl. at 9, 18-19. Plaintiff further alleges that before the expiration of this initial SHU confinement period, he received additional disciplinary charges while at Southport Correctional Facility, which resulted in one or more sentences of additional SHU confinement that continued until April, 2017, when he was transferred to Elmira Correctional Facility and placed on keeplock status, apparently to conclude the disciplinary sentence he received at Southport Correctional Facility. Am. Compl. at 20-21. [21]

[21]    By plaintiff's own allegations, he was released from SHU and confined to his cell on keeplock status for twenty-seven days while housed at Elmira Correctional Facility. Am. Compl. at 12, 20.

**\*12** The amended complaint is devoid of any allegations explaining the nature of the disciplinary charges that resulted in plaintiff's initial SHU confinement beyond six months. Furthermore, the amended complaint lacks any allegations which plausibly suggest that any of the hearing officers who imposed disciplinary sentences that resulted in plaintiff's SHU confinement between August, 2016 and April, 2017, were aware that plaintiff was suffering from any mental health problems likely to be impacted by SHU confinement. Indeed, plaintiff does not even allege that he was suffering from mental health problems during this time. Thus, there is no basis for the Court to plausibly infer that plaintiff's SHU confinement between August, 2016 and April, 2017, was grossly disproportionate to the charged violations and/or imposed out of deliberate indifference to a significant risk to plaintiff's well-being.

### (ii) SHU Sentence in May 2017

Plaintiff alleges that three days before the conclusion of the disciplinary sentences imposed in 2016, he was placed in SHU for six months after he was found guilty of being involved in an altercation with another inmate. *See* Am. Compl. at 12, 20-21. Plaintiff does not deny his involvement in the altercation, and in fact alleges that he cut the inmate he

fought with a weapon. *Id.* at 26-27. In addition, the amended complaint lacks any allegations which plausibly suggest that the hearing officer who imposed this disciplinary sentence did so despite knowing that plaintiff was suffering from mental health problems likely to be impacted by SHU confinement. Thus, there is no basis to plausibly infer that the disciplinary sentence of SHU confinement imposed following plaintiff's placement on keeplock status was grossly disproportionate to the charged violation and/or issued out of deliberate indifference to a significant risk to plaintiff's well-being.

### (iii) SHU Sentences After May 2017

Plaintiff alleges that he received at least fifteen disciplinary charges between June, 2017 and July, 2019, including charges for assaulting other inmates and a corrections official. Am. Compl. at 3-5, 7-8, 12-13, 30-31, 36-38. The amended complaint lacks any allegations indicating the amount of SHU confinement imposed on plaintiff for any of the disciplinary sentences he received between June, 2017 and February, 2019, and contains virtually no details regarding plaintiff's conduct giving rise to these charges. In addition, although plaintiff alleges that he was sentenced to 30 days of SHU confinement at his most recent disciplinary hearing in July, 2019, the amended complaint does not contain any allegations which plausibly suggest that the hearing officer, defendant Klein, or any of the other hearing officers who imposed disciplinary sentences after May, 2017, were aware, before sentencing plaintiff, either of how much time he had already spent in SHU, or how much additional SHU time he was already facing as a result of prior disciplinary sentences. Nor does the amended complaint contain any allegations which plausibly suggest that any of the hearing officers who sentenced plaintiff to SHU confinement between June, 2017 and July, 2019 were aware that he was suffering from a mental illness impacted by SHU confinement.

Moreover, pursuant to 7 NYCRR § 254.6(b), a hearing officer presiding over a disciplinary hearing is required to "consider evidence regarding the inmate's mental condition ... at the time of the incident and at the time of the hearing" when the inmate's mental state is "at issue." The regulation expressly states that an inmate's mental state is "at issue" when

> (i) the inmate is classified as level 1 by
> the Office of Mental Health (OMH),
> as indicated on the hearing record

sheet; (ii) the inmate is designated as an "S" by OMH, as indicated on the hearing record sheet; (iii) the inmate is charged with engaging in an act of self-harm in violation of rule 123.10 (section 270.2(B)(23)(i) of this Title), as indicated on the misbehavior report; (iv) the incident occurred while the inmate was being transported to or from the Central New York Psychiatric Center (CNYPC), as alleged in the misbehavior report; (v) the inmate was an inpatient at the CNYPC within nine months prior to the incident, as indicated on the hearing record sheet; (vi) the incident occurred while the inmate was assigned to an OMH satellite unit, or intermediate care program, as indicated on the hearing record sheet; (vii) the incident occurred while the inmate was being escorted to or from an OMH satellite unit or intermediate care program, as alleged in the misbehavior report; (viii) the hearing was delayed or adjourned, after an extension of time was obtained in accordance with section 251-5.1 of this Title, because the inmate became an inpatient at the CNYPC or was assigned to the OMH satellite unit; or (ix) it appears to the hearing officer, based on the inmate's testimony, demeanor, the circumstances of the alleged offense or any other reason, that the inmate may have been mentally impaired at the time of the incident or may be mentally impaired at the time of the hearing.

**\*13** 7 NYCRR § 254.6(b)(1)(i)-(ix).

When an inmate's mental state is "at issue," the hearing officer is required to undertake steps to ensure that the inmate understands the disciplinary charge(s), the purpose of the hearing, and the role of the participants in the hearing, and evaluate the inmate's mental condition at the time of the incident and the hearing. 7 NYCRR § 254.6(c). In addition, if it is determined that the inmate whose mental state is "at

issue" is "capable of proceeding with the hearing[,] and a finding of guilt is subsequently made with regard to one or more of the charges," the hearing officer is required to "consider the inmate's mental condition ... at the time of the incident ... in determining the appropriate penalty to be imposed[,]" and may dismiss the charge(s) altogether if the officer believes that a penalty would "serve no useful purpose[.]" 7 NYCRR § 254.6(f). When the inmate's mental state is "at issue," the written disposition of the charges must also "reflect how the inmate's mental condition ... was considered." *Id.*

Thus, even if the Court were to assume that each hearing officer who presided over plaintiff's disciplinary hearings in and after June, 2017, was aware that plaintiff was suffering from a mental health issue at the time of the disciplinary event or hearing,[22] the amended complaint fails to allege facts which plausibly suggest that plaintiff's mental health was not taken into consideration by any of these hearing officers when his disciplinary sentences were imposed. For example, plaintiff does not allege that any hearing officer failed to investigate his mental condition at the time of the charged infraction or hearing, or advise him in the written disposition how his mental health was considered. Nor does plaintiff allege that any medical professional recommended against a disciplinary sentence of SHU confinement, which was nonetheless imposed by one or more hearing officers.[23] Plaintiff also does not allege that he appealed any of the disciplinary sentences that included SHU confinement.

[22]    Plaintiff conclusorily alleges that by June, 2018, it became apparent that he was suffering from mental health issues impacted by his SHU confinement. *See* Am. Compl. at 15.

[23]    Plaintiff attached documents to the original complaint showing that between July, 2018, and March, 2019, he received a mental health examination by a medical professional roughly once a month. *See* Dkt. No. 1-1 at 37-48.

In other words, the Court has no basis to plausibly infer from the allegations in the amended complaint, or documents attached to the original complaint, that any hearing officer imposed a disciplinary sentence of SHU confinement on plaintiff in deliberate disregard to his mental condition, and the impact SHU confinement might have on him. There is also no basis to infer from the allegations in the amended complaint that any of the imposed sentences of SHU

confinement were grossly disproportionate to the charged misconduct.

For all of these reasons, plaintiff's Eighth Amendment conditions-of-confinement claims against defendants Mogavero, Cantwell, Klein, and Hearing Officer Burns are dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### d. Annucci

**\*14** Insofar as plaintiff has asserted a conditions-of-confinement claim against defendant Annucci for allegedly failing to take steps to either shorten plaintiff's period of SHU confinement due to his mental health condition(s), or prevent plaintiff from suffering an indefinite period of SHU confinement, his claim must be dismissed because the amended complaint fails to adequately plead that plaintiff's placement in SHU at any point violated his Eighth Amendment rights. *See Toole v. Connell*, No. 9:04-CV-0724 (LEK/DEP), 2008 WL 4186334, at *7 (N.D.N.Y. Sep. 10, 2008) (Peebles, M.J.), *report and recommendation adopted by* 2008 WL 4186334, at *1 (supervisory defendant cannot be liable for failing to investigate or correct conduct that has already been found to be not actionable under section 1983); *see also Linares v. Mahunik*, No. 9:05-CV-625 (GLS/RJT), 2006 WL 2595200, at *11 (N.D.N.Y. Sept. 11, 2006), *report and recommendation adopted by* 2006 WL 2595200, at *1 (plaintiff could not "sustain a supervisory liability claim as there was no wrong for [supervisor-defendant] to remedy since there [was] no constitutional violation"); *Johnson v. McClure*, No. 9:06-CV-0431 (GTS/DEP), 2009 WL 2356147, at *20 (N.D.N.Y. May 11, 2009) ("Rather than providing an independent basis for a cause of action, supervisory liability on the part of any of the defendants is more appropriately considered in the context of each of the substantive constitutional claims raised in the case. Since I have recommended dismissal of each of those claims, there is therefore no basis to find supervisory liability in connection with any of them."), *report and recommendation adopted by* 2009 WL 2356147, at *1-3 (N.D.N.Y. July 28, 2009).[24]

[24] Prior to *Iqbal*, the Second Circuit held that supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or

appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)). The Second Circuit has not yet addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing supervisory liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of *Iqbal* on *Colon* because the complaint "did not adequately plead the Warden's personal involvement even under *Colon*); *see also Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) (expressing "no view on the extent to which [*Iqbal*] may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations[.]" (citing *Grullon*, 720 F.3d at 139)). For purposes of this Decision and Order, the Court assumes that all five categories under *Colon* remain valid.

Furthermore, even if plaintiff had alleged sufficient facts to plausibly suggest that one or more of his SHU sentences was cruel and unusual, the amended complaint lacks any allegations which plausibly suggest that procedural safeguards were not implemented or followed to ensure that plaintiff was not forced to remain confined in SHU despite a significant risk to his mental health. To the contrary, by plaintiff's own allegations, he was in "phase 2" of a "Step-Down Program" in September, 2019, and on track to be released from SHU in less than nine months, despite disciplinary determinations that were supposed to keep him in SHU through at least March, 2023. Am. Compl. at 40.

In addition, plaintiff alleges that he was transferred to Clinton Correctional Facility on August 31, 2018, for better mental health treatment. Am. Compl. at 21, 31. Thereafter, he was transferred to Attica Correctional Facility and then Mid-State Correctional Facility before his transfer out of state to the Baltimore County Detention Facility. Publically available information on the New York State Office of Mental Health's website makes clear that each of these facilities

is a level 1 facility. *See* https://www.omh.ny.gov/omhweb/
facilities/cnpc/satellite.pdf (last visited Jan. 22, 2020). [25]

[25]    The accuracy and authenticity of OMH's website
cannot reasonably be questioned.

**\*15** Pursuant to 7 NYCRR § 310.1, each correctional
facility designated as level 1 by the Office of Mental Health
("OMH") must set up "a committee to be known as the
special housing unit case management committee[,]" which
must be "co-chaired by the first deputy superintendent or
deputy superintendent for security or designee and the unit
chief or clinical director of the OMH mental health satellite
unit or designee." Each co-chairperson must also select at
least two individuals to sit as additional committee members
from among a select list, and "[i]f the OMH co-chairperson
is not a clinician[,] at least one of the additional individuals
selected to sit on the committee shall be an OMH clinician."
*Id.* Pursuant to 7 NYCRR § 310.2, the special housing unit
case management committee is assigned to

> review, monitor and coordinate the
> behavior and treatment plan for
> those inmates assigned to SHU in
> a correctional facility designated as
> level 1 by OMH who are on the
> OMH mental health caseload and other
> SHU inmates based upon a recent
> request to the committee from OMH
> or department staff, and to initially
> review the status of all inmates newly
> assigned to SHU in a correctional
> facility designated as level 1 by OMH
> following a superintendent's hearing
> in which the inmate's mental state ...
> was deemed to be at issue[.]

After reviewing the inmate's status, which includes
discussing the inmate's disciplinary and criminal history,
mental health diagnoses, and treatment needs, the committee
may, among other things, "recommend to the superintendent
the temporary or permanent restoration of one or more
privileges, the suspension or reduction of confinement time,
or a housing reassignment." 7 NYCRR § 310.2(c), (d)(1).

Thus, assuming plaintiff's mental condition was "at issue"
during any of his disciplinary hearings after August 31,

2018, or that he was on the OMH mental health caseload at
at least one medical professional from the special housing
unit case management committee was supposed to evaluate
the medical effects, if any, of plaintiff's continued SHU
confinement. [26] Moreover, it is clear from the documents
attached to the original complaint that plaintiff received
mental health evaluations throughout 2018 and 2019. *See* Am.
Compl. at 14, 21, 29, 32; Dkt. No. 1-1 at 2-48.

[26]    Plaintiff was evaluated by OMH professionals
several times throughout 2018. *See* Dkt. No. 1-1
at 2-48. In addition, as noted, between July 2018,
and March, 2019, plaintiff received a mental health
examination by a medical professional roughly
once a month. *Id.* at 37-48. Thus, if plaintiff was
never evaluated by a special housing unit case
management committee, it appears that would be
because of a determination by one or more OMH
professionals that he was not suffering from a
condition that (1) placed his mental health "at
issue" during any of his disciplinary hearings, or
(2) warranted placement on the OMH mental health
caseload. A non-medical professional's deference
to such a determination does not give rise to a
cognizable Eighth Amendment claim against that
official. *See Sharma v. D'Silva*, 157 F. Supp. 3d 293,
305 (S.D.N.Y. Jan. 25, 2016) ("As a non-medical
official, Defendant Annucci was not in a position
to critically evaluate the quality of Plaintiff's
medical treatment nor was he required to engage
in a deep-dive investigation of the exact nature
of Plaintiff's medical ailments. The Court finds
that Defendant Annucci's course of action does not
establish that he acted with deliberate indifference
towards Plaintiff and dismisses Plaintiff's claim
against Defendant Annucci."); *Gonzales v. Wright*,
9:06-CV-1424, 2010 WL 681323, at \*10 (N.D.N.Y.
Feb. 23, 2010) ("The Superintendent's and Deputy
Superintendent's delegation of medical judgment
to appropriate staff was proper as the Second
Circuit has cautioned that non-medical Defendants
should not intercede in the medical care and
treatment of an inmate.") (citing *Cuoco v.
Moritsugu*, 222 F.3d 99, 111(2d Cir. 2000) ("One
can imagine the repercussions if non-medical
prison officials were to attempt to dictate the
specific medical treatment to be given particular
prisoners....")).

**\*16** Simply put, if plaintiff's mental condition might have warranted reducing or ending his SHU confinement, it appears procedures were in place for this to occur, and plaintiff has not alleged otherwise. The Court therefore has no basis to plausibly infer that defendant Annucci failed to take the necessary steps to ensure that plaintiff was not indefinitely confined to SHU, or confined to SHU despite a release being medically necessary.

For all of these reasons, plaintiff's Eighth Amendment conditions-of-confinement claim against defendant Annucci is dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 5. Fourteenth Amendment Due Process Claims

To successfully state a claim under Section 1983 for denial of due process, a plaintiff must establish both the existence of a protected liberty or property interest, and that he or she was deprived of that interest without being afforded sufficient process. *Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004) (citing *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989)). Due process generally requires that the state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003).

An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995). The duration of the challenged confinement, while not determinative, is a significant factor under *Sandin*. Although the Second Circuit has declined to provide a bright-line rule as to what duration of punitive confinement implicates a prisoner's constitutional rights, SHU confinement for more than 305 days rises to the level of atypicality. *See Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

### a. Annarino and Corrections Sergeant Burns

As noted, the amended complaint alleges that defendants Annarino and Corrections Sergeant Burns engaged in conduct that denied plaintiff recreation on four consecutive days, even though plaintiff had yet to have his disciplinary hearing on the charges in the misbehavior report issued by defendant Annarino. *See* Am. Compl. at 3-4; Letter Request at 1-2.

It is well-settled that a brief deprivation of recreation privileges, such as that alleged here, does not constitute an atypical and significant hardship implicating a protected liberty interest. *See Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998) (twenty-one days in pre-hearing keeplock not an atypical hardship); *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (eighteen days of administrative confinement and exercise deprivation not an atypical hardship); *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996) (twelve days in pre-hearing confinement not an atypical or significant hardship); *Latona v. Chautauqua Cty. Jail*, No. 97-CV-0661, 2004 WL 2457797, at \*5 (W.D.N.Y. Nov. 2, 2004) (finding that "the 17-day keeplock status and denial of recreation did not create an atypical or significant hardship in relation to the ordinary incidents of prison life [and] [t]hus, the plaintiff ... may not maintain the due process claims asserted in this matter"); *Wells v. Wade*, 36 F. Supp. 2d 154, 158 (S.D.N.Y. 1999) ("Wells's thirteen days of keeplock confinement was less severe than that of the inmate in Sandin both in duration and condition. At his deposition, Wells complained that during his thirteen days of confinement he could not enjoy the same opportunities for recreation normally available to inmates in dormitory housing, including viewing television, cooking, and playing games.... Absent any allegation of unusual conditions, denial of such privileges for less than two weeks does not implicate a liberty interest and is not actionable under § 1983."); *Ragland v. Crawford*, No. 95-CV-10069, 1997 WL 53279, \*3 (S.D.N.Y. Feb. 7, 1997) ("In light of the Court's holding in *Sandin*, neither Ragland's loss of one hour daily recreation time for one week, nor his alleged confinement to keeplock on October 13, 1995, constitutes an atypical, significant hardship implicating a protected liberty interest.").

**\*17** Accordingly, plaintiff's Fourteenth Amendment due process claims against defendants Annarino and Corrections Sergeant Burns are dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. [27]

27  Defendant Annarino's alleged issuance of a false misbehavior report also does not, without more, give rise to a cognizable Section 1983 claim. *See Freeman v. Rideout*, 808 F.2d 949, 950, 953 (2d Cir. 1986) ("[T]he filing of unfounded charges

is not *per se* a constitutional violation under section 1983[.]"); *Mitchell v. Senkowski*, 158 Fed. App'x 346, 349 (2d Cir. 2005) ("The issuance of false misbehavior reports and provision of false testimony against an inmate ... violates due process only where either procedural protections were denied that would have allowed the inmate to expose the falsity of the evidence against him, ..., or where the fabrication of evidence was motivated by a desire to retaliate for the inmate's exercise of his substantive constitutional rights...." (internal citations omitted)).

### b. Diego, Loomis, Martin, Strajack, Fischer, "Ms. C" and "Ms. A"

The amended complaint alleges that in September, 2019, defendants Diego, Loomis, Martin, Strajack, Fischer, "Ms. C" and "Ms. A." delayed plaintiff's "progress into Phase 3 [of the] Step Down Program" by one week, and as a result, plaintiff's SHU confinement and lack of access to commissary buy privileges was extended by one week. *Id.* at 6.

As an initial matter, the amended complaint is devoid of any allegations explaining why plaintiff's progression into "Phase 3" of the "Step-Down Program" was delayed, or if plaintiff was given notice and an opportunity to be heard prior to the alleged delay. Plaintiff also does not explain how or when he was admitted into the program, or under what terms. Thus, the Court has no basis to plausibly infer that the alleged delay was wrongful in any respect. Moreover, it does not appear that plaintiff has a protected liberty interest in participating in the "Step-Down Program," which is apparently a program designed to facilitate plaintiff's early release from SHU confinement. *See Nieves v. Prack*, No. 15-CV-6101, 2016 WL 1165820, at *4 (W.D.N.Y. Mar. 24, 2016) ("[Plaintiff's] claim that his inability ... to participate in various educational, vocational, rehabilitative or self-help programs might have hindered his ability to receive an early parole or release is ... speculative and fails to allege interference with a protected liberty interest.") (citations omitted); *Thompson v. LaClair*, No. 08-CV-0037 (FJS/DEP), 2009 WL 2762164, at *5 (N.D.N.Y. Jan. 30, 2009) ("Courts considering inmate claims regarding [the] denial of participation in or access to prison programs or privileges under *Sandin* have uniformly concluded that inmates do not enjoy a protected liberty interest in such aspects of prison life."), *report and recommendation adopted*

by 2009 WL 2762164 (N.D.N.Y. Aug. 25, 2009). In any event, and even assuming that the State has granted plaintiff a liberty interest in participating in the "Step-Down Program," such a brief denial of plaintiff's progression through the program, which allegedly only had the effect of prolonging his SHU confinement and lack of access to commissary buy privileges by one week, did not impose an "atypical and significant hardship" on plaintiff. *Shariff v. Artuz*, No. 99-CV-0321, 2000 WL 1219381, at *6 (S.D.N.Y. Aug. 28, 2000) (concluding that, even assuming "the State has granted inmates, by regulation or statute, a protected liberty interest ... in participating in Honor Block, it is clear that the mere denial of the extra privileges associated with Honor Block does not impose an 'atypical and significant hardship' on plaintiffs").

**\*18** Accordingly, plaintiff's Fourteenth Amendment due process claims against defendants Diego, Loomis, Martin, Strajack, Fischer, "Ms. C" and "Ms. A" are dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### c. Mogavero, Cantwell, Klein, and Hearing Officer Burns

Liberally construed, the amended complaint alleges that defendants Mogavero, Cantwell, Klein, and Hearing Officer Burns denied plaintiff due process during his disciplinary hearings before them. For purposes of this Decision and Order only, the Court assumes that plaintiff had a protected liberty interest in remaining free from the SHU confinement that resulted from each of the disciplinary sentences imposed by these defendants. Even with that assumption, plaintiff has failed to allege facts which plausibly suggest that any of hearing officers named as defendants denied him the process to which he was entitled during any of his disciplinary hearings.

The due process protections afforded inmates facing disciplinary hearings that affect a liberty or property interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing, *inter alia, Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)). The hearing officer's findings must be supported by "some"

"reliable evidence." *Id.* (citing, *inter alia, Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

With respect to defendants Mogavero, Cantwell, and Hearing Officer Burns, the amended complaint is devoid of any allegations regarding plaintiff's disciplinary hearings before them. Instead, plaintiff simply alleges that these defendants presided over disciplinary hearings that resulted in sentences of SHU confinement. *See* Am. Compl. at 7-12, 14, 21, 37. Thus, plaintiff has failed to allege sufficient facts to plausibly suggest that any of these hearing officers denied him the process to which he was entitled during one or more of his disciplinary hearings before them.

Furthermore, with respect to defendant Klein, plaintiff alleges only that this defendant refused to allow him to call any witnesses to rebut defendant Annarino's testimony that plaintiff directed inappropriate language at her from his cell, which was the basis for the misbehavior report she authored. Am. Compl. at 3-5.

It is well-settled that an inmate's due process right to call witnesses "is not unfettered." *Allen v. Graham*, No. 9:16-CV-47 (GTS/ATB), 2017 WL 9511168, at *15 (N.D.N.Y. Sept. 26, 2017) (citing *Alicea v. Howell*, 387 F. Supp. 2d 227, 234 (W.D.N.Y. 2005) (citing *Ponte v. Real*, 471 U.S. 491, 495 (1985))), *report and recommendation adopted by* 2017 WL 5957742 (N.D.N.Y. Dec. 1, 2017). Rather, it "may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity." *Id.* (citing *Alicea*, 387 F. Supp. 2d at 234). "An inmate's due process right to witnesses is only violated when a prison hearing officer refuses to interview witnesses without assigning a reason 'logically related to preventing undue hazards to 'institutional safety or correctional goals.' '" *Id.* (quoting *Ponte*, 471 U.S. at 497).

**\*19** While plaintiff alleges that he sought to call his "neighbors or the state actors known to walk the area of the incident" to rebut defendant Annarino's testimony, he fails to allege that any of these individuals actually witnessed the events giving rise to the misbehavior report. In addition, based on plaintiff's allegations that he challenged the credibility of defendant Annarino's testimony, and stated his innocence to defendant Klein, *see* Am. Compl. at 4-5, it appears that plaintiff sought to call these witnesses only to further corroborate his version of the events. It is well-settled that "[t]he refusal to call witnesses whose testimony would be redundant is not a violation of any established

due process right." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014); *see also Russell v. Selsky*, 35 F.3d 55, 58-59 (2d Cir. 1994) (prison official "did not violate any clearly established constitutional or statutory right" when he refused to permit inmate's requested witnesses to testify where the witnesses' testimony would have been "duplicative or non-probative"); *Garrett v. Ask-Carlson*, No. 15-CV-0723, 2016 WL 439029, at *4 (S.D.N.Y. Feb. 3, 2016) ("The complaint alleges that inmate Brito witnessed Rodriguez refuse to permit Garrett witness the sealing of his urine sample. If called to testify, the Court assumes Brito would have corroborated Garrett's account. But such corroboration would be merely duplicative of Garrett's own testimony, and thus the hearing officer permissibly exercised his discretion to refuse to call the witness.").

Furthermore, the amended complaint lacks any allegations which plausibly suggest that defendant Klein denied plaintiff's request without assigning a justifiable reason. In addition, there is no basis for the Court to plausibly infer from the allegations in the amended complaint that defendant Klein's determination of guilt was not based on some credible evidence. *See Hinton v. Prack*, 9:12-CV-1844 (LEK/RFT), 2014 WL 4627120, at *15 (N.D.N.Y. Sept. 11, 2014) ("some evidence" standard satisfied where the misbehavior report was made by the officer personally involved in the incident and was based upon his first hand observation and detailed account of the incident); *Creech v. Schoellkoph*, 688 F. Supp. 2d 205, 214 (W.D.N.Y. 2010) (same). Thus, plaintiff has failed to allege sufficient facts to plausibly suggest that defendant Klein denied him the process to which he was entitled during his disciplinary hearing in July, 2019.

Accordingly, plaintiff's Fourteenth Amendment due process claims against defendants Mogavero, Cantwell, Klein, and Hearing Officer Burns are dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. [28]

[28]    Plaintiff also cannot state a Fourteenth Amendment substantive due process claim against these defendants based on allegations that they wrongfully imposed disciplinary sentences that included SHU confinement because such allegations are more properly analyzed under the Eighth Amendment. *See Albright v. Oliver*, 510 U.S. 266, 274-75 (1994) (where a specific amendment provides protection against a particular government action, claims must be brought

pursuant to that amendment rather than as a violation of substantive due process under the Fourteenth Amendment); *Velez v. Levy,* 401 F.3d 75, 94 (2d Cir. 2005) ("[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process.").

### E. Dismissal with Leave to Amend

Based on the foregoing, plaintiff's amended complaint is dismissed under 28 U.S.C. § 1915A(b). Although plaintiff was already given an opportunity to amend his complaint and it does not appear that plaintiff will be able to state a cognizable claim against the named defendants, in light of his pro se status, the Court will afford plaintiff a final opportunity to file a proper amended complaint with respect to the claims that were not dismissed with prejudice or transferred. *See Gomez v. USAA Fed. Savings Bank,* 171 F.3d 794, 796 (2d Cir. 1999).

Any amended complaint filed by plaintiff must bear his original signature, and must be a complete pleading which will supersede and replace the original complaint in its entirety. Plaintiff must name one or more defendants, and must set forth a short and plain statement of the facts he relies on in support of his claim that the individual named as a defendant engaged in misconduct or wrongdoing that violated plaintiff's constitutional rights.

**\*20** Plaintiff is forewarned that, if he fails to submit an amended complaint within thirty (30) days of the filing date of this Decision and Order, the Court will, without further order, dismiss this action without prejudice pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### III. CONCLUSION
**WHEREFORE**, it is hereby

**ORDERED** that the Clerk is directed to attach a copy of the exhibits to the original complaint (Dkt. No. 1-1; Dkt. No. 6-1) to the amended complaint; and it is further

**ORDERED** that the Clerk is directed to revise the docket to add the following individuals as defendants: (1) Corrections Officer John Doe, Auburn Correctional Facility; (2) Corrections Lieutenant Klein, Mid-State

Correctional Facility; (3) Corrections Officer Riley, Mid-State Correctional Facility; (4) Corrections Sergeant Burns, Mid-State Correctional Facility; (5) Hearing Officer Mogavero, Auburn Correctional Facility; (6) Hearing Officer Burns, Attica Correctional Facility; (7) Hearing Officer Cantwell, Upstate Correctional Facility; (8) Corrections Officer Annarino, Mid-State Correctional Facility; (9) Diego, Step Down Program Counselor; (10) Loomis, Step Down Program Counselor; (11) Martin, Step Down Program Counselor; (12) Strajack, Step Down Program Counselor; (13) Fischer, Step Down Program Counselor; (14) "Ms. C", Step Down Program Counselor; and (15) "Ms. A", Step Down Program Counselor; and it is further

**ORDERED** that the claim(s) arising out of plaintiff's confinement at Elmira Correctional Facility asserted against defendant Corrections Sergeant John Doe are severed and transferred to the Western District of New York; and it is further

**ORDERED** that the Clerk shall advise the Clerk of the Western District of New York, in writing, of the entry of this Order and provide that Clerk with a certified copy of this Order and of the docket sheet for this action, together with all information necessary for the Western District Clerk to electronically access the documents filed in this action; and it is further

**ORDERED** that the Clerk shall remove Corrections Sergeant John Doe from the docket as a defendant in the Northern District action; and it is further

**ORDERED** that plaintiff's Letter Request (Dkt. No. 13) is **GRANTED** to the extent that plaintiff seeks to name Hearing Officer Mogavero, Corrections Officer Riley, and Corrections Sergeant Burns as defendants and **DENIED** in all other respects; and it is further

**ORDERED** that plaintiff's official capacity claims against each of the named defendants, as well as his individual capacity claims against former DOCCS Commissioner Brian Fischer, are **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. The Clerk is directed to terminate former DOCCS Commissioner Brian Fischer as a defendant; and it is further

**ORDERED** that the remaining claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915A(b) for

Case 5:22-cv-00216-GTS-TWD   Document 7   Filed 04/13/22   Page 166 of 227

failure to state a claim upon which relief may be granted; and it is further

**ORDERED** that if plaintiff wishes to proceed with this action, he must file an amended complaint as directed above within thirty (30) days from the filing date of this Decision and Order; and it is further

**ORDERED** that, if plaintiff timely files an amended complaint, this matter be returned to the Court for further review; and it is further

 **\*21 ORDERED** that if plaintiff fails to timely file an amended complaint as directed above, the Clerk shall enter judgment indicating that this action is **DISMISSED without prejudice** without further order of this Court pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. In that event, the Clerk is directed to close this case; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with all requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions; motions will be decided on submitted papers, without oral argument, unless otherwise ordered by this Court. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so may result in the dismissal of this action**; and it is further

**ORDERED** that the Clerk shall serve a copy of this Decision and Order on plaintiff.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 374578

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 4392485
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Llewellyn Sinclair GEORGE, Plaintiff,

v.

COUNTY OF WESTCHESTER, et al., Defendants.

No. 20-CV-1723 (KMK)
|
Signed 09/24/2021

**Attorneys and Law Firms**

Llewellyn Sinclair George, White Plains, NY, Pro se Plaintiff.

Jordan Silver, Esq., Westchester County Attorney, White Plains, NY, for Defendants.

OPINION & ORDER

KENNETH M. KARAS, District Judge:

**\*1** Plaintiff Llewellyn Sinclair George ("Plaintiff"), proceeding pro se, brings this Action pursuant to 42 U.S.C. § 1983 against the County of Westchester (the "County"), Assistant Warden La Fonda Spaulding ("Spaulding"), Assistant Warden Eric Middleton ("Middleton"), Sergeant Daniel Lopez ("Lopez"), Sergeant Matthew Kitt ("Kitt"), Captain Andre Mabra ("Mabra"), Captain Christopher Roberts ("Roberts"), and Captain Natasha Vanlierop ("Vanlierop"; collectively, "Defendants"), alleging that Defendants violated his rights under the First, Eighth, and Fourteenth Amendments to the U.S. Constitution. (Compl. 2– 6 (Dkt. No. 2); Ord. of Serv. 1 (Dkt. No. 9); Defs.' Mem. of Law in Supp. of Mot. ("Defs.' Mem.") 1 (Dkt. No. 30).) [1] Before the Court is Defendants' Motion To Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Motion"). (See Defs.' Not. of Mot. (Dkt. No. 28).) For the reasons that follow, Defendants' Motion is granted in part and denied in part.

[1]     Because Plaintiff's Complaint includes several handwritten pages interspersed within a standard complaint form, the Court will refer to the ECF page stamp at the top of each page. Note that Plaintiff's Complaint refers to Defendant Spaulding as "A. Spaulding" and omits first names for all but

one Defendant. (See Compl. 3–4.) Defendants have provided additional identifying information in their Memorandum of Law. (See Defs.' Mem. 1.)

I. Background

A. Factual Background

The alleged facts, which are accepted as true for purposes of resolving this Motion, are as follows. On April 4, 2019, while incarcerated at the Westchester County Jail, Plaintiff approached the desk of Vanlierop, who was conducting a tour of the "2 southwest housing unit" in her capacity as a "sector supervisor." (Compl. 6.) [2] Plaintiff tried to hand Vanlierop a grievance (the "First Grievance"), but Vanlierop "glanced" at the grievance, "turned away," and stated, "you know I don't do grievances." (Id.) Later that day, Lopez was touring the upper tier of the same housing unit when Plaintiff attempted to hand him the same grievance. (Id. at 6.) Lopez read the grievance, handed it back to Plaintiff, and said, "I'm not getting into the middle of this mess." (Id. at 7.)

[2]     Although Vanlierop was not initially named as a Defendant, (see Compl. 3–4), the Court directed the Clerk of Court to add her as a Defendant on April 21, 2020, (Ord. of Serv. 1).

Five days later, on the morning of April 9, 2019, Plaintiff's cell was being searched by two male officers when Vanlierop entered the cell and "confiscated" a separate grievance Plaintiff had prepared (the "Second Grievance") regarding Vanlierop's refusal to accept the First Grievance. (See id. at 7, 10.) Shortly thereafter, Vanlierop issued a fabricated misbehavior report against Plaintiff in retaliation for the Second Grievance. (See id.) [3]

[3]     Although at one point the Complaint does not draw a clear distinction between the First Grievance and the Second Grievance, (see Compl. 7), it also suggests that the grievance confiscated by Vanlierop addressed Vanlierop's refusal to process Plaintiff's *initial* grievance, (see id. at 7, 10), which necessarily indicates that Plaintiff had written a *second* grievance after Vanlierop refused to process the first. Specifically, Plaintiff suggests that the misbehavior report issued by Vanlierop was made in retaliation for the grievance she had seized, (see id. at 7), and Plaintiff alleges that the misbehavior report was issued in retaliation for a

grievance regarding "Defendant Vanlierop's refusal to accept and process [P]laintiff's grievance," (*id.* at 10). Construing the Complaint liberally, the Court therefore assumes there were two distinct grievances: (1) the First Grievance (the subject of which is unclear), and (2) the Second Grievance, which addressed Vanlierop's refusal to accept the First Grievance. It is the Second Grievance which Vanlierop allegedly confiscated, and for which she allegedly issued a false misbehavior report in retaliation. (*See id.* at 7, 10.)

**\*2** Around 11:30 A.M. on the following day (April 10), Mabra and Kitt stopped by Plaintiff's cell door with the housing unit officer. (*Id.* at 7.) Mabra ordered the housing unit officer to open Plaintiff's door, which she did. (*Id.*) While Kitt and the housing unit officer stood outside Plaintiff's cell and "act[ed] as lookouts," Mabra entered Plaintiff's cell and "inquire[d] about" Plaintiff's grievance against Vanlierop. (*Id.* at 7, 9.) Before Plaintiff could respond, Mabra, using a "stiff open palm," "shoved" Plaintiff against his cell wall and "demanded that [P]laintiff retract the contents of [his] grievance." (*Id.* at 9.) Plaintiff told Mabra "to go to hell." (*Id.*) Mabra, while exiting Plaintiff's cell, said, "I'm going to make your accommodations here a little more lengthy, your ass won't be making it home." (*Id.*) [4]

[4] Quotations from Plaintiff's submissions occasionally reflect minor corrections to spelling and grammar.

After Vanlierop had issued the fabricated misbehavior report against Plaintiff, Defendant Roberts conducted a disciplinary hearing. (*Id.* at 10.) At the hearing, Roberts denied Plaintiff's "repeated[ ] request[s]" to call witnesses and present audio and video evidence." (*Id.*) Before the hearing had begun, Roberts stated that he had received several comments from the "warden's office" indicating "that they were pissed off about [Plaintiff's] treatment of Defendant Vanlierop." (*Id.*) Plaintiff alleges that, contrary to Roberts' written disposition, he did not plead guilty to any of the charges. (*Id.* at 11.) He further alleges that Roberts' handling of the hearing was "improperly influenced by the warden's office." (*Id.*) At the conclusion of the hearing, Roberts imposed a penalty of "several days of cell confinement and loss of good time." (*Id.* at 10.) Plaintiff subsequently appealed the hearing disposition to Spaulding and Middleton. (*Id.* at 11.) He alleges that the outcome of these appeals "[was] improper and unjust." (*Id.*)

Plaintiff alleges that as a result of Defendants' actions, specifically their "constant threats and taunting," he suffered "mental anguish and psychological issues," as well as a "loss of sleep." (*Id.* at 8.) Plaintiff "was repeatedly seen" by the Office of Mental Health at the Westchester County Jail and was prescribed medication—Plaintiff does not identify which one(s)—"to cope with the trauma caused by the [D]efendants." (*Id.*) He seeks a "permanent court order" requiring administrators at the Westchester County Department of Correction "to record all future disciplinary hearings by audio/video." (*Id.*) He also seeks $100,000 in compensatory damages and $60,000 in punitive damages. (*Id.*)

B. Procedural History

Plaintiff filed his Complaint on February 26, 2020. (Dkt. Nos. 1–2.) On April 8, 2020, the Court granted Plaintiff leave to proceed in forma pauperis. (Dkt. No. 6.) On April 21, 2020, the Court dismissed Plaintiff's claims against the Westchester County Department of Correction and directed the Clerk of Court to add Vanlierop and the County as Defendants. (Dkt. No. 9.) [5] On August 10, 2020, Defendants filed a pre-motion letter outlining the grounds for their proposed motion to dismiss. (Dkt. No. 21.) Having received no response from Plaintiff, the Court adopted a briefing schedule for the Motion on August 25, 2020. (Dkt. No. 22.) Defendants filed the instant Motion and supporting papers on October 9, 2020. (*See* Not. of Mot.; Decl. of Jordan L. Silver, Esq., in Supp. of Mot. (Dkt. No. 29); Defs' Mem.) Plaintiff failed to oppose the Motion, (*see* Dkt. No. 32), and on November 24, 2020, the Court deemed the Motion fully submitted, (Dkt. No. 33).

[5] The Court dismissed claims against the Westchester County Department of Correction because municipal agencies or departments do not have the capacity to be sued under New York law. *See Omnipoint Commc'ns, Inc. v. Town of LaGrange,* 658 F. Supp. 2d 539, 552 (S.D.N.Y. 2009) ("In New York, agencies of a municipality are not suable entities."); *Hall v. City of White Plains,* 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002) ("Under New York law, departments which are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and cannot sue or be sued." (collecting cases)); *see also* N.Y. GEN. MUN. LAW § 2 ("The term 'municipal corporation,' as used in this chapter, includes only

a county, town, city and village."). The Court nevertheless concluded that in light of Plaintiff's pro se status and his "clear intention to assert claims against the County of Westchester," it would construe the Complaint as asserting claims against the County. (Dkt. No. 9.) Likewise, given Plaintiff's intention to assert claims against Vanlierop, the Court directed that Vanlierop be added as a Defendant. (*Id.*)

## II. Discussion

### A. Standard of Review

**\*3** The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the 'grounds' of his [or her] 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and citation omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged —but it has not 'show[n]'—'that the pleader is entitled to relief.' " (alteration in original) (citation omitted) (quoting FED. R. CIV. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same). However, when the complaint is from a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at \*4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at \*4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant['s] request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at \*2 (E.D.N.Y. Sept. 19, 2013), "documents either in [the] plaintiff['s] possession or of which [the] plaintiff[ ] had knowledge and relied on in bringing suit," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quotation marks omitted), and "his opposition memorandum," *Gadson v. Goord*, No. 96-CV-7544, 1997 WL 714878, at \*1 n.2 (S.D.N.Y. Nov. 17, 1997).

Where, as here, a plaintiff proceeds pro se, the court must "construe[ ] [his] [complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (citation and italics omitted)).

### B. Analysis

Although Plaintiff does not identify the precise nature of his claims under the First, Eighth, and Fourteenth Amendments, the Court interprets the Complaint to raise eight distinct claims. Specifically, the Complaint claims (i) that Vanlierop and Lopez improperly refused to accept Plaintiff's First Grievance (the "Grievance Claim"), (*see* Compl. 6–7); (ii) that Vanlierop retaliated against Plaintiff in response to the Second Grievance by confiscating this grievance and filing a false misbehavior report (the "Vanlierop Retaliation Claim"), (*see id.* at 7, 10); (iii) that Mabra also retaliated against Plaintiff in response to the Second Grievance by entering Plaintiff's cell, shoving him against a wall, and demanding that he retract the contents of the Second Grievance (the "Mabra Retaliation Claim", and together with the Vanlierop Retaliation Claim, the "Retaliation Claims"), (*see id.* at 7, 9); (iv) that Mabra used excessive force when demanding that Plaintiff retract the contents of the Second Grievance (the "Excessive Force Claim"), (*see id.* at 9;) (v) that Kitt failed to intervene when Mabra was assaulting Plaintiff (the "Failure to Intervene Claim"), (*see id.* at 7, 9); (vi) that Roberts, by denying Plaintiff the opportunity to call witnesses and present audio and video evidence at his disciplinary hearing, violated Plaintiff's procedural due process rights (the "Roberts Procedural Due Process Claim"), (*see id.* at 10–11); (vii) that Spaulding and Middleton, by affirming Roberts' decision, also violated Plaintiff's procedural due process rights (the "Spaulding/Middleton Procedural Due Process Claim" and, together with the "Roberts Procedural Due Process Claim," the "Procedural Due Process Claims"), (*see id.* at 11); and (viii) that the County should be liable for the foregoing violations (the "*Monell* Claim"). The Court will address these claims in order.

### 1. The Grievance Claim

**\*4** As discussed, Plaintiff alleges that Vanlierop and Lopez refused to accept the First Grievance. (*Id.* at 6–7.) To the extent Plaintiff asserts a discrete claim based on these allegations, the Court must dismiss the claim.

"It is well-established that inmates do not have a protected liberty interest in the processing of their prison grievances." *Crichlow v. Fischer*, No. 15-CV-6252, 2017 WL 920753, at \*7 (W.D.N.Y. Mar. 7, 2017); *see also Corley v. City of New York*, No. 14-CV-3202, 2017 WL 4357662, at \*7 (S.D.N.Y. Sept. 28, 2017) ("[The] [p]laintiff did not have a liberty interest to access the [prison's] grievance program that would provide a basis for a constitutional due process claim

here."); *Nji v. Heath*, No. 13-CV-200, 2013 WL 6250298, at \*6 (S.D.N.Y. Dec. 2, 2013) ("[I]nmate grievance programs created by state law are not required by the Constitution and consequently[,] allegations that prison officials violated those procedures do[ ] not give rise to a cognizable § 1983 claim." (citation omitted)); *Mimms v. Carr*, No. 09-CV-5740, 2011 WL 2360059, at \*10 (E.D.N.Y. June 9, 2011) ("It is well-established that prison grievance procedures do not create a due-process-protected liberty interest."), *aff'd*, 548 F. App'x 29 (2d Cir. 2013); *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003) ("Prison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment."). "Rather, in the event that prison officials ignore a grievance that raises constitutional claims, the proper avenue to seek relief is ... directly petitioning the government for redress of his claims." *Harris v. Westchester Cnty. Dep't of Corr.*, No. 06-CV-2011, 2008 WL 953616, at \*5 (S.D.N.Y. Apr. 3, 2008) (collecting cases). Consequently, "courts regularly dismiss claims brought to remedy alleged violations of inmate grievance procedures." *Martinez v. Schriro*, No. 14-CV-3965, 2017 WL 87049, at \*3 (S.D.N.Y. Jan. 9, 2017) (alteration omitted). Accordingly, any due process claim against Vanlierop and Lopez based on their purported interference with the grievance process is dismissed.

### 2. The Retaliation Claims

"Prisoners have a constitutional right to petition the government, and it is a violation of § 1983 for prison officials to retaliate against prisoners for the exercise of that right." *Perkins v. Perez*, No. 17-CV-1341, 2019 WL 1244495, at \*13 (S.D.N.Y. Mar. 18, 2019) (citation omitted). To state a First Amendment claim of retaliation, an inmate must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the [inmate], and (3) that there was a causal connection between the protected conduct and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (citation and alteration omitted). An adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (quotation marks omitted). In determining whether a prison official's conduct constitutes adverse action, "the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners

may be required to tolerate more than average citizens." *Id.* (quotation marks and alterations omitted). "[B]ecause virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has instructed that district courts must "approach prisoner retaliation claims with skepticism and particular care." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quotation marks omitted); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." (quotation marks omitted)). Accordingly, First Amendment retaliation claims must be "supported by specific and detailed factual allegations" and may not be stated "in wholly conclusory terms." *Dolan*, 794 F.3d at 295 (citation omitted).

**\*5** As noted, Plaintiff alleges that Vanlierop and Mabra both retaliated against him in response to the Second Grievance —Vanlierop by confiscating the grievance and filing a false misbehavior report, (*see* Compl. 7, 10), and Mabra by entering Plaintiff's cell, shoving him against a wall, and demanding a retraction, (*id.* at 7, 9). The Court will evaluate each claim separately under the three-part test set out in *Holland*.

### a. The Vanlierop Retaliation Claim

With respect to the first prong of the *Holland* test, the Complaint plausibly alleges that Vanlierop's actions against Plaintiff came in response to a form of protected conduct —namely, Plaintiff's preparation of the Second Grievance. "It is well-established that inmates' filing of grievances is a constitutionally protected exercise of their right under the First Amendment to petition the government for the redress of grievances." *Mateo v. Bristow*, No. 12-CV-5052, 2013 WL 3863865, at \*4 (S.D.N.Y. July 16, 2013) (citing *Graham*, 89 F.3d at 80); *see also Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at \*10 (S.D.N.Y. Sept. 28, 2018) (same); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 367 & n.21 (S.D.N.Y. 2011) (same; collecting cases). Thus, Plaintiff's allegations with respect to Vanlierop are sufficient to satisfy the first prong of the *Holland* test.

With respect to *Holland*'s second prong, Plaintiff alleges two distinct forms of possibly adverse action by Vanlierop —(1) her confiscation of the Second Grievance and (2) her

filing of a false misbehavior report. (*See* Compl. 7, 10.) Although inmates have no constitutional right to be free from a cell search, including retaliatory searches, *see, e.g.*, *Joseph v. Annucci*, No. 18-CV-7197, 2020 WL 409744, at \*5 (S.D.N.Y. Jan. 23, 2020) (stating that inmates have "no constitutional right to be free from cell searches of any kind, including retaliatory cell searches" (citation omitted)), they may nevertheless "assert a retaliation claim for retaliatory conduct in connection with a cell search," *Hill v. Laird*, No. 06-CV-126, 2014 WL 1315226, at \*8 (E.D.N.Y. Mar. 31, 2014), including a prison official's seizure of legal documents or administrative grievances, *Smith v. City of New York*, No. 03-CV-7576, 2005 WL 1026551, at \*3 (S.D.N.Y. May 3, 2005) (holding on summary judgment that the defendants' "destruction of [the plaintiff's] legal papers" constituted "an adverse action substantial enough to satisfy the second prong of the retaliation test"). At this early stage of the case, Plaintiff's allegation that Vanlierop seized the Second Grievance is sufficient to state an adverse action. *See Yunus v. Jones*, No. 16-CV-1282, 2017 WL 9511176, at \*9 (N.D.N.Y. Aug. 23, 2017) (concluding that "the allegation that [the] defendant ... confiscated [the] plaintiff's personal property"— including prison grievances—"in retaliation for the exercise of his First Amendment grievance rights [was] sufficient to withstand a motion to dismiss"), *report and recommendation adopted*, 2017 WL 5956762 (N.D.N.Y. Dec. 1, 2017); *Guillory v. Haywood*, No. 13-CV-1564, 2015 WL 268933, at \*21 (N.D.N.Y. Jan. 21, 2015) (order adopting report & recommendation) (holding that the plaintiff adequately stated a claim for retaliation where he alleged that his legal documents were confiscated shortly after complaints over his treatment at the prison facility); *Gomez v. Graham*, No. 14-CV-201, 2014 WL 5475348, at \*5 (N.D.N.Y. Oct. 29, 2014) (concluding that "[a]t th[e] early juncture of" a motion to dismiss, allegations that the plaintiff's legal papers were confiscated were sufficient to state a retaliation claim).

**\*6** Similarly, although "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report," *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997); *see also Thomas v. Calero*, 824 F. Supp. 2d 488, 499 (S.D.N.Y. 2011) (noting that "[t]he Second Circuit has long held ... that a prison inmate has no constitutional right to be free from being falsely accused in a misbehavior report"), there is an exception where the inmate can "show either (1) that he was disciplined without adequate due process as a result of the report; or (2) that the report was issued in retaliation for exercising a constitutionally protected right," *Willey v. Kirkpatrick*, 801 F.3d 51, 63

(2d Cir. 2015) (quotation marks omitted); *see also Cook v. Quattrocchi*, No. 19-CV-11659, 2020 WL 564082, at *2 (S.D.N.Y. Feb. 5, 2020) (same). Here, Vanlierop allegedly issued the false misbehavior report in retaliation for Plaintiff's participation in constitutionally protected conduct—namely, his preparation of the Second Grievance—and thus, the Complaint sufficiently alleges an adverse action based on Vanlierop's issuance of the misbehavior report. *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) (concluding that the plaintiff sufficiently alleged an adverse action based on the defendants' filing of false misbehavior reports in response to the plaintiff's prior grievance submissions); *Arriaga v. Gage*, No. 16-CV-1628, 2019 WL 2053990, at *6 (S.D.N.Y. May 9, 2019) (concluding on a motion to dismiss that allegedly false misbehavior reports issued in retaliation for the plaintiff's grievances "qualif[ied] as adverse actions"); *Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) (concluding that the defendants' alleged retaliation—"[f]iling a false misbehavior report about [the plaintiff]" in response to the plaintiff's submission of a grievance—"would deter a similarly situated person of ordinary firmness from exercising his First Amendment rights," and therefore "qualifie[d] as an adverse action").

Finally, in considering whether "there was a causal connection between the protected conduct and the adverse action" under *Holland*'s third prong, *see* 758 F.3d at 225, "a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff," *Thomas v. DeCastro*, No. 14-CV-6409, 2019 WL 1428365, at *9 (S.D.N.Y. Mar. 29, 2019) (citation omitted). Here, Plaintiff alleges that Vanlierop seized the Second Grievance and issued the false misbehavior report on or around April 9, (*see* Compl. 7, 10)—only five days after the incident that was the subject of the Second Grievance, (*see id.* at 6, 10). [6] The Second Circuit has "held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation." *Harnage v. Brighthaupt*, 168 F. Supp. 3d 400, 413 (D. Conn. 2016) (quoting *Faulk v. Fisher*, 545 F. App'x 56, 58 (2d Cir. 2013)), *aff'd*, 720 F. App'x 79 (2d Cir. 2018); *see also Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017) (summary order) (same); *Mateo*, 2013 WL 3863865, at *6 (finding a "plausible inference" that the defendants issued a misbehavior report in retaliation for the plaintiff's past grievances based in part on the fact that the report was

issued just one day after the plaintiff had a confrontation with the defendants). "Although temporal proximity between constitutionally protected activity and potentially retaliatory activity generally will not, on its own, allow a plaintiff to withstand a motion to dismiss," *Salahuddin v. Mead*, No. 95-CV-8581, 2002 WL 1968329, at *6 n.6 (S.D.N.Y. Aug. 26, 2002), courts may "exercise [their] judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases," *Quezada v. Roy*, No. 14-CV-4056, 2017 WL 6887793, at *10 (S.D.N.Y. Dec. 14, 2017) (quotation marks omitted). Though Plaintiff appears to rely solely on the temporal proximity between his protected conduct and Vanlierop's alleged retaliation, some courts in this District have found that, at the pleadings stage of a case, such close temporal proximity is sufficient to establish a causal connection, particularly where, as here, the defendant appears to retaliate in response to grievance of which he (or she) was the subject. *See Vogelfang v. Capra*, 889 F. Supp. 2d 489, 518 (S.D.N.Y. 2012) (concluding, for purposes of a motion to dismiss, that where the defendant filed a false misbehavior report against the plaintiff three days after the plaintiff had filed a grievance against that defendant, "[t]he temporal proximity of th[o]se two events, as well as the common identity between the subject of [the plaintiff's] grievance and the author of the [misbehavior report], plausibly suggest[ed]" a causal connection); *Mateo*, 682 F. Supp. 2d at 435 (concluding that, on a motion to dismiss, the plaintiff's allegation that the defendant filed a false misbehavior report one day after the plaintiff filed a sexual harassment grievance against the defendant was sufficient to plead the causation element of his retaliation claim). [7] Consistent with these cases, the Court concludes that Plaintiff has adequately alleged the causation element of his retaliation claim.

---

6    Plaintiff does not specify precisely when he drafted the Second Grievance, but it necessarily was sometime between April 4 and April 9. *See generally* n.3 *supra*.

7    Note, however, that Plaintiff may not rely on temporal proximity alone to survive a summary judgment motion. *See, e.g., Bryant v. Goord*, No. 99-CV-9442, 2002 WL 553556, at *2 (S.D.N.Y. Apr. 12, 2002) ("Although the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment.").

**\*7** Accordingly, the Vanlierop Retaliation Claim survives the instant Motion.

#### b. The Mabra Retaliation Claim

Mabra allegedly retaliated against Plaintiff in response to the Second Grievance by entering his cell, shoving him against a wall, demanding that Plaintiff retract the contents of the Second Grievance, and then threatening Plaintiff that he would "make [Plaintiff's] accommodations ... a little more lengthy," such that Plaintiff "[wouldn't] be making it home." (Compl. 7, 9.) "As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant," *Kotler v. Boley*, No. 17-CV-239, 2018 WL 4682026, at \*4 n.2 (S.D.N.Y. Sept. 28, 2018) (collecting cases)—in this case, Mabra's retaliation for complaints against Vanlierop. But courts have recognized an exception where, for example, the defendant made clear that he or she was retaliating on behalf of a colleague. *See, e.g.*, *Headley v. Fisher*, No. 06-CV-6331, 2008 WL 1990771, at \*18 (S.D.N.Y. May 7, 2008) (finding that the plaintiff adequately alleged a retaliation claim where the defendant hit him and stated, "this is for CO. Simpson," the defendant against whom the plaintiff had filed a grievance). That is the case here, where Mabra allegedly made clear that he was acting in response to the grievance concerning Vanlierop. (*See* Compl. 9 (alleging that Mabra entered Plaintiff's cell and "inquire[d] about the grievance that [P]laintiff had written against Defendant Vanlierop" before shoving Plaintiff and demanding that he "retract the contents of the grievance" against Vanlierop).) For reasons discussed with respect to Vanlierop in Part II.B.2.a, *supra*, the Court concludes that Plaintiff has adequately alleged *Holland*'s first and third elements with respect to Mabra. That is, the Complaint plausibly suggests that Mabra's allegedly retaliatory actions were in response to Plaintiff's exercise of constitutionally protected conduct (his preparation of the Second Grievance), and Mabra's actions occurred on April 10, just one day after Vanlierop seized the Second Grievance, (*see* Compl. 7), which itself had only been drafted within the past several days, *see* notes 3 & 6 *supra*, thereby establishing the necessary causal connection.

The only question remaining is whether Mabra's conduct constitutes adverse action so as to satisfy *Holland*'s second prong. Here, there are three discrete actions to consider: (1) Mabra's threat to Plaintiff ("[Y]our ass won't be making it home"); (2) Mabra's demand that Plaintiff "retract the contents of" the Second Grievance; and (3) Mabra's act of shoving Plaintiff against the wall. (*See* Compl. 9.)

With respect to the first action, "verbal threats may qualify as adverse actions" in the prison retaliation context *only* where they are "sufficiently specific and direct." *White v. Westchester County*, No. 18-CV-730, 2018 WL 6726555, at \*17 (S.D.N.Y. Dec. 21, 2018) (quotation marks omitted) (collecting cases); *see also Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at \*11 (S.D.N.Y. Sept. 28, 2018) (same); *Mateo*, 682 F. Supp. 2d at 434 (explaining that "[t]he less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights"). "Thus, vague intimations of some unspecified harm generally will not rise to the level of adverse action for the purpose of a First Amendment retaliation claim." *Bumpus v. Canfield*, 495 F. Supp. 2d 316, 326 (W.D.N.Y. 2007). Here, Mabra's alleged threat is more benign than many threats which courts in the Second Circuit have found insufficient to constitute an adverse action. *See Terry*, 2018 WL 4682784, at \*11 (dismissing a First Amendment retaliation claim because the alleged threat was insufficiently specific and direct even where corrections officers stated that "they were gonna kill" the plaintiff (record citation and alteration omitted)); *see also Albritton v. Morris*, No. 13-CV-3708, 2016 WL 1267799, at \*18 (S.D.N.Y. Mar. 30, 2016) (dismissing First Amendment retaliation claims because a corrections officer's statements to a plaintiff that his "grievances were unlikely to succeed" and that the officer "would handle things 'his way' " were insufficiently specific or direct); *Barrington v. New York*, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011) (granting summary judgment in favor of a defendant who told an inmate that " 'me and my boys ... going to get you' while brandishing a copy of a grievance"); *Bilal v. N.Y. State Dep't of Corr.*, No. 09-CV-8433, 2010 WL 2506988, at \*16 (S.D.N.Y. June 21, 2010) ("Neither [the defendant's] comment ... that [the plaintiff] was 'lucky' because correction officers 'usually fuck people up for writing a bunch of bullshit grievances' nor his ... comment that '[y]ou're not the only one who can write. I'm willing to bet you'll break or get broke up,' was a 'direct' or 'specific' threat." (alteration and record citations omitted)), *aff'd sub nom.*, *Bilal v. White*, 494 F. App'x 143 (2d Cir. 2012); *cf. White*, 2018 WL 6726555, at \*14 ("This allegation constitutes a specific, clear threat made in response to [the] [p]laintiff's prospective grievance against [the] [d]efendant .... [The defendant] threatened physical harm to [the] [p]laintiff, and did so with particularity, by pointing to the inmates who would harm [the] [p]laintiff and explaining why they would

harm him at her direction."). In sum, Plaintiff has failed to allege an adverse action based on Mabra's alleged threat.

**\*8** With respect to Mabra's second action, case law suggests that where a defendant demands that an inmate withdraw a prison grievance, such a demand does not give rise to a retaliation claim unless the demand is accompanied by a sufficiently specific and direct threat. Here, because Mabra's threat was not sufficiently specific or direct, his alleged demand that Plaintiff "retract the contents" of the Second Grievance does not constitute an adverse action. *See Rodriguez v. Patchen*, No. 13-CV-1086, 2018 WL 2122877, at \*9 (W.D.N.Y. Mar. 1, 2018) (concluding on summary judgment that the defendant's alleged "threat[ ] to use physical violence against [the] [p]laintiff unless [he] withdrew his inmate grievance" did not establish a retaliation claim because "physical violence" constituted a vague threat), *report and recommendation adopted*, 2018 WL 2119768 (W.D.N.Y. May 8, 2018); *Bartley v. Collins*, No. 95-CV-10161, 2006 WL 1289256, at \*6 (S.D.N.Y. May 10, 2006) (concluding on summary judgment that "verbal threats such as 'we [are] going to get you, you better drop the [law]suit,' do not rise to the level of adverse action" (footnote omitted)); *cf. St. Pierre v. Semple*, No. 14-CV-1866, 2015 WL 6872442, at \*4 (D. Conn. Nov. 9, 2015) (finding that the plaintiff adequately stated a retaliation claim against a nurse who threatened to continue to stop providing him with his prescribed pain medication unless he withdrew a grievance against her). Thus, Plaintiff cannot state a retaliation claim against Mabra based on Mabra's demand that he retract the Second Grievance.

With respect to Mabra's third action, physical assault may, depending on its severity, constitute an adverse action for purposes of a First Amendment retaliation claim. *See Flemming v. King*, No. 14-CV-316, 2016 WL 5219995, at \*5 (N.D.N.Y. June 20, 2016), *report and recommendation adopted*, 2016 WL 5173282 (N.D.N.Y. Sept. 21, 2016); *see also Baskerville v. Blot*, 224 F. Supp. 2d 723, 731–32 (S.D.N.Y. 2002) (holding that a "retaliatory assault" sufficiently described an adverse action for purposes of a retaliation claim). Notably, "the alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis." *Flemming*, 2016 WL 5219995, at \*5. Even in light of this lower standard, however, Mabra's alleged action is still insufficient to constitute an adverse action. The cases in which courts have recognized assault as a form of adverse action have involved markedly more violent conduct than that alleged here. *See, e.g.,*

*Salgado v. NYS Dep't of Corr. & Cmty. Supervision*, No. 13-CV-1108, 2016 WL 6311296, at \*3, \*8 (W.D.N.Y. Sept. 15, 2016) (concluding that slamming the plaintiff's finger in a cell window and beating him constituted adverse action for purposes of retaliation claim); *Baskerville*, 224 F. Supp. 2d at 726, 732 (holding that a "retaliatory assault" in which the plaintiff was placed in a chokehold, shoved into the bars of his cell, and choked until he "was on the verge of collapsing" "sufficiently describe[d] adverse conduct that would deter a reasonable inmate from exercising his constitutional rights"). By contrast, courts have found that shoving an inmate or comparable conduct is insufficient to constitute an adverse action. *See Flynn v. Ward*, No. 15-CV-1028, 2018 WL 3195095, at \*9 (N.D.N.Y. June 7, 2018) (observing that "[a]lthough an alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis, [the plaintiff's] allegations that [a defendant] 'push[ed] him around' " was "de minimis" and therefore insufficient to constitute adverse action (record citation omitted) (last alteration in original)), *report and recommendation adopted*, 2018 WL 3193201 (N.D.N.Y. June 28, 2018); *Rivera v. Goord*, 119 F. Supp. 2d 327, 340 (S.D.N.Y. 2000) (concluding that particular defendants' "alleged acts of retaliation"—" 'shov[ing]' [the plaintiff] while taking him to the [Special Housing Unit ("SHU")]"—"even if assumed to be true, [were] de minimis ... [and] would not chill a person of ordinary firmness from continuing to engage in First Amendment activity" (italics omitted)); *see also, e.g., Myers v. Saxton*, No. 20-CV-465, 2021 WL 149062, at \*7 (N.D.N.Y. Jan. 15, 2021) ("[I]n this circuit, courts have routinely concluded that the type of physical assault suffered by [the] plaintiff in this case (i.e., having a food tray thrown at him) is de minimis for purposes of a retaliation claim and is not sufficient to satisfy the adverse action element."); *Woodward v. Afify*, No. 14-CV-856, 2018 WL 9875253, at \*11 (W.D.N.Y. Sept. 28, 2018) ("[V]iewing the allegations here in the light most favorable to [the] plaintiff, the [c]ourt concludes that a single punch is an insufficient adverse action to meet even the lower standard required in a First Amendment retaliation claim."), *report and recommendation adopted*, 2019 WL 5394217 (W.D.N.Y. Oct. 22, 2019). Accordingly, Plaintiff has failed to allege an adverse action taken by Mabra.

**\*9** Because Plaintiff has failed to allege adequately the "adverse action" prong of his retaliation claim against Mabra, the Court dismisses the Mabra Retaliation Claim.

2021 WL 4392485

### 3. The Excessive Force Claim

To the extent Plaintiff alleges a distinct excessive force claim against Mabra based on his act of shoving Plaintiff into his cell wall, (*see* Compl. 9), this claim fails for reasons already discussed: Just as the act of shoving an inmate fails to satisfy the relaxed standard necessary to allege an "adverse action," it necessarily fails to satisfy the more demanding standard necessary to establish an Eighth Amendment excessive force claim.

The Eighth Amendment's guarantee of freedom from "cruel and unusual punishment" encompasses "restraints on prison officials, who may not, for example, use excessive physical force against prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "[An] [a]nalysis of cruel and unusual punishment claims requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for the conduct." *Manley v. Grossman*, No. 13-CV-1974, 2017 WL 4326541, at *8 (S.D.N.Y. Sept. 27, 2017). The objective element focuses on the harm done "in light of contemporary standards of decency," *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (quotation marks omitted), and asks whether "the deprivation alleged is 'sufficiently serious,' or 'harmful enough,' to reach constitutional dimensions," *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (citing *Wilson v. Seiter*, 501 U.S. 294, 298, 303 (1991)). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citation omitted). The subjective element requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by wantonness' in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (citation omitted).

Here, even assuming Plaintiff could satisfy the subjective element of his excessive force claim, the Court finds no basis to conclude that the alleged use of force was "objectively 'harmful enough' or 'sufficiently serious' " to violate the Eighth Amendment. *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015) (citation omitted). Courts in the Second Circuit have found that comparable uses of force—where a corrections officer forcefully shoves or pushes an inmate—are insufficient to satisfy the objective prong of an excessive force claim. *See, e.g.*, *Tavares v. City of New York*, No. 08-CV-3782, 2011 WL 5877550, at *5–6 (S.D.N.Y. Oct. 17, 2011) (holding that a pat frisk where the plaintiff was "forcefully 'compressed' against the wall" was not a violation of the Eighth Amendment and noting that "[c]ourts in this Circuit have routinely found such types of minimal injuries and pain insufficiently serious or harmful to satisfy the objective element of the Eighth Amendment analysis" (citing cases)), *report and recommendation adopted*, 2011 WL 5877548 (S.D.N.Y. Nov. 23, 2011); *James v. Phillips*, No. 05-CV-1539, 2008 WL 1700125, at *5 (S.D.N.Y. Apr. 9, 2008) (concluding that a guard's "shov[ing] of an inmate" constituted a de minimis use of force that could not give rise to a viable excessive force claim); *Show v. Patterson*, 955 F. Supp. 182, 192–93 (S.D.N.Y. 1997) (concluding that the alleged force—"pushing [the plaintiff] against the wall"—was "de minimis and thus not protected by the Eighth Amendment"); *Bryan v. Admin. of F.C.I. Otisville*, 897 F. Supp. 134, 137 (S.D.N.Y. 1995) ("The Second Circuit has deemed brief confrontations between prisoners and guards such as the pushing incident alleged here insignificant for Eighth Amendment purposes."). Accordingly, the Court dismisses the Excessive Force Claim.

### 4. The Failure to Intervene Claim

**\*10** Construed liberally, the Complaint raises a claim for failure to intervene against Kitt. (Compl. 7, 9.)

Under the Eighth Amendment, prison officials must "take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. N.Y. C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). Moreover, "[l]aw enforcement officials, including prison officials, can be held liable under § 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence." *McRae v. Gentile*, No. 14-CV-783, 2015 WL 7292875, at *2 (N.D.N.Y. Oct. 20, 2015), *report and recommendation adopted*, 2015 WL 7300540 (N.D.N.Y. Nov. 18, 2015); *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." (collecting cases)), *reh'g denied*, 27 F.3d 29 (2d Cir. 1994). Specifically, "[a]n officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know that excessive force is being used," provided there was "a realistic opportunity to intervene to prevent the harm from occurring." *Rahman v. Acevedo*, No. 08-CV-4368, 2011

WL 6028212, at *8 (S.D.N.Y. Dec. 5, 2011) (alteration and quotation marks omitted).

"However, 'there can be no failure to intervene claim without a primary constitutional violation.' " *Sanabria v. Tezlof*, No. 11-CV-6578, 2016 WL 4371750, at *5 (S.D.N.Y. Aug. 12, 2016) (quoting *Forney v. Forney*, 96 F. Supp. 3d 7, 13 (E.D.N.Y. 2015)); *see also Posner v. City of New York*, No. 11-CV-4859, 2014 WL 185880, at *8 (S.D.N.Y. Jan. 16, 2014) (explaining that "[b]ecause [the] [d]efendants [were] entitled to summary judgment on [the] [p]laintiff's primary claims that they violated her constitutional rights, it follow[ed] that they [were] entitled to summary judgment on her failure-to-intervene ... claim[ ] as well"); *Matthews v. City of New York*, 889 F. Supp. 2d 418, 443–44 (E.D.N.Y. 2012) (observing that a "failure to intervene claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim"). Because Plaintiff failed to state an excessive force claim against Mabra, it necessarily follows that the Failure to Intervene Claim against Kitt—which is premised on Kitt allegedly turning a blind eye while Mabra entered Plaintiff's cell—must also fail. *See, e.g.*, *Forney*, 96 F. Supp. 3d at 13 (explaining that because "all of [the] [p]laintiff's primary [§] 1983 claims ha[d] been dismissed, [the] [d]efendants' motion to dismiss [the] [p]laintiff's failure to intervene claim" also had to be granted). Accordingly, the Court dismisses the Failure to Intervene Claim.

### 5. The Procedural Due Process Claims

Plaintiff alleges that after Vanlierop issued a false misbehavior report in retaliation for the Second Grievance, "a disciplinary hearing was conducted by Defendant Roberts, during which [P]laintiff's repeat[ed] request[s] ... to present audio and video evidence, as well as to call witnesses[,]" were "denied." (Compl. 10.) Plaintiff also alleges that Roberts' "handling of the disciplinary hearing was improperly influenced by the warden's office," which had apparently notified Roberts that it was displeased with Plaintiff's "treatment of Defendant Vanlierop." (*Id.* at 10–11.) At the end of the hearing, the punishment imposed by Roberts was "several days of cell confinement and loss of good time." (*Id.* at 10.)

**\*11** "To present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride*, 380 F.3d 649, 654

(2d Cir. 2004) (citation and alteration omitted), *cert. denied sub nom.*, *McBride v. Ortiz*, 543 U.S. 1187 (2005). The Supreme Court has held that inmates retain due process rights in prison disciplinary proceedings. *See Wolff v. McDonnell*, 418 U.S. 539, 563–72 (1974) (describing the procedural protections that inmates are to receive when subject to significant disciplinary punishment).

With respect to the first requirement, "[p]rison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). When evaluating whether an inmate has suffered "atypical and significant hardship," courts must compare the conditions imposed upon that inmate with the conditions "endured by prisoners in [the] general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." *Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999). When evaluating the severity of an inmate's hardship, courts should consider both the duration and the conditions of confinement. *Dawkins v. Gonyea*, 646 F. Supp. 2d 594, 606 (S.D.N.Y. 2009).

Regarding the process an inmate is due, a disciplinary hearing comports with due process when an inmate receives "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). "Prison disciplinary proceedings," however, "are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Smith v. Fischer*, 803 F.3d 124, 127 (2d Cir. 2015) (quoting *Wolff*, 418 U.S. at 556). Ultimately, a guilty finding in an inmate disciplinary hearing only needs to be supported by "some evidence from which the conclusion ... could be deduced." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985) (quotation marks omitted). The Second Circuit has explained that "[j]udicial review of this 'some evidence' standard is narrowly focused." *Sira v. Morton*, 380 F.3d 57, 76 (2d Cir. 2004). Such review "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Id.* (quoting *Hill*, 472 U.S. at 455–56). Finally, "the

Second Circuit has said that its 'conception of an impartial decisionmaker is one who, inter alia, does not prejudge the evidence and who cannot say, with ... utter certainty ..., how he would assess evidence he has not yet seen.' " *Rahman*, 2011 WL 6028212, at \*7 (quoting *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990)) (italics omitted).

a. The Roberts Procedural Due Process Claim

As noted, Plaintiff alleges that he was sentenced to "several days of cell confinement," along with "loss of good time." (Compl. 10.) Based on the latter allegation—but not the former—Plaintiff has adequately alleged a "liberty interest sufficient to trigger due process protections during his administrative hearing." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009). However, his vague allegation that Roberts "denied" his "repeat[ed] request[s]" to "present audio and video evidence, as well as to call witnesses," (Compl. 10), is insufficient to allege a procedural violation by Roberts.

**\*12** The Second Circuit has explained that "[t]he length of disciplinary confinement is one of the guiding factors in applying *Sandin*'s 'atypical and significant hardship' test." *Hanrahan v. Doling*, 331 F.3d 93, 97 (2d Cir. 2003). It is not, however, the only relevant factor. "The conditions of confinement are a distinct and equally important consideration in determining whether a confinement in SHU rises to the level of 'atypical and severe hardship.' " *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (quotation marks omitted). Accordingly, courts must consider both the conditions of disciplinary confinement and their duration, as "especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999).

Although the Second Circuit has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights," it has nevertheless established certain "guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed." *Palmer*, 364 F.3d at 64. For example, the Second Circuit has explained that where a plaintiff is confined in SHU for an "intermediate duration" of between 101 and 305 days, "development of a detailed record" regarding the conditions of confinement as compared to "ordinary prison conditions" is required. *Id.* at 64–65 (quotation marks omitted). Moreover, "although shorter confinements under

normal SHU conditions may not implicate a prisoner's liberty interest, [the Second Circuit has] explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Id.* at 65 (citation omitted). "In the absence of a detailed factual record," the Second Circuit has "affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short—less than ... 30 days ... spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions." *Id.* at 66 (collecting cases); *see also, e.g.*, *Colon v. Annucci*, 344 F. Supp. 3d 612, 633–34 (S.D.N.Y. 2018) (holding that the plaintiff's "30-day keeplock confinement alone [was] insufficient to create a liberty interest triggering due process protections" (collecting cases)); *Walker v. Quiros*, No. 11-CV-82, 2014 WL 7404550, at \*8 (D. Conn. Sept. 30, 2014) ("In the absence of a more detailed factual record, a term of segregated confinement shorter than [30] days generally does not create a constitutional liberty interest."); *Houston v. Cotter*, 7 F. Supp. 3d 283, 298 (E.D.N.Y. 2014) ("Absent a detailed factual record, courts typically affirm dismissals of due process claims where the period of time spent in SHU was short—e.g., [30] days—and there was no indication of unusual conditions." (italics omitted)).

Here, Plaintiff alleges merely that he was sentenced to "several days of cell confinement," along with "loss of good time." (Compl. 10.) [8] Plaintiff offers no allegations regarding the severity or atypicality of the conditions he experienced in disciplinary confinement. Without such allegations, "several days" in disciplinary confinement is insufficient to trigger a liberty interest in his disciplinary hearing. *See Washington v. Fitzpatrick*, No. 20-CV-911, 2021 WL 966085, at \*9 (S.D.N.Y. Mar. 15, 2021) (holding that the plaintiff's allegation that he was sentenced to 30 days in keeplock confinement, during which he was denied various privileges such as phone calls, television, and commissary access, did "not plausibly plead a liberty interest"); *Ruggiero v. Way*, No. 19-CV-3631, 2020 WL 5126112, at \*9 (S.D.N.Y. Aug. 31, 2020) (holding that where the plaintiff alleged he was confined to SHU for 30 days, without "any allegation that he endured unusual SHU conditions during his confinement," the plaintiff "ha[d] not pleaded deprivation of a cognizable interest in liberty"); *Brown v. Murphy*, No. 16-CV-710, 2019 WL 2325777, at \*2–3 (S.D.N.Y. May 30, 2019) (holding that the plaintiff's 30-day period in keeplock confinement did

not constitute an atypical and significant hardship where the complaint was "devoid of any allegations of the conditions of his keeplock confinement"); *Colon*, 344 F. Supp. 3d at 633–34 (dismissing due process claim where the plaintiff alleged that he was sentenced to 30 days in keeplock confinement and failed to "allege any facts suggesting that he was exposed to any conditions of confinement more harsh than typical keeplock"). Accordingly, Plaintiff has failed to allege a liberty interest based on his time in disciplinary confinement.

8          Plaintiff has attached to his Complaint a document labeled "Disciplinary Hearing Officers Report." (*See* Compl. 18.) Under a section labeled "Confinement Sanctions Imposed," the document indicates that Plaintiff was sentenced to keeplock confinement, (*see id.*), which is "a type of residential segregation," *Brown v. Markham*, No. 16-CV-710, 2018 WL 1918625, at *1 (S.D.N.Y. Apr. 20, 2018). Although the number of days to which he was sentenced appears to be 22, because the writing is almost illegibly faint, the Court cannot determine with certainty how long Plaintiff was confined in keeplock.

*13  Plaintiff also alleges, however, that he suffered a "loss of good time," (Compl. 10), and the Disciplinary Hearing Officers Report attached to his Complaint indicates that he did lose a certain number of days of his good-time behavior allowance, (*see id.* at 18). It is well-established that "the loss of good time credit can implicate a liberty interest." *Jenkins v. Cordero*, No. 17-CV-1592, 2018 WL 456311, at *4 (S.D.N.Y. Jan. 17, 2018) (citing *Wolff*, 418 U.S. at 556–57); *see also, e.g.*, *Gulley v. Roach*, No. 02-CV-908, 2004 WL 2331922, at *5 (W.D.N.Y. Oct. 15, 2004) ("Loss of good time credits implicates a prisoner's liberty interest."). Thus, Plaintiff's allegation that he lost good time credits, which is corroborated by the document attached to his Complaint, is sufficient to establish a liberty interest in his disciplinary proceedings. *See, e.g.*, *Rivers v. Paige*, No. 12-CV-6593, 2014 WL 897094, at *3 (W.D.N.Y. Mar. 6, 2014) (holding that the plaintiff adequately alleged a liberty interest in his disciplinary hearing based on allegation that he had "lost 30 days of good time credit").

But while Plaintiff has adequately alleged a liberty interest in his disciplinary hearing, his allegations regarding procedural deficiencies are too vague and conclusory to establish a procedural due process claim. As noted, Plaintiff alleges merely that Roberts "denied" his "repeat[ed] request[s]" to "present audio and video evidence, as well as to call

witnesses." (Compl. 10.) Courts have held that such vague, conclusory allegations are insufficient to establish the second prong of a procedural due process claim. *See McFadden v. Annucci*, No. 18-CV-6684, 2021 WL 463829, at *9 (S.D.N.Y. Feb. 9, 2021) ("Simply alleging that he was denied the right to call witnesses, present documents or to 'confront accusations' is wholly conclusory and does not state a claim upon which relief can be granted."); *Banks v. Royce*, No. 18-CV-4738, 2020 WL 5038590, at *4 (S.D.N.Y. Aug. 26, 2020) (concluding that the plaintiff's allegation—that the defendants "denied [him] [his] procedural due process when they prevented [him] from presenting evidence in the form of witnesses and documents"—was "the type of 'unadorned, the-defendant-unlawfully-harmed-me' allegation" that is insufficient to state a claim (citations omitted)); *see also Rush v. Canfield*, 649 F. App'x 70, 71 (2d Cir. 2016) (summary order) (holding that the plaintiff's "assertion that he was 'denied the right to call witnesses' " was "a bare legal conclusion incapable of surviving a motion to dismiss" (citation omitted)). Likewise, Plaintiff's allegation that Roberts was improperly swayed by the warden's office, (*see* Compl. 10–11), is merely a "[c]onclusory allegation[ ] of bias," which "[is] not enough to show that a plaintiff received constitutionally insufficient process," *Banks*, 2020 WL 5038590, at *4 (collecting cases); *see also Fabricio v. Griffin*, No. 16-CV-8731, 2019 WL 1059999, at *9 (S.D.N.Y. Mar. 6, 2019) (holding that the plaintiff's "conclusory allegation[ ]" that the hearing officer was biased failed to state a procedural due process claim).

Accordingly, the Court dismisses the Roberts Procedural Due Process Claim.

#### b. The Spaulding/Middleton Procedural Due Process Claim

As discussed, Plaintiff also alleges that the outcome of his "appeals to Defendants Spaulding and Middleton's office [was] improper and unjust." (Compl. 11.) "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional deprivation." *Falls v. Pitt*, No. 16-CV-8863, 2021 WL 1164185, at *31 (S.D.N.Y. Mar. 26, 2021) (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013)) (alteration omitted). There has been a long-running split in the Second Circuit as to "whether an allegation that a defendant affirmed a disciplinary proceeding is sufficient to establish" that defendant's personal involvement in the

2021 WL 4392485

underlying constitutional violation. *Samuels v. Fischer*, 168 F. Supp. 3d 625, 643 (S.D.N.Y. 2016) (surveying authority on both sides) (alterations and quotation marks omitted). Relying on the Second Circuit's 2020 decision in *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020)—which eliminated special standards for supervisory liability and required that alleged constitutional violations be "established against the supervisory official directly," *id.* at 618—at least two courts in this District have found that a defendant's "fail[ure] to correct another officer's violation" at a prison disciplinary hearing "does not suffice" to establish that defendant's personal involvement in the alleged constitutional violation, *Washington*, 2021 WL 966085, at *10 (alteration and citation omitted); *see also Smart v. Annucci*, No. 19-CV-7908, 2021 WL 260105, at *5 (S.D.N.Y. Jan. 26, 2021) (dismissing due process claim based on the hearing officer's "deni[al] [of the] [p]laintiff's administrative appeal" because, under *Tangreti*, such an allegation "cannot support the inference" that the officer was personally involved in the alleged constitutional violation). Thus, even if Roberts had committed a constitutional violation at Plaintiff's disciplinary hearing, it seems doubtful that Plaintiff could state a claim against Spaulding and Middleton based on their affirmance of Roberts' determination. But the Court need not resolve the claim against Spaulding and Middleton on this basis. Here, given "the absence of any underlying constitutional violation" at Plaintiff's disciplinary hearing to begin with, "Plaintiff cannot maintain a cause of action against Defendant[s] [Spaulding and Middleton] based on" their affirmance of Roberts' determination. *Hinton v. Prack*, No. 12-CV-1844, 2014 WL 4627120, at *13 (N.D.N.Y. Sept. 11, 2014); *see also Barnes v. Annucci*, No. 15-CV-777, 2019 WL 1387460, at *15 (N.D.N.Y. Mar. 12, 2019) (explaining that "because no constitutional violation occurred" at the plaintiff's disciplinary hearing, "and there was no wrong to remedy," the plaintiff could not state a due process claim against a defendant based on his affirmance of the disciplinary determination), *report and recommendation adopted*, 201 WL 1385297 (N.D.N.Y. Mar. 27, 2019).

**\*14** For these reasons, the Court also dismisses the Spaulding/Middleton Procedural Due Process Claim.

### 6. The *Monell* Claim

To the extent Plaintiff intends to assert a claim against the County pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), his claim fails. "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused

a constitutional tort." *Id.* at 691. Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell*, 436 U.S. at 690–91). The fifth element reflects the notion that a *Monell* defendant "may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997). In other words, a municipality may not be held liable under § 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted). Rather, "municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right." *Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008). A plaintiff may satisfy the fifth element by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted). Moreover, a plaintiff also must establish an "affirmative" causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *City of Okla. City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985).

Here, the Complaint is utterly devoid of any allegations that would establish the fifth element of a *Monell* claim. (*See*

*generally* Compl.) Plaintiff does not allege, for example, that the County officially endorsed a formal policy of retaliating against inmates who file grievances, or of depriving them of procedural due process at disciplinary hearings. *Brandon, 705 F. Supp. 2d at 276.* Nor does he describe actions by "government officials responsible for establishing the policies that caused the particular deprivation in question," or a "practice so consistent and widespread" that it "constitutes a custom or usage of which a supervising policy-maker must have been aware." *Id.* at 276–77. Likewise, the Complaint says nothing with respect to the County's alleged failure "to provide adequate training or supervision to subordinates." *Id.* at 277. Because Plaintiff offers no allegations to establish the fifth element of a municipal liability claim, any such claim must be dismissed. *See Jackson v. Westchester County,* No. 18-CV-7207, 2019 WL 3338020, at \*4 (S.D.N.Y. July 25, 2019) (dismissing *Monell* claim where the plaintiff failed to "allege the existence of any policy, any actions taken or decisions made by any ... policymaking officials, any systemic failures to train or supervise, or any practices so widespread that they practically have the force of law" and failed to "provide any factual details regarding ... other [purported] lawsuits and grievances" on similar issues (collecting cases)); *see also McKenzie v. City of Mount Vernon,* No. 18-CV-603, 2018 WL 6831157, at \*7 (S.D.N.Y. Dec. 28, 2018) (dismissing *Monell* claim where the plaintiff did "not allege any facts suggesting a policy or custom that led to [the] alleged" constitutional deprivation); *5 Borough Pawn, LLC v. City of New York,* 640 F. Supp. 2d 268, 300 (S.D.N.Y. 2009) (dismissing *Monell* claim where the "plaintiffs fail[ed] to allege any facts showing that there is a [municipal] policy—unspoken or otherwise—that violates the Federal Constitution").

## III. Conclusion

**\*15** For the reasons stated above, the Court dismisses the Grievance Claim, the Mabra Retaliation Claim, the Excessive Force Claim, the Failure to Intervene Claim, the Procedural Due Process Claims, and the *Monell* Claim. The Vanlierop Retaliation Claim survives.

Because this is the first adjudication of Plaintiff's claims on the merits, the dismissed claims are dismissed without prejudice. Plaintiff may file an amended complaint within 30 days of the date of this Opinion & Order. The amended complaint should contain appropriate changes to remedy the deficiencies identified in this Opinion & Order. Plaintiff is advised that the amended complaint will replace, not supplement, the instant Complaint, and therefore must contain all of the claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider. If Plaintiff fails to abide by the 30-day deadline, his claims may be dismissed with prejudice.

The Clerk of Court is respectfully directed to terminate the instant Motion, (Dkt. No. 28), and mail a copy of this Opinion & Order to Plaintiff.

SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 4392485

---

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

2019 WL 3219442

2019 WL 3219442
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Joseph VIDAL, Plaintiff,

v.

Jackeline VALENTIN, Defendant.

16-CV-5745 (CS)
|
Signed 07/02/2019
|
Filed 07/17/2019

**Attorneys and Law Firms**

Benjamin J.A. Sauter, Sara Gribbon, Kobre & Kim LLP, New York, New York, Counsel for Plaintiff. [1]

Neil Shevlin, Assistant Attorney General, Office of the Attorney General of the State of New York, New York, New York, Counsel for Defendant.

[1]     The Court thanks Plaintiff's counsel for taking on Plaintiff's representation *pro bono*.

**OPINION & ORDER**

Seibel, District Judge

**\*1** Before the Court is Defendant's motion for summary judgment. (Doc. 61.)

**I. BACKGROUND**

The following facts are based on the parties' Local Civil Rule 56.1 statements, replies, and supporting materials, and are undisputed except as noted.

New York State Department of Corrections and Community Supervision ("DOCCS") Directive 4422 ("Offender Correspondence Program") contains the following relevant provisions:

- "The sending and receiving of mail by offenders will be restricted only to the extent necessary to prevent a threat to the safety, security, and good order of the facility or the safety or well being of any person, and

to prevent unsolicited and unwanted mail." (Doc. 65 ("Russo Decl.") Ex. A ¶ II(C).)

- "Except for oversize envelopes and parcels, offender-to-offender correspondence and correspondence specified in ... [Directive 4421], ... outgoing correspondence may be sealed by the offender." (*Id.* ¶ III(B)(7).)

- "Oversize correspondence, defined as mail which cannot be enclosed in a standard business envelope, shall be inspected in the presence of the offender by a designated security staff person for the presence of contraband." (*Id.* ¶ (B)(8).)

- [O]utgoing mail purporting to be privileged correspondence will not be considered to be privileged correspondence until it has been placed in the control of the administration [2] for processing. (*Id.* ¶ III(A).)

[2]     The term "administration" is not defined in DOCCS Directive 4422. Anthony Russo, currently employed by DOCCS as the Deputy Superintendent for Security at the Green Haven Correctional Facility ("Green Haven"), averred that the term "administration" refers to mail room staff. (Russo Decl. ¶ 8.) Plaintiff disputes this fact, pointing to Defendant's deposition testimony during which she explained that the term "administration" refers to "civilian employees," which means "somebody who's not in uniform." (Doc. 67 ("Sauter Decl.") Ex. A ("Valentin Tr.") at 102:19-25.) But the testimony continues in a vein consistent with Russo's position:

    Q: So your interpretation of [DOCCS Directive 4422 ¶ III(A) ] is that outgoing mail is not privileged until it's in the control of those persons in that building?

    A (Valentin): The mailroom personnel, yes.

(*Id.* at 103:15-19.) Plaintiff also points to Defendant's October 27, 2014 memorandum where she wrote: "[P]er directive, legal mail (oversized) is not considered privileged until it reaches the facility administrator." (Sauter Decl. Ex. T.) Plaintiff claims that the "facility administrator" does not refer only to mail room personnel. (Doc. 68 ("P's 56.1 Resp.") ¶ 15.) (Citations to Plaintiff's 56.1 Response refer to the paragraphs under the heading "Plaintiff's Responses to Defendant's

Case 5:22-cv-00216-GTS-TWD  Document 7  Filed 04/13/22  Page 182 of 227

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

2019 WL 3219442

Statements of Material Facts," which begins on page two of Document 68.)

Neither side explains why the definition of the term "administration" affects the outcome of the instant motion, and I do not consider the term's definition material to this case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (fact is material when it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment).

**\*2** Further, DOCCS Directive 4421 ("Privileged Correspondence") provides that once outgoing privileged correspondence has been sealed by an inmate, it "shall not be opened, inspected, or read without express written authorization from the facility Superintendent." (*Id.* Ex. B ¶ 721.3(A)(2).)

Plaintiff Joseph Vidal is an inmate currently incarcerated by DOCCS at the Elmira Correctional Facility. (P's 56.1 Resp. ¶ 1.) From October 2014 to March 2015, Plaintiff was incarcerated at Green Haven. (*Id.*) Defendant Jackeline Valentin has been employed as a Correction Officer ("CO") by DOCCS since January 7, 2013. (*Id.* ¶ 2.) Defendant was assigned to Green Haven in April or May 2013, but she is no longer working there because she has been "out on medical" leave as of September 2017. (*Id.*; Valentin Tr. at 8:14-21.)

On October 12, 2014, Defendant worked at Green Haven as the A officer on E Block during the 7:00 a.m. to 3:00 p.m. shift. (P's 56.1 Resp. ¶ 3.) That day, Plaintiff approached Defendant and asked her to sign a disbursement form for a sealed 8.5″ × 11″ envelope marked "legal mail" that Plaintiff stated he wanted to send to his attorney. (P's 56.1 Resp. ¶ 4; Sauter Decl. Ex. B ("Vidal Decl.") ¶ 7.) Because a standard business envelope is approximately 9″ × 4″, Plaintiff's envelope was oversized under the applicable regulation, and thus subject to inspection. (*See* Russo Decl. Ex. A ¶ III(B)(7)-(8).) Defendant advised Plaintiff that she could not sign the disbursement form unless he agreed to open the envelope to allow Defendant to inspect the contents. (P's 56.1 Resp. ¶ 5.) Defendant claims that she told Plaintiff she needed to inspect his envelope for contraband and gang paraphernalia, (Doc. 66 ("Valentin Decl.") ¶ 4), but Plaintiff disputes that Defendant told him why she needed to inspect the envelope, (Vidal Decl. ¶ 4; P's 56.1 Resp. ¶ 5.) Plaintiff refused to open his envelope and left. (P's 56.1 Resp. ¶ 6.)

That same day, Plaintiff submitted a letter to the facility Superintendent. (*Id.* ¶ 7; Valentin Decl. Ex. A (the "Letter").) [3] On October 14, 2014, Plaintiff filed a grievance with Green Haven. (P's 56.1 Resp. ¶ 8; Valentin Decl. Ex. B (the "Grievance").) In both his Letter and Grievance, Plaintiff complained that Defendant had acted improperly on October 12, 2014, when she informed Plaintiff she would not sign the disbursement form unless he opened the envelope so that she could review its contents. (P's 56.1 Resp. ¶ 9.) The Letter also asserted that Defendant had acted improperly by sharing her personal information with inmates. (*Id.* ¶ 10.) Specifically, Plaintiff alleged:

> [T]he fact that [Defendant] has problems with her black [A]merican husband, has either a cousin or cousin-in-law, if not in the block, in the facility, and that she shares her business or that she is from 190th Street, Washington Height[s], should not be affairs she should discuss. Employee Rule Manual, section 7.18, if I am not mistaken states that an officer should not display any familiarity with offenders.

(Letter at 2; *see* P's 56.1 Resp. ¶ 10.) Plaintiff testified that he included Defendant's personal information in his Letter to the Superintendent

> [b]ecause [Defendant] feels that she knows all the rules and regulations. Obviously, she doesn't because if somebody else knew her address on the block, she had to share it with somebody if somebody knows her and she hasn't told the superintendent that there's somebody here that knows her. That's why I did that. I have a right to do that. If an officer is acting – is out of place and not following his own rules and employee manual, I have a right to complain. That's what 139 says, Correctional 139. Find me guilty.

Case 5:22-cv-00216-GTS-TWD   Document 7   Filed 04/13/22   Page 183 of 227

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

2019 WL 3219442

**\*3**  (Doc. 64 ("Shevlin Decl.") Ex. A at 113:14-114:2; P's 56.1 Resp. ¶ 11.) Defendant does not have a black American husband or a relative in the facility. (Valentin Decl. ¶ 11.) She does not live on 190th Street [Redacted]. (*Id.* ¶¶ 11-12.)

3          The Letter is incorrectly dated October 12, 2012.

A supervisor shared copies of Plaintiff's Letter and Grievance with Defendant "[a]t some point in time following" the October 12 mail-related interaction between Plaintiff and Defendant. (*Id.* ¶ 7.) Defendant does not remember when she received the documents, whether she received them at the same or different times, the identity of the supervisor who gave the Letter to her, or whether she was interviewed by a supervisor about them. (*Id.*) Defendant testified that she would have received the October 14 Grievance by the time she discussed the matter with another officer (Sergeant Malark), although she does not remember precisely when that discussion occurred either. (*Id.*; Valentin Tr. at 117:13-118:24, 133:25-134:25.)

Defendant testified that the filing of Plaintiff's October 14 Grievance did not bother her because inmate complaints are part of her job. (Doc. 71 Ex. A at 121:23-122:8.)[4] But she did testify that she became "upset" that Plaintiff [Redacted] because she perceived Plaintiff's allegations to be an "attack on [her] character" insofar as they accused her of improperly "fraternizing with inmates" and made "a false statement about [her] sharing [her] personal information with other people." (Valentin Tr. at 122:5-8, 151:7-153:5, 200:13-22.) She also stated that she was [Redacted] (*Id.* at 123:8-12, 162:5-11.)

4          Doc. 71 Ex. A contains transcript excerpts from the
           same deposition as the Valentin Tr.

On October 20, 2014, Plaintiff sent a note to civilian employee Alfia Alioto concerning her October 16, 2014 review of Plaintiff's inmate chart. (P's 56.1 Resp. ¶ 18.) In the note, Plaintiff commented, "I must admit you are a pretty down to Earth lady. Thank you. P.S. Keep it simple. I will try." (*Id.*) The note contained a written smiley face. (*Id.*) The next day (October 21), Sergeant Dragoon issued Plaintiff an Inmate Misbehavior Report charging him with violating Rule 107.11 ("Inmates shall not communicate messages of a personal nature to any employee."). (*Id.* ¶ 17.) That same day, Plaintiff was placed on keeplock status in his cell on E Block pending resolution of the charge against him. (*Id.* ¶ 19.)[5] The paperwork relating to Sergeant Dragoon's Report asks,

"Inmate confined/restricted for this report?" and the option "Yes" is selected, with the date "10/20/14" specified. (Russo Decl. Ex. C at 9.)[6] On October 29, 2014, Captain Carey conducted a disciplinary hearing in connection with Sergeant Dragoon's Report and Plaintiff's punishment was keeplock status for thirty days (with a start date of October 20) and loss of privileges. (*Id.* Ex. C at 1.) Plaintiff describes the punishment he received as "disproportionate" – although he provides no facts as to the typical punishment for such an offense by an inmate with his history – and claims it is disputed whether there were other factors that led to his keeplock status aside from Sergeant Dragoon's Inmate Misbehavior Report. (P's 56.1 Resp. ¶ 19.) Plaintiff also disputes whether he actually violated Rule 107.11 and claims the issuance of the Inmate Misbehavior Report was part of a retaliatory scheme. (*Id.* ¶¶ 17-19.)

5          An inmate on keeplock status is confined to his cell
           for twenty-three hours per day, and is allowed one
           hour of recreation per day. (P's 56.1 Resp. ¶ 19.)

6          All page citations to exhibits attached to the Russo
           Declaration refer to the pagination generated by the
           Court's Electronic Case Filing System.

**\*4**  On October 23, 2014, Plaintiff was issued two additional Inmate Misbehavior Reports for his alleged continuing improper interactions with Alioto. (P's 56.1 Resp. ¶ 20.) The first Report, issued by Alioto for an incident occurring on October 23, 2014, at approximately 9:15 a.m., charged Plaintiff with violating Rules 101.22 ("stalking") and 107.11 ("harassment"). (*Id.* ¶ 21.) According to the Report, that morning Alioto had received a thank-you note from Plaintiff attached to Plaintiff's yellow copy of the October 21, 2014 Inmate Misbehavior Report written by Sergeant Dragoon. (*Id.*) Alioto said she feared for her safety. (*Id.*) Plaintiff disputes that he violated Rules 101.22 and 107.11 and whether the alleged thank you note was the true or sole reason for the cited Inmate Misbehavior Report. (*Id.*)

Later that day, at approximately 5:00 p.m., Sergeant Kutz issued an additional Inmate Misbehavior Report to Plaintiff for allegedly having sent inappropriate correspondence to Alioto. (*Id.* ¶ 22.) That ticket charged Plaintiff with violating Rules 107.11 ("harassment") and 180.11 ("Facility Correspondence Guidelines"). (*Id.*) Plaintiff again disputes that he violated those rules and whether the alleged correspondence was the true or sole reason for the cited Inmate Misbehavior Report. (*Id.*)

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

2019 WL 3219442

On October 23, 2014, Defendant issued an Inmate Misbehavior Report, stating that Plaintiff's "grievance/ complaint" "discussed my personal information and stated my address (cross street) and town. I have never; nor will I ever discuss or provide my personal/physical address or information with any inmate." (Russo Decl. Ex. E at 5 ("Defendant's Report").) Defendant's Report cites Plaintiff for violating Rule 113.26 ("Personal information of a current or former employee"), which provides:

> An inmate shall not, without written authorization of the superintendent, solicit, possess or exchange personal identifying information (*e.g.* social security number, home address, private e-mail address or home telephone number) belonging to a person who is a present or former employee of the department or presently or formerly employed in a department facility, or to any member of the person's household, unless the inmate is an immediate family member of such person.

(P's 56.1 Resp. ¶¶ 23-24.) Defendant's Report says that Plaintiff's housing location at the time was "SHU 1," (Defendant's Report), which I understand to be the Special Housing Unit.

Plaintiff disputes that he violated Rule 113.26 and disputes that the alleged Rule violation was the true or sole reason for Valentin's Inmate Misbehavior Report. (P's 56.1 Resp. ¶ 23.) Specifically, the parties dispute whether "190th Street, Washington Height[s]" amounts to "personal identifying information" as contemplated by Rule 113.26, and whether the mere "possession" of such information is sufficient to violate Rule 113.26. (*Id.*; Doc. 69 ("P's Opp.") at 17-19.) On October 27, 2014, Defendant provided a memorandum to Sergeant Malark responding to Plaintiff's Grievance and denying any wrongdoing. (Valentin Decl. Ex. E.)

On October 23, 2014, Plaintiff was sent to SHU where he stayed until March 3, 2015. (Vidal Decl. ¶ 16.) Plaintiff claims that before he was sent to SHU, Defendant stopped by Plaintiff's cell and said, "You are going to SHU." (*Id.* ¶ 17.)[7] The day after Plaintiff was sent to SHU, Plaintiff says

Defendant appeared in SHU and said, "Look at you now" and "Pendejo yo no soy de 190th y Washington Heights," (*id.*), which I understand to mean, "Idiot, I'm not from 190th and Washington Heights." Plaintiff also attests that on March 6, three days after he was released from SHU, he was beaten by COs and sent back to SHU. (*Id.* ¶ 18.) Plaintiff says that on the same day, Defendant visited Plaintiff in SHU and "mock[ed] and taunt[ed]" him. (*Id.*)

[7]     Plaintiff's Amended Complaint says that Defendant told Plaintiff "You are going to SHU" at 9:55 a.m., (Doc. 26 ("AC") ¶ 29), but there is no evidence in the record – including Plaintiff's Declaration – as to what time this occurred, and I cannot consider Plaintiff's unsworn, unverified complaint on a motion for summary judgment. *See Trinidad v. N.Y.C. Dep't of Corr.*, 423 F. Supp. 2d 151, 161 (S.D.N.Y. 2006) (unsworn materials are "an insufficient basis for opposing a motion for summary judgment") (internal quotation marks omitted); *Dukes v. City of N.Y.*, 879 F. Supp. 335, 343 (S.D.N.Y. 1995) ("[U]nsworn statements are not admissible to controvert a summary judgment motion."). The time of the remark is not material in any event.

**\*5** On December 31, 2014, Captain Carey conducted two disciplinary hearings involving Plaintiff. (P's 56.1 Resp. ¶ 27.) One concerned the October 23, 2014 Inmate Misbehavior Report issued by Defendant, and the other concerned the two October 23, 2014 Inmate Misbehavior Reports issued to Plaintiff in connection with his interactions with staff member Alioto. (*Id.*) Following the first hearing Defendant's Inmate Misbehavior Report was dismissed. (*Id.* ¶ 28; Russo Decl. Ex. E at 1.)

Following the hearing on the two Alioto-related Reports, Plaintiff was found guilty of the two charges of harassment (Rule 107.11) and the charge of a facility correspondence violation (Rule 180.11), and the allegation of stalking (Rule 101.22) was dismissed. (P's 56.1 Resp. ¶ 29; Russo Decl. Ex. D at 1.) Plaintiff's punishment was "six months (with two months suspended) in SHU (commencing October 23, 2014 to February 23, 2015), and six months loss of packages, phones, and commissary (commencing October 23, 2014 to April 23, 2015)." (P's 56.1 Resp. ¶ 30.)

On June 17, November 26, and September 28, 2013, pursuant to a practice whereby staff are to notify a supervisor if the staff member knows an inmate from the outside, (*see* Russo

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

2019 WL 3219442

Decl. ¶ 29), Defendant submitted a total of four memoranda (submitting two on June 17) to the Deputy Superintendent of Security for Green Haven informing him that she recognized certain inmates from her life outside of DOCCS. (*Id.* ¶ 31; Sauter Decl. Ex. O.) In addition, Defendant learned that Plaintiff had obtained the personal information in the Letter from an inmate in J-block, nicknamed "Monstro," and tracked down his real name, Jose Padilla. (Valentin Tr. at 168:6-17.) Valentin testified that, having learned that Padilla, who she knew [Redacted] (*id.* at 164:12), was in the facility, she submitted a "to/from," which is a memo, "explain[ing] the situation," (*id.* at 169:20-24), *i.e.*, that Padilla knew Defendant from her life outside of DOCCS, (*id.* at 164:12-15). DOCCS has no record of it, (P's 56.1 Resp. ¶ 31), but Defendant notes that Padilla was transferred to another jail, and there would be no other reason to move him except that she had submitted a to/from stating she knew him, (Valentin Tr. at 169:24-170:12).

On July 19, 2016, Plaintiff initiated this action. (Doc. 2.) He filed an amended complaint on March 23, 2017. (AC.) Following discovery, Defendant filed the instant motion for summary judgment. (Doc. 61.)

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a).* "[T]he dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248.* A fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008)* (citing *Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)*). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson, 477 U.S. at 252.* Moreover, the non-movant "must do more than simply show that there is

some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986),* and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 428 (2d Cir. 2001)* (internal quotation marks omitted).

**\*6** "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials...." *Fed. R. Civ. P. 56(c)(1).* Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant ... is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008).* In the event that "a party fails ... to properly address another party's assertion of fact as required by *Rule 56(c),* the court may ... consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." *Fed. R. Civ. P. 56(e).*

## III. DISCUSSION

### A. First Amendment Retaliation

Plaintiff's Amended Complaint alleges that Defendant, in her individual capacity,[8] retaliated against him in violation of *42 U.S.C. § 1983* for exercising his right under the First Amendment to submit grievances and complaints. (AC ¶¶ 1-2.)[9] The Second Circuit has instructed district courts to "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly, 794 F.3d 290, 295 (2d Cir. 2015)* (internal quotation marks omitted); *see Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)* ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike.") (internal quotation marks omitted); *Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995)* (skepticism warranted by "near inevitability of decisions and actions by prison officials to which prisoners will take

Case 5:22-cv-00216-GTS-TWD   Document 7   Filed 04/13/22   Page 186 of 227

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

2019 WL 3219442

exception and the ease with which claims of retaliation may be fabricated").

8    Plaintiff's AC alleges that Defendant was acting "in her individual and/or official capacity." (AC ¶ 62.) Plaintiff's counsel clarified that Plaintiff's AC – which Plaintiff drafted before he acquired *pro bono* counsel – intended to assert a claim for damages against Defendant in her individual capacity and not her official capacity. (P's Opp. at 24.) Complaints made by *pro se* plaintiffs are to be examined with "special solicitude," interpreted "to raise the strongest arguments that they suggest," *Shibeshi v. City of N.Y.*, 475 F. App'x 807, 808 (2d Cir. 2012) (summary order) (emphasis and internal quotation marks omitted), and "held to less stringent standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (internal quotation marks omitted). Accordingly, I interpret Plaintiff's Amended Complaint to allege a claim against Defendant in her individual capacity.

9    Plaintiff's Amended Complaint also alleges violations under the Ninth and Fourteenth Amendments. (AC ¶ 1.) Plaintiff has offered no evidence to support this claim except to say that the First Amendment is incorporated against the States by the Fourteenth Amendment. (P's Opp. at 22.) Accordingly, to the extent Plaintiff alleges independent causes of action under the Ninth and Fourteenth Amendments, those claims are dismissed.

To prevail on a First Amendment retaliation claim under 42 U.S.C. § 1983, a prisoner must demonstrate: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." *Washington v. Gonyea*, 538 F. App'x 23, 26 (2d Cir. 2013) (summary order) (alteration and internal quotation marks omitted). Once a plaintiff has "carrie[d] that burden, the defendants must show by a preponderance of the evidence that they would have [taken the allegedly retaliatory action] even in the absence of the protected conduct." *Graham*, 89 F.3d at 79 (internal quotation marks omitted). If the defendant meets this burden, summary judgment is appropriate. See *Davidson v. Chestnut*, 193 F.3d 144, 149 (2d Cir. 1999). In other words, "[r]egardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation,

*i.e.*, that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)); *see Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) (affirming dismissal on summary judgment because correction officer's actions were of mixed motives and "would have been issued on proper grounds alone"); *see also Sher v. Coughlin*, 739 F.2d 77, 81-82 (2d Cir. 1984) (affirming summary judgment dismissal of prisoner's retaliation claim where dual motivation existed for prisoner's transfer to another facility).

**\*7** For purposes of this motion, Defendant does not contest that Plaintiff's Letter and Grievance constitute protected activity. (Doc. 63 ("D's Mem.") at 17 n.2.) That concession is well supported by case law. *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) ("[Plaintiff] has sufficiently alleged ... participation in protected activity: the use of the prison grievance system...."); *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) ("[I]ntentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy.") (alterations and internal quotation marks omitted); *Morgan v. Dzurenda*, No. 14-CV-966, 2017 WL 1217092, at \*12 (D. Conn. Mar. 31, 2017) ("The filing of grievances is a constitutionally protected activity....") (internal quotation marks omitted); *Pledger v. Hudson*, No. 99-CV-2167, 2005 WL 736228, at \*4 (S.D.N.Y. Mar. 31, 2005) ("A prisoner's filing of an internal prison complaint against an officer is protected by the First Amendment...."). Thus, Plaintiff has satisfied the first element of his First Amendment retaliation claim.

Additionally, Defendant does not contest that Plaintiff meets the causation prong of the First Amendment retaliation standard, because Defendant concedes that she issued the Inmate Misbehavior Report to Plaintiff in response to the Letter to the Superintendent. (D's Mem. at 17 n.2.)

Accordingly, the only hurdle Plaintiff must clear to establish his *prima facie* case of retaliation is whether he suffered an adverse action. The Second Circuit "define[s] adverse action objectively, as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights." *Gill*, 389 F.3d at 381 (alterations, internal quotation marks, emphasis omitted). If the retaliatory conduct does not rise to that level, "the retaliatory act is simply *de minimis*, and therefore outside

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

Case 5:22-cv-00216-GTS-TWD    Document 7    Filed 04/13/22    Page 187 of 227

2019 WL 3219442

the ambit of constitutional protection." *Roseboro v. Gillespie,* 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (internal quotation marks omitted). Defendant argues that Plaintiff's stay in SHU cannot satisfy the adverse action element, because Plaintiff was transferred to SHU because of the Inmate Misbehavior Reports issued by Sergeant Kutz and Alioto, and not Defendant's Report. (D's Mem. at 17-18.)

In response, Plaintiff argues that Defendant's filing of an Inmate Misbehavior Report constituted an adverse action in itself. (P's Opp. at 15.) Plaintiff is correct that "a plaintiff's allegation that a defendant issued a false misbehavior report in response to the plaintiff's protected activity can support a claim of unlawful retaliation," *Ward v. Lee,* No. 16-CV-1224, 2018 WL 4610682, at *6 (N.D.N.Y. July 3, 2018), *report and recommendation adopted,* 2018 WL 3574872 (N.D.N.Y. July 25, 2018); *see Franco,* 854 F.2d at 589 (false disciplinary charges as adverse actions); *Reed v. Doe No. 1,* No. 11-CV-250, 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (same), *report and recommendation adopted,* 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012). But Plaintiff offers no evidence that Defendant's Report was actually false. Defendant's Report cites Plaintiff for violating Rule 113.26 and states that Plaintiff's Grievance "discussed my personal information and stated my address (cross street) and town" and wrongly accused her of sharing that information with an inmate. (Defendant's Report.) Plaintiff does not dispute that Defendant in her Report accurately described his Letter.[10] Plaintiff now disputes that the information regarding 190th Street constituted "personal information," but he plainly and concededly included it in his Letter to accuse Defendant of sharing personal information with inmates. (P's 56.1 Resp. ¶ 11; Letter at 2.) This hardly amounts to Defendant's Report being "false." Because Plaintiff offers no evidence that Defendant's misbehavior report was actually false and does not otherwise contest the accuracy of Defendant's Report's contents, Defendant's motion for summary judgment is granted to the extent Plaintiff's theory is that the adverse action was a false misbehavior report. *See Bilal v. White,* 494 F. App'x 143, 147 (2d Cir. 2012) (summary order) ("[Plaintiff's] failure to adduce any evidence that the disciplinary charges were in fact false supports summary judgment for defendant on the merits of that claim."); *Charles v. Rockland Cty. Office of the Sheriff,* No. 16-CV-166, 2019 WL 1299804, at *5 (S.D.N.Y. Mar. 21, 2019) ("[A]lthough the filing of false misbehavior reports can constitute an adverse action, plaintiff offers no evidence these misbehavior reports were actually false.") (emphasis omitted), *appeal docketed,* No. 19-1041 (2d Cir. Apr. 22, 2019); *Pledger* 2005 WL 736228, at *5 (declining to find adverse action where plaintiff "admitted to the content of the [misbehavior] report and plead guilty to one of the charges in it").

10    Plaintiff admits that he heard from another inmate that Defendant lived on 190th Street in Washington Heights and does not purport to have been present when that inmate obtained the information. (Vidal Decl. ¶ 11.)

**\*8** Plaintiff next argues that Defendant's Report constituted an adverse action regardless of its truthfulness and "regardless of the actual penalty imposed." (P's Opp. at 16-17.) But Plaintiff points to no cases – and I know of none – in which a court found that the filing of a non-falsified misbehavior report alone, without evidence of other repercussions, amounted to an adverse action. In fact, courts have held that misbehavior reports do not constitute adverse actions because they are "*de minimis*: they do not constitute penalties that would deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights." *Bartley v. Collins,* No. 95-CV-10161, 2006 WL 1289256, at *7 (S.D.N.Y. May 10, 2006) (finding misbehavior report that resulted in plaintiff's temporary loss of privileges did not amount to adverse action but misbehavior report that resulted in keeplock confinement for ten days did). Typically, courts require a showing of additional punishment above the filing of a misbehavior report to find an adverse action. *Gill,* 389 F.3d at 383 ("[A] plaintiff asserting First Amendment retaliation must allege some sort of harm...."); *see Washington v. Chaboty,* No. 09-CV-9199, 2015 WL 1439348, at *10 (S.D.N.Y. Mar. 30, 2015) ("The filing of the misbehavior report and the disciplinary sanction of 65 days in the S.H.U. constitute adverse actions that satisfy the second element of a retaliation claim."); *cf. Bilal,* 494 F. App'x at 147 (in standing context, fabricated misbehavior report insufficient to show adverse action because "the petitioning prisoner must adduce evidence of some other harm"); *McFadden v. Friedman,* No. 12-CV-685, 2015 WL 5603433, at *13 (N.D.N.Y. Sept. 23, 2015) ("even if plaintiff were issued a false contraband receipt, the injury is *de minimis* and insufficient to show that he suffered an adverse action" where "plaintiff fail[ed] to allege that he received any punishment or reprimand arising out of the seizure of contraband"); *Pledger,* 2005 WL 736228, at *5 (correction officer's issuance of unfavorable evaluation of prisoner and threat to place him in SHU was not an adverse action).

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)
Case 5:22-cv-00216-GTS-TWD   Document 7   Filed 04/13/22   Page 188 of 227
2019 WL 3219442

Plaintiff argues that "[a] retaliatory misbehavior report would deter an inmate's use of the grievance system irrespective of the punishment that is eventually meted out." (P's Opp. at 16.) But the only case Plaintiff cites in support of this argument is *Brown v. Crowley*, 312 F.3d 782 (6th Cir. 2002). There, fact issues precluded a finding that the issuance of a "major misconduct charge," by itself, was not an adverse action because "the risk of such severe sanctions for raising a legitimate complaint would deter a person of ordinary firmness from continuing to engage in that [protected] conduct." *Id.* at 789 (internal quotation marks omitted) (alteration in original). But there the charge of misconduct was plainly unjustified. *See id.* at 783-84 (prisoner charged with filing false report that prison officials embezzled his funds when they docked his inmate account for a debt he did not owe). In any event, the Sixth Circuit's decision is not binding here, and as discussed, no cases in this Circuit hold that the filing of a misbehavior report is, without additional punishment, sufficient to find an adverse action. Further, were an accurate misbehavior report alone a proper basis for a retaliation claim, one can readily imagine the interference with legitimate prison administration. *See Graham*, 89 F.3d at 79 ("A finding of sufficient permissible reasons to justify state action is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority."). Accordingly, I reject Plaintiff's theory that the filing of a misbehavior report alone is sufficient to establish an adverse action. [11]

> [11]    Nor do the alleged inappropriate comments by Defendant rise to the level of adverse action. *See Roseboro*, 791 F. Supp. 2d at 375 (collecting cases).

Confinement in the SHU is an adverse action. *See, e.g., Smith v. Hash*, No. 904-CV-74, 2006 WL 2806464, at *6 (N.D.N.Y. Sept. 28, 2006). But the paperwork associated with the three Inmate Misbehavior Reports Plaintiff received on October 23, 2014, makes clear that Plaintiff was transferred to SHU as a result of Inmate Misbehavior Reports associated with Plaintiff's inappropriate communication with Alioto, not Defendant's Report. (Russo Decl. Ex. D at 1.) [12] In fact, when Defendant filled out the Inmate Misbehavior Report, Plaintiff's housing location was listed as "SHU 1," indicating that Plaintiff was already in SHU at the time she filed her Report. And the record is equally clear that Plaintiff's continued stay in SHU occurred because of the Alioto-related Reports. On December 31, 2014, following the hearing, Defendant's Report was dismissed. (P's 56.1 Resp.

¶ 28; Russo Decl. Ex. E at 1.) But following the hearing on the two Alioto-related Reports, Plaintiff was found guilty of two counts of harassment (Rule 107.11) and one count of facility correspondence violation (Rule 180.11), but not guilty of stalking (Rule 101.22). (P's 56.1 Resp. ¶ 29; Russo Decl. Ex. D at 1.) Plaintiff's punishment was six months (with two months suspended) in SHU (commencing October 23, 2014, to February 23, 2015), and six months loss of packages, phones, and commissary (commencing October 23, 2014, to April 23, 2015). (P's 56.1 Resp. ¶ 30; Russo Decl. Ex. D at 1.) Thus, the evidence shows that Plaintiff's stay in SHU was because of the two incidents related to his inappropriate communication with Alioto, not because of Defendant's Report. Without a showing of facts from which a jury could conclude that Plaintiff was sent to SHU because of Defendant's actions, Plaintiff has not satisfied the adverse action element of his *prima facie* case, and Defendant's motion for summary judgment must be granted.

> [12]    Alioto's report indicates that Plaintiff was moved from keeplock status to the SHU due to the incident. (Russo Decl. Ex. D at 6.) The records of the disciplinary hearing confirm the same. (*Id.* Ex. D at 2.) Defendant's Report indicates that Plaintiff was not restricted as a result of the incident, (*id.* Ex. E at 5), and the hearing records confirm the same, (*id.* Ex. E at 1).

**\*9**  Even if Plaintiff had established his *prima facie* First Amendment retaliation claim, Defendant would still be entitled to summary judgment. Once a plaintiff carries his *prima facie* burden, the burden shifts to the defendant to show by a preponderance of the evidence on the undisputed facts that the plaintiff "would have been disciplined even in the absence of the protected conduct." *Harnage v. Brighthaupt*, 168 F. Supp. 3d 400, 414 (D. Conn. 2016), *aff'd*, 720 F. App'x 79 (2d Cir. 2018) (summary order); *see Graham*, 89 F.3d at 81. To satisfy her burden, "it is not enough that [Defendant] allege[s] that the allegedly retaliatory actions could have been taken absent a retaliatory animus – *i.e.*, that there was a possible legitimate basis for the challenged actions. Rather, [Defendant] must establish that the actions would have been taken, even absent impermissible motives." *Davis v. Rhoomes*, No. 07-CV-6592, 2010 WL 3825728, at *7 (S.D.N.Y. Sept. 30, 2010) (emphasis omitted).

Here, there is ample undisputed evidence that Plaintiff was sentenced to the SHU because of his inappropriate communications with Alioto. (*See* pages 17-18 above.) Defendant played no part in issuing the Inmate Misbehavior

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

Case 5:22-cv-00216-GTS-TWD   Document 7   Filed 04/13/22   Page 189 of 227

2019 WL 3219442

Reports related to these communications or at the disciplinary hearing as a result of which Plaintiff was punished with six months in SHU. In other words, even absent Defendant's retaliatory motive, Plaintiff would have served the time in the SHU anyway. *See Osborne v. Grussing*, 477 F.3d 1002, 1006 (8th Cir. 2007) ("[W]e have repeatedly held that a prisoner fails to state a claim for retaliatory discipline when the alleged retaliation arose from discipline imparted for acts that a prisoner was not entitled to perform, *i.e.*, for violations of prison rules.") (internal quotation marks omitted); *Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir. 1994) ("[I]f the discipline which the prisoner claims to have been retaliatory was in fact imposed for an actual violation of prisoner rules or regulations, then the prisoner's claim that the discipline was retaliatory in nature must fail.") (internal quotation marks omitted). And Plaintiff has provided no evidence of a broader retaliatory scheme such that any other prison employees had retaliatory intent toward Plaintiff. [13]

13      Indeed, had such a scheme existed, it is highly unlikely that Defendant's Report would have been dismissed.

Defendant's comment to Plaintiff, "You are going to SHU," shows that Defendant knew that Plaintiff was going to SHU, but reflects nothing about why. Likewise, her alleged comments "Look at you now" and "Pendejo yo no soy de 190th y Washington Heights," while unprofessional, do not constitute evidence that Defendant had Plaintiff sent to the SHU.

Plaintiff spends much time arguing that Defendant had a retaliatory motive for writing her Report. But even if she did, that does not undermine the showing that the adverse action Plaintiff experienced was based on the Alioto misbehavior reports. So "the actions would have been taken, even absent the impermissible motives." *Davis*, 2010 WL 3825728, at *7 (emphasis omitted). Plaintiff also spends much time arguing that he did not violate Rule 113.26. Again, even if true, Defendant has still shown that Plaintiff would have been sent to SHU anyway. Further, even if Plaintiff's interpretation of Rule 113.26 is correct, Defendant's interpretation was not unreasonable, as discussed in the next section.

Accordingly, Defendant has established by a preponderance of the undisputed evidence that Plaintiff would have been disciplined even in the absence of any retaliatory motive, entitling her to summary judgment. [14]

14      Plaintiff argues in part that the Court should deny summary judgment because Defendant's inconsistent testimony regarding the scope of Rule 113.26 "undermines her credibility and stated basis for filing the [Inmate Misbehavior Report]." (P's Opp. at 20-21.) I do not regard Defendant's testimony about the Rule to be necessarily inconsistent, but I will assume for the sake of argument that it is. Plaintiff cites to no cases in which a court used a defendant's shifting explanations as evidence of retaliatory conduct in the prison context. *Cf. Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846-47 (2d Cir. 2013) (reversing denial of summary judgment on plaintiff's Title VII retaliation claim, finding that the defendant's shifting explanations for why it fired plaintiff, combined with other evidence, precluded summary judgment). But even if inconsistent testimony about the scope of the Rule showed retaliatory animus, for reasons already discussed, Plaintiff would have been sent to SHU anyway. *See Coughlin*, 344 F.3d at 287-88.

### B. Qualified Immunity

**\*10**   Finally, Defendant argues that at the very least she is entitled to qualified immunity. Government officials exercising discretionary functions are entitled to qualified immunity shielding them from damages in a § 1983 suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), or insofar as it was objectively reasonable for them to believe that their conduct did not violate such rights, *see Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). " 'Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.' " *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (*quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). A government official sued in his individual capacity is entitled to qualified immunity

> (1) if the conduct attributed to him was not prohibited by federal law; or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

2019 WL 3219442

at the time it occurred; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.

*Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 210 (2d Cir. 2002) (internal quotation marks, citations, and alterations omitted); *see Creighton*, 483 U.S. at 639 ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken.") (internal quotation marks and citation omitted). Summary judgment should be granted where "the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the [p]laintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *Husain v. Springer*, 494 F.3d 108, 131 (2d Cir. 2007) (internal quotation marks omitted).

Had Plaintiff's claims survived, Defendant would be entitled to qualified immunity. While case law establishes that retaliation for the exercise of the right to petition prison officials is improper, *see Farid v. Goord*, 200 F. Supp. 2d 220, 245 (W.D.N.Y. 2002), "[e]ven if the right at issue was clearly established in certain respects, ... an officer is still entitled to qualified immunity if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context," *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007). No case reads Rule 113.26 as Plaintiff claims it ought to be read. Plaintiff argues that he did not violate Rule 113.26 because the information about Defendant that he possessed was not "personal identifying information" within the meaning of the Rule and because mere possession of information should not constitute a violation. But Defendant's interpretation was objectively reasonable: [Redacted], or at least reasonable minds could differ on the point, and whether Plaintiff finds it fair or not, the regulation penalizes mere possession.[15] At the very least, there was no clearly established law stating that what Plaintiff did – which Defendant accurately described in her Report – was *not* a violation of Rule 113.26.

[15] Further, Plaintiff did not merely possess the information. He used it to make false accusations of misconduct against a court officer. (P's 56.1 Resp. ¶ 11; Letter at 2.)

Claims of retaliatory arrest and prosecution provide useful comparisons. The Supreme Court recently declared that a "plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019). A similar rule applies in the context of retaliatory prosecutions. *See Reichle v. Howards*, 566 U.S. 658, 666 (2012) ("[A] plaintiff cannot state a claim of retaliatory prosecution in violation of the First Amendment if the charges were supported by probable cause."). Although the retaliatory act here is not an arrest or prosecution, the import of the rules is that where retaliation is alleged, if the allegedly retaliatory actor can show probable cause, the retaliation claim cannot stand, or if "arguable probable cause" is shown, the defendant is entitled to qualified immunity. *See, e.g.*, *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) ("Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest."). Here, in the absence of clearly established law that Plaintiff's conduct did not violate Rule 113.26, Plaintiff cannot show the equivalent of the absence of probable cause, or at least arguable probable cause, for Defendant's Report. Defendant would thus be entitled to qualified immunity had summary judgment otherwise been denied. *See Rodriguez v. Phillips*, 66 F.3d 470, 479 (2d Cir. 1995) (reversing denial of summary judgment where plaintiff had no clearly established First Amendment right to speak to officer).

## IV. CONCLUSION

**\*11** For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 61), enter judgment for Defendant, and close the case.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3219442

**Vidal v. Valentin, Not Reported in Fed. Supp. (2019)**

2019 WL 3219442

---

**End of Document**                                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

2006 WL 2806464
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Bryant SMITH, Plaintiff,

v.

Sgt. HASH, Corrections Officer at Oneida
Correctional Facility, et al., Defendant.

No. 904-CV-0074 LEK/DRH.
|
Sept. 28, 2006.

**Attorneys and Law Firms**

Bryant Smith, Brooklyn, NY, Plaintiff Pro Se.

Hon. Eliot Spitzer, Attorney General for the State of New York, Attorney for Defendants, Roger W. Kinsey, ESQ. Assistant Attorney General, The Capitol, Albany, NY, for Defendant.

### *DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

 **\*1** This matter comes before the Court following a Report-Recommendation filed on September 6, 2006, by the Honorable David R. Homer, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report-Rec. (Dkt. No. 21).

Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report-Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," Fed.R.Civ.P. 72(b), in compliance with L.R. 72.1. In the interval of at least fifteen days since the Magistrate Judge filed the subject Report-Recommendation, no objections to it have been raised. Furthermore, after examining the record, the Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice.[1]

[1]    The Court, however, notes several things, which do not otherwise have a material impact upon the Report-Recommendation. First, on page 6 of the

Report citation is made to *Sims v. Artuz* (where the Report cites to "*Id.* at 262"). Report-Rec. (Dkt. No. 21) at 6. However, the citation is actually to *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999), which is cited earlier on page 6 of the Report. Second, the cases of *Dawes v. Walker,* 239 F.3d 489 (2d Cir.2001), Report-Rec. (Dkt. No. 21) at 10, and *Morales v. Mackalm,* 278 F.3d 126 (2d Cir.2002), Report-Rec. (Dkt. No. 21) at 11, were overruled on grounds other than those for which they were cited by Judge Homer.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 21) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 17) is **GRANTED** as to Defendants Hash, Sipley, and Noble on all claims; and it is further

**ORDERED,** that the Complaint is **DISMISSED WITHOUT PREJUDICE** as to Defendant Metzler; and it is further

**ORDERED,** that this matter is **TERMINATED IN ITS ENTIRETY** as to all Defendants and all claims; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

DAVID R. HOMER, Magistrate Judge.

### **REPORT-RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Plaintiff pro se Bryant Smith ("Smith"), formerly an inmate in the custody of the New York State Department of Correctional Services (DOCS), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, four DOCS employees, violated his constitutional rights under the First, Eighth, and Fourteenth Amendments. Compl. (Docket No. 1). Presently

pending is the motion of three defendants[2] for summary judgment pursuant to Fed.R.Civ.P. 56. Docket No. 17. Smith has not responded to the motion. *See* subsections I and VI *infra*. For the following reasons, it is recommended that defendants' motion be granted as to all causes of action and it is further recommended that the complaint be dismissed without prejudice as to the fourth defendant.

[2]     Hash, Noble, and Sipley. Defs. Mem. Of Law (Docket No. 17) at 1.

### I. Failure to Respond

By Order dated December 1, 2005, this Court warned Smith that his failure to respond to defendants' motion by setting forth specific facts demonstrating a genuine issue of fact would result in this Court treating the facts asserted by defendants as true and that the motion might be granted absent a response from Smith. Docket No. 19. Smith was given additional time to respond. *Id.* Despite this notice, Smith has failed to respond to the motion.

"The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the absence of a response, defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.; * Fed.R.Civ.P. 56(c). Because Smith has not responded to raise any question of material fact, however, the facts as set forth in defendants' Rule 7.1 Statement of Facts (Docket No. 17) are accepted as true. *Adirondack Cycle & Marine, Inc. v. American Honda Motor Co.,* No. 00-CV-1619, 2002 WL 449757, at *1 (N.D.N.Y. Mar. 18, 2002) (McAvoy, J.) (citing *Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997)).

### II. Background

**\*2** The facts are presented in the light most favorable to Smith as the non-moving party. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

At all relevant times, Smith was incarcerated at Oneida Correctional Facility ("Oneida"). In March 2003, after allegedly being verbally abused by defendant Metzler, Smith filed a grievance. Compl. at ¶ 9. On March 27, 2003, Smith

was escorted to the Special Housing Unit ("SHU").[3] *Id.* at ¶ 10. Smith alleges that defendant Hash, the escort officer, asked him about his feeling concerning the war in Iraq, and that Smith was verbally abused by Hash at his office before entering SHU. *Id.* at ¶ 10-11. Smith also alleges that while in SHU, he was verbally abused, kicked, punched, and violently pushed into a wall without provocation by defendants Sipley and Noble. *Id.* at ¶ 13.

[3]     SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (1995). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

Shortly after his admission to SHU, Smith alleges that defendants denied him his arthritis medicine. *Id.* at ¶ 16. On March 28, 2003, Nurse Zuchowskil physically examined Smith in accordance with SHU procedure but noted no bruises or other evidence of an assault. Defs. Statement of Material Facts (Docket No. 17) at ¶ 17. Smith's medical records also indicate that, contrary to his allegation, his medication was refilled on March 28. *Id.* at ¶ 32.

On March 31, 2003, Smith complained that he was assaulted by defendants upon his admission to SHU. *Id.* at ¶ 21. In response, Smith was thoroughly examined and statements and photographs were taken of the alleged injuries. *Id.* at ¶¶ 22-27. Smith received a response asserting that his claims were unsubstantiated. Compl. at ¶ 20. This action followed.

### III. Summary Judgment Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable

inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Id.* However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

## IV. Discussion

**\*3** Smith asserts three causes of action in his complaint. The first alleges that defendants used excessive force and caused him serious physical injury, the second that defendants subjected him to cruel and unusual punishment, and the third that defendants retaliated against him for exercising his First Amendment rights. The moving defendants seek summary judgment on all claims.

## A. Excessive Force

Smith contends in his first cause of action that defendants physically assaulted him without provocation causing him serious physical injury in violation of his constitutional rights under the Eighth and Fourteenth Amendments. Defendants contend this claim is without merit.

The Eighth Amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Cooper Indus. Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 433-34 (2001). It prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII.

The Supreme Court has established that inmates enjoy the Eighth Amendment protection against the use of excessive force and may recover damages for its violation under §

1983. *Hudson v. McMillian,* 503 U.S. 1, 9-10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir .2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). The objective element requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Id.* However, "the malicious use of force to cause harm constitute[s][an] Eighth Amendment violation *per se"* regardless of the seriousness of the injuries. *Id.* at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9-10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 262 (citing *Wilson v. Seiter,* 501 U.S. 294, 298-99 (1991)). "[T]he 'wantonness' inquiry turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id* . (quoting *Hudson,* 503 U.S. at 7).

**\*4** Here, a physical examination of Smith by Nurse Zuchowski less than eleven hours after his admission to SHU failed to show any injuries, either old or new. Smith also denied any medical concerns or needs. On March 31, 2003, four days after his admission to SHU, Smith filed a complaint regarding the alleged assault. Smith gave no response when asked why he did not report the alleged assault immediately. Smith was again examined by medical staff. The examination revealed a minor bruise to the inner arm, a small "resolving bruise" to his lower left back and one superficial scrape to the right ankle. The medical examination on March 31, the examination photographs, the medical report on March 28, and admission photographs on March 27 all failed to reveal any injury that would support Smith's allegations.

Smith v. Hash, Not Reported in F.Supp.2d (2006)
Case 5:22-cv-00216-GTS-TWD   Document 7   Filed 04/13/22   Page 195 of 227
2006 WL 2806464

Further, Hash was not present when the alleged assault occurred. Hash, who was in charge of transporting Smith to SHU, did not enter SHU and was not present during the strip frisk of Smith. Smith's own statements in his complaint and in his grievance fail to place Hash in any area where the alleged assault happened. Thus, in addition, Smith has failed to show that Hash was personally involved in any alleged deprivation of rights. *See Wright v. Smith,* 21 F .3d 496, 501 (2d Cir.1994).

Therefore, defendants' motion should be granted as to the first cause of action.

## B. Medical Care

Smith contends in his second cause of action that defendants deprived him of his constitutional rights under the Eighth Amendment when they denied him his medication. Defendants contend that this claim is without merit.

A prisoner advancing an Eighth Amendment claim for denial of medical care must allege deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). More than negligence is required but less than "conduct undertaken for the purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there is a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998); *Hathaway,* 37 F.3d at 66. Next, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of the substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

## 1. Serious Medical Need

A serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Camberos v. Branstad,* 73 F.3d 174, 176 (8th Cir.1995) (citing *Johnson v. Busby,* 953 F.2d 349, 351 (8th Cir.1991)); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 310 (S.D.N.Y.2001). " '[A]n injury that a reasonable doctor or patient would find important and worthy of ... treatment ..., a medical condition that significantly affects an individual's daily activities, or the existence of chronic and substantial pain' ' " are all factors that are relevant in the consideration of whether a medical condition is serious. *Chance,* 143 F.3d at 702-03 (quotation marks and citation omitted). The ailment may be considered serious if the prisoner has multiple complaints of pain. *Williams v. M.C.C. Inst.,* No. 99-Civ.-5352, 1999 WL 179604, at *5 (S.D.N.Y. Mar. 31, 1999).

**\*5** Here, Smith was being treated for arthritis pain and was given a prescription for Ultram. Janicki Aff. (Docket No. 17) at ¶ 4. Smith was to take Ultram only as needed. *Id.* at ¶ 5. Further, in his complaint, Smith did not allege that he suffered any pain associated with the arthritis. Compl. at ¶ 16. Smith only alleged that he inquired about receiving his medication. *Id.* Thus, there is insufficient evidence to establish that Smith suffered a serious medical need or that the alleged deprivation was "sufficiently serious." Cf. *Veloz v. New York,* 35 F.Supp.2d 305 (S.D.N.Y.1999) (holding that a foot condition involving fracture fragment, bone cyst, and degenerative arthritis did not constitute a serious medical need).

## 2. Deliberate Indifference

Defendants also contend that the alleged acts by defendants did not demonstrate the culpable state of mind necessary to satisfy the subjective element of deliberate indifference.

Deliberate indifference requires the prisoner to prove that the prison official knew of and disregarded the prisoner's serious medical needs. *Chance,* 143 F.3d at 702. "[M]ere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Id.* at 703. Allegations of negligent malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hemmings v.. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998); *Hathaway,* 99 F.3d at 553..

Here, Smith was being treated for his arthritis pain. Janicki Aff. at ¶ 4. Although he alleges that he requested his medication, Smith did not complain about any pain or any serious medical need. *See* Compl. at ¶ 16; Zuchowski Aff. (Docket No. 17) at ¶ 8. Therefore, even accepting Smith's allegations as true, defendants could not have been aware that a substantial risk of serious harm existed and, thus, Smith's

2006 WL 2806464

Eighth Amendment claim fails to demonstrate defendants' deliberate indifference to a serious medical need.

Therefore, defendants' motion should be granted as to the second cause of action.

### C. Retaliation

In the third cause of action, Smith contends that defendants placed him in SHU after questioning him about his feelings toward the war in Iraq. Defendants contend that this claim is without merit.

In order to prevail on a retaliation claim, a plaintiff must first assert that the plaintiff's conduct was constitutionally protected and that this conduct was a "substantial factor" that caused the adverse action against plaintiff. The burden then shifts to the defendant to show that by a preponderance of the evidence, the adverse action would have resulted even in the absence of the protected conduct. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Dawes v. Walker,* 239 F.3d 489, 492 (2d. Cir.2001). Retaliation claims are actionable because they may tend to chill an individual's exercise of constitutional rights. *Dawes,* 239 F.3d at 491. However, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Id.*

**\*6** Smith's freedom to express his feeling toward the war was a constitutionally protected right. However, Hash escorted Smith to SHU on the orders of his superior for an investigation of a disturbance. The alleged conversation between Hash and Smith happened while Hash was carrying out his duty to escort Smith to SHU. Therefore, Smith would have been escorted to SHU regardless of exercising his constitutionally protected right and the alleged retaliatory action was thus (1) ordered by someone other than a defendant, and (2) taken prior, not subsequent, to the discussion on the Iraq war. Accordingly, Smith has failed to show that any defendant was motivated by retaliation.

Liberally construed, Smith may also base his retaliation claim on his filing a grievance against Metzler, whom Smith alleges verbally abused him six days before Smith went to SHU. Defendants contend that this claim should be dismissed because Smith could not demonstrate that this was a substantial reason for his transfer to SHU. Smith's filing of a grievance was clearly an assertion of a constitutional

right protected by the First Amendment. *Morales v. Macklam,* 278 F.3d 126, 131 (2d Cir.2002). Smith claims that the adverse action which resulted from filing grievances was his transfer to SHU. In order for any action to constitute adverse action, a plaintiff must establish that the adverse action would deter a similarly situated individual from exercising his or her constitutional rights. *Dawes,* 239 F.3d at 491. It is reasonably possible that other inmates would fail to exercise their constitutional right to file grievances for fear that they would be transferred to SHU. Thus, Smith's alleged transfer to SHU in retaliation for filing a grievance could be considered an adverse action.

However, Smith fails to show a causal connection between his filing of the grievance and his placement in SHU because he only offers conclusory statements to support this claim. Smith alleges that Metzler verbally abused him and he subsequently filed a grievance because of this alleged abuse. However, Smith's transfer to SHU was not until six days later after he filed the grievance and he was there for less than twenty-four hours. The uncontradicted record also showed that Smith's transfer to SHU was due to an investigation of a disturbance. Thus, Smith cannot prove that improper motive played a substantial role in his transfer to SHU.

Therefore, defendants' motion should be granted as to the third cause of action.

### D. Qualified Immunity

Defendant Hash contends that he is entitled to qualified immunity with respect to Smith's claim that Hash placed him in SHU without following the requisite DOCS rules.

Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229-30 (N.D.N.Y.2002). Even if plaintiff's allegations, being accepted as true, would constitute a violation of a clearly established constitutional right, the "contour of the right" must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).

**\*7** Here, it is undisputed that Hash was ordered by his superior, Lt. Matte, to supervise the escort of Smith to SHU due to a disturbance. Even if the allegation that Smith's confinement at SHU was a constitutional violation, it could not be said that Hash knowingly violated Smith's rights because he reasonably relied on his superior's order to transport Smith to SHU.

Therefore, in the alternative, defendant Hash's motion on this ground should be granted.

### E. Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State ." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100.

A suit brought against a person in his or her official capacity is to be treated as a suit against the public entity represented by that person, provided that the public entity received notice and an opportunity to respond. *Brandon v. Holt,* 469 U.S. 464, 471-72 (1985). In an official capacity action, a governmental entity is liable under § 1983 only when the entity itself is the "moving force" behind the deprivation. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). In other words, "the entity's 'policy or custom' must have played a part in the violation of federal law" for liability to attach. *Id.* at 166 (citations omitted); *Hafer v. Melo,* 502 U.S. 21, 25 (1991).

Here, the entity represented by defendants, DOCS, cannot be found liable under § 1983 for the acts of which Smith complains. Smith fails to allege or prove that a policy or custom of DOCS contributed in any way to the alleged constitutional deprivations.

Accordingly, in the alternative, defendants' motion should be granted as to all defendants in their official capacities.

### V. Failure to Serve Defendant Metzler

Smith's complaint asserts a claim against Metzler, who has not been served with the complaint. Rule 4(m) of the Federal Rules of Civil Procedure requires that service of process be effectuated within 120 days of the date of the filing of the complaint. *See* N.D.N.Y.L.R. 4.1(b). A summons was issued for Metzler on February 6, 2004. Docket entry dated 2/6/04. Because Metzler has not been timely served with process, it is recommended that the complaint be dismissed without prejudice against this defendant.

### Vi. Failure to Prosecute

It appears from the docket of this case that in addition to failing to file any response to defendants' instant motion, Smith has taken no action in this case since May 6, 2004 when he notified the Court of his address following his release from incarceration. Docket No. 7. Since that date, Smith has been mailed various orders and other communications from the Court which have not been returned as undeliverable and, therefore, presumably were received by him. *See, e.g.,* Docket Nos. 15, 16, 18, 19, 20. Nevertheless, Smith still has taken no action.

**\*8** Under Fed.R.Civ.P. 41(b), a court may dismiss an action for a plaintiff's sustained failure to prosecute the action. *See West v. City of New York,* 130 F.R.D. 522, 524 (S.D.N.Y.1990); *see also* N.D.N.Y.L.R. 41.2(a) ( "Whenever it appears that the plaintiff has failed to prosecute an action or proceeding diligently, the assigned judge shall order it dismissed...."). In determining whether to dismiss an action on this ground, a court should consider the duration of a plaintiff's failures, whether the plaintiff has received notice that further delays would result in dismissal, whether the defendant was likely to be prejudiced by further delay, a balancing of the court's need to alleviate calendar congestion with a party's right to due process, and the efficacy of lesser sanctions. *See Patterson v. Newspaper & Mail Deliverers' Union of N.Y. & Vicinity,* 884 F.Supp. 869, 872 (S.D.N.Y.1995); *Stoenescu v. Jablonski,* 162 F.R.D. 268, 270 (S.D.N.Y.1995).

Here, Smith's unexplained failure to take any action despite numerous communications from the Court and opposing counsel appears to reveal an abandonment of the action.

2006 WL 2806464

Accordingly, it is recommended in the alternative that this action be dismissed for Smith's failure to prosecute.

## VII. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that:

1. Defendants' motion for summary judgment (Docket No. 17) be **GRANTED** as to defendants Hash, Sipley, and Noble as to all claims.

2. The complaint be **DISMISSED** without prejudice as to Metzler; and

3. This action be **TERMINATED** in its entirety as to all defendants and all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2806464

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 541767
Only the Westlaw citation is currently available.
<u>For Online Publication Only</u>
United States District Court, E.D. New York.

Wayne Jonathan SPEAKS, Plaintiff,

v.

C.O. SAEED, Shield #2544, and
County of Nassau, Defendants.

14-CV-06826 (JMA) (AYS)
|
Signed 02/23/2022

**Attorneys and Law Firms**

Wayne Jonathan Speaks, Pro Se Plaintiff.

Liora M. Ben-Sorek, Deputy County Attorney, One West
Street, Mineola, New York 11501, Attorney for Defendants,
C.O. Saeed, County of Nassau.

<u>MEMORANDUM AND ORDER</u>

AZRACK, United States District Judge:

 **\*1** Plaintiff Wayne Jonathan Speaks ("plaintiff") has
commenced this <u>pro se</u> civil rights action under 42 U.S.C
§ 1983 ("Section 1983") for violation of his constitutional
rights under the First and Fourteenth Amendments during
his confinement in the Nassau County Correctional Center
("NCCC"). (ECF No. 1.) Currently before the Court
is defendants, the County of Nassau ("Nassau County")
and Correction Officer Saeed ("C.O. Saeed") (together
"defendants")' motion for summary judgment pursuant to
Rule 56 of the Federal Rules of Civil Procedure. For the
reasons set forth below, the Court grants defendants' motion.

**I. BACKGROUND**

A. **Factual Background** [1]

[1] The facts set forth in this section are taken
from defendants' unopposed Local Rule 56.1
Statement ("Defs. 56.1 Stmt."), ECF No. 64-1;
the declaration and exhibits submitted in support
of the instant motion, including the transcript of

plaintiff's deposition (Declaration of Liora M. Ben-
Sorek ("Ben-Sorek Decl."), Plaintiff's Deposition,
Oct. 14, 2020 ("Pl. Dep."), Ex. C, ECF No. 64-6;
and plaintiff's exhibits submitted in opposition to
the instant motion, ECF No. 65-1-65-11. Plaintiff
has not submitted a sworn affidavit in opposition to
defendants' motion for summary judgment.
Because plaintiff's Complaint is unsigned, the
allegations contained therein are not admissible
evidence and cannot be considered on summary
judgment. Nevertheless, in an abundance of
caution, the Court has still included relevant
allegations from the Complaint in this background
section and addresses any potentially relevant
factual allegations from the Complaint in the
Court's ultimate analysis. As discussed <u>infra</u>, even
if the Court considered the factual allegations in
plaintiff's Complaint as admissible evidence, he has
not raised material factual disputes that necessitate
a trial.

The facts in this case, unless otherwise noted, are undisputed.
Plaintiff was detained at the NCCC on July 30, 2012 and
remained there until his transfer to the custody of the
New York State Department of Corrections and Community
Services on January 23, 2015. (Pl.'s Opp. at 1; Pl. Dep.
17:4-24.) [2] Plaintiff was represented by counsel from the
time of his arraignment until December 17, 2013, first by
a privately retained attorney, and subsequently by a court-
appointed attorney. (Pl. Dep. 20:7-23.) While represented by
counsel, plaintiff was offered, but rejected a plea of a thirteen-
year sentence. (<u>Id.</u> 21:13-22:10.) When plaintiff terminated
his court-appointed attorney's services to proceed <u>pro se</u>,
the court appointed an attorney-advisor to assist him. (<u>Id.</u>
22:21-23:7, 71:13-17.)

[2] For ease of reference, the Court refers to
the electronic document filing system ("ECF")
pagination.

According to plaintiff, the inmates at NCCC were generally
allowed one hour each week in the law library. (<u>Id.</u> 26:6-13.)
Plaintiff claims that at five pre-trial appearances between
July 31, 2013 and July 22, 2014 he requested additional
time in the law library which County Court Judge Jerald
Carter ("Judge Carter") granted as refenced in handwritten
notations on five securing orders. [3] (<u>Id.</u> 28:20-32:3, 33:7-12;
Ben-Sorek Decl., securing orders, Ex. D.) The parties dispute
whether or not these notations constitute "court orders," and
further dispute the amount of time allotted to plaintiff at

2022 WL 541767

the law library. The securing orders are dated as follows and include the following handwritten notations: July 31, 2013 —"*Additional law library time.*"; December 17, 2013 —"Please allow [Defendant] access to Law Library consistent with safety & security"; March 11, 2014 —"*Additional law library time-[defendant] is pro se preparing for trial.* Judge's chambers to contact NCCC per law library issue"; June 24, 2014 —"Please allow deft. 2 hours of law library time daily"; July 22, 2014 —"Deft. allowed 4 hours law library time." (Ex. D.)

3       A securing order is a directive indicating defendant's remand to custody and the date of his next scheduled court appearance. (Defs 56.1 Stmt. ¶ 7.)

**\*2** The crux of plaintiff's complaint is that C.O. Saeed, who, according to plaintiff, ran the law library, was denying him additional time in the library in violation of his right to access the courts. (Compl.; Pl. Dep. 13:5-14:13; 42:20.) Though plaintiff testified that he was receiving his housing unit's weekly one-hour session of library time, he was not getting the additional time he signed up for.[4] (Pl. Dep. 38:13-39:15-25.) In this regard, plaintiff filed six grievances —on November 26, 2013, December 7, 2013, January 13, 2014, March 3, 2014, May 19, 2014, and July 9, 2014. (Pl. Dep. 47:23-25, 48:2-24, grievances, Pl. Dep., Ex. A at 103-108.) He claims that C.O. Saeed issued him disciplinary infractions in retaliation for plaintiff's grievances and in an effort to impede his access there. (Compl. at 8.)

4       Plaintiff testified that he kept track of his library hours in a pad which was lost when he was transferred to upstate prison. (Pl. Dep. 36:25-37:25.) During discovery, defendants were unable to locate the library logbooks. (Pl. Ex. J10).

Specifically, on August 30, 2013, while on his way to the law library, plaintiff had an encounter with C.O. Saeed resulting in a disciplinary ticket for talking in line and insolence for which he pled guilty. (Compl. at 5; Ben-Sorek Decl., Ex. E.) As a result of this disciplinary infraction, plaintiff, who was represented by counsel at the time, received sixteen days of lock-in which he accepted without appeal. (Ex. E.) At his deposition, plaintiff denied that he was talking while on line, but admitted that he called C.O. Saeed "an asshole." (Pl. Dep. 43:18-44:3.) Additionally, plaintiff testified that at the time he was in lock-in, he was aware that he could have made a written request for library materials to be brought to his cell. (Pl. Dep. 45:5-9.) He testified that the NCCC "don't have the

proper staff for that," but admitted that he never made any such requests. (Id. 45:5-10, 46:9-12.)

On November 26, 2013, plaintiff filed a grievance claiming that he had been signing up for daily access to the law library but was not receiving this additional "court-ordered" time. (Pl. Dep., Ex. A at 103.) After being informed that his grievance did not contain the relevant dates, plaintiff refiled his grievance on December 7, 2013 noting the specific dates that he was not called to the library. (Id. at 104; Compl. at 6.) Grievance responded that they had not located a court order stating that plaintiff was granted additional time in the law library. (Id.) Plaintiff testified that in December 2013, when he requested additional law library time, C.O. Saeed told him, "I will call you if I feel like it." (Pl. Dep. 44:14-21.) He filed another grievance on January 13, 2014 and received a similar response to his December 2013 grievance, namely that Grievance was unable to locate a court order. (Pl. Dep., Ex. A at 105.)

With the assistance of his legal advisor, plaintiff filed another grievance on March 3, 2014 attaching a securing order from Judge Carter dated July 31, 2013. (Pl. Dep., Ex. A at 106.) Grievance responded that "[t]he rehabilitation unit has been notified of a securing order to allow extra law library time to the grievant consistent with safety security and [ ] working orders of the facility." (Id.) Plaintiff claims that when he appeared before Judge Carter on March 28, 2014, he complained that he was still not receiving additional time in the law library. (Compl. at 6.)

Plaintiff alleges that on March 29, 2014, he was informed by a prison official that he would receive twenty additional hours of law library time each week which would be broken up into two, two-hour sessions for five days each week. (Id. at 7.) Plaintiff claims that he received this additional time for approximately one and a half months. (Id.) On May 19, 2014, plaintiff filed another grievance claiming that "either the housing officers or the law library officers were obstructing" the court's order of twenty additional hours of time in the law library. (Id.; Pl. Dep., Ex. A at 107.) Grievance deemed his grievance non-grievable finding that plaintiff failed to include specific dates for which he claimed he was obstructed access to the law library. (Pl. Dep., Ex. A at 107.)

**\*3** On June 5, 2014, plaintiff complained to C.O. Saeed that he was not getting his additional two-hour period in the law library. (Compl. at 7-8.) Allegedly, C.O. Saeed responded, "that's right because you are not going to [ ] come down

here when you want," and that he "don't give a dam[n] about a court order." (Compl. at 8.) On June 17, 2014, as alleged, plaintiff received a "false disciplinary report" by Officer Saeed for conversing with another inmate in the library instead of doing legal work. (Id.; Ben-Sorek Decl., Ex. F.) He claims that he "was found guilty of disorderly conduct and refusing to obey a direct order." (Compl. at 8.) According to the misbehavior report—which sets out C.O. Saeed's allegations against plaintiff—plaintiff was communicating with an inmate through the window in the law library and C.O. Saeed observed plaintiff "motion with his hands" and "point[ ] to the door" and to a third inmate who was sitting beside him." (Ex. F at 2.) Subsequently, the inmate plaintiff had been communicating with slid an envelope under the door. (Id.) C.O. Saeed confiscated the envelope and "order[ed] everyone out of the law library to deal with the situation." (Id.) However, plaintiff "initiall[y refused] several orders to leave the area and kept asking what did he do" and only complied after "the [thir]d order." (Id.) Following a hearing, plaintiff was found guilty of refusing to obey a direct order, and was given seventeen days of lock-in. (Id.) Plaintiff's appeal was denied on July 10, 2014. (Id.) At his deposition, plaintiff admitted that he did, in fact, "point[ ]" to the other inmate and told him, "you know, tell [C.O. Saeed] to let you come on this side and you can probably tell me what you need to tell me." (Pl. Dep. 66:2, 67:9-11.) At his deposition, plaintiff did not dispute that he disobeyed C.O. Saeed's first two orders and no admissible evidence in the record contradicts C.O. Saeed's account of plaintiff's disregard of those orders.

On June 24, 2014, at an appearance before Judge Carter, plaintiff complained that he was not getting his additional hours in the law library and that he received a false disciplinary report in retaliation for filing a grievance. (Compl. at 8.) On July 9, 2014, plaintiff filed another grievance claiming that "Officer Saeed has been blocking my hours by calling me late and making me leave early, or not calling me for a period, saying I refuse." (Pl. Dep., Ex. A at 108.)

Plaintiff claims that the "last known incident in the law library occurred on July 31, 2014" when he received a disciplinary report from Correction Officer Condell ("C.O. Condell"), C.O. Saeed's partner, for disorderly conduct and refusal to obey a direct order. (Compl. at 4; Pl. Ex. F6 at 6.) Following a hearing, plaintiff's appeal was denied on August 20, 2014 and he received twelve days of lock-in. (Pl. Ex. F6 at 7.)

Prior to trial, plaintiff's case was transferred to the Honorable Judge Meryl J. Berkowitz ("Judge Berkowitz"). (Pl. Dep. 63:9-64:2, 19:11-12.) Plaintiff testified that he never discussed the issue of additional time in the law library with Judge Berkowitz or any of the other judges that handled his criminal case. (Id. at 18:2-21, 58:20-60:13.) During plaintiff's November 2014 trial before Judge Berkowitz, pro se plaintiff negotiated a nine-year sentence plea agreement; he did not appeal his conviction. (Id. 64:3-14.)

The evidence in the record does not identify any specific instances where plaintiff was denied law library access after his July 22, 2014 appearance before Judge Carter. (Compl. at 9.)

## B. Procedural History

On November 17, 2014, pro se, incarcerated plaintiff filed the instant Complaint against C.O. Saeed, Nassau County, Sheriff Michael Sposato ("Sposato") and the Nassau County Sheriff Department, Division of Corrections ("the Prison") pursuant to Section 1983. (See Compl.) On July 30, 2015, pursuant to Federal Rule of Procedure 41(a)(2), the Court granted plaintiff's motion to dismiss the Complaint with respect to defendants Sposato and the Prison. (ECF No. 23.) On July 7, 2021, the remaining defendants, C.O. Saeed and Nassau County filed the instant motion for summary judgment (ECF No. 64) which plaintiff opposes. (ECF No. 65.)

## II. DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). The movant bears the burden of demonstrating that "no genuine issue of material fact exists." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,' " while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.' " Konikoff v. Prudential

Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

**\*4** When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant...." Marvel Characters, 310 F.3d at 286 (citing Matsushita, 475 U.S. at 587; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)). To defeat a properly supported motion for summary judgment, "the non[-]moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " Matsushita, 475 U.S. at 587 (emphasis in original) (quoting Fed. R. Civ. P. 56(e)). The non-moving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586 (citations omitted). Mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment. See Shannon v. N.Y.C. Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003). Unless the non-moving party produces "significant probative evidence" demonstrating that a factual dispute exists, summary judgment is appropriate. Anderson, 477 U.S. at 249.

Additionally, "[a] pro se party's submissions are to be read liberally, a requirement that is especially strong in the summary judgment context, where a pro se plaintiff's claims are subject to a final dismissal." Ferguson v. Bizzario, No. 09-CV-8106, 2010 WL 4227298, at *3 (S.D.N.Y. Oct. 19, 2010). Nevertheless, "[p]roceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment." Rodriguez v. Hahn, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002) (internal quotation marks and citation omitted); Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (plaintiff "may not rely on conclusory allegations or unsubstantiated speculation"); Johnson v. Al Tech Specialties Steel Corp., 731 F.2d 143, 147 n.2 (2d Cir. 1984) ("[A] mere allegation in [a] pleading [is] insufficient to defeat a summary judgment motion.") (internal quotation marks omitted).

**B. Local Rule 56.1 Statements**
As an initial matter, defendants argue that the facts set forth in their Statement of Material Facts pursuant to Local Civil Rule 56.1(c) should be deemed admitted because plaintiff failed to submit a response as required by Rule 56.1. (Defs. Reply, ECF No. 66 at 5.)

Local Civil Rule 56.1 requires any motion for summary judgment to be accompanied by a statement of material facts itemized into numbered paragraphs followed by a citation to the evidence in support of those facts that would be admissible. Local Civ. R. 56.1(a) & (d). Pursuant to subsection (c), "[e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Civ. R. 56.1(c). "A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009).

Here, defendants properly filed a Rule 56.1 statement along with the notice required by Local Rule 56.2 providing a pro se party specific instructions regarding how to respond. Plaintiff failed to submit a responsive statement, which would permit the Court to deem all of the proffered facts admitted. However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules" and may instead "opt to conduct an assiduous review of the record even where one of the parties has failed to file such a [Rule 56.1] statement." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001) (cleaned up). In light of plaintiff's pro se status, and in the exercise of its broad discretion, "the court has liberally construed the pro se plaintiff's opposition papers and the evidence in the record in a light most favorable to the non-moving pro se party." Urena v. Yan Wolfson, M.D., No. 09-CV-01107, 2012 WL 958529 at *2 n. 4 (E.D.N.Y. Mar. 20, 2012). Plaintiff's pro se status, however, "does not allow him to rely on conclusory allegations or unsubstantiated speculation to overcome a motion for summary judgment." Almonte v. Florio, No. 02-CV-6722, 2004 WL 60306, at *3 n.10 (S.D.N.Y. Jan. 13, 2004).

**C. Standard for Section 1983 Claims**
**\*5** Section 1983 provides a remedy for constitutional deprivations occasioned by state actors. To maintain a Section 1983 claim, the plaintiff must establish that the conduct complained of: (1) was committed by a person acting under color of state law; and (2) deprived the plaintiff of rights, privileges, or immunities secured by the United States Constitution or laws of the United States. See Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994).

When a plaintiff asserts a Section 1983 claim against a municipal defendant, plaintiff must also demonstrate that the constitutional deprivation "resulted from a municipal custom or policy." Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 122 (2d Cir. 1991). Municipal liability is "an extension of liability, not an independent cause of action, and therefore requires an underlying constitutional violation." Soto v. City of New York, 132 F. Supp. 3d 424, 459 (E.D.N.Y. 2015) (citing Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006)).

Plaintiff alleges that he was denied access to the courts in violation of his Fourteenth Amendment rights and that defendant C.O. Saeed retaliated against him in violation of the First Amendment. (See Compl. generally.) He further alleges that Nassau County is liable for the acts of C.O. Saeed pursuant to Monell v. Dep't of Social Services, 436 U.S. 658, 694-95 (1978). Id.

As plaintiff fails to establish that his constitutional rights were violated, the Court grants defendants' summary judgment. [5]

[5]     Because the Court is granting summary judgment in defendants' favor on the merits, the Court finds it unnecessary to address defendants' request for summary judgment on qualified immunity grounds. (See Defs. Mot. at 16-17.)

**1. Access to the Courts Claim**
Plaintiff claims that defendants violated his right of access to the courts by denying him access to the law library in violation of his due process rights.

Defendants contend that plaintiff was provided sufficient access to the law library and that, in any event, plaintiff has failed to demonstrate an actual injury. The Court agrees.

a. Standard

"It is well established that all persons enjoy a constitutional right of access to the courts." Monsky v. Moraghan, 127 F.3d 243, 246 (2d Cir. 1997). "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." Brisco v. Rice, No. 11-CV-0578, 2012 WL 253874, at *5 (E.D.N.Y. Jan. 27, 2012) (quoting Washington v. James, 782 F.2d 1134, 1138 (2d Cir. 1986)). In order to comply with prisoners'

constitutional rights of access to the courts, prisons must furnish prisoners with "adequate law libraries or adequate assistance from persons trained in the law." Lewis v. Casey, 518 U.S. 343, 356 (1996) (quoting Bounds v. Smith, 430 U.S. 817, 828 (1977).) "However, the Constitution does not require unlimited and unrestricted access to a law library at the demand of a prisoner [and] [p]rison officials may impose reasonable restrictions on the use of a prison law library." Oliver v. Head Sherriff of Dep't & Div. of Corr. of Nassau Cnty., No. 07-CV-4355, 2008 WL 238577, at *2 (E.D.N.Y. Jan. 28, 2008) (citing Morello v. James, 810 F.2d 344, 347 (2d Cir. 1987)) (exercise of right of access to courts may be "shaped and guided by the state but cannot be obstructed"); Jermosen v. Coughlin, No. 89-CV-1866, 1995 WL 144155 at *4 (S.D.N.Y. Mar. 30, 1995) ("Interferences that merely delay an inmate's ability to work on a pending cause of action or to communicate with the courts do not violate this constitutional right.").

To survive a motion for summary judgment on an access to courts claim based on denial of law library access, the plaintiff must present evidence that: "(1) the defendants acted deliberately and maliciously; and (2) that he has suffered actual injury." Guarneri v. Hazzard, No. 06-CV-985, 2010 WL 1064330 at *21 (N.D.N.Y. Mar. 22, 2010) (citing Lewis, 518 U.S. at 351-54.). "In order to satisfy the actual injury requirement, the plaintiff must show that, by denying plaintiff access to the law library, prison officials frustrated or impeded the plaintiff's ability to file non-frivolous direct appeals from his conviction, a habeas corpus petition or a civil rights claim pursuant to § 1983 to vindicate basic constitutional rights." Bilal v. New York State Dep't of Corr., No. 09-CV-8433, 2010 WL 2506988, at *12 (S.D.N.Y. June 21, 2010) (citing Lewis, 518 U.S. at 354-55) (internal quotations omitted); accord, Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003) ("To state a claim for denial of access to the courts[,] ... a plaintiff must allege that the defendant took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim.") (internal quotations omitted). Where a plaintiff cannot articulate any actual injury as a result of defendants purported efforts to prevent him from litigating his case, his access claim cannot survive scrutiny. See Odom v. Kerns, No. 99-CV-10668, 2002 WL 31059341, at *4 (S.D.N.Y. Sept. 16, 2002).

b. Analysis

**\*6** Plaintiff claims that his constitutional rights were violated when he was denied additional hours in the law library in accordance with Judge Carter's "orders." Even assuming, for purposes of the instant motion, that defendants intentionally denied plaintiff access to the law library, plaintiff has not submitted evidence that he sustained any actual injury. [6]

> [6]  Because the Court finds that plaintiff fails to demonstrate an actual injury as required to state an access to court claim, it need not determine whether or not Judge Carter's handwritten notations regarding additional time in the law library constitute "orders" for the purpose of this motion.

Plaintiff alleges that he suffered a "[d]eprivation of knowledge of law, los[s] of filing timely and accurate motions, [and] los[s] of raising relevant and timely arguments." (Compl. at 11.) Such "vague and conclusory allegations" are insufficient to plead that plaintiff suffered an actual injury as a result of defendants' actions. Gunn v. McNeil, No. 19-CV-11821, 2020 WL 7647422, at \*5 (S.D.N.Y. Dec. 23, 2020) ("[P]laintiff does not allege which specific, nonfrivolous legal challenges were affected by the named defendants' actions; which particular deadlines, if any, he missed due to such actions; or what specific documents, such as motions or pleadings, he was prevented from filing."); Amaker v. Kelley, No. 01-CV-877, 2009 WL 385413, at \*10 (N.D.N.Y. Feb. 9, 2009) (Although plaintiff alleged that he missed a court deadline due to denial of library access, plaintiff did not satisfy the actual injury requirement because plaintiff "failed to offer any specifics ... and to adduce proof from which a reasonable factfinder could conclude that he did indeed experience prejudice by virtue of defendants' failure to provide him with library access."), aff'd 399 F. App'x (2d Cir. 2010). See also Williams v. City of N.Y., No. 19-CV-3347, 2022 WL 130409, at \*20-21 (S.D.N.Y. Jan. 14, 2022) (granting summary judgment where plaintiff failed to allege he suffered an actual injury from lack of access to the prison's law library).

In his opposition to defendants' motion, plaintiff argues that "[d]ue to the incompetencies of the NCCC Law Library workers, the pro se [plaintiff] was forced to proceed to trial without the legal claim of witnesses for his defense," and was therefore "left with very little options and was caused to negotiate in the middle of trial [ ] for a sentence of 9 years." (Pl. Opp. at 6). More specifically, plaintiff contends that he was injured because he ended up submitting pre-trial

subpoenas in the wrong form to the court. (See Pl. Ex. H8 at 11; Pl. Dep. 61:6-62:7.)

According to plaintiff, he wanted to subpoena defense witnesses to appear at his trial, however, an inmate, working as a clerk in the law library had incorrectly given him a subpoena for witness statements. (Id.) During a pre-trial proceeding on November 5, 2014, Judge Berkowitz explained to plaintiff that though the subpoenas he had prepared were "in the wrong form," nonetheless, he was, in any event, unable to subpoena defense witnesses in order to cross-examine them. (Pl. Ex. H8 at 11.) Judge Berkowitz, however, did sign the subpoena for the records plaintiff requested. (Id.)

This does not constitute a cognizable injury for purposes of plaintiff's access to courts claim. First, this purported injury does not even stem from plaintiff being denied access to the law library. Instead, plaintiff is arguing that he was injured because a clerk in the law library gave him the wrong form. However, incorrect advice from a clerk does not constitute an unconstitutional denial of access to the courts. Second, plaintiff has not established that he was denied access to the law library during the specific time period in question and, even if he had, as explained above, this injury was the result of a clerk error and was not a result of plaintiff being denied access to the law library. Third, plaintiff has not established that the use of this incorrect form prejudiced him at trial. The Court cannot even discern what exactly happened at this pretrial conference because plaintiff has not provided a complete transcript. (See Pl. Ex. H8.) The excerpt of the transcript that plaintiff has provided suggests that plaintiff was attempting to subpoena witnesses who were going to be called by the prosecution and, thus, could already be questioned on cross-examination during the prosecution's case. (See id.) Plaintiff has also not even identified the potential witnesses at issue. Thus, the evidence in the record fails to show that plaintiff suffered an injury as a result of his submission of subpoenas in the incorrect form.

**\*7** Moreover, even where an inmate's ability to litigate effectively may be impeded, that is insufficient to demonstrate actual injury when the inmate was still able to present his claim to a court. Lewis, 518 U.S. at 354 ("[T]he injury requirement is not satisfied by just any type of frustrated legal claim."); see Brisco, 2012 WL 253874, at \*5 ("Impeding plaintiff's ability to litigate effectively does not constitute a denial of the right of access to the courts.") Rather, the inmate must show that he was unable to file the initial complaint, or that the complaint he filed was dismissed for "failure to

satisfy some technical requirement" due to deficiencies or inadequacies in the prison's legal assistance facilities." Lewis, 518 U.S. at 351. The injury must be to an inmate's ability "to attack [his] sentence[ ], directly or collaterally, [or] ... to challenge the conditions of [his] confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." Id. at 355. (emphasis in original). Thus, as plaintiff has not demonstrated that he was prevented from pursing a particular legal claim, no reasonable fact finder could conclude that plaintiff suffered an actual injury.

To the extent that plaintiff claims that his conviction and nine-year sentence are his injuries, his claim also fails because it is barred under Heck v. Humphrey, 512 U.S. 477, 486-87 (1994). Id. ("A claim for damages [that would necessarily imply the invalidity of a plaintiff's state court] conviction or sentence that has not been so invalidated is not cognizable under § 1983."); see Gilmore v. Smith, No. 9:17-CV-1349, 2019 WL 3948074, at *7-8 (N.D.N.Y. July 22, 2019) ("any judgment finding Plaintiff's First Amendment right to access the courts was violated would necessarily call into question the state court proceedings that rendered and affirmed his conviction, [and would therefore] also be barred by the Heck doctrine.") (citing Mancuso v. Hynes, 379 F. App'x 60, 61 (2d Cir. 2010)). [7] Therefore, because plaintiff's conviction has not been invalidated, his right to access the courts claim is barred by Heck.

[7]    Notably, the nine-year plea deal that pro se plaintiff negotiated was considerably more favorable than the thirteen-year plea offer he received when he was represented by an attorney. Additionally, plaintiff has not appealed his conviction. (See Pl. Dep. 21:13-22:10, 63:13-14.)

Finally, it is undisputed that at all relevant times, plaintiff had access to an attorney advisor for legal assistance, even after electing to proceed pro se in December 2013. (Pl. Dep. 71:13-17.) "The Second Circuit has previously indicated the involvement of standby counsel is sufficient to protect an inmate's access to the courts." Gilmore, 2019 WL 3948074, at *6 (finding pro se prisoner's access to court-appointed standby counsel "negat[ed] his claim that Defendants unconstitutionally denied him access to the courts") (citing Spates v. Manson, 644 F.2d 80, 85 (2d Cir. 1981)). Thus, plaintiff's access to court claim fails for the additional reason that plaintiff had access to a court-appointed attorney advisor while detained at NCCC.

Accordingly, based on the foregoing, defendants are entitled to judgment as a matter of law with respect to plaintiff's Fourteenth Amendment access to the courts claim.

**2. First Amendment Retaliation Claim**

Plaintiff alleges that C.O. Saeed created a "false disciplinary report" on June 17, 2014 "in retaliation for [his] grievant" which he filed on or about May 19, 2014 in which he alleged that "someone had been marking [him] off as refusing [the] law library." [8] (Compl. at 7-8.) The Court finds that plaintiff's retaliation claim fails as a matter of law.

[8]    Plaintiff received two disciplinary tickets from C.O. Saeed, the first was issued on August 30, 2013, prior to his filing of any grievances, and for which he accepted responsibility without appeal. (Ben-Sorek Decl., Ex. E.)

a. Standard

To prevail on a First Amendment retaliation claim under Section 1983, a plaintiff must demonstrate "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action" Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citation omitted). "The Second Circuit has cautioned that retaliation claims by prisoners are 'prone to abuse' as '[v]irtually every prisoner can assert such a claim as to every decision which he or she dislikes.' " Baskerville v. Blot, 224 F. Supp. 2d 723, 731 (S.D.N.Y. 2002) (quoting Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983)). Accordingly, even though "[p]risoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right," courts must examine a prisoner's retaliation claim with "skepticism and particular care." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (internal quotation and citation omitted). Thus, claims of this nature must be "supported by specific and detailed factual allegations," and not stated in "wholly conclusory terms." Flaherty, 713 F.2d at 13.

b. Analysis

**\*8** In the instant case, plaintiff satisfies the first prong of a retaliation claim as it is well-settled that filing prison grievances is activity protected by the First Amendment. See, e.g., Gill v. Pidlypchak, 389 F.3d 379, 384 (2d Cir. 2004); Johnson v. Eggersdorf, 8 F. App'x 140, 144 (2d Cir. 2001) ("It is undisputed that retaliation by prison officials against an inmate for the filing of a grievance can act as a deprivation of a constitutionally protected right.")

Plaintiff has also met the second requirement—that the prison officials' actions be "adverse" to the prisoner. In the prison context, whether a retaliatory action is "adverse" depends on whether it would deter a similarly situated prisoner of ordinary firmness from exercising his or her constitutional rights. Pidlypchak, 389 F.3d at 381. The Second Circuit has held that the retaliatory filing of false misbehavior reports against a prisoner and his placement in "keeplock" constitutes adverse action. Id.; see e.g., Washington v. Chaboty, No. 09-CV-9199, 2015 WL 1439348, at \*10 (S.D.N.Y. Mar. 30, 2015) ("The filing of the misbehavior report and the disciplinary sanction of 65 days in the [special housing unit] constitute adverse actions that satisfy the second element of a retaliation claim."). Thus, plaintiff's claim that he received a "false disciplinary report" resulting in his lock down for seventeen days constitutes adverse action because it is the type of action that would deter a prisoner of ordinary firmness from vindicating his constitutional rights through the grievance process. [9]

[9]   Contrary to defendants' argument, plaintiff does not have to establish that he was actually chilled in exercising his rights. As the Second Circuit has explained:

We have described the essential elements of a First Amendment retaliation claim differently depending on the factual context. Compare Gill, 389 F.3d at 381 (requiring, in the prison context, that the prisoner responded to retaliatory conduct by defendants "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights" (quotation marks omitted)) with Curley v. Village of Suffern, 268 F.3d 65, 73 (2d Cir. 2001) (requiring that a private citizen, who alleged he was arrested by public officials in retaliation for his

unsuccessful campaign to unseat the Village's mayor, show that he was "actually chilled" in exercising his rights (quotation marks omitted)). See Espinal, 558 F.3d at 128 n. 7.

Plaintiff, however, fails to satisfy the third requirement of a retaliation claim as he has not established a causal connection between the filing of his grievance and the issuance of a disciplinary report resulting in his lockdown.

"An inmate bears the burden of showing that 'the protected conduct was a substantial or motivating factor' in the prison officials' disciplinary decision." Holland v. Goord, 758 F.3d 215, 226 (2d Cir. 2014) (quoting Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)). "The defendant official then bears the burden of establishing that the disciplinary action would have occurred 'even absent the retaliatory motivation,' which he may satisfy by showing that the inmate 'committed the ... prohibited conduct charged in the misbehavior report." Id. (quoting Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002)) (internal quotation marks omitted). In evaluating whether a plaintiff has established the necessary causal connection of a retaliation claim, "a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff." Sharif v. Poole, 689 F. Supp. 2d 470, 479 (W.D.N.Y. 2010) (citing Colon, 58 F.3d at 872-73).

**\*9** Plaintiff alleges that on or about May 19, 2014, after discovering that "someone [had] been marking [him] off as refusing law library," he filed a grievance which stated that "housing officers or the law library officers" were "obstructing [his] court order" by refusing his access to the law library. (Compl. at 7; Pl. Dep., Ex. A at 107.) He claims that following his grievance he was getting called to the law library late and was required to leave twenty to thirty minutes early. (Compl. at 7.) On June 5, 2014, plaintiff informed C.O. Saeed that he was not getting his two-hour period in the law library to which he allegedly responded, "that's right because you are not going to be come down here when you want," and "[I] don't give a dam[n] about a Court order." (Compl. at 7-8.) Approximately one month after filing his grievance, on June 17, 2014, plaintiff purportedly received a "false disciplinary report" from C.O. Saeed for refusing to obey a direct order for which he received seventeen days of lock down. (Id. at 8; Ex. F.)

2022 WL 541767

Aside from the near four-week proximity between the filing of plaintiff's grievance and his disciplinary infraction, plaintiff has not proffered any evidence supporting his claim that C.O. Saeed took disciplinary action against him <u>because</u> of his grievance. "Although the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment." Williams v. Goord, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000); see also Gill v. DeFrank, No. 98-CV-7851, 2000 WL 270854, at *16 (S.D.N.Y. 2000) (collecting cases). C.O. Saeed was not specifically named in plaintiff's May 2014 grievance and his comments to plaintiff fail to demonstrate a retaliatory motive. Cf. Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) (refusing to find a disciplinary report retaliatory where the defendant was not named in plaintiff's original grievance). "Simply adding an allegation that [defendants] acted out of retaliatory motives is easy to do, but it is not enough." Dolberry v. Levine, 567 F. Supp. 2d 413, 420 (W.D.N.Y. 2008).

Additionally, the record does not show that plaintiff has a prior good disciplinary record or that he was vindicated at the disciplinary hearing. Plaintiff's sanction was upheld following a hearing and an appeal. (See Ex. F.) The fact that C.O. Saeed issued plaintiff a disciplinary ticket for similar misconduct prior to plaintiff filing any grievances further weighs against an inference of retaliation here.

Finally, plaintiff's evidence fails to create a factual question on the issue of whether C.O. Saeed's allegations against him were false. Plaintiff's Complaint asserts, in conclusory fashion, that the disciplinary report was "false," but the Complaint is unsigned and, in any event, provides no particulars about plaintiff's conduct on the day in question to dispute C.O. Saeed's allegations. At his deposition, plaintiff admitted that he did, in fact, "point[ ]" to the other inmate in question and spoke to him. (Pl. Dep. 66:2-5, 67:9-11.) That is largely consistent with C.O. Saeed's allegation in the disciplinary report, which states: "I witness inmate Christian ... communicating with I/M Speaks .. through the window. During which time I saw Speaks motion with his hands to I/M Christian and pointed to the door and the inmate who was sitting beside him." (Ex. F at 2.) Additionally, plaintiff never squarely denies, in either his Complaint or his deposition testimony, that he initially refused C.O. Saeed's two orders to leave, which was one of the grounds for the disciplinary report and plaintiff's ultimate sanction. A reasonable juror could not conclude from this evidence

that C.O. Saeed's allegations were false and motivated by retaliation.

Ultimately, plaintiff's conclusory assertions regarding defendants alleged retaliatory motivations are insufficient to demonstrate the requisite causal connection for a retaliation claim. See Ross v. Koenigsmann, No. 14-CV-1321, 2016 WL 11480164, at *17 (N.D.N.Y. Sept. 8, 2016) ("[The] [p]laintiff's sole evidence that the misbehavior report was issued in retaliation for his [protected activity] is temporal proximity. [The] [p]laintiff does not allege that [the defendant] made any statements regarding her motive for issuing the misbehavior reports, nor is there any evidence that the misbehavior reports were dismissed. A retaliation claim based on such thin evidence may fail at summary judgment."), report & rec. adopted by 2016 WL 5408163 (N.D.N.Y. Sept. 28, 2016). Thus, even viewing the record in the light most favorable to plaintiff, there is insufficient evidence of retaliatory motive. Accordingly, because plaintiff has failed to present sufficient evidence of retaliation, defendants' motion for summary judgment on plaintiff's First Amendment retaliation claim is granted. [10]

[10]   Plaintiff's Complaint also references a disciplinary ticket that he received from C.O. Condell on July 31, 2014. (Pl. Ex. F6 at 6.) However, aside from stating that C.O. Condell is C.O. Saeed's partner, (Compl. at 4), plaintiff does not offer any evidence that this infraction was issued in retaliation for filing any grievance. Notably, like his June 14, 2014 disciplinary infraction, this disciplinary violation was upheld following a hearing and an appeal. (Pl. Ex. F6 at 7.) Moreover, C.O. Condell is not a named defendant and there is no evidence that C.O. Saeed was involved in the July 31, 2014 disciplinary ticket. And, as discussed <u>infra</u>, plaintiff does not have any viable <u>Monell</u> claim against Nassau County.

### 3. Monell Claims

**\*10**  Plaintiff's <u>Monell</u> claims concerning the conduct of both C.O. Saeed and C.O. Condell also fail. It is well-established that a municipality, such as Nassau County, may be liable under Section 1983 only if the "plaintiff proves that action pursuant to official ... policy of some nature caused a constitutional tort." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978); see also Patterson v. Cnty. of Oneida, 375 F.3d 206, 226 (2d Cir. 2004). To establish the existence of a municipal policy or custom, the plaintiff

must establish (1) the existence of a formal policy officially endorsed by the municipality, (2) actions taken or decisions made by an official with final decision making authority, (3) a practice so persistent and widespread that it constitutes a custom, or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to a "deliberate indifference" to the rights of those who come in contact with the municipal employees. Davis v. Lynbrook Police Dep't, 224 F. Supp. 2d 463, 478 (E.D.N.Y. 2002). Plaintiff's Monell claims concerning the conduct of both C.O. Saeed and C.O. Condell fail because the record does not contain evidence from which a reasonable jury could find that the officers' alleged violations of plaintiff's rights were the result of a policy, practice, or custom of Nassau County. Plaintiff's Monell claims also fail because plaintiff has not established any underlying constitutional violations. Accordingly, the County is entitled to summary judgment on plaintiff's Monell claims.

**4. Minimum Standards Claim**

To the extent plaintiff alleges that defendants violated New York Minimum Standards and Regulations for Management of County Jails and Penitentiaries (the "Minimum Standards"), N.Y. Comp. Codes R. & Regs. tit. 9, § 7031.4, by not allowing him access to the law library (see Compl. at 10, 12), this claim is not cognizable under Section 1983. "As a general matter, there is no federal right to have state law properly administered." Ramirez v. Holmes, 921 F. Supp. 204, 208 (S.D.N.Y. 1996). "[A]n official's failure to follow a prison directive does not constitute a violation of

a prisoner's federal constitutional rights." Kruppenbacher v. Annucci, No. 20-CV-0110, 2021 WL 412281, at *3 (S.D.N.Y. Feb. 3, 2021) (citing Holcomb v. Lykens, 337 F.3d 217, 224 (2d Cir. 2013)); see also Rivera v. Wohlrab, 232 F. Supp. 2d 117, 123 (S.D.N.Y. Nov. 6, 2002) ("Regardless of any alleged violations of internal regulations, the law is settled that the failure to follow a DOCS Directive or prison regulation does not give rise to a federal constitutional claim.") Absent some further allegations, the failure to comply with prison regulations does not state a claim under Section 1983. Accordingly, this claim is dismissed.

## III. CONCLUSION

For the reasons set forth above, the Court GRANTS the defendants' motion for summary judgment and DISMISSES all of plaintiff's claims with prejudice.

Although plaintiff paid the filing fee to commence this action, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that, should he seek in forma pauperis status for the purpose of an appeal, any appeal from this order would not be taken in good faith and therefore in forma pauperis status is denied. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 541767

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 260102
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Andrew HARDY-GRAHAM, Plaintiff,

v.

SOUTHAMPTON JUSTICE COURT, Southampton
Town Police Dept., Jane Doe, Eileen Powers, John Doe 2,
Keith Lawston, Barbara Wilson, John Doe, Defendants.

20-CV-0981(JS)(SIL)
|
Signed 01/25/2021

**Attorneys and Law Firms**

For Plaintiff: Andrew Hardy-Graham, 836 Davis Avenue,
Uniondale, New York 11553.

For Defendants: No appearances.

MEMORANDUM AND ORDER

SEYBERT, District Judge:

 **\*1**  Before the Court is the Second Amended Complaint
(ECF No. 9; hereafter, the "SAC") filed in forma pauperis
by pro se plaintiff Andrew Hardy-Graham ("Plaintiff")
purporting to allege civil rights violations pursuant to 42
U.S.C. § 1983 ("Section 1983") against the Southampton
Justice Court (the "SJ Court"), the Southampton Town Police
Department (the "Police Department"), Eileen Powers, Esq.
("Powers"), Keith Lawston ("Officer Lawston"), Barbara
Wilson ("Justice Wilson"), and three unidentified individuals
who are alleged to be "police or court officers" ("John Doe 1",
"John Doe 2", "Jane Doe", and collectively, "Defendants").
Upon review of the SAC in accordance with the in forma
pauperis statute, 28 U.S.C. § 1915, the Court finds that
Plaintiff has failed to allege a plausible claim for relief as
against the SJ Court, the Police Department, Justice Wilson,
Powers, and Jane Doe. Accordingly, the SAC is DISMISSED
as against these Defendants pursuant to 28 U.S.C. § 1915(e)
(2)(B). Though attenuated, Plaintiff's remaining excessive
force claims against Lawston and John Does 1 and 2 shall
proceed and the Court ORDERS service of the Summonses
and the SAC by the United States Marshals Service (USMS)
as set forth herein.

BACKGROUND

By Memorandum and Order dated May 15, 2020, the
Court granted Plaintiff's application to proceed in forma
pauperis and dismissed Plaintiff's Amended Complaint
without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and
Federal Rule of Civil Procedure 8. (See Memo & Order, ECF
No. 8.) Plaintiff was granted leave to file a SAC within thirty
(30) days and, on June 15, 2020, Plaintiff timely did so. (See
SAC, ECF No. 9.) Because Plaintiff largely complained of
events alleged to have occurred in 2014, the Court ordered
Plaintiff to show cause (hereafter, "OSC") why his claims
arising from events alleged to have occurred during February
2014 are not barred by the applicable statute of limitations.
(See OSC, ECF No. 10.) On September 21, 2020, Plaintiff
filed an unsigned response to the OSC that barely addressed
the timeliness of his claims. (See Response, ECF No. 11.)
Rather, Plaintiff largely argued the merits of his claims. (See
id.)

In an abundance of caution and in light of Plaintiff's pro se
status, the Court issued another Order to Show Cause whereby
Plaintiff was "afforded a final opportunity to properly
respond ... in writing, by October 30, 2020, why his Section
1983 claims are not barred by the applicable three-year
statute of limitations." (Sept. 25, 2020 Elec. Order to Show
Cause; hereafter, "Electronic OSC.") Plaintiff's response to
the Electronic OSC was dated October 29, 2021 and was
received by the Court on November 2, 2020; it has been
accepted for filing. (See Reply, ECF No. 12.)

The Court finds that, at this early stage in the proceedings
and though barely, Plaintiff has demonstrated that he acted
with reasonable diligence during the time period he seeks
to be tolled and that his circumstances are so extraordinary
that the equitable tolling doctrine should apply. See Zerilli-
Edelglass v. N.Y.C. Transit Auth., 333 F.3d 74, 80-81 (2d
Cir. 2003) (internal citations and quotation marks omitted).
Specifically, Plaintiff reports that his untimely filing was a
result of the conditions of his confinement at the Suffolk
County Correctional Facility, as well as his homelessness,
addiction, and recovery efforts. (See Reply, generally, and
at 2-3.) Plaintiff describes that corrections officers "did
not allow complaints and used fear to keep inmates from
trying to complain." (Id. at 3.) He also explains that his
"appeal paperwork was damaged in Suffolk County jail
transfers and cell tossing." (Id.) Further, Plaintiff states that
he was homeless after his release from incarceration and he

"prioritized survival over recovering what was lost. I lost personal items and release paperwork." (Id.) According to Plaintiff, once he "recovered some stability" in his sobriety and the necessities of living, he focused on his claims. (Id. at 5.) Thus, the Court finds that Plaintiff's response to the Electronic OSC sufficiently demonstrates a basis for equitable tolling of the statute of limitations. [1] Accordingly, the Court next considers the merits of Plaintiff's claims in accordance with the screening provision of 28 U.S.C. § 1915(e)(2)(B).

[1]     However, this finding is without prejudice to the further adjudication of the timeliness of Plaintiff's claims should the Defendants raise the statute of limitations as an affirmative defense.

THE SECOND AMENDED COMPLAINT

**\*2** Plaintiff's claims are brought pursuant to 42 U.S.C. § 1983 to redress the alleged deprivation of his Sixth, Eighth, and Fourteenth Amendment rights, as well as several sections under Title 18 of the United States Code, specifically 18 U.S.C. §§ 1510, 1512, and 1519. (SAC, ¶ II.A. [2])

[2]     Plaintiff also lists 28 U.S.C §§ 455, 1332, 1343, 1361, and 1491; "C.P.L.P 213", "Prisoner Reform Laws", and "466 U.S. 668."

According to his SAC, in February 2014, Plaintiff was arrested after breaking the windshield of his then-girlfriend's car. (SAC at 6.) Plaintiff was "detained and held overnight" by the Police Department. (Id.) Plaintiff was then taken by Southampton Town police to the SJ Court for arraignment on criminal mischief charges. (See id.) He describes respectfully "request[ing] to use the bathroom multiple times" to Jane Doe and to Officer Lawston. (Id.) Jane Doe allegedly advised Plaintiff that he could not use the restroom if he was next to be called for Court and Officer Lawston just questioned why Plaintiff did not go before leaving his cell for Court. (See id. at 6-7.) Plaintiff alleges that he had consumed "two oranges juices" necessitating his need to use the restroom. (Id.) He claims hearing a toilet flush and again asking Officer Lawston to use the bathroom since it was "right there." (Id. at 7.) Plaintiff contends that while Officer Lawston told him to go, when he attempted to do so, Officer Lawston "pulled" Plaintiff and physically kept Plaintiff from using the restroom. (Id.)

According to Plaintiff, he then "jump[ed] on top of the seating arrangement ... protesting ... [that he] will not sit until he goes to the bathroom or until Defendant Keith Lawston attempts to trip (Pl[aintiff] ) from 3 feet above ground where (Pl[aintiff] ) protested." (Id.) Plaintiff describes that he "gave up the protest but did not sit" and instead "lung[ed] for the bathroom" when Officer Lawston "put[ ] an elbow to [Plaintiff's] throat." (Id.) Officer Lawston allegedly "trips both parties" and "propel[led] [Plaintiff] towards the exit, not the restroom." (Id.)

Plaintiff asserts that John Doe entered and, after consultation with Officer Lawston, accused Plaintiff of "multiple charges" including attempted escape and assaulting an officer. (Id.) Plaintiff also claims that John Doe "ignored" his request to use the restroom and, instead, restrained Plaintiff. (Id. at 7-8.) Plaintiff contends that, thereafter, he was placed face-down on the floor, with an unknown officer twisting Plaintiff's arm until it hurt and digging his knee into Plaintiff's back. (See id. at 8.) Plaintiff alleges that Jane Doe then pointed a taser at him and threatened to taser him because he was yelling and kicking. (See id.)

Plaintiff was then taken back to the Police Department where he was placed on suicide watch after Plaintiff said "I should kill myself." (Id.) Claiming to have used that phrase as a "figure of speech", Plaintiff further contends he has never been suicidal or violent. (Id.) The following day, Plaintiff was returned to the SJ Court for arraignment where he again requested to use the bathroom. (See id.) Plaintiff claims that he "possibl[y] [has a] small bladder" and his request was ignored by John Doe 2. (See id.) When Jane Doe called Plaintiff's name, Plaintiff requested to use the bathroom, to which Jane Doe acquiesced and for which Plaintiff was grateful and relieved. (See id.)

**\*3** Next, Plaintiff complains about his court-appointed attorney, Powers, claiming she called him an "asshole" and has a reputation, as reported in the newspapers, for representing "a rape/murder[er] Mexican." (Id. at 8-9.) Therefore, Plaintiff requested that Powers be relieved from her representation of him. (See id.) Justice Wilson did not permit Powers to be relieved; thus, Plaintiff asserts that Powers defended him without his consent. (See id. at 8-9.)

Finally, Plaintiff alleges that the "Suffolk County Jail does not allow timely visits to the law library", "has no grievance policy", and "flipped cells destroying important documents, tainting pro se efforts." (Id. at 9.)

As a result of the foregoing, Plaintiff claims to have suffered "monetary and mental damages" for which he seeks to recover a damages award in the total sum of $1 million. (SAC, ¶II.B(3), ¶IV.)

## DISCUSSION

Application of 28 U.S.C. § 1915

Section 1915 of Title 28 requires a district court to dismiss an in forma pauperis complaint if the action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. See 28 U.S.C. § 1915(e)(2)(B)(i)-(iii). Courts are obliged to construe the pleadings of a pro se plaintiff liberally. See Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008); McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir. 2004). However, a complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009) (citations omitted). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." Id. at 678; accord Wilson v. Merrill Lynch & Co., 671 F.3d 120, 128 (2d Cir. 2011). While " 'detailed factual allegations' " are not required, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

### A. Claims Brought Pursuant to 18 U.S.C. §§ 1510, 1512, and 1519

Plaintiff seeks to pursue claims for relief pursuant to three sections of Title 18 of the United States Code, specifically 18 U.S.C. §§ 1510, 1512, and 1519. (See SAC, ¶II.A.) However, these sections are criminal statutes that proscribe the obstruction of justice and do not provide for a private right of action. See Arthur Andersen LLP v. United States, 544 U.S. 696, 703, 125 S. Ct. 2129, 2134 (2005) ("Chapter 73 of Title 18 of the United States Code provides criminal sanctions for those who obstruct justice."); see also LoPorto v. County of Rensselaer, No. 15-CV-0866, 2018 WL 4565768, at *16 (N.D.N.Y. Sept. 24, 2018) ("[T]here is no indication that §

1510 creates an individual right that can be enforced ...."); Hilow v. Rome City Sch. Dist., No. 14-CV-288, 2015 WL 893050, at *8 (N.D.N.Y. Mar. 2, 2015) (finding 18 U.S.C. § 1512 does not contain a private right of action); Kalola v. Int'l Bus. Machines Corp., No. 19-CV-9900, 2019 WL 6879307, at *3 (S.D.N.Y. Dec. 16, 2019) ("[N]o private right of action exists under the criminal statutes enumerated above", including 18 U.S.C. § 1519 (citing Bruin v. White, 2019 WL 4889270, at *4 (W.D. Ky. Oct. 3, 2019) (finding no private cause of action under 18 U.S.C. § 1519)). Accordingly, because there is no private right of action under these criminal statutes, these claims are implausible, warranting their DISMISSAL pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii).

### B. Claims Brought Pursuant to 28 U.S.C §§ 455, 1332, 1343, 1361, and 1491; "C.P.L.P 213", "Prisoner Reform Laws", and "466 U.S. 668" [3]

[3]    Insofar as Plaintiff also includes "C.P.L.P. 213", "Prisoner Reform Laws", and "466 U.S. 668", none of these cites provide a cause of action or claim for relief. It appears that Plaintiff intended to cite to N.Y. C.P.L.R. § 213 in support of his mistaken belief that the statute of limitations applicable to his claims is six years. Additionally, Plaintiff's vague reference to unidentified "Prison Reform Laws" and his citation to Strickland v. Washington, 466 U.S. 668 (1984), do not provide independent causes of action.

**\*4**  Plaintiff's claims brought pursuant to 28 U.S.C. §§ 455, 1332, 1343, 1361, and 1491 fare no better. Each of these statutes govern procedure in the federal district courts and none of them provide a separate claim for relief. Section 455 of Title 28 of the United States Code governs the disqualification of a federal justice, judge, or magistrate judge "in any proceeding in which his impartiality might reasonably be question." 28 U.S.C. § 455(a). Section 1332 of Title 28 of the United States Code governs the jurisdiction of the federal district courts and requires that the parties be of diverse citizenship and that the amount in controversy exceeds the sum or value of $75,000. See 28 U.S.C. § 1332(a)(1). Section 1343 of Title 28 of the United States Code provides that federal "district courts shall have original jurisdiction" over civil rights claims, including the right to vote. See 28 U.S.C. § 1343(a). Section 1361 of Title 28 of the United States Code provides that the federal "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of

the United States or any agency thereof to perform a duty owed to the plaintiff." Finally, Section 1491 of Title 28 of the United States Code, known as the Tucker Act, provides "a limited waiver of sovereign immunity and establish[es] federal jurisdiction over certain non-tort claims against the United States." Odonoghue v. U.S. Dep't of the Army, No. 12-CV-4959, 2012 WL 5505921, at *1 (E.D.N.Y. Nov. 13, 2012).

Because each of these statutes are procedural in nature, and do not provide a substantive cause of action or a right to relief, Plaintiff's damages claims arising from these statutes are implausible, warranting their DISMISSAL pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii).

C. Claims Brought Pursuant to Section 1983

Section 1983 provides:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

42 U.S.C. § 1983; accord Rehberg v. Paulk, 566 U.S. 356, 361, 132 S. Ct. 1497, 1501 (2012). To state a claim under Section 1983, a plaintiff must "allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." Rodriguez v. Shoprite Supermarket, No. 19-CV-6565, 2020 WL 1875291, at *2 (E.D.N.Y. Apr. 15, 2020) (internal quotation marks and citation omitted); see also Rae v. County of Suffolk, 693 F. Supp. 2d 217, 223 (E.D.N.Y. 2010)(same)(quoting Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999)).

1. Claims Against the SJ Court

To the extent that Plaintiff seeks to impose Section 1983 liability on the SJ Court, such claims are implausible. First, it is well-established that a Section 1983 action may only be maintained against a "person" who has deprived another of

rights under the "Constitution and Laws." See Dames v. de Blasio, No. 20-CV-0226, 2020 WL 3869724, at *2 (S.D.N.Y. July 8, 2020) (citing Will v. Mich. Dep't of State Police, 491 U.S. 58 (1989) (state is not a "person" for the purpose of § 1983 claims)); Zuckerman v. Appellate Div., Second Dep't Supreme Court, 421 F.2d 625, 626 (2d Cir. 1970) (court not a "person" within the meaning of 42 U.S.C. § 1983).

Second, because the "the Southampton Village Justice Court is part of the New York State Unified Court System", see Davis v. County of Suffolk, No. 18-CV-0303, 2020 WL 7699919, at *12 (E.D.N.Y. Oct. 30, 2020), report and recommendation adopted, 2020 WL 7041082 (E.D.N.Y. Dec. 1, 2020) (citing Ceparano v. Southampton Justice Court, No. 09-CV-0423, 2010 WL 11527157, at *12 (E.D.N.Y. Mar. 22, 2010), report and recommendation adopted, 2010 WL 11527158 (E.D.N.Y. May 12, 2010), aff'd, 404 F. App'x 537 (2d Cir. 2011)), Plaintiff's claims against the SJ Court are barred by the Eleventh Amendment. It is well-established that "[s]tates and their agencies possess sovereign immunity, as memorialized in the Eleventh Amendment." Ojeda v. Mendez, No. 20-CV-3910, 2021 WL 66265, at *3 (E.D.N.Y. Jan. 7, 2021) (citing Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100 (1984)). "The Eleventh Amendment bars suits for damages against states and state agencies absent a state's consent or a valid abrogation of the state's sovereign immunity by an act of Congress." Ojeda, 2021 WL 66265, at *3 (citing Pennhurst, 465 U.S. at 99-100). Here, Plaintiff has not identified any waiver of sovereign immunity that would permit him to bring suit against the SJ Court, nor could he given that " 'New York State has not waived its sovereign immunity from Section 1983 claims, nor did Congress override that immunity by enacting Section 1983.' " Ojeda, 2021 WL 66265, at *3 (quoting Nolan v. Cuomo, No. 11-CV-5827, 2013 WL 168674, at *7 (E.D.N.Y. Jan. 16, 2013)) (internal citations omitted). Accordingly, as they are barred by the Eleventh Amendment, Plaintiff's Section 1983 claims against the SJ Court are DISMISSED pursuant 28 U.S.C. § 1915(e)(2)(B).

2. Claims Against Justice Wilson

**\*5** Plaintiff also names Justice Wilson as a Defendant. Because Justice Wilson is a state actor sued in her official capacity, Plaintiff's Section 1983 claims for damages against her are likewise barred by the Eleventh Amendment. See supra at 13-14; see also London v. Nassau County Dist. Attorney's Office, No. 20-CV-3988, 2020 WL 7699644, at *7

(E.D.N.Y. Dec. 28, 2020) ("Eleventh Amendment immunity bars Plaintiff's claims for damages against the State of New York and the individual state Defendants in their official capacities).

Moreover, Justice Wilson is absolutely immune from suit.

> "It is well settled that judges generally have absolute immunity from suits for money damages for their judicial actions." Bliven v. Hunt, 579 F.3d 204, 209 (2d Cir. 2009) (citations omitted). This immunity is "from suit, not just from ultimate assessment of damages." Mireles v. Waco, 502 U.S. 9, 11 (1991) (citation omitted).

Guarnieri v. Kelley, No. 19-CV-0318, 2019 WL 1486688, at *3 (N.D.N.Y. Apr. 4, 2019), report and recommendation adopted, 2019 WL 5596468 (N.D.N.Y. Oct. 30, 2019), appeal dismissed (Jan. 17, 2020).

In addition, the 1996 Congressional amendments to Section 1983 bar injunctive relief and provide that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." See Federal Courts Improvement Act of 1996, Pub. L. No. 104–317, § 309(c), 110 Stat. 3847, 3853 (1996); see also Montero v. Travis, 171 F.3d 757 (2d Cir. 1999). Therefore, unless a judge has "acted either beyond the judge's judicial capacity, or in the complete absence of all jurisdiction", he or she will be immune from all forms of suit. Guarnieri, 2019 WL 1486688, at *3 (internal quotation marks and citation omitted).

Here, Plaintiff alleges only that Justice Wilson denied his request to have his court-appointed attorney, Powers, relieved from representing him during the preliminary proceedings in the underlying state court criminal case. (See SAC at 8-9.) Yet, there can be no dispute that deciding motions during a court proceeding is a purely judicial function. Further, Plaintiff has not alleged that Justice Wilson acted beyond the scope of her authority, nor could he, given that the SJ Court had jurisdiction over the underlying criminal case. See N.Y. Crim. Proc. Law §§ 10.30(1)-(2) (local criminal courts possess jurisdiction over all offenses other than felonies). Accordingly, Plaintiff's claims against Justice Wilson are barred by absolute judicial immunity compelling their DISMISSAL pursuant to 28 U.S.C. § 1915(e)(2)(B). See also Mills v. Fischer, 645 F.3d 176, 177 (2d Cir. 2011) ("Any claim dismissed on the ground of absolute judicial immunity is 'frivolous' for purposes of [the IFP statute].").

### 3. Claims Against the Police Department

**\*6** Plaintiff's claims against the Police Department are implausible because it is an administrative arm of the Town of Southampton and thus lacks the capacity to be sued as a separate entity. See, e.g., Ayers v. Suffolk County Dist. Attorney Office Inc., No. 20-CV-1192, 2020 WL 6363898, at *3 (E.D.N.Y. Oct. 28, 2020) (dismissing claims against the Southampton Town Police Department because, as "an arm of the Southampton Town government", it "cannot sue or be sued") (citing Southampton Town Code §§ 19-1, 19-3; Arum v. Miller, 331 F. Supp. 2d 99, 107 (E.D.N.Y. 2004) ("[U]nder New York law, a town police department is not a suable entity." (citation omitted)); Kiernan v. Town of Southampton, No. 14-CV-1831, 2015 WL 1258309, at *10 (E.D.N.Y. Mar. 17, 2015)).

### 4. Purported Claims Against the Town of Southampton

Given Plaintiff's pro se status and affording his Complaint a liberal construction, the Court has considered whether Plaintiff has alleged a plausible Section 1983 claim against the municipality, the Town of Southampton, and finds that he has not for the reasons that follow.

It is well-established that a municipality such as Southampton cannot be held liable under § 1983 on a respondeat superior theory. See Monell v. Dep't of Soc. Servs. of N.Y. City, 436 U.S. 658, 691, 98 S. Ct. 2018, 2036 (1978); Agosto v. N.Y.C. Dep't of Educ., 982 F.3d 86, 98 (2d Cir. 2020) ("Monell expressly prohibits respondeat superior liability for municipalities.")(citing Monell, 436 U.S. at 691; Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008) (additional citation omitted)); Ayers, 2020 WL 6363898, *3. To prevail on a Section 1983 claim against a municipality, a plaintiff must show that "action pursuant to official municipal policy" caused the alleged constitutional injury." Cash v. County of Erie, 654 F.3d 324, 333 (2d Cir. 2011) (quoting Connick v. Thompson, 563 U.S. 51, 60, 131 S. Ct. 1350, 1359 (2011)); see also Monell, 436 U.S. at 690-91. "[L]ocal governments ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Monell, 436 U.S. at 690-91 (internal citation omitted); City of St. Louis v. Praprotnik, 485 U.S. 112, 122, 108 S. Ct. 915 (1988) (plurality

opinion) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

"The elements of a <u>Monell</u> claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." <u>Agosto, 982 F.3d at 97.</u> To establish the existence of a municipal policy or custom, the plaintiff must allege: (1) the existence of a formal policy which is officially endorsed by the municipality, see <u>Connick, 563 U.S. at 60-61;</u> (2) actions taken or decisions made by municipal policymaking officials, <u>i.e.,</u> officials with final decisionmaking authority, which caused the alleged violation of the plaintiff's civil rights, see <u>Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 126 (2d Cir. 2004);</u> <u>Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000);</u> (3) a practice "so persistent and widespread as to practically have the force of law," <u>Connick, 563 U. S. at 61;</u> see also <u>Green v. City of N.Y., 465 F.3d 65, 80 (2d Cir. 2006),</u> or that "was so manifest as to imply the constructive acquiescence of senior policy-making officials," <u>Patterson v. County of Oneida, N.Y., 375 F.3d 206, 226 (2d Cir. 2004)</u> (internal quotation marks and citations omitted); or (4) that "a policymaking official exhibit[ed] deliberate indifference to constitutional deprivations caused by subordinates." <u>Cash, 654 F.3d at 334</u> (internal quotation marks and citations omitted); see also <u>Okin v. Vill. of Cornwall-on-Hudson Police Dep't, 577 F.3d 415, 439 (2d Cir. 2009)</u> (holding a municipal custom may be found "when 'faced with a pattern of misconduct, [the municipality] does nothing, compelling the conclusion that [it] has acquiesced in or tacitly authorized its subordinates' unlawful actions' ") (quoting <u>Reynolds v. Giuliani, 506 F.3d 183, 192 (2d Cir. 2007)</u> (second alteration in original)).

**\*7** Here, even affording the SAC a liberal construction, Plaintiff has not alleged that the challenged conduct was taken pursuant to a municipal policy or custom. (See SAC, generally.) Nor are there any factual allegations from which the Court could reasonably construe a plausible Section 1983 cause of action against the Town of Southampton.

### 5. Claims Against Powers

Plaintiff also seeks to impose Section 1983 liability on his court-appointed defense attorney, Powers, in the underlying state court criminal case. However, court-appointed "attorneys are generally not 'state actors' for purposes of § 1983." <u>O'Donoghue v. U.S. Soc. Sec. Admin.,</u>

<u>828 F. App'x 784, 787 (2d Cir. 2020)</u> (citing <u>Rodriguez v. Weprin, 116 F.3d 62, 65–66 (2d Cir. 1997)</u> ("[I]t is well-established that court-appointed attorneys performing a lawyer's traditional functions as counsel to defendant do not act under color of state law and therefore are not subject to suit under <u>42 U.S.C. § 1983."</u>)); see also <u>Pappas v. Lorintz, No. 19-3103, —— F. App'x ——, 2020 WL 6066083, at \*3 (2d Cir. Oct. 15, 2020)</u> (affirming dismissal of constitutional claims against a private lawyer because lawyer was not a state actor, not acting under color of state law, and not subject to a § 1983 claim) (citing <u>McGugan v. Aldana-Bernier, 752 F.3d 224, 229 (2d Cir. 2014)</u>). Accordingly, because Powers is not a state actor, Plaintiff's Section 1983 claims against her are not plausible, compelling their DISMISSAL pursuant to <u>28 U.S.C. § 1915(e)(2)(B)(i)-(ii).</u>

### 6. Claims Against Officer Lawston and the John/Jane Does

Plaintiff complains that Officer Lawston, Jane Doe, and John Doe 2 denied his requests to use the restroom while Plaintiff was awaiting his arraignment at the SJ Court. (See SAC at 6-8.) After repeated requests, Officer Lawston allegedly said Plaintiff could use the restroom and, as Plaintiff proceeded to do so, he was "pulled by Lawston" and not permitted to use the restroom. (Id. at 7.) Instead, Plaintiff was accused of trying to escape. (See id. at 7-8.) Plaintiff protested by jumping on top of the seating arrangement and refusing to come down until he was permitted to use the restroom. (See id.) He eventually "gave up the protest but would not sit." (Id.) Jane Doe is alleged to have pointed a taser at Plaintiff, threatening to use it on him. (See id. at 8.) Plaintiff also describes that a John Doe Defendant and Officer Lawston used "unnecessary roughness" by twisting his arm and digging a knee into his back. (See id.) Although Plaintiff alleges that he was in "pain," he does not claim any injuries other than "mental damages" and "depression". (Id. at 8, 11.)

"Courts in this district have consistently found that the temporary deprivation of the right to use the toilet, absent serious physical harm or serious risk of contamination, does not rise to the level of an objective constitutional violation." <u>Cooper v. Marrero, No. 11-CV-9260, 2013 WL 2529723, at \*4 (S.D.N.Y. June 11, 2013)</u> (collecting cases: <u>Walker v. Dep't of Corr. Serv., No. 11-CV-0993, 2012 WL 527210, at \*2 (S.D.N.Y. Feb. 14, 2012)</u> (no constitutional violation where prisoner was denied right to use bathroom for 80 minutes); <u>Jones v. Marshall, No. 08-CV-0562, 2010 WL 234990, at \*3 (S.D.N.Y. Jan. 19, 2010)</u> (same, 90 minutes);

Hardy-Graham v. Southampton Justice Court, Slip Copy (2021)

2021 WL 260102

Whitted v. Lazerson, No. 96-CV-2746, 1998 WL 259929, at *2 (S.D.N.Y. May 21, 1998) (no constitutional violation where prisoner had to wait 90 minutes to use bathroom and urinated and defecated in his pants); Odom v. Keane, No. 95-CV-9941, 1997 WL 576088, at *4–5 (S.D.N.Y. Sept. 17, 1997) (Sotomayor, J.) (no constitutional violation where plaintiff was deprived of a working toilet for 10 hours, nor where he could not flush his toilet between 9 p.m. and 7 a.m. for a period of several months)). Here, Plaintiff's sparse allegations do not allege a constitutional deprivation regarding his delayed access to the restroom. Indeed, although Plaintiff alleges that his initial requests for restroom access were denied, he expressly alleged that "he did not pee on himself" and does not allege anything more than de minimis discomfort. (SAC at 8 and generally.) Accordingly, Plaintiff has not alleged a plausible Section 1983 claim arising from the alleged delay in restroom access. Such claims are DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii).

*8 Conversely and though sparsely pled, at this early stage and affording Plaintiff's pro se pleading a liberal interpretation, the Court declines to sua sponte dismiss Plaintiff's remaining excessive force claims against Officer Lawston and John Doe 1 and John Doe 2.[4] Accordingly, the Court will order service of the Summonses and the SAC upon Officer Lawston, John Doe 1 and John Doe 2. Without more information, however, the USMS will not be able to effect service of the Summonses and the SAC on the John Doe Defendants. Since the Second Circuit has held that district courts must provide pro se litigants with reasonable assistance in investigating the identity of such "John Doe" defendants, see Valentin v. Dinkins, 121 F.3d 72, 75–76 (2d Cir. 1997), the Clerk of the Court will be directed to serve a copy of the SAC, together with this Order, upon the Town Attorney for the Town of Southampton. Upon said service, the Town Attorney will be directed to attempt to ascertain the full names of the unidentified John Doe Defendants identified in the SAC as allegedly having interacted with Plaintiff at the SJ Court in February 2014. Thereafter, and within thirty (30) days of the date that this Order is served upon him or her, the Town Attorney will be ordered to provide the Court and Plaintiff with the names and address(es) where the John Doe Defendants can be served.

[4]   It is unclear from Plaintiff's submission whether the challenged conduct is attributable to John Doe 1, John Doe 2, or both. Given Plaintiff's allegations that he was placed face down on the floor while

his arm was twisted and a knee was pressed into his back, in an abundance of caution and affording the pro se pleading a liberal construction, the Court declines to sua sponte dismiss Plaintiff's claims against John Doe 1 and John Doe 2.

Once the information regarding the John Doe Defendants is provided to the Court by the Town Attorney, Plaintiff's SAC shall be deemed amended to reflect the full names of these Defendants, a Summons shall be issued as to each Defendant, and the USMS are to serve each of them. The Town Attorney need not undertake to defend or indemnify these individuals at this juncture. This Order merely provides a means by which Plaintiff may properly name and serve these Defendants as instructed by the Second Circuit in Valentin.

CONCLUSION

Accordingly and for the reasons articulated herein, **IT IS HEREBY ORDERED** that Plaintiff's:

1. Claims against the SJ Court, Justice Wilson, the Police Department, Powers, and Jane Doe are DISMISSED pursuant to 28 U.S.C. § 1915(e)(2)(B);

2. Excessive force claims against Officer Lawston, John Doe 1, and John Doe 2 based upon the denial of access to the restroom are DISMISSED; and,

3. Remaining excessive force claims against Officer Lawston, John Doe 1, and John Doe 2 shall proceed;

**IT IS FURTHER ORDERED** that the Clerk of the Court shall:

4. Issue Summonses and forward such Summonses and the SAC, together with this Memorandum and Order, to the USMS for service;

5. Serve a copy of the SAC, together with this Memorandum and Order, upon the Town Attorney for the Town of Southampton; and

6. Mail a copy of this Memorandum and Order to the pro se Plaintiff at his address of record; and

**IT IS FURTHER ORDERED** that the Town Attorney:

7. shall attempt to ascertain the full names of the unidentified Defendants who are identified in the SAC as John Doe 1 and John Doe 2 and who are alleged to

have interacted with Plaintiff at the SJ Court in February 2014 as is described in the SAC; and

8. within thirty (30) days of the date that this Memorandum and Order is served upon him or her, shall provide the Court and Plaintiff with the names and address(es) where the John Doe Defendants can be served.

Pursuant to 28 U.S.C. § 1915(a)(3), the Court certifies that any appeal from this Order would not be taken in good faith and therefore in forma pauperis status is DENIED for the purpose of any appeal. See Coppedge v. United States, 369 U.S. 438, 444-45, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962).

**SO ORDERED**.

**All Citations**

Slip Copy, 2021 WL 260102

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1841470
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Marsheem JOHNSON, Plaintiff,

v.

D. BIELING, Onondaga County Sheriff's Officer;
S. Mollica, Onondaga County Sheriff's Officer;
J.M. Young, Sgt.; August Nordon, Public Defender;
Burnettii, Onondaga County Supreme Court Judge;
Celie, Onondaga County Drug Court Judge; and
Cliffton Cardan, Public Defender, Defendants.

5:20-CV-1124 (GTS/ML)
|
Signed 01/06/2021

**Attorneys and Law Firms**

MARSHEEM JOHNSON, Plaintiff, Pro Se, Collins
Correctional Facility, Post Office Box 340, Collins, New York
14034.

## ORDER and REPORT-RECOMMENDATION

Miroslav Lovric, U.S. Magistrate Judge

## I. INTRODUCTION

 **\*1** The Clerk has sent this *pro se* complaint (Dkt. No.
1) together with an amended application to proceed *in
forma pauperis* (Dkt. No. 5) filed by Marsheem Johnson
("Plaintiff") to the Court for review. For the reasons
discussed below, I grant Plaintiff's amended *in forma pauperis*
application (Dkt. No. 5) and recommend that Plaintiff's
Complaint be dismissed in part with leave to amend, and in
part without leave to amend.

## II. BACKGROUND

On July 2, 2020, Plaintiff commenced a *pro se* habeas corpus
action in the Northern District of New York, No. 9:20-
CV-0836 (MAD) ("*Johnson I*"), which is currently pending.
(*Johsnon I*, Dkt. No. 1.)

On September 17, 2020, Plaintiff commenced this action
(*Johnson II*) by the filing of a verified Complaint. (Dkt. No.
1.) The Complaint asserts that it is "amending [Plaintiff's]
complaint to docket # 9:20-CV-0836." (Dkt. No. 1 at 2.)

However, construed as liberally [1] as possible, the Complaint
alleges that Plaintiff's civil rights were violated by the
following seven Defendants: (1) D. Bieling, Onondaga
County Sheriff's Officer; (2) S. Mollica, Onondaga County
Sheriff's Officer; (3) J.M. Young, Sgt.; (4) August
Nordon, Public Defender; (5) Burnettii, Onondaga County
Supreme Court Judge; [2] (6) Celie, Onondaga County Drug
Court Judge; [3] and (7) Cliffton Cardan, Public Defender
(collectively "Defendants"). (*See generally* Dkt. No. 1.)

[1]  The court must interpret *pro se* complaints to
raise the strongest arguments they suggest. *Soto v.
Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting
*Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.
1994)).

[2]  The Court notes that Plaintiff likely intended
to assert claims against retired New York State
Supreme Court Justice Brunetti. However, based
on the recommendation *infra* and at this juncture,
without additional information from Plaintiff, the
Court declines to *sua sponte* amend the caption
and will refer to Defendant Burnettii, as alleged by
Plaintiff.

[3]  The Court notes that Plaintiff likely intended to
assert claims against Syracuse City Court Judge
Cecile. However, based on the recommendation
*infra* and at this juncture, without additional
information from Plaintiff, the Court declines to
*sua sponte* amend the caption and will refer to
Defendant Celie, as alleged by Plaintiff.

More specifically, the Complaint alleges that on June 2, 2016,
Plaintiff exited the 7-Eleven on North Salina Street and was
walking down the street, when Defendant Bieling "jumped
out of his patrol car with his taser in hand" and ordered
Plaintiff to get on his knees and put his hands on his head.
(Dkt. No. 1 at 6.) Plaintiff alleges that Defendant Mollica
"flew through the parking lot of N. Salina and Cour[t] St ...
jumped out of his unmarked car and placed" handcuffs on
Plaintiff and did not read Plaintiff any *Miranda* warnings. (*Id.*
at 13.) Plaintiff alleges that he was not provided with a search
warrant for his person but that Defendant Bieling pat searched
him, took everything out of his pockets, and Defendant
Mollica "yanked the back of [Plaintiff's] pants." (*Id.* at
6-7, 13.) Plaintiff alleges that Defendant Bieling "unbuckled
[Plaintiff's] pants in public and (sexually assaulted [Plaintiff])

2021 WL 1841470

by grabbing [Plaintiff] by the groin area." (*Id.* at 7.) Plaintiff alleges that he was then placed in the back of a patrol vehicle and booked at the Onondaga County Justice Center. (*Id.*)

**\*2** Plaintiff alleges that Defendant Young "signed off on the police report without a search warrant." (*Id.* at 7-8.)

Plaintiff alleges that Defendant Nordon was assigned to represent him with respect to the pending criminal charges. (*Id.* at 8.) Plaintiff further alleges that Defendant Nordon did not inform Plaintiff of his options, never explained the weight of the drugs, the quantity of the drugs, whether the drugs were real or fake, did not produce a test report on the drugs, and did not consider Plaintiff's defense that he was illegally searched. (*Id.*) Plaintiff alleges that Defendant Nordon waived Plaintiff's right to a preliminary hearing without Plaintiff's consent, entered a plea agreement on Plaintiff's behalf in drug court, and Plaintiff "never [saw] or heard from [Defendant Nordon] again." (*Id.*)

Plaintiff alleges that in July 2016, after being held at the Onondaga County Jail for fifty-five days, he filed a motion pursuant to N.Y. Crim. Proc. Law § 190.80, before Defendant Burnettii. (*Id.* at 8.) Plaintiff alleges that in July 2016, he was brought before Defendant Burnettii, who informed him that Defendant Nordon had passed away and denied Plaintiff's motion pursuant to N.Y. Crim. Proc. Law § 190.80. (*Id.* at 8-9.)

Plaintiff alleges that in September 2016, Defendant Cardan was assigned to represent him with respect to the pending criminal charges. (*Id.* at 9.) Plaintiff alleges that Defendant Cardan "never took the time to look into [Plaintiff's] case," failed to provide Plaintiff with documents establishing the weight, quantity, or quality of the drug he allegedly possessed, and did not pursue Plaintiff's defenses that he was being improperly held without an indictment, was illegally searched, and was sexually assaulted by officers. (*Id.*) Moreover, Plaintiff alleges that Defendant Cardan failed to advise him of his options and "forced" Plaintiff into signing the drug court agreement. (*Id.*)

Plaintiff alleges that on September 19, 2017, Defendant Celie sentenced him to a term of three years-incarceration and two years post-release supervision. (*Id.* at 10.) Plaintiff alleges that Defendant Celie knew that the Onondaga County Sheriff's Department officers "grabbed [Plaintiff] by the [ ]groin area[,] ... there was never a [ ]search warrant[ ] produce[d], ... [Plaintiff] was never read [his] [ ]Miranda

rights[ ] while being [ ]handcuffed[ ], ... there was no [ ]indictment[ ], ... there was never a [ ]test result[ ] produce[d] [ ]showing or stating[ ] the [ ]weight[ ] ... of the drug [Plaintiff] was allege[d to have] possessed." (*Id.* at 10.)

Based on these factual allegations, Plaintiff asserts the following seven causes of action: (1) a claim that Defendants violated his right to due process pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983; (2) a claim that Defendants violated his right to equal protection, pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983; (3) a claim of false arrest, pursuant to the Fourth Amendment and 42 U.S.C. § 1983; (4) a claim of excessive force, pursuant to the Fourth Amendment and 42 U.S.C. § 1983; (5) a claim of failure to intervene, pursuant to the Fourth Amendment and 42 U.S.C. § 1983; (6) a claim that Defendants illegally searched and seized him, in violation of the Fourth Amendment and 42 U.S.C. § 1983; and (7) a claim of malicious prosecution, pursuant to the Fourth Amendment and 42 U.S.C. § 1983. (Dkt. No. 1 at 6.)

**\*3** As relief, Plaintiff seeks $805,000.00 in damages (based on a demand for $115,000.00 in damages per claim). (Dkt. No. 1 at 13.)

## III. PLAINTIFF'S AMENDED APPLICATION TO PROCEED *IN FORMA PAUPERIS*

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, 09-CV-1922, 2010 WL 5185047, at \*1 (S.D.N.Y. Oct. 26, 2010).[4] "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Cash*, 2010 WL 5185047, at \*1 (citing 28 U.S.C. § 1915(b); *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

4      Section § 1915(g) prohibits a prisoner from proceeding *in forma pauperis* where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(g). The Court has reviewed Plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service. *See* http://

pacer.uspci.uscourts.gov. It does not appear from that review that Plaintiff had accumulated three strikes for purposes of 28 U.S.C. § 1915(g) as of the date this action was commenced.

Upon review, the Court finds that Plaintiff has submitted a completed IFP application which has been certified by an appropriate official at his facility (Dkt. No. 5), and which demonstrates economic need. *See* 28 U.S.C. § 1915(a)(2). Plaintiff has also filed the inmate authorization required in the Northern District. (Dkt. No. 6.)

Accordingly, Plaintiff's amended application to proceed with this action IFP is granted. (Dkt. No. 5.)

## IV. LEGAL STANDARD FOR INITIAL REVIEW OF COMPLAINT

Having found that Plaintiff meets the financial criteria for commencing this action *in forma pauperis*, and because Plaintiff seeks relief from an officer or employee of a governmental entity, the Court must consider the sufficiency of the allegations set forth in the Complaint in light of 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A(a). Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that— ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [5]

[5]     To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis in either law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

Similarly, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a government entity or officer or employee of a government entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curium) (noting that Section 1915A applies to all actions brought by prisoners against governmental officials even when plaintiff paid the filing fee).

**\*4** Additionally, when reviewing a complaint, a court may also look to the Federal Rules of Civil Procedure. Rule 8 of the Federal Rules of Civil Procedure provides that a pleading which sets forth a claim for relief shall contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, C.J.) (quoting *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977)).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Rule 8 "demands more than an unadorned the-defendant-unlawfully-harmed-me accusation." *Id.* Thus, a pleading that contains only allegations which "are so vague as to fail to give the defendants adequate notice of the claims against them" is subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009).

## V. ANALYSIS
In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

### A. Claims Against Defendants Burnettii and Celie
Plaintiff's Complaint appears to assert claims against Defendants Burnettii and Celie in their individual and official capacities, for actions they allegedly took in their positions as Onondaga County Supreme Court Judge and Onondaga County Drug Court, respectively. (Dkt. No. 1 at 3.)

It is well settled that "officials acting in a judicial capacity are entitled to absolute immunity against § 1983 actions, and this immunity acts as a complete shield to claims for money damages." *Montero v. Travis*, 171 F.3d 757, 760 (2d Cir. 1999); *see also Mireles v. Waco*, 502 U.S. 9, 9-10 (1991) (citations omitted) ("A long line of this Court's precedents acknowledges that, generally, a judge is immune from a suit for money damages. Although unfairness and injustice to a litigant may result on occasion, 'it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself.'"); *Mahapatra v. Comstock*, 97-CV-7129, 1998 WL 88054, at *1 (2d Cir. Feb. 26, 1998) ("[T]he district court properly dismissed the claims for damages based on absolute immunity. Judges are shielded from liability for civil damages for acts performed in their judicial capacities."); *McKnight v. Middleton*, 699 F. Supp. 2d 507, 523 (E.D.N.Y. 2010) ("It is well settled that judges generally have absolute immunity from suits for money damages for their judicial actions."). This immunity applies to state court judges who are sued in federal court. *Pizzolato v. Baer*, 551 F. Supp. 355, 356 (S.D.N.Y. 1982), *aff'd sub nom. Pizzolato v. City of New York*, 742 F.2d 1430 (2d Cir. 1983). "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction." *Stump v. Sparkman*, 435 U.S. 349, 357 (1978).

**\*5** Plaintiff's allegations regarding Defendants Burnettii and Celie appear to relate to actions they took as judges, while presiding over Plaintiff's state criminal proceedings. (*See generally* Dkt. No. 1.) The Complaint is devoid of facts plausibly suggesting that Defendants Burnettii or Celie took any action as an individual, and therefore also fails to allege that either acted in the clear absence of all jurisdiction. As a result, I recommend that the claims against Defendants Burnettii and Celie be dismissed in their entirety based on the doctrine of absolute judicial immunity.

**B. Claims Against Defendants Nordon and Cardan**
"To state a claim under § 1983, a plaintiff must allege (1) the deprivation of a right secured by the Constitution or laws of the United States (2) which has taken place under color of state law." *Rodriguez v. Weprin*, 116 F.3d 62, 65 (2d Cir. 1997) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982)). "However, it is well-established that

court-appointed attorneys performing a lawyer's traditional functions as counsel to defendant do not act 'under color of state law' and therefore are not subject to suit under 42 U.S.C. § 1983." *Rodriguez*, 116 F.3d at 65-66 (citing *Housand v. Heiman*, 594 F.2d 923, 924-25 (2d Cir. 1979) (per curiam); *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981) (public defenders do not act under color of state law)). Moreover, "[p]rivate attorneys are generally not 'state actors' for purposes of § 1983." *O'Donoghue v. United States Soc. Sec. Admin.*, 828 F. App'x 784, 787 (2d Cir. 2020) (citing *Rodriguez*, 116 F.3d at 65-66); *see Szymonik v. Connecticut*, 807 F. App'x 97, 102 (2d Cir. 2020) (holding that the defendant, "as a private attorney, was not a state actor; that he was licensed by the state to practice law does not render him a state actor."); *Caldwell v. Barrier*, 19-CV-1516, 2020 WL 918717, at *3 (N.D.N.Y. Feb. 26, 2020) (Hummel, M.J.) ("Private attorneys, whether court appointed or privately retained, are not liable under 42 U.S.C. § 1983."), *report and recommendation adopted by* 2020 WL 1904034 (N.D.N.Y. Apr. 17, 2020 (Sannes, J.).

The allegations in the Complaint fail to allege facts plausibly alleging that Defendants Nordon and Cardan were state actors subject to liability pursuant to 42 U.S.C. § 1983.

As a result, I recommend dismissal of the claims against Defendants Nordon[6] and Cardan with prejudice.

[6]    The Complaint alleges that Defendant Nordon died during his representation of Plaintiff sometime on or before July 2016. (Dkt. No. 1 at 8-9.) To the extent that Plaintiff has any viable claims pursuant to 42 U.S.C. § 1983 against Defendant Nordon, those claims would likely survive Defendant Nordon's death. *See Graham v. Henderson*, 224 F.R.D. 59, 62-63 (2004) (holding that "[b]ecause no court has held that § 1983 retaliation claims do not survive the death of the defendant in New York and further, because no court held that only § 1983 'personal injury' claims survive the death of the defendant, plaintiff's § 1983 retaliation claim survives the death of defendants."). However, a motion pursuant to Fed. R. Civ. P. 25(a) must be filed to substitute the proper party on behalf of Defendant Nordon's estate.

**C. Claims Against Defendants Bieling, Mollica, and Young**

After carefully considering the matter, I recommend that Plaintiff's claims for violation of his right to due process, violation of the equal protection clause, and malicious prosecution against Defendants Bieling, Mollica, and Young in their individual capacities be dismissed without prejudice as premature pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994), because they seek to impugn the validity of his underlying state court criminal proceeding. In addition, I recommend that Plaintiff's claims for false arrest, excessive force, failure to intervene, and unlawful search and seizure against Defendants Bieling, Mollica, and Young in their individual capacities be dismissed because they are untimely. Moreover, I recommend that Plaintiff's claims against Defendants Bieling, Mollica, and Young in their official capacities be dismissed with prejudice.

### 1. Individual Capacity Claims

**\*6** "A claim for damages [that would necessarily imply the invalidity of a plaintiff's state court] conviction or sentence that has *not* been so invalidated is not cognizable under *§ 1983*." *Heck*, 512 U.S. at 486-87. In *Covington v. City of New York*, the Second Circuit held that "if success on a *§ 1983* claim would necessarily impugn the validity of a conviction in a pending criminal prosecution, such a claim *does not accrue* so long as the potential for a judgment in the pending criminal prosecution continues to exist." *Covington v. City of New York*, 171 F.3d 117, 124 (2d Cir. 1999).

In contrast, the Supreme Court held in *Wallace v. Kato*, 549 U.S. 384 (2007), that the statute of limitations for a false arrest claim begins to accrue "when legal process was initiated." *Wallace*, 549 U.S. at 390. "Following *Wallace*, several Courts have applied that same analysis for Fourth Amendment claims based on events occurring 'between an unlawful arrest and the institution of legal process.' " *Nussbaumer v. Nesbitt*, 11-CV-6331, 2011 WL 4828844, at \*1 (W.D.N.Y. Oct. 7, 2011) (citing *Mondragon v. Thompson*, 519 F.3d 1078, 1083 (10th Cir. 2008); *see Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008) ("Fourth Amendment claims for false arrest or unlawful searches accrue at the time of (or termination of) the violation."); *Johnson v. Dossey*, 515 F.3d 778, 781-82 (7th Cir. 2008) (distinguishing between claims that accrue when a litigant first appears before a magistrate, controlled by *Wallace*, and claims that arise during the legal process (controlled by *Heck*)); *Mallard v. Potenza*, 94-CV-0223, 2007 WL 4198246, at \*3 (E.D.N.Y. Nov. 21, 2007) (seeing no reason to distinguish between false arrest

and search and seizure claims; "*Wallace* applies with equal force to a claim for an illegal search and seizure.")).

#### a. *Heck* Delayed Accrual Claims

I recommend that Plaintiff's claims for violation of his right to due process, violation of his right to equal protection, and malicious prosecution be dismissed without prejudice as premature pursuant to *Heck* because they seek to impugn the validity of his underlying state court criminal proceeding. *See McDonough v. Smith*, 139 S. Ct. 2149, 2156-57 (2019) (holding that the plaintiff could not bring a "fabricated-evidence claim under *§ 1983* prior to favorable termination of his prosecution" because a fabricated-evidence claim is most analogous to the tort of malicious prosecution, which also only accrues after the plaintiff prevailed in the underlying criminal proceeding); *Roberties v. Huff*, 11-CV-0521, 2012 WL 1113479, at \*4 (W.D.N.Y. Mar. 30, 2012) (dismissing as premature, pursuant to *Heck*, due process, conspiracy to prosecute, obstruction of justice, fabrication of evidence, and equal protection claims related to the plaintiff's conviction); *Nussbaumer*, 2011 WL 4828844, at \*1 (dismissing as premature, pursuant to *Heck*, due process, equal protection, malicious prosecution, and access to the courts claims related to the plaintiff's conviction); *Harris v. Buffardi*, 08-CV-1322, 2011 WL 3794235, at \*10 (N.D.N.Y. Aug. 24, 2011) (Sharpe, J.) (where plaintiff's conviction had not been overturned or otherwise invalidated, his claims for "violation of his due process rights, fabrication of evidence, obstruction of justice, bad faith inadequate investigation, and *§§ 1983* and *1985* conspiracy—all of which are patent attacks on the validity of his conviction—[were] barred.").

In the alternative, I recommend dismissal of Plaintiff's malicious prosecution claim for failure to state a claim.

**\*7** To state a claim for malicious prosecution pursuant to *42 U.S.C. § 1983*, a plaintiff must allege facts plausibly suggesting the following four elements: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as motivation for defendant's actions. *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 604 (E.D.N.Y. 2017) (citing *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010)).

2021 WL 1841470

With regard to the second element, "it must be alleged that the prosecution is at an end, either by alleging that defendant was acquitted of the charge, or by alleging facts showing the legal termination of the prosecution complained of, in favor of defendant, prior to the commencement of the action." *Carpenter v. Nutter*, 127 Cal. 61, 63 (1899); *see also Wallace*, 549 U.S. at 392. "Proceedings are 'terminated in favor of the accused' only when their final disposition is such as to indicate the accused is not guilty." *DiBlasio v. City of New York*, 102 F.3d 654, 658 (2d Cir. 1996); *see also Spak v. Phillips*, 857 F.3d 458, 462 (2d Cir. 2017) ("A 'favorable termination' does not occur until the prosecution against the plaintiff has 'conclusively' ended."). A reversal of a criminal conviction and remand for a new trial does not constitute such a termination. *DiBlasio*, 102 F.3d at 658 (citing *Russell v. Smith*, 68 F.3d 33, 36-37 (2d Cir. 1995)); *accord Poventud v. City of New York*, 750 F.3d 121, 130-31 (2d Cir. 2014) (quoting *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195 (2000)) ("[U]nder the common law any final termination of a criminal proceeding in favor of the accused, such that the proceeding cannot be brought again, qualifies as a favorable termination for purposes of a malicious prosecution action.").

Plaintiff alleges that on September 19, 2017, Defendant Celie sentenced him to a term of three years incarceration, and two years post-release supervision. (Dkt. No. 1 at 10.) Thus, Plaintiff has not alleged that the criminal proceeding terminated in his favor. (*Id.*) It is not clear based on the allegations of the Complaint whether Plaintiff sought to appeal his criminal conviction. (Dkt. No. 1 at 9-10 [alleging that Plaintiff was "forced to sign the drug court agreement ... [and] that by signing the agreement ... [he] will not have the [ ]right[ ]s[ ] to appeal."].) However, Plaintiff has not alleged that his conviction has been overturned and finally disposed of, such that the charges cannot be brought against him again. As a result, I recommend that Plaintiff's malicious prosecution claim be dismissed without prejudice.

**b. Untimely Claims**

The statute of limitations for a § 1983 action accruing in New York is three years. *See Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009). Generally, under federal law, a cause of action accrues when "the plaintiff knows or has reason to know the injury which is the basis of his action." *Covington v. New York*, 171 F.3d 117, 121 (2d Cir. 1999) (quoting *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980)); *see Fahs Constr. Grp., Inc. v. Gray*, 725 F.3d 289, 292 (2d Cir. 2013) (per curiam) (citing *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002)) (a claim for equal protection accrues "when the plaintiff knew or should have known of the disparate treatment.").

**\*8** Although the statute of limitations is an affirmative defense, where it is clear from the face of the complaint that a claim is barred by the applicable statute of limitations, the claim is subject to dismissal for failure to state a claim on 28 U.S.C. § 1915(e)(2)(B) review. *See Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) (holding that a complaint can be dismissed on initial review based on a defense that appears on the face of the complaint); *Syfert v. City of Rome*, 17-CV-0578, 2018 WL 3121611, at *3-5 (N.D.N.Y. Feb. 12, 2018) (Dancks, M.J.) (dismissing all claims barred by the statute of limitations on initial review pursuant to 28 U.S.C. § 1915(e)(2)(B)); *Syfert v. City of Rome*, 17-CV-0578, 2017 WL 3405521, at *8-10 (N.D.N.Y. Aug. 7, 2017) (Dancks, M.J.) (same); *Syfert v. City of Rome*, 15-CV-1149, 2015 WL 6819168, at *7-8 (N.D.N.Y. 2015) (Baxter, M.J.) (same).

**i. False Arrest**

As set forth above in Part V.C.1. of this Order and Report-Recommendation, the statute of limitations for a false arrest claim begins to accrue "when legal process was initiated." *Wallace*, 549 U.S. at 390. According to the Complaint, legal process was initiated against Plaintiff in June 2016. (Dkt. No. 1 at 7-8.) Thus, the statute of limitations for Plaintiff's false arrest claim expired three years later, in June 2019. Plaintiff commenced this action more than one year later, on August 28, 2020. [7] As a result, I recommend that Plaintiff's false arrest claims against Defendants Bieling, Mollica, and Young in their individual capacities be dismissed as time-barred. [8]

[7]     Plaintiff's Complaint was filed with the Clerk of the Court on September 17, 2020. (Dkt. No. 1.) However, pursuant to the prison mailbox rule, the Complaint is deemed to have been filed on the date that the Complaint was signed, which was August 28, 2020. *Mayandeunas v. Bigelow*, 18-CV-1161, 2019 WL 3955484, at *4 (N.D.N.Y. Aug. 22, 2019) (Suddaby, C.J.) (holding that "the prisoner's federal court complaint was signed (which, pursuant to the Prison Mailbox Rule, is the date of the filing of the prisoner's court action).").

8        After carefully reviewing the Complaint, the Court
         discerns no basis to invoke equitable tolling or
         equitable estoppel in order to salvage what are
         otherwise untimely claims.

In the alternative, I recommend dismissal of Plaintiff's false
arrest claims against Defendants Bieling, Mollica, and Young
in their individual capacities for failure to state a claim.

"A § 1983 claim for false arrest, which derives from an
individual's right under the Fourth Amendment to be free
from unreasonable seizures, including arrest without probable
cause, *see, e.g., Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir.
1995), is substantially the same as a claim for false arrest
under New York law." *Kates v. Greece Police Dep't*, 16-
CV-6554, 2017 WL 11548970, at *3 (W.D.N.Y. Feb. 21,
2017) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996);
*Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991)). "Under New
York law, the elements of a false arrest and false imprisonment
claim are: '(1) the defendant intended to confine the plaintiff,
(2) the plaintiff was conscious of the confinement, (3) the
plaintiff did not consent to the confinement and (4) the
confinement was not otherwise privileged.' " *Hernandez v.
United States*, 939 F.3d 191, 199 (2d Cir. 2019) (quoting
*McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016)
(per curium)).

"Probable cause 'is a complete defense to an action for false
arrest' brought under New York law or § 1983." *Kates*, 2017
WL 11548970, at *3 (citing *Weyant*, 101 F.3d at 852).

 *9   "For purposes of the privilege element of a false arrest
and imprisonment claim, an act of confinement is privileged
if it stems from a lawful arrest supported by probable cause."
*De Lourdes Torres v. Jones*, 26 N.Y.3d 742, 759 (N.Y. 2016);
*accord Marshall v. Sullivan*, 105 F.3d 47, 50 (2d Cir. 1996).
"A person who has been convicted of the crime for which
he was arrested cannot state a claim for false arrest because
his conviction establishes that his confinement was grounded
on probable cause; therefore, it was privileged." *Johnson v.
Pugh*, 11-CV-0385, 2013 WL 3013661, at *2 (E.D.N.Y. June
18, 2013); *see also Marcavage v. City of New York*, 689 F.3d
98, 109-10 (2d Cir. 2012) ("Defendants prevail if there was
probable cause to arrest Plaintiff[ ] for any single offense.");
*Phelan v. Sullivan*, 541 F. App'x 21, 23-24 (2d Cir. 2013) ("A
false arrest claim is defeated by the plaintiff's conviction for
the offense for which he was arrested.").

The Complaint alleges that Plaintiff's was convicted and
sentenced for his underlying criminal charges. (Dkt. No. 1

at 10.) Thus, his arrest was grounded on probable cause and
was privileged. As a result, I recommend that Plaintiff's false
arrest claims against Defendants Bieling, Mollica, and Young
in their individual capacities be dismissed for failure to state
a claim.

**ii. Excessive Force**

"The statute of limitations applicable to federal claims of ...
excessive force ... is three years." *B. v. City of New York*,
14-CV-1021, 14-CV-1924, 15-CV-0462, 15-CV-0463, 15-
CV-0876, 15-CV-1146, 2016 WL 4530455, at *6 (E.D.N.Y.
Aug. 29, 2016) (citing *Gilmore v. Goord*, 360 F. Supp. 2d
528, 530 (W.D.N.Y. 2005); *Shomo*, 579 F.3d at 181). "A claim
for excessive force accrues when the use of force occurred."
*Mitchell v. Kugler*, 07-CV-1801, 2009 WL 160798, at *6
(E.D.N.Y. Jan. 23, 2009).

Construing the Complaint liberally, as the Court must at this
juncture, it alleges that Defendants Bieling and Mollica used
excessive force while arresting Plaintiff on June 6, 2016. (Dkt.
No. 1 at 6-7, 13; Dkt. No. 1, Attach. 1 at 1.) Thus, the statute
of limitations for Plaintiff's excessive force claim expired on
June 6, 2019. Plaintiff did not commence this action until
August 28, 2020. [9] As a result, I recommend dismissal of
Plaintiff's excessive force claims against Defendants Bieling,
Mollica, and Young [10] in their individual capacities because
those claims are untimely.

9        *See, supra*, note 7.

10       The Complaint does not contain any facts plausibly
         alleging that Defendant Young was involved in
         the use of force on June 6, 2016. (*See generally*
         Dkt. No. 1.) Instead, the Complaint alleges only
         that on June 2, 2016, Defendant Young "signed
         off on the police report without a search warrant
         produce[d] or without [Plaintiff] being read [his]
         Miranda rights or that [he] was under arrest until
         [he] arrived at the county jail." (Dkt. No. 1 at
         7-8.) These allegations are insufficient to state a
         claim for excessive force against Defendant Young.
         As a result, in the alternative, to the extent that
         Plaintiff attempts to assert a use of force claim
         against Defendant Young, I recommend that such
         claim be dismissed for failure to state a claim.

### iii. Failure to Intervene

"It is widely recognized that law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). "The statute of limitations for a claim based on failure to intervene accrues when the failure to intervene occurs." *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 303 (N.D.N.Y. 2018) (Suddaby, C.J.) (citing *Roundtree v. City of New York*, 15-CV-6582, 2018 WL 443751, at *3 (S.D.N.Y. Jan. 16, 2018)); *accord Mercano v. City of New York*, 15-CV-3544, 2017 WL 1969676, at *3 (S.D.N.Y. May 12, 2017).

**\*10** Construing the Complaint liberally, as the Court must at this juncture, it alleges that, in the alternative to Plaintiff's excessive force claims against Defendants Bieling and Mollica, they failed to intervene to protect him on June 6, 2016. (Dkt. No. 1 at 6-7, 13; Dkt. No. 1, Attach. 1 at 1.) Thus, the statute of limitations for Plaintiff's failure to intervene claim expired on June 6, 2019. Plaintiff did not initiate this lawsuit until August 28, 2020.[11] As a result, I recommend dismissal of Plaintiff's failure to intervene claims against Defendants Bieling, Mollica, and Young[12] in their individual capacities because they are untimely.

[11]   *See, supra*, note 7.

[12]   To establish a claim of failure to intervene, a plaintiff must prove the following four elements: (1) that a constitutional violation was being committed against the plaintiff; (2) that the officer knew, or deliberately ignored, the fact that the constitutional violation was going to be, or was being, committed; (3) that the defendant had a reasonable opportunity to intervene and prevent the harm; and (4) that the defendant did not take reasonable steps to intervene. *Curley v. Vil. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001); *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988); *Henry v. Dinelle*, 10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.). As set forth in note 10 *supra*, the Complaint does not allege that Defendant Young was even present

for the use of force on June 6, 2016. Thus, the Complaint does not contain facts plausibly alleging that Defendant Young had a reasonable opportunity to intervene during the use of force on June 6, 2016. As a result, in the alternative, to the extent that Plaintiff attempts to assert a failure to intervene claim against Defendant Young, I recommend that such claim be dismissed for failure to state a claim.

### iv. Unlawful Search and Seizure

The statute of limitations for an unlawful search and seizure claim begins to run when the plaintiff is detained pursuant to legal process. *Hagans v. Nassau Cnty. Police Dep't*, 18-CV-1918, 2020 WL 1289529, at *5 (E.D.N.Y. Mar. 18, 2020) (citing *Mallard v. Potenza*, 94-CV-0223, 2007 WL 4198246, at *5 (E.D.N.Y. Nov. 21, 2007)).

Construing the Complaint liberally, as the Court must at this juncture, it alleges that Defendants Bieling and Mollica unlawfully seized and searched Plaintiff on June 6, 2016. (Dkt. No. 1 at 6-7, 13; Dkt. No. 1, Attach. 1 at 1.) Thus, the statute of limitations for Plaintiff's unlawful search and seizure claim expired on June 6, 2019. Plaintiff did not initiate this lawsuit until August 28, 2020.[13] As a result, I recommend dismissal of Plaintiff's excessive force claims against Defendants Bieling, Mollica, and Young[14] in their individual capacities because they are untimely.

[13]   *See, supra*, note 7.

[14]   Plaintiff appears to allege that Defendant Young was aware of the unlawful search and seizure when he signed off on the police report. (Dkt. No. 1 at 7-8.) However, it is unclear what police report Defendant Young would have been reviewing on June 2, 2016, which was four days before the alleged incident on June 6, 2016. (*See generally* Dkt. No. 1.) As a result, in the alternative, to the extent that Plaintiff attempts to assert an unlawful search and seizure claim against Defendant Young, I recommend that such claim be dismissed for failure to state a claim.

### 2. Official Capacity Claims

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any

suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). "New York State has not consented to suit in federal court." *Abrahams v. Appellate Div. of Supreme Court*, 473 F. Supp. 2d 550, 556 (S.D.N.Y. 2007) (citing *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38-40 (2d. Cir. 1977)).

**\*11** Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan*, 440 U.S. 332, 340-41 (1979). "[C]laims against a government employee in his official capacity are treated as a claim against the municipality," and, thus, cannot stand under the Eleventh Amendment. *Hines v. City of Albany*, 542 F. Supp. 2d 218, 227 (N.D.N.Y. 2008).

As a result, I recommend that all claims against Defendants Bieling, Mollica, and Young in their official capacities be dismissed with prejudice and without leave to amend. *Jackson v. Gunsalus*, 16-CV-0647, 2016 WL 4004612, at \*2 (N.D.N.Y. June 24, 2016) (Dancks, M.J.), *report and recommendation adopted*, 2016 WL 3983635 (July 25, 2016) (Sharpe, J.).

## VI. OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v.*

*Peters*, 95-CV-1641, 1997 WL 599355, at \*1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.). [15]

15      *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

For the reasons stated in Section V.C.1.a., I recommend that Plaintiff's claims regarding due process, equal protection, and malicious prosecution "be dismissed without prejudice until and if the conviction is later overturned or vacated." *Kates v. Greece Police Dep't*, 16-CV-6544, 2017 WL 11548969, at \*3 (W.D.N.Y. Nov. 13, 2017).

For the reasons stated in Section V.C.1.b., all of Plaintiff's claims that accrued before August 28, 2017, are barred by the statute of limitations. Nonetheless, a district court typically should not dismiss claims as time-barred without providing a *pro se* plaintiff with "notice and opportunity to be heard" as to whether there might be a meritorious tolling argument or other reason why the complaint might be considered. *See Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007). Therefore, it is recommended that Plaintiff's time-barred claims be dismissed with leave to amend. This by no means suggests that Plaintiff's time-barred claims are meritorious, as it appears very unlikely that Plaintiff can state federal constitutional claims based upon any of the time-barred claims in his complaint.

**\*12** However, I recommend that Plaintiff's claims against Defendants Burnetti and Celie be dismissed with prejudice based on the doctrine of judicial immunity. *See Olszyk v. Thorne*, 20-CV-0445, 2020 WL 5634328, at \*9 (N.D.N.Y. June 17, 2020) (Lovric, M.J.) (recommending dismissal with prejudice, claims against a judge overseeing the plaintiff's parole violation based on the doctrine of judicial immunity), *report and recommendation adopted by* 2020 WL 5633791 (N.D.N.Y. Sept. 21, 2020) (McAvoy, J.); *Wellington v. Foland*, 19-CV-0615, 2019 WL 3315181, at \*11 (N.D.N.Y. July 24, 2019) (Lovric, M.J.) (recommending dismissal with prejudice and without leave to amend, claims against a village

2021 WL 1841470

court judge based on the doctrine of absolute immunity), *report and recommendation adopted by*, 2019 WL 6485157 (N.D.N.Y. Dec. 3, 2019) (Suddaby, C.J.); *Brooks v. Ukieley*, 14-CV-6662, 2015 WL 235406, at \*4 (E.D.N.Y. Jan. 16, 2015) (dismissing the plaintiff's claims in their entirety with prejudice against Judges Ukieley and Toomey based on the doctrine of judicial immunity); *Gonzalez v. Sharpe*, 06-CV-1023, 2006 WL 2591065, at \*3 (N.D.N.Y. Sept. 8, 2006) (Scullin, J.) (dismissing without leave to amend, the plaintiff's claims against U.S. District Court Judge Gary L. Sharpe based on the doctrine of judicial immunity).

Moreover, I recommend that Plaintiff's claims against Defendants Nordon and Carden be dismissed with prejudice. *See Giles v. Fitzgerald*, 20-CV-0980, 2020 WL 6287459, at \*10 (N.D.N.Y. Oct. 27, 2020) (Lovric, M.J.) (recommending dismissal with prejudice, claims pursuant to 42 U.S.C. § 1983, against the plaintiff's attorneys in his underlying criminal action); *Caldwell v. Barrier*, 19-CV-1516, 2020 WL 918717, at \*3 (N.D.N.Y. Feb. 26, 2020) (Hummel, M.J.) (dismissing with prejudice, claims against the defendant private attorney, who represented the plaintiff in different case because the defendant was not liable under § 1983), *report and recommendation adopted by* 2020 WL 1904034 (N.D.N.Y. Apr. 17, 2020) (Sannes, J.).

In addition, I recommend that any claims against Defendants Bieling, Mollica, and Young in their official capacities be dismissed with prejudice. *See Giles*, 2020 WL 6287459, at \*11 (recommending dismissal with prejudice, claims for monetary damages against the defendant police officers in their official capacities based on Eleventh Amendment immunity); *Wrobleski v. Miller*, 19-CV-0876, 2019 WL 6496723, at \*9 (N.D.N.Y. Dec. 2, 2019) (Lovric, M.J.) (recommending dismissal with prejudice and without leave to amend, claims against officers in their official capacities pursuant to the doctrine of immunity pursuant to the Eleventh Amendment), *report and recommendation adopted in part and rejected in part on other grounds*, 2020 WL 219221 (N.D.N.Y. Jan. 15, 2020) (Sharpe, J.); *Jackson v. Gunsalus*, 16-CV-0647, 2016 WL 4004612, at \*2 (N.D.N.Y. June 24, 2016) (Dancks, M.J.) (dismissing with prejudice and without leave to amend, claims against police officers in their official capacities based on the doctrine of immunity pursuant to the Eleventh Amendment), *report and recommendation adopted by*, 2016 WL 3983635 (July 25, 2016) (Sharpe, J.).

If Plaintiff chooses to file an amended complaint, he should note that the law in this circuit clearly provides

that " 'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.' " *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *accord Pourzancvakil v. Humphry*, 94-CV-1594, 1995 WL 316935, at \*7 (N.D.N.Y. May 22, 1995) (Pooler, J.). Therefore, in any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such amended complaint will replace the existing Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

**\*13 ACCORDINGLY**, it is

**ORDERED** that Plaintiff's amended IFP application (Dkt. No. 5) is **GRANTED**; and it is further

**ORDERED** that the Clerk of the Court (1) provide the Superintendent of the facility that Plaintiff has designated as his current location with a copy of Plaintiff's inmate authorization form (Dkt. No. 6) and notify that official that Plaintiff has filed this action and is required to pay the Northern District of New York the entire statutory filing fee of $350.00 in installments, over time, pursuant to 28 U.S.C. § 1915; and (2) provide a copy of Plaintiff's inmate authorization form (Dkt. No. 6) to the Financial Deputy of the Clerk's Office; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITH LEAVE TO REPLEAD** Plaintiff's Complaint (Dkt. No. 1) to the extent that it alleges claims for violation of his right to due process, violation of the equal protection clause, false arrest, excessive force, failure to intervene, unlawful search and seizure, and malicious prosecution against Defendants Bieling, Mollica, and Young in their individual capacities,

pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(a) for failure to state a claim upon which relief may be granted; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITHOUT LEAVE TO REPLEAD** Plaintiff's Complaint (Dkt. No. 1) to the extent that it alleges claims against (1) Defendant Burnettii, (2) Defendant Celie, (3) Defendant Nordon, (4) Defendant Carden, and (5) Defendants Bieling, Mollica, and Young in their official capacities, pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim and because those claims seek relief from defendants who are immune from such relief; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Order and Report-Recommendation on Plaintiff, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [16] Such objections shall be filed

with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

[16]  If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**All Citations**

Slip Copy, 2021 WL 1841470

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.